# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

12 CIV 2274



---

JAENEAN LIGON, individually and on behalf of her minor son, J.G., FAWN BRACY, individually and on behalf of her minor son, W.B., JACQUELINE YATES, LETITIA LEDAN, ROSHEA JOHNSON, KIERON JOHNSON, JOVAN JEFFERSON, A.O., by his parent DINAH ADAMES, ABDULLAH TURNER, FERNANDO MORONTA, and CHARLES BRADLEY, individually and on behalf of a class of all others similarly situated;

      Plaintiffs,

        -versus-

CITY OF NEW YORK; RAYMOND W. KELLY, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT; POLICE OFFICER JOHNNY BLASINI; POLICE OFFICER GREGORY LOMANGINO; POLICE OFFICER JOSEPH KOCH;  POLICE OFFICER KIERON RAMDEEN; POLICE OFFICER JOSEPH BERMUDEZ; POLICE OFFICER MIGUEL SANTIAGO; POLICE OFFICERS JOHN DOE 1-12;

      Defendants.

COMPLAINT

12 Civ. No.

**JURY TRIAL DEMANDED**

**ECF CASE**

---

## PRELIMINARY STATEMENT

    1.    This action, brought on behalf of twelve New York City residents, one former New York City resident, and a class of similarly situated individuals, challenges the New York City Police Department's unconstitutional stop, question, search, citation, and arrest policies

implemented pursuant to "Operation Clean Halls," a program that allows police officers to patrol

inside and around thousands of private residential apartment buildings across the City. Each

year this program results in thousands of illegal stops, searches, summonses, and arrests of those

buildings' residents and their invited guests without cause.

2.      The abusive stop, question, search, citation, and arrest practices of New York City

Police Department ("NYPD") officers in buildings enrolled in Operation Clean Halls ("Clean

Halls Buildings") stand in stark contrast to the program's professed purpose, which is to combat

illegal activity in apartment buildings with records of high crime. NYPD officers routinely

detain residents of Clean Halls Buildings and their visitors without individualized suspicion of

unlawful activity and make arrests or issue summonses without probable cause of criminal

activity.

3.      For residents of Clean Halls Buildings and their visitors, merely exiting a Clean

Halls Building frequently leads to being stopped, searched, and interrogated by NYPD officers

on public sidewalks and in exterior courtyards. These stops typically involve full searches and

questioning as to the person's reason for having been inside the building, and frequently result in

arrest or the issuance of a summons if the person cannot affirmatively justify his presence to the

police officer's satisfaction.

4.      Such seizures also take place in the lobbies, vestibules, stairwells, hallways, and

other public areas of Clean Halls Buildings, where residents are often illegally stopped, searched,

questioned, issued summonses, and even arrested without cause for allegedly trespassing inside

in their own buildings. They are frequently stopped and forced to produce identification while

engaged in completely innocuous activities like checking their mail or taking out their garbage.

To avoid arrests or summonses for trespassing, many residents of Clean Halls Buildings are

compelled to carry identification with them whenever they exit their apartments for any purpose—including trips to the laundry room or to visit a neighbor.

5.      Illegal stops inside Clean Halls Buildings sometimes occur during floor-by-floor sweeps by NYPD officers, known as vertical patrols. Upon information and belief, hundreds of thousands of vertical patrols take place annually in Clean Halls Buildings. For instance, testimony before the New York City Council Committee on Public Safety by Inspector Michael C. Phipps, the Commanding Officer of the NYPD's Housing Borough Manhattan, indicates that the NYPD conducted approximately 240,000 vertical patrols in privately owned buildings in 2003 alone.

6.      Residents of some Clean Halls Buildings are stopped, questioned, and searched by NYPD officers on a regular basis—sometimes multiple times a week. For many young men of color in particular, being searched and seized by NYPD officers in and around their homes has become normalized and is simply a routine part of their lives.

7.      The NYPD's illegal stop, question, search, citation, and arrest practices in Clean Halls Buildings mirror those in properties managed by the New York City Housing Authority ("NYCHA Residences"). But while the NYPD has recently adopted new regulations and instituted limited training for officers concerning appropriate stop, search, and arrest activity at NYCHA Residences, it has ignored the problems of suspicionless stops, searches, citations, and arrests in and around Clean Halls Buildings.

8.      The NYPD's use of overzealous and baseless tactics harms not just residents of Clean Halls Buildings, but also their guests, who are often seized in and around Clean Halls Buildings by NYPD officers when they visit. Residents of some Clean Halls Buildings warn their friends, family members, and others not to visit them for fear that they will be stopped,

questioned, searched, and issued summonses or arrested for trespassing by NYPD officers. Consequently, residents of Clean Halls Buildings are restricted in their ability to maintain familial ties, friendships, and other relationships with individuals of their choosing.

9.      Upon information and belief, although Clean Halls Buildings are inhabited by New Yorkers of all racial backgrounds, the residents of Clean Halls Buildings are disproportionately black and Latino as compared to the City's population. Because the NYPD does not evaluate whether a building has substantial or sustained criminal activity that could justify its enrollment in Operation Clean Halls, these racial disparities persist without any meaningful correlation to actual crime levels. The NYPD selects certain Clean Halls Buildings for particularly aggressive tactics, where residents and their guests are at heightened risk of being stopped, questioned, searched, issued summonses, and arrested by NYPD officers. Upon information and belief, the residents of those targeted buildings are disproportionately black and Latino compared with the population of residents of all Clean Halls Buildings and with the population of New York City as a whole. As a result, the NYPD's illegal stop, question, search, citation, and arrest practices in and around Clean Halls Buildings have a significant disparate impact on blacks and Latinos in their enjoyment of housing and in their receipt of municipal services connected with housing as compared to whites.

10.     The NYPD's abusive practices of stopping, questioning, searching, citing, and arresting residents of Clean Halls Buildings and their visitors without adequate cause violate the United States and New York Constitutions, the Fair Housing Act, and New York common law. Plaintiffs here, who seek to represent a class of similarly situated individuals, seek a declaration that the NYPD's practices are unlawful and an injunction against those practices.

**PARTIES**

Plaintiffs

11.     Plaintiff JAENEAN LIGON is a black resident of the Bronx, New York.

12.     Plaintiff J.G. is 17 years old and appears in this action by and through his mother, JAENEAN LIGON.  J.G. is black and lives in the Bronx, New York.

13.     Plaintiff FAWN BRACY is a black resident of the Bronx, New York.

14.     Plaintiff W.B. is 17 years old and appears in this action by and through his mother, FAWN BRACY.  W.B. is black and lives in the Bronx, New York.

15.     Plaintiff JACQUELINE YATES is a black resident of the Bronx, New York.

16.     Plaintiff LETITIA LEDAN is a black resident of the Bronx, New York.

17.     Plaintiff ROSHEA JOHNSON is a black resident of Schenectady, New York.

18.     Plaintiff KIERON JOHNSON is a black resident of the Bronx, New York.

19.     Plaintiff JOVAN JEFFERSON is a black resident of the Bronx, New York.

20.     Plaintiff A.O. is 17 years old and appears in this action by and through his mother, DINAH ADAMES.  A.O. is Latino and lives in the Bronx, New York.

21.     Plaintiff ABDULLAH TURNER is a black resident of the Bronx, New York.

22.     Plaintiff FERNANDO MORONTA is a Latino resident of the Bronx, New York.

23.     Plaintiff CHARLES BRADLEY is a black resident of the Bronx, New York.

Defendants

24.     Defendant THE CITY OF NEW YORK is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  The City of New York has established and maintains the NYPD as a constituent department or agency.

25.      Defendant RAYMOND W. KELLY is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting and managing all NYPD officers. He is sued in his official capacity.

26.      Defendant Police Officer JOHNNY BLASINI is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

27.      Defendant Police Officer GREGORY LOMANGINO is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

28.      Defendant Police Officer JOSEPH KOCH is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

29.      Defendant Police Officer KIERON RAMDEEN is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

30.      Defendant Police Officer JOSEPH BERMUDEZ is or was an employee of the NYPD at all relevant times. He is sued in his official and individual capacities.

31.      Defendants JOHN DOES 1-12 are members of the NYPD whose full identities are not known to the Plaintiffs, but who are officers who participated in the encounters with the Plaintiffs described in paragraphs 36-142, *infra*. They are all sued in their official and individual capacities.

## FACTS

### Operation Clean Halls

32.      Operation Clean Halls is a citywide program operated by the NYPD that has existed in some form since 1991. In some Bronx neighborhoods, virtually every private apartment building is enrolled in the program, with hundreds of buildings in any given police

precinct.  In Manhattan alone, there are at least 3,895 Clean Halls Buildings.  The program

operates under the names "Trespass Affidavit Program" and "Formal Trespass Affidavit

Program" in Manhattan and Brooklyn, respectively.  (All references in this complaint to "Clean

Halls" or "Operation Clean Halls" refer to all such programs in all five boroughs.)

33.     Enrollment of a private residential building in Operation Clean Halls is

accomplished simply by virtue of an executed "Clean Halls affidavit"—a boilerplate form on

which a building's address is filled in that is signed by a landlord or managing agent.  Clean

Halls affidavits state that NYPD officers have permission to enter enrolled buildings and arrest

anyone found within who is engaged in criminal activity.  In the Bronx, Clean Halls affidavits

confer authority on NYPD officers to enter enrolled buildings "into perpetuity."

34.     The NYPD has a widespread practice of stopping, questioning, and searching

those they encounter in Clean Halls Buildings without any suspicion of unlawful behavior, and

arresting them or issuing summonses without probable cause.  (A summons is sometimes

referred to herein as a "citation.")  All tenants of New York City's thousands of Clean Halls

Buildings, their guests, and anyone in close proximity to the buildings are at risk of being

subjected to these unlawful practices.

35.     The rights of the individual Plaintiffs and the class they seek to represent have

been infringed by the NYPD's practices of unlawfully stopping, questioning, searching,

arresting, and issuing summonses pursuant to Operation Clean Halls.

**Named Plaintiffs**

Jaenean Ligon & J.G.

36.     Jaenean Ligon is a 40-year-old black woman who has lived for the past seven

years at 290 East 163rd Street in the Bronx, a building that is enrolled in Operation Clean Halls.

She lives with her three sons, J.G., J.A.G., and Jerome Grant.  J.G. and J.A.G., twins, are 17

years old.  Jerome is 19 years old.

37.     Ms. Ligon and J.G. have been unlawfully seized, and J.G. has been unlawfully

searched and arrested, pursuant to Operation Clean Halls.

38.     Ms. Ligon and her sons have been stopped, questioned, and searched without

cause by NYPD officers in and around their building.  Police officers typically stop Ms. Ligon's

sons in front of their own home on East 163rd Street, at other locations on their own block, and

on surrounding blocks multiple times a week.  During the course of such stops, they are usually

questioned about where they live and where they are going, and are searched without cause.

Many of these stops have been made in connection to their building's enrollment in Operation

Clean Halls.

39.     In August 2011, Ms. Ligon asked J.G. to go to a store near their home to purchase

ketchup for use with the dinner she was preparing.  J.G. walked to the store, purchased the

ketchup, and returned to their apartment building.  Four officers, John Does 1-4, two in plain-

clothes and two in uniforms, stopped J.G. without cause just outside the front door of his

building and asked him why he was going inside the building.  J.G. responded that he lived in the

building and produced identification.  He told the officers that he had just returned from the store

and showed the officers the bag in his hand, which contained ketchup.  One officer asked J.G. to

identify the apartment in which he lived.  J.G. responded, telling the officer his family's

apartment number.

40.     The officers then rang the bell to Ms. Ligon's apartment.  Over the intercom, Ms.

Ligon heard a man say that he was a police officer, and he needed her to come down to identify

her son.  Terrified that J.G. was injured or dead, Ms. Ligon ran out of the apartment to find out

what had happened to J.G. As she approached the lobby she saw J.G. standing just outside the vestibule near the mailboxes, surrounded by four officers. She collapsed and began weeping. One officer began laughing, asked Ms. Ligon if J.G. was her son, and handed her the ketchup.

41.     During the 2011 July 4th holiday weekend, Ms. Ligon and J.A.G. were stopped without justification by NYPD officers shortly after they exited their building. They got into their car, and as Ms. Ligon drove down their block, two officers in an unmarked vehicle signaled for Ms. Ligon to pull over. She complied with the order. The officers asked for permission to search J.A.G.'s backpack. Ms. Ligon consented to the search, during which the officers found J.A.G.'s gym shorts and driver's manual. After joking about J.A.G.'s driving skills, the officers let Ms. Ligon and J.A.G. go. Upon information and belief, the only basis for the stop and search was their emergence from their building, which is enrolled in Operation Clean Halls.

42.     Ms. Ligon's son Jerome was stopped without cause in the fall of 2010, as he returned home from visiting Ms. Ligon's father, his grandfather. Ms. Ligon's father drove Jerome home, and when they arrived, Jerome exited the vehicle. While his grandfather looked for a parking spot, Jerome approached the front door of his family's building. Two NYPD officers approached Jerome, asked him why he was entering the building and ordered him to produce identification. Ms. Ligon's father saw that Jerome had been stopped, exited his vehicle, identified himself as Jerome's grandfather, and asked the officers why they had stopped his grandson. The officers proceeded to search Jerome without cause. The officers then let Jerome enter the building and Ms. Ligon's father left.

43.     Ms. Ligon, J.G. and their friends and relatives fear and face a substantial risk of being unlawfully stopped, questioned, searched, and arrested or cited for trespassing in and

around 290 E. 163rd Street by NYPD officers in the future because of the building's enrollment in Operation Clean Halls.

Fawn Bracy & W.B.

44.     Fawn Bracy is a 50-year-old black woman who has lived for the past 15 years at 363 East 163rd Street in the Bronx, a building that is enrolled in Operation Clean Halls. She lives with her 17-year-old son, W.B.

45.     W.B. has been unlawfully seized, searched, and arrested pursuant to Operation Clean Halls.

46.     W.B. is stopped unlawfully multiple times every week by NYPD officers in and around his building, particularly in the courtyard outside the building and on the sidewalk in front of the building. He is also regularly stopped unlawfully by NYPD officers in the vestibule near the building's mailboxes and in the building's stairwells.

47.     During the course of a stop, W.B. typically is asked whether he lives in the building, ordered to produce identification, and searched, despite the lack of reasonable suspicion of any crime.

48.     Police harassment in and around Ms. Bracy and W.B.'s building extends to adults as well as teenagers. Adults who live there cannot even gather in the building's courtyard. When Ms. Bracy gathers there with friends and neighbors, police officers sometimes approach them, tell them that they are not allowed to sit in the courtyard, and order them without cause to return to their apartments.

49.     As a result of interactions like these with police officers in her own building, Ms. Bracy's relatives and friends are less willing to visit her at her home. She therefore receives few

visitors at her home and is unable to socialize with her friends and neighbors in or around her apartment building.

50.    Ms. Bracy's sister and nephew, who are W.B.'s aunt and cousin, used to visit Ms. Bracy and W.B. at their home regularly but in recent years have been stopped often by NYPD officers in the course of those visits. In an effort to avoid contact with police officers in Ms. Bracy's building, they now visit far less frequently.

51.    Other family and friends seeking to visit Ms. Bracy and W.B. have also been unlawfully stopped, questioned, and searched in and around 363 E. 163rd Street.

52.    Ms. Bracy, W.B., and their friends and relatives fear and face a substantial risk of being unlawfully stopped, questioned, searched, and arrested or cited for trespassing in and around 363 E. 163rd Street by NYPD officers in the future due to the building's enrollment in Operation Clean Halls.

W.B. & J.G.

53.    W.B. and J.G., who, as noted above, reside in Clean Halls Buildings, have also been subjected to suspicionless stops away from their block pursuant to Operation Clean Halls.

54.    On June 15, 2011, W.B. and J.G. were unlawfully stopped and arrested for trespassing while leaving the apartment of their friend, Alex Lebron. Mr. Lebron's apartment is located at 1106 College Avenue in the Bronx, a building that is enrolled in Operation Clean Halls.

55.    At around 5:00 p.m., shortly after arriving at Mr. Lebron's apartment, W.B., J.G., and their friend left to go to the store, intending to return immediately thereafter. Mr. Lebron stayed in the apartment.

56.     As W.B., J.G., and their friend walked downstairs from Mr. Lebron's apartment, they encountered two NYPD officers, John Does 5-6, who were walking up the stairs. The officers ordered the three teenagers to produce identification. After seeing that the identifications indicated that the young men did not live in the building, the officers handcuffed all three and told them that they would be placed under arrest for trespassing.

57.     W.B., J.G., and their friend told the officers that they were visiting their friend Alex and told them Mr. Lebron's apartment number. While one officer remained with the teenagers in the stairwell, the other officer walked up to Mr. Lebron's floor and knocked on the wall of Mr. Lebron's apartment. Mr. Lebron's mother answered the door, and the officer showed her the identification cards of the three teenagers and asked whether she knew them. Mr. Lebron's mother replied that she did and that they had just visited her apartment.

58.     After the officers left her door, Mr. Lebron's mother informed Mr. Lebron that his friends had been stopped by police officers. Mr. Lebron went downstairs in an attempt to intervene and prevent their arrest. Mr. Lebron encountered his handcuffed friends and the two police officers in the lobby of his building. He told the officers that he lived in the building and that the teens had been visiting him. The officers responded that it was "too late" and placed the three young men in a police van.

59.     The arresting officers took W.B., J.G., and their friend to the 44th Precinct, where they were locked in a cell. After approximately two hours, they were given summonses for trespassing and released. The trespassing charges against W.B., J.G., and their friend were later dismissed.

60.     W.B. and J.G. plan to return to 1106 College Avenue to visit Mr. Lebron. They fear and face a substantial risk of being unlawfully stopped, questioned, searched and arrested or

cited for trespassing there by NYPD officers in the future due to the building's enrollment in Operation Clean Halls.

Jacqueline Yates

61.    Jacqueline Yates is a 53-year-old black woman who works at a Head Start center with pre-schoolers in the Bronx. She has previously worked as a New York State correctional officer.

62.    Ms. Yates has lived for the past 14 years at 361 East 163rd Street in the Bronx, a building that is enrolled in Operation Clean Halls. She lives with her two sons, 18-year-old Artemus Robinson, and 14-year-old M.R. Clinton Robinson, Artemus and M.R.'s father, is a frequent visitor to Ms. Yates's home.

63.    Artemus and Clinton Robinson are frequently stopped without cause by NYPD officers in and around 361 East 163rd Street, particularly on the sidewalks and in the building's courtyard. They are also regularly stopped without cause by NYPD officers in the building's stairwells and vestibule, where the building's mailboxes are located. M.R. has been approached by NYPD officers in and around the building and ordered to return to his apartment at least three or four times.

64.    During such stops, Artemus and Clinton are usually asked whether they are residents of the building and ordered to produce identification. They are also usually searched without cause.

65.    For example, the family was subjected to one incident with the police at their home in late 2010. As the family was about to depart for a baby shower, NYPD officers stopped Artemus without cause in the vestibule of 361 East 163rd Street. Clinton saw NYPD officers speaking with Artemus as he descended the stairs to exit the building and inquired as to why the

officers had stopped his son.  The officers then instructed Clinton to stand against the wall and frisked him.  The officers then released Artemus but issued Clinton a summons for possession of an open container in a public place, even though the container he was holding was closed, not open.

66.     Police harassment in and around Ms. Yates's building is so pervasive that adults who live there cannot gather in their own courtyard.  When Ms. Yates and Clinton Robinson gather with their friends and neighbors in their building's courtyard, police officers sometimes approach them and tell them that they are not allowed to sit in the courtyard and order them to return to their apartments.

67.     As a result of interactions like these with police officers in her own building, Ms. Yates's relatives and friends are less willing to visit her at her home.  She therefore receives few visitors at her home and is unable to socialize with her friends and neighbors in and around her apartment.

68.     Some family members and friends of Ms. Yates and her children refrain from visiting them because they fear being stopped or otherwise harassed by police officers in and around their building.  Among Ms. Yates's cousins, those who are black men are particularly reluctant to visit.  At least two have been stopped and searched without cause by NYPD officers on the sidewalk adjacent to Ms. Yates's building and in the building's courtyard.

69.     Ms. Yates, her children, Clinton Robinson, and her friends and relatives fear and face a substantial risk of being unlawfully stopped, questioned, searched and arrested or cited for trespassing in or around 361 E. 163rd Street by NYPD officers in the future due to the building's enrollment in Operation Clean Halls.

Letitia Ledan & Roshea Johnson

70.     Letitia Ledan is a 41-year-old black woman who has lived since 2001 in Building 30 of River Park Towers, a private residential complex in the Bronx that is enrolled in Operation Clean Halls. Ms. Ledan works at Picture the Homeless, a non-profit organization.

71.     Roshea Johnson, a 36-year-old black man, is Ms. Ledan's brother and a frequent invited guest of Ms. Ledan. Mr. Johnson previously lived in New York City and resided with Ms. Ledan at River Park Towers for over a year. He moved upstate over a year ago, in part to escape the constant harassment he faced from the NYPD. He currently resides in Schenectady, New York.

72.     Ms. Ledan and Mr. Johnson have been unlawfully seized and searched, and Mr. Johnson has been unlawfully arrested, pursuant to Operation Clean Halls.

73.     Ms. Ledan has often been stopped while in and around the building she lives in, without reasonable suspicion of any crime. She has been stopped while checking her mail, walking out of her building, on her way to the elevator in the lobby of her building, and on the sidewalk outside of her building. During such stops, police officers typically ask Ms. Ledan whether she lives in the complex and order her to show identification.

74.     When Mr. Johnson resided in River Park Towers, he was frequently stopped without cause by NYPD officers in and around his building, usually three to four times per week over the course of the time he lived there. In the course of those stops, he was typically asked whether he lived in the building, ordered to produce identification, and searched, despite the lack of reasonable suspicion of any unlawful activity.

75.     In June 2010, Mr. Johnson was residing elsewhere in New York City but stored most of his belongings at Ms. Ledan's apartment in River Park Towers. He had an open

invitation from Ms. Ledan to visit.  One day that month, he went to Ms. Ledan's apartment to retrieve some clothes he had left there.

76.     On his way out of the building, as Mr. Johnson walked on the pathway leading away from Building 30, a black van pulled up in front of him.  Two plain-clothes NYPD officers, John Does 7-8, emerged from the van and asked him what he was doing.  Mr. Johnson replied that he was coming from his sister's house, where he had gone to change his clothes but that she was not home at the moment.  The officers asked if he had anything on him and searched him. The officers told Mr. Johnson that he was not supposed to be there and that he was trespassing. Mr. Johnson said he could show the officers mail in his pocket indicating that he was authorized to be there.  He tried to reach into his pocket to show the mail, but the officers refused to look at it.  Instead, they handcuffed Mr. Johnson and placed him in the police van.  A third NYPD officer who was in uniform was also present.

77.     After placing Mr. Johnson in the van, the officers drove around with him, during which time they interrogated him about drugs and guns.  Mr. Johnson repeatedly insisted that he had no information about those topics.  After driving around for approximately 30 minutes, the officers stopped the van, unfastened the handcuffs, and released Mr. Johnson onto the street.  He was never formally arrested or charged with any crime.

78.     Since moving away from New York City, Mr. Johnson returns approximately three times a year and stays with Ms. Ledan in River Park Towers.  During those visits, he tries to avoid walking outside any more than is necessary, out of fear that he could be harassed or detained by NYPD officers.

79.     Other relatives and friends of Ms. Ledan have often been stopped and ordered to show identification by NYPD officers while coming to visit her without any apparent basis.  For

example, another of Ms. Ledan's brothers, Maurice Johnson, used to visit her regularly and was frequently stopped without cause by police officers during those visits. As a result, he is no longer comfortable visiting Ms. Ledan at her apartment and has not done so in approximately one year.

80.     Ms. Ledan, Mr. Johnson, and their friends and relatives fear and face a substantial risk of being unlawfully stopped, questioned, searched, and arrested or cited for trespassing in or around River Park Towers by NYPD officers in the future due to the buildings' enrollment in Operation Clean Halls.

Kieron Johnson & Jovan Jefferson

81.     Kieron Johnson is a 21-year-old black man who lives in the Bronx. He resides with his wife, child, and mother-in-law at 1515 Selwyn Avenue, a building that is enrolled in Operation Clean Halls. He has resided there for two years; prior to that he lived for almost ten years in a private house on the same block. He is enrolled in a G.E.D. program at the nonprofit Bronxworks.

82.     Mr. Johnson has been unlawfully seized, searched, and arrested pursuant to Operation Clean Halls.

83.     Mr. Johnson is stopped, searched, and detained without cause by NYPD officers on the block where he resides between two and six times per week. Two particular officers from the 44th Precinct, John Doe 9 (whose last name is Marquez) and John Doe 10 (whose last name is Rodriguez), frequently stop him even though they know that he resides on the block. NYPD officers also stop him while he is merely walking past buildings enrolled in Operation Clean Halls.

84.   For example, in the summer of 2011, a NYPD officer stopped and searched Mr. Johnson while he was entering 1515 Selwyn Avenue, the building where he lives. He was ordered to produce identification even though he told the officer that he lived in the building. The officer took Mr. Johnson to his apartment, where his wife answered the door and verified that Mr. Johnson lived there. The officer then departed.

85.   Mr. Johnson's relatives and friends are sometimes stopped, questioned, and searched without cause in and around his building while visiting him.

86.   Mr. Johnson has also been stopped, questioned, and searched without cause by NYPD officers numerous times while visiting friends in Clean Halls Buildings on his block. On multiple occasions he has been unlawfully arrested or cited by NYPD officers for trespassing.

87.   Jovan Jefferson is a 20-year-old black man who lives in the Bronx. He will soon begin an internship at the nonprofit Bronxworks, and is also enrolled in an online university. He lives with his mother and 13-year-old brother at 1546 Selwyn Avenue in the Bronx, a building that is enrolled in Operation Clean Halls. Mr. Jefferson has lived in that building since he was born.

88.   Mr. Jefferson has been unlawfully seized, searched, and arrested pursuant to Operation Clean Halls.

89.   NYPD officers have frequently stationed themselves behind an elevator in the lobby of 1546 Selwyn Avenue, emerging when someone enters the lobby through the building's main entrance. The person who enters the lobby is typically stopped, ordered to produce identification, questioned, and sometimes searched, cited, or arrested. NYPD officers also routinely patrol the sidewalk immediately in front of 1546 Selwyn Avenue, where they

frequently stop, question, and search individuals, and sometimes cite or arrest them for trespassing.

90.    Mr. Jefferson has been stopped without cause by police officers inside his own building on multiple occasions, including several times by John Doe 9 and John Doe 10. Typically, the officers who stop him order him to produce identification and search him.

91.    Mr. Jefferson's relatives and friends are frequently stopped, questioned, and searched without cause in the lobby of his building while visiting him, sometimes even while accompanied by Mr. Jefferson.

92.    Approximately two to three times every month, Mr. Jefferson is unlawfully stopped and asked for identification by NYPD officers outside his building, outside his neighbor's buildings on his block, or while visiting friends who live in Clean Halls Buildings on his block. The police often search him without cause during these stops. For example, one day in early 2012 the police demanded that Mr. Jefferson take off his shoes in the middle of the street and searched between his toes.   Mr. Jefferson is often stopped by NYPD officers while merely walking past Clean Halls Buildings. NYPD officers also occasionally stop and question Mr. Jefferson's 13-year-old brother on the sidewalk outside of their building.

93.    In approximately early 2009, when Mr. Jefferson was a junior in high school, NYPD officers arrested him for trespassing in his own building. As Mr. Jefferson returned to his apartment to change clothes so he could play basketball with friends, NYPD officers stopped him without cause as he was opening the front door of his building and ordered him to produce identification. Mr. Jefferson did not have identification with him but told the officers he lived in the building and offered to go up to his apartment to get his identification. The officers did not allow Mr. Jefferson to get his identification. They instead told him he was being "detained" for

trespassing, handcuffed him, and placed him in a police van. Mr. Jefferson's mother learned that he was being arrested and ran downstairs to intervene. She pleaded with the officers, explaining that Mr. Jefferson was her son and lived in the building. The officers told her that it was "too late" and took Mr. Jefferson to the precinct. Mr. Jefferson spent three nights in police custody and missed school as a result. All charges against him were dismissed.

94.     In another incident sometime in 2009, NYPD officers unlawfully stopped, searched, and questioned Kieron Johnson at 1546 Selwyn Avenue as he was going to visit Mr. Jefferson. Mr. Jefferson was not home and therefore could not vouch for Mr. Johnson's standing invitation to come over to his friend's apartment. Mr. Johnson was issued a summons for trespassing.

95.     In another incident in or around the summer of 2010, John Doe 10 and other NYPD officers again stopped Mr. Jefferson without cause in his own building. The incident began when a friend of Mr. Jefferson's arrived to visit him and was unlawfully stopped by NYPD officers in the lobby of Mr. Jefferson's building. Without verifying whether he was indeed a legitimate visitor to 1546 Selwyn Avenue, these officers accused Mr. Jefferson's friend of trespassing and handcuffed him. The friend's girlfriend saw what was happening from outside the building and called Mr. Jefferson in his apartment to ask him to come down and help. Mr. Jefferson rushed down to the lobby with his older brother Jamel. When Mr. Jefferson protested to the officers that they were arresting his visitor, John Doe 10 unlawfully detained and searched him. Jamel, who is in the Navy, complained that the officers' conduct was illegal and showed the officers his Navy identification card. Only at that point did the officers allow Mr. Jefferson, Jamel, and the friend to leave.

96.     In another incident on May 3, 2011, Mr. Jefferson arrived at his building with Mr. Johnson and another friend.  While their friend remained outside, Mr. Jefferson and Mr. Johnson entered the lobby of Mr. Jefferson's building.  John Doe 9 and John Doe 10, along with Officer Johnny Blasini and another officer, John Doe 11, stepped out from behind the elevator in the lobby and stopped Mr. Jefferson and Mr. Johnson without cause.  Mr. Jefferson told the officers that he lived in the building and John Doe 10 ordered him to go to his apartment.  After telling the officers that Mr. Johnson was his invited guest, Mr. Jefferson complied with the order.  The four officers then arrested Mr. Johnson for trespassing even though he had entered the building with Mr. Jefferson, whom the officers knew was a resident.  The NYPD held Mr. Johnson at the 44th Precinct for seven hours and released him with a Desk Appearance Ticket that charged him with trespassing.  Mr. Jefferson wrote a letter attesting that Mr. Johnson was his invited guest and attended Mr. Johnson's arraignment.  The trespassing charge against Mr. Johnson was dismissed by the court on July 12, 2011.

97.     As a result of incidents like these, Mr. Jefferson is afraid of inviting friends and relatives to his apartment, and has largely stopped doing so.

98.     Mr. Jefferson and his invited guests fear and face a substantial risk of being unlawfully stopped, questioned, searched, cited and arrested in and around 1546 Selwyn Avenue and other Clean Halls Buildings on his block by NYPD officers in the future due to the buildings' enrollment in Operation Clean Halls.

99.     Mr. Johnson, his family members, and invited guests fear and face a substantial risk of being unlawfully stopped, questioned, searched, and arrested in and around 1515 Selwyn Avenue, 1546 Selwyn Avenue, and other Clean Halls Buildings on his block by NYPD officers

in the future due to the buildings' enrollment in Operation Clean Halls.  He is afraid to visit Mr.

Jefferson at 1515 Selwyn Avenue unless Mr. Jefferson is with him and carrying identification.

A.O.

100.    A.O. is a 17-year-old Latino male who resides in the Bronx.

101.    A.O. has been unlawfully seized, searched, and arrested pursuant to Operation

Clean Halls.

102.    On February 19, 2011, A.O. and two friends met after school and visited another

friend, Mr. Justin Drinkwine, in his apartment in the Far Rockaway neighborhood of Queens.

The apartment building, which is located at 22-59 Dix Avenue, is enrolled in Operation Clean

Halls.  Within minutes of leaving Mr. Drinkwine's apartment, A.O. and his friends were

approached and stopped on the sidewalk outside 22-59 Dix Avenue by NYPD Police Officers

Gregory Lomangino and Joseph Koch.  At the time, the three teenaged boys were merely

walking alongside the building and were not engaged in any activity that might indicate or imply

that criminal activity was afoot.

103.    Officer Lomangino and Officer Koch accused the three of trespassing within the

residential apartment building located at 22-59 Dix Avenue.  One of the boys explained that they

had just left 22-59 Dix Avenue where their friend resided and identified Mr. Drinkwine's

apartment number.  Officer Lomangino detained A.O. and his friends on the sidewalk while

Officer Koch walked away from the group, heading in the direction of the building located at 22-

59 Dix Avenue.

104.    During their detention and before conducting any investigation into whether A.O.

or his friends had, in fact, been visiting a friend at the Dix Avenue apartment, Officer

Lomangino told the three teenagers that they would be arrested.  When A.O. and his friends

asked why they were being arrested, Officer Lomangino pointed at the Operation Clean Halls sign on the building and said, "You can't fucking read that sign?"

105.    Within minutes, Officer Koch returned, stating that he had gone into the building at 22-59 Dix Avenue and no one had answered the door at the apartment A.O. and his friends had identified. A.O. explained that the teenagers had just been inside the apartment, described the various people present in the apartment, and asked whether the officer had seen those people. P.O Koch promptly changed his story, asserting that he had spoken with a man inside the apartment who informed him that no one had just left the apartment.

106.    The officers then handcuffed A.O. and his friends and transported them to the 101st Precinct. The boys were held at the precinct for several hours and thereafter issued Desk Appearance Tickets charging them with criminal trespass.

107.    A.O. complied with the instruction on the Desk Appearance Ticket to appear in Queens Criminal Court on March 3, 2011. When he arrived, he was informed that the Queens County District Attorney's Office had declined to prosecute his case, as well as the cases of his two friends.

Abdullah Turner

108.    Abdullah Turner is a 24-year-old black man who lives at 2249 Morris Avenue in the Bronx, a building that is enrolled in Operation Clean Halls. Mr. Turner attends a G.E.D. program and works as a volunteer at St. Barnabas Hospital in the Bronx.

109.    Mr. Turner has been unlawfully seized, searched, and arrested pursuant to Operation Clean Halls.

110.    In the early evening on March 26, 2011, Mr. Turner left his apartment with his friend Angie Trinidad to go to an engagement party at their friend Jessica's home.

111.   On the way to the engagement party, they stopped at the apartment building of a friend of Ms. Trinidad's so Ms. Trinidad could return a sweater to that friend. That building, which is located at 2020 Davidson Avenue in the Bronx, is enrolled in Operation Clean Halls.

112.   Ms. Trinidad went inside the building to her friend's apartment while Mr. Turner remained outside. Mr. Turner waited just outside the door of the building and called another friend on his cell phone.

113.   A few minutes after Ms. Trinidad had entered the building, three NYPD officers, including Defendants Officer Kieron Ramdeen and John Doe 12, arrived and approached Mr. Turner without cause. One of the two defendant-officers snatched Mr. Turner's cell phone, which was still connected with his friend, out of his hand. The officer asked Mr. Turner what he was doing and whether he knew someone in the building. Mr. Turner responded that he was waiting for a friend who was inside the building. The officer ordered Mr. Turner to produce identification, which he did. The officer looked at the identification and said that Mr. Turner did not live at the building, to which Mr. Turner responded, "I know, I'm waiting for my friend." That officer then went inside with another officer (not named as a defendant), taking Mr. Turner's cell phone and identification with him.

114.   Mr. Turner remained outside with the second defendant-officer, who continued to question him about his presence near the building. While that officer was questioning Mr. Turner, Ms. Trinidad came out of building, and Mr. Turner told the officer that she was the friend for whom he was waiting. The officer then radioed the other two officers, who returned from inside the building. The officers ordered Ms. Trinidad to show identification and questioned her.

115.    While the other officers questioned Ms. Trinidad, the first defendant-officer approached Mr. Turner, pointed to the Operation Clean Halls sign on the building, and said, "You see that? You're trespassing." He then handcuffed Mr. Turner and arrested him for trespassing. At no time had Mr. Turner entered the lobby or any other part of the building.

116.    Mr. Turner was taken to the 46th Precinct and then to Central Booking. He was held for a total of approximately 24 hours before being released. Mr. Turner was charged with trespassing.

117.    Mr. Turner appeared in court eight times before the prosecution voluntarily dismissed the trespassing charges against him on February 28, 2012. Each appearance required Mr. Turner to spend between three and six hours at the court and often to miss school or work.

118.    Mr. Turner has also been subjected to police harassment in his own building due to its enrollment in Operation Clean Halls. For example, one night in late 2011, Mr. Turner left his apartment with his younger brother, his friend, and his friend's nephew. The four walked through the courtyard of their apartment building and onto the sidewalk, on their way to a store to buy food. Three NYPD officers watched Mr. Turner and his companions as they walked through the courtyard and the officers approached them once they reached the sidewalk. The officers stopped them and asked what they were doing in the courtyard. Mr. Turner told the officers that he lived in the building, but the officers told him and his companions that they were not allowed to stand in the courtyard. The officers further stated that they were going to leave and then return shortly and that the four had better not be in the courtyard when the officers returned. Mr. Turner and his companions then proceeded to walk to the store as they had intended, and the officers followed slowly in a car until they entered the store.

119.    Mr. Turner and his friends and relatives fear and face a substantial risk of being unlawfully stopped, questioned and arrested or cited for trespassing in or around 2249 Morris Avenue by NYPD officers in the future due to the building's enrollment in Operation Clean Halls.

Fernando Moronta

120.    Fernando Moronta is a 35-year-old Latino man who resides at 2035 Marmion Avenue in the Bronx, a building that is enrolled in Operation Clean Halls.  Mr. Moronta works as a store manager.

121.    Mr. Moronta has been unlawfully seized, searched, and arrested pursuant to Operation Clean Halls.

122.    On the afternoon of December 6, 2010, Mr. Moronta was walking home carrying pizza for dinner with his girlfriend.  Mr. Moronta ran into a friend outside of the friend's apartment building at 2082 Crotona Parkway, a building around the corner from his own home that is also enrolled in Operation Clean Halls.  Mr. Moronta said hello and shook his friend's hand as the friend entered the building.  Mr. Moronta did not enter the building.

123.    NYPD officer Joseph Bermudez then approached Mr. Moronta and asked, "What did you just sell him?"  The officer told him that he did not care about marijuana, just crack and heroin.  Mr. Moronta responded that he had not sold his friend anything and that he did not have any drugs on him.  The officer then frisked Mr. Moronta and searched his pockets three times without any justification.  He then ordered him to "go inside" to the lobby of 2082 Crotona Parkway.  Mr. Moronta complied with the order and entered the lobby.

124.    Once inside, the officer ordered Mr. Moronta to sit on the ground.  Two other NYPD officers in the lobby stopped and searched two other people.  After a few minutes, Officer

Bermudez told him to stand up with his hands against the wall. Mr. Moronta complied, and the officer searched him again.

125.   At that point, Mr. Moronta became upset that he was being harassed and asked Officer Bermudez why he was treating him that way. Mr. Moronta reiterated that he did not have any drugs and even took off his shoes to demonstrate to the officer that he was not hiding any contraband. Officer Bermudez then cursed at Mr. Moronta, handcuffed him, and told him he was under arrest for trespassing.

126.   At no time during the course of this encounter did Officer Bermudez find any contraband on Mr. Moronta. At no time did Mr. Moronta enter the building except when he was ordered to do so by Officer Bermudez.

127.   Mr. Moronta was taken to the 48th Precinct and then to Central Booking. He was held for a total of approximately 24 hours before being released.

128.   Mr. Moronta was charged with trespassing. He pled not guilty, and after ten court appearances his case was adjourned in contemplation of dismissal with immediate sealing on December 14, 2011.

129.   On another occasion, in the winter of 2010, Mr. Moronta visited his brother at his brother's apartment at 1453 Walton Avenue, a building that is enrolled in Operation Clean Halls. Immediately after Mr. Moronta exited the building, NYPD officers pulled up in a vehicle, stopped him without cause, and asked what he was doing in the building. Mr. Moronta responded that he had visited his brother. The officers asked where his brother lived, and Mr. Moronta told them the apartment number.

130.   The officers then ordered Mr. Moronta to accompany them to his brother's apartment to verify that he had been visiting his brother. Mr. Moronta took the elevator with

approximately six officers to his brother's apartment on the sixth floor, where his brother

verified that Mr. Moronta was in fact his brother and had just visited him. The officers then

accompanied Mr. Moronta back downstairs and allowed him to leave. Mr. Moronta was not

charged with any offense.

131.    Mr. Moronta has also been unlawfully stopped outside of his own apartment

building on several occasions. During such stops, officers typically ask him what he is doing and

why he is standing in front of his building, and allow him to leave only once they are satisfied

with his justification for his presence.

132.    Mr. Moronta and his friends and relatives face a substantial risk of being

unlawfully stopped, questioned, searched, and arrested or cited for trespassing in or around 2035

Marmion Avenue by NYPD officers in the future due to the building's enrollment in Operation

Clean Halls.

Charles Bradley

133.    Charles Bradley is a 52-year-old black man who lives in the Bronx. He holds a

security guard license issued by New York State and worked as a security officer at an apartment

complex in the Bronx until January 2012. He is currently training for a new job.

134.    Mr. Bradley has been unlawfully seized, searched, and arrested pursuant to

Operation Clean Halls.

135.    Mr. Bradley's former fiancée resides at 1527 Taylor Avenue in the Bronx, a

building that is enrolled in Operation Clean Halls. Mr. Bradley previously lived with his fiancée

in that building but has since moved to his own apartment.

136.    On May 3, 2011, Mr. Bradley made arrangements to meet his fiancée at her

apartment. Around 5:00 p.m. that day, Mr. Bradley went to her building. Another tenant who

knew Mr. Bradley unlocked the door for him. Mr. Bradley proceeded to his fiancee's apartment on the fifth floor. He knocked on the apartment door, but there was no answer. Mr. Bradley then left the building and went outside. Mr. Bradley waited on the sidewalk outside of the building.

137.    While Mr. Bradley was waiting for his fiancée to arrive home, an NYPD van drove up and stopped in front of the building. Police Officer Miguel Santiago, who was seated in the van, whistled at Mr. Bradley and ordered him to approach the van. Mr. Bradley walked toward the police van.

138.    Officer Santiago asked Mr. Bradley what he was doing. Mr. Bradley responded that he was visiting his fiancée. Officer Santiago then searched through Mr. Bradley's pockets and ordered him to produce identification. Mr. Bradley said that he was a security officer and did not have anything on him. Officer Santiago then said, "You want to act like a fucking animal? Fuck that. You're going inside." He then arrested Mr. Bradley for trespassing.

139.    Mr. Bradley was put in the police van and brought to the 43rd Precinct, where Officer Santiago strip-searched him. He was held for approximately three hours and then issued a Desk Appearance Ticket that charged him with trespassing.

140.    Shortly after his arrest, Mr. Bradley feared that his job as a security guard was in jeopardy because the New York Department of State, which had issued his security guard license, sent him a letter indicating that he would be deemed ineligible to register as a security guard if he did not submit documentation of the status of his trespassing prosecution within 30 days. If he became ineligible to register as a security guard, Mr. Bradley would have been fired by his employer.

141.    Mr. Bradley was required to visit the Bronx District Attorney's office to request that his case be heard as soon as possible so he could ensure that his security guard license would not be jeopardized.  He submitted to the District Attorney a letter from his fiancée indicating that she lived at 1527 Taylor Avenue and that Mr. Bradley had been there to visit her when he was arrested.  The Bronx District Attorney declined to prosecute the case on July 13, 2011.

142.    Shortly thereafter, Mr. Bradley secured documentation from the criminal court indicating that the case had been dismissed.  He then went to his employer's office in Manhattan, where he presented the certificate of disposition to his employer's human resources department to ensure that his job was no longer endangered by his arrest.

143.    Each of the Plaintiffs has been injured proximately and directly by the Defendants, including being subjected to unlawful seizures, searches, and false charges, deprivation of liberty, interference with intimate relationships, infringement of their right to enjoy housing and to receive municipal services related to housing.

### The NYPD Has a Practice of Stopping, Questioning, Searching, and Arresting Residents of Clean Halls Buildings and their Visitors Without Justification

144.    The experiences of the individual Plaintiffs do not constitute isolated incidents. Rather, they are part of a larger pattern and practice that exists within private residential buildings enrolled in Operation Clean Halls.  The challenged policies and practices are so widespread and frequent as to constitute a custom and usage of the NYPD.

145.    The City of New York and Commissioner Kelly (together, "City-Defendants") have enforced, promoted, authorized, and sanctioned the NYPD's customs and practices of stopping, questioning, searching, arresting, and citing individuals, including residents, for their mere presence in and around Clean Halls Buildings.

146.    NYPD officers frequently conduct suspicionless stops of people they encounter in the lobbies, vestibules, hallways, stairwells, courtyards, and other common areas in and around Clean Halls Buildings.  In some Clean Halls Buildings, NYPD officers establish de facto illegal residential checkpoints at times, stopping virtually all people who enter or exit the buildings, including residents, and requiring them show identification as they enter or exit the lobby, subject themselves to a frisk or search, and justify their presence in the building to NYPD officers.

147.    NYPD officers also frequently stop people on sidewalks simply because they have exited a Clean Halls Building, are entering a Clean Halls Building, or are merely standing or walking near a Clean Halls Building.  During such stops, the individual is ordered to show identification, searched, and questioned about his presence in or around the building.

148.    A report issued by a district attorney's office concerning a shooting that took place in a Clean Halls Building confirms that NYPD officers make suspicionless stops in and around Clean Halls Buildings.  It describes NYPD practices as follows: "Authority for [Operation Clean Halls] depends upon consent by a landlord or a group of tenants that allows police to enter a particular building and the immediate area and to stop anyone found there and ask for identification.  In carrying out Operation Clean Halls, the police go up and down the stairways in a building and around the grounds, stop all who are found, question them as to why they are in the building or on the grounds, and ask for identification showing that they live on the premises or for an apartment number to verify a legitimate visit." (emphases added).

149.    Data collected by the NYPD on "stop, question, and frisk" activity, including in Clean Halls Buildings, confirm that tens of thousands of stops for trespassing are reported annually.  According to NYPD data, police officers made 329,446 stops of individuals upon

suspicion of trespassing between 2006 and 2010, representing approximately 12.2% of all reported stops. Upon information and belief, NYPD officers made many additional stops of individuals upon suspicion of trespassing during that period of time that were not reported.

150. Only 7.7% of reported trespass stops resulted in arrest and approximately 4.9% in the issuance of a summons. Weapons were found in only 0.2% of reported trespass stops—compared to 1.1% of reported stops made on suspicion of any other crime—and contraband was found in only 1.8% of reported trespass stops.

151. In the 10 precincts with the most reported stops made upon suspicion of trespassing in 2010, at least 28,209 such stops were made—nearly as many trespassing stops as the City's remaining 66 precincts combined. In the Bronx's 40th Precinct alone, police officers reported stopping over 5,000 people upon suspicion of trespassing that year. Suspicion of trespassing provided the basis for nearly 30% of all reported stops in the 40th Precinct.

152. A recent survey of men in the South Bronx found that residents of Clean Halls Buildings are routinely stopped by police officers in their own buildings. In October 2011 the Daily News questioned men of color on the street in three Bronx neighborhoods about their encounters with NYPD officers. A "resounding complaint" concerned patrols by NYPD officers in Clean Halls Buildings, during which "cops patrolling apartment buildings ask to see entrants' keys or IDs to make sure they are residents." One man described his recent stop by NYPD officers—while he was putting his key into the front door of his building—during which he was questioned as to his identity and forced to show identification. Another 17-year-old similarly described a recent stop that took place when he was walking into his own building, during which police officers searched his pockets.

153.    At a New York City Council hearing held on September 28, 2010, officials of the Civilian Complaint Review Board ("CCRB"), the New York City agency responsible for investigating civilian complaint about police misconduct, presented data indicating that complaints concerning stops by NYPD officers in NYCHA Residences and Clean Halls Buildings were substantiated at a significantly higher rate than other complaints.  The testimony of Mitchell G. Taylor, Board Member of the CCRB, indicated that the CCRB noticed "an escalation in complaints" concerning improper stops and questioning by NYPD officers in and around NYCHA Residences and Clean Halls Buildings.  He further testified that a review of all complaints concerning police misconduct received between July 1, 2008 and November 10, 2009 revealed 237 complaints concerning stops by NYPD officers in NYCHA Residences and buildings enrolled in Operation Clean Halls.  Of those that were fully investigated, 32 percent were substantiated, while only 11 percent of complaints concerning stops in other locations were substantiated.

154.    People who are stopped by NYPD officers are routinely frisked and fully searched without adequate cause.

155.    It is not uncommon for NYPD officers to issue summonses for trespassing to people they stop inside and just outside of Clean Halls Buildings even though there is no probable cause to believe that the stopped person has committed any crime or violation.  In 2010, the NYPD filed in court more than 15,800 summonses charging trespass.  Upon information and belief, many of those summonses related to Clean Halls Buildings.

156.    Although only a tiny percentage of reported trespass stops lead to arrests or summonses, thousands are arrested for trespassing in New York City annually.  Upon

information and belief, a substantial percentage of such arrests take place in Clean Halls Buildings.

157.    Residents of Clean Halls Buildings and their guests are sometimes arrested solely for failure to produce identification that matches the address of the building.  Some are individuals who enter a Clean Halls building with the intent of visiting someone who turns out to not be at home; others are arrested based solely on their mere presence in or around Clean Halls Buildings.  At times, individuals are arrested because they only know their friend's first name or nickname or know the apartment only by the location rather than by number.  Further, upon information and belief, those who remain silent upon questioning by NYPD officers are routinely arrested or issued a summons for trespassing.

158.    A police officer stationed in the Bronx's 46th Precinct described stops and arrests for trespassing as "standard practice" in Clean Halls Buildings.  In sworn deposition testimony provided in 2008, Police Officer Robert Barnett described Operation Clean Halls as follows: "Landlords sign up to have us patrol their buildings periodically and we're permitted to ask people coming in and out what their business is.  If they cannot answer where they are coming from, we place them under arrest for criminal trespass."  The officer further affirmed that it was "typical" for officers to arrest people for trespassing under these circumstances in the 46th precinct and throughout New York City.

159.    This description underscores that stops conducted pursuant to Operation Clean Halls are regularly conducted without any suspicion of wrongdoing and that the outcome of an encounter with an NYPD officer in a Clean Halls building—either free to go about one's business or placed under arrest—turns on whether an officer is satisfied with a person's explanation for his presence in the building.

160.    In October 2006 NYPD Sergeant Reginald McReynolds was stopped in the stairwell of his girlfriend's apartment building, which is enrolled in Operation Clean Halls, while returning to her apartment with a take-out Chinese food order.  One officer asked Sergeant McReynolds, "What fucking apartment are you going to?"  McReynolds indicated that he was going to his girlfriend's apartment, and the officers threatened to arrest him for trespassing. Ivelisse Cruz, McReynolds' girlfriend, took pictures of the incident as it unfolded and called 911. Sergeant McReynolds's arrest was reported by major media outlets, including the New York Daily News, and CNN.

161.    Since 2007 there have been at least 16,000 misdemeanor arrests for trespass in New York City annually, making it one of the highest-volume crimes charged in the City. Between 2007 and 2010, over 37 percent of the criminal cases stemming from those arrests were resolved in favor of the accused, including dismissals, acquittals, or declination to prosecute. Upon information and belief, criminal cases that are opened against individuals arrested for trespass in New York City are dismissed at a high rate relative to similar crimes.

162.    Given the high number of false arrests for trespassing, the criminal complaints and summonses filed in trespassing cases often lack sufficient detail to support a prosecution.  As a result, New York City Criminal Court judges routinely dismiss as facially insufficient criminal court complaints and summonses charging individuals with criminal trespass in Clean Halls Buildings.  Over four years ago, a Bronx County Supreme Court justice characterized the custom of unlawful trespassing arrests in Clean Halls Buildings as a "dreadful practice," whereby "[s]ome people get arrested simply for being in the lobby of a residential building in which they do not reside."  The court further recognized the "unacceptable harm" that results from unlawful trespass arrests, including inconvenience, humiliation, lengthy pre-arraignment imprisonments,

and a "level of intrusion upon freedom [that] is unacceptable, especially when it appears to be a result of an unlawful arrest" and specifically appealed to the NYPD to "better train its officers in the realm of Criminal Trespass so that only true trespassers will be arrested, and innocents will be spared." Over three years ago, another Bronx County court likewise noted that there are "far too many occasions where the trespass arrests are not justified and innocent individuals are simply caught in a trap while going about their everyday lives in a perfectly legal way." In both cases the court admonished prosecutors that innocent activities, such as "paying an unannounced visit to a friend," "having a standing invitation to visit a friend or relative," and being "in a lobby of a building that you don't live in" constitute lawful activities that do not support an arrest for criminal trespass.

163.    Trespassing cases resulting from arrests in or around Clean Halls Buildings are also frequently not pursued after arrest because prosecutors decline to prosecute them. In many cases, prosecutors decline to prosecute individuals arrested for trespassing in or around Clean Halls Buildings because the initial stop and detention is unlawful, such as when it is premised upon mere presence in or around the building, rather than suspicious behavior. NYPD officers also frequently fail to supply information that is sufficiently detailed to support criminal prosecution. According to a 2009 law review article, from 2005 to 2008, prosecutors declined to prosecute 11.2% of trespass cases—the fifth-highest declination rate among the 19 highest-volume crimes in New York City. In 2011 prosecutors declined to prosecute over 13% of people arrested for trespassing in New York City.

164.    Upon information and belief, a substantial number of trespassing arrests that take place in and around Clean Halls Buildings are made without probable cause of any unlawful conduct.

165.   The stop, question, search, citation, and arrest practices of NYPD officers in and around Clean Halls Buildings are so customary as to constitute official municipal policy. Many residents of Clean Halls Buildings are subjected to these practices on a routine basis, including some who are stopped, questioned, and searched nearly every day. These practices constitute just one part of a citywide phenomenon of systematic suspicionless stops and arrests of individuals in and around certain low-income areas. The other locus of such activity is, collectively, the residential apartment buildings owned and operated by the New York City Housing Authority.

166.   As a result of these practices, all residents of Clean Halls Buildings, their guests, and others in close proximity to the buildings are at risk of being stopped, questioned, searched, and even arrested or cited for trespassing for mere presence in or around a Clean Halls Buildings without suspicion of any criminal activity. In certain Clean Halls Buildings where the NYPD regularly deploys officers, residents, their visitors, and others in the vicinity are at heightened risk of being subjected to these practices.

167.   The NYPD's practices of stopping, questioning, searching, and arresting individuals in Clean Halls Buildings interfere with the ability of residents and their guests to maintain intimate relationships, and with the ability of residents to freely entertain guests in their homes. For example, many residents of Clean Halls Buildings feel that they are unable to extend standing invitations to visit to friends and family members because they may be unable to justify their presence in the building to police officers. Further, many residents' friends and family members are less likely to visit Clean Halls Buildings because they fear being stopped and harassed by NYPD officers.

### The NYPD's Unlawful Stop, Question, Search, Citation, and Arrest Practices In and Around Clean Halls Buildings Result from Improper and Inadequate Training and Supervision

168.　Unlawful stops, searches, summonses and trespassing arrests in and around Clean Halls Buildings result from the improper training and instruction of NYPD officers on the appropriate bases for those actions. For example, upon information and belief, the NYPD trains officers to stop and question any person they encounter in a Clean Halls Building—even if there are no additional facts that make the person's presence in the building suspicious. Further, the NYPD has failed to implement any safeguards against unlawful arrests or citations in connection with Operation Clean Halls.

169.　NYPD officers frequently fail to conduct investigations that are sufficient to determine whether there is probable cause to arrest individuals they encounter in Clean Halls Buildings. For example, when a stopped individual tells NYPD officers that he was visiting a friend in a particular apartment, the officers often refuse to accompany the stopped person to the apartment and confirm the stopped person's account. It is not uncommon for one officer to remain with the stopped person and another officer to say that he will go to the apartment identified by the stopped person as the one he was visiting. The officer who claims that he will go to the apartment does not actually go the apartment but returns quickly and says that no one answered the door at the apartment or that the person who answered did not confirm acquaintance with the stopped person. The stopped person is then placed under arrest.

170.　In addition, the NYPD does not provide sufficient training to officers on conducting adequate investigations prior to arrest for trespassing. Upon information and belief, NYPD officers who patrol in and around Clean Halls Buildings are trained and instructed that when a person who has been asked or ordered to show identification or otherwise justify his

presence in a Clean Halls building and the person refuses or declines to do so, such a response constitutes probable cause that the individual is trespassing.

171.    The inadequacy of NYPD officers' training and supervision are only magnified by the longstanding intense pressure on individual police officers to meet monthly numerical targets for stops, arrests and the issuance of summonses. Most recently, Defendant Commissioner Kelly directed the release of NYPD Operations Order No. 52, which explicitly endorses the use of "performance objectives." These "performance objectives" pressure police officers to stop, cite and arrest people without regard for the applicable legal standards. This pressure is not balanced by adequate training on legal standards.

172.    Operation Clean Halls includes insufficient safeguards to ensure that people are not wrongfully arrested or cited. For example, although Clean Halls affidavits state that tenant rosters of enrolled buildings must be provided to the NYPD, many are not. Even if landlords or managing agents agree to do so, it is not uncommon for them to fail to update them when tenants move into or out of the building. Moreover, rosters that are provided frequently fail to list residents who are not named on a lease, such as teenaged children.

173.    NYPD officers sometimes—although rarely—review tenant rosters or consult with managing agents to ascertain whether a detained person is a resident of the building, but these practices do not enable NYPD officers to accurately identify lawful visitors to Clean Halls Buildings. Of course, no tenant roster could identity other people who may be lawfully present in a Clean Halls Building, such as residents' visitors or delivery people. Similarly, residents' nicknames, by which some invited guests might know them, are highly unlikely to be listed on tenant rosters. As a result, an NYPD's officer review of a tenant roster is insufficient to establish probable cause for trespassing.

## Deliberate Indifference in Failure to Train and Supervise

174.   City-Defendants have been aware of the incidents described above and the stop, question, search, and arrest practices of NYPD officers in and around Clean Halls Buildings for several years.  Yet City-Defendants have been deliberately indifferent to these practices and have not attempted to remedy them.

175.   City-Defendants have received notice of the NYPD's stop, question, search, and arrest practices in Clean Halls Buildings.  City-Defendants are aware of the CCRB review of complaints lodged in connection with stops in Clean Halls Buildings that revealed a high substantiation rate compared to stops at other locations.  City-Defendants are also aware of the high rate of declinations to prosecute trespass arrestees, the judicial admonitions relaying the high frequency of baseless and unlawful trespass arrests, and the class action litigation, *Davis v. City of New York*, No. 10-cv-699, that has been pending in the Southern District of New York since January 2010 and challenges the NYPD's stop, question, search, and arrest practices in NYCHA Residences, which are virtually identical to those at issue in Clean Halls Buildings.

176.   City-Defendants responded to complaints about suspicionless stops, searches, detentions, interrogations, and arrests in NYCHA Residences by amending the sections of the NYPD Patrol Guide, the NYPD's official set of policies governing police actions, that address vertical patrols and investigations into trespassing in NYCHA Residences.  The NYPD also instituted limited training of police officers who patrol NYCHA Residences.  The NYPD has not taken any of those minimal steps to address the problems with its policies and practices in Clean Halls Buildings.

177.    Until June 2010, the sections of the NYPD Patrol Guide that governed the use of vertical patrols in Clean Halls Buildings on one hand, and NYCHA Residences on the other, were virtually indistinguishable.

178.    Section 212-59 of the Patrol Guide, which remains in effect, governs vertical patrols in Clean Halls Buildings. It directs commanding officers to "[o]btain permission of building owner/authorized agent to conduct vertical patrol when private property is involved" and provides that uniformed patrol officers should "[c]onduct vertical patrol of assigned location and take appropriate police action."

179.    Section 212-59 of the Patrol Guide also simply directs uniformed patrol officers to "[c]onduct vertical patrol of assigned location and take appropriate police action." Section 212-60 of the Patrol Guide, which is listed as a "related procedure" and was in effect until June 2010 and concerning vertical patrols in NYCHA Residences, similarly directed uniformed patrol officers to "[b]e alert for persons loitering within the buildings, or suspicious conditions," and to "take note of unauthorized persons remaining in lobbies, basements, stair cases and roof landings and take appropriate police action when necessary." Neither section provides any guidance as to the factors an officer may consider in determining whether a person may be lawfully stopped, seized, questioned, searched, or arrested for trespass, or the steps an officer should take when conducting an investigation into trespassing.

180.    On June 8, 2010, the NYPD issued Interim Order No. 23 ("Interim Order"), which addresses vertical patrols in NYCHA Residences and which superseded Section 212-60. The Interim Order provides that "an officer may not stop (temporarily detain) a suspected trespasser unless the officer reasonably suspects that the person is in the building without authority." It further provides that following a stop an officer should "[a]pproach the person(s)

and ask; (1) If he or she lives in the building (2) If he or she is visiting someone in the building (3) If he or she has business in the building." The Interim Order also directs as follows: "When a person's authority to be present in the building is in question, take reasonable measures to verify such authority (e.g., asking for identification, a key to the building entrance doors, etc.)." The Interim Order directs, "If a person refuses to explain or is unable to explain his or her presence in the building, the officer may instruct the person that he or she must leave the building or be subject to arrest for trespass. The officer may then arrest the person for trespass if: (1) The person refuses to exit the building and does not promptly establish a right to be in the building." The NYPD began training officers to comply with the Interim Order in the fall of 2010.

181.    There have not been any changes to the NYPD Patrol Guide sections addressing vertical patrols conducted pursuant to Operation Clean Halls in at least ten years. Upon information and belief, the NYPD has not conducted any specialized training concerning officers' authority to stop, question, search, and arrest any individuals upon suspicion of trespassing. Further, NYPD officers in Clean Halls Buildings frequently arrest or cite individuals for trespassing without giving them the opportunity to either exit the building or establish a right to be in the building.

182.    The NYPD Patrol Guide provides no guidance to NYPD officers conducting vertical patrols pursuant to Operation Clean Halls on who is to be stopped, seized, questioned, searched, or arrested for trespass. The only guidance provided to NYPD officers in connection with Operation Clean Halls is consistent with, and reflective of, a policy, practice, and custom of stops and arrests for trespassing based on insufficient cause.

183.    City-Defendants have failed to make meaningful attempts to improve the training and supervision of NYPD officers who conduct vertical patrols and stop, question, search and

arrest people in buildings enrolled in Operation Clean Halls. In contrast, City-Defendants have recognized the need for training of police officers who patrol NYCHA Residences on the appropriate standard for stopping individuals upon suspicion of trespassing as well as steps officers should take to investigate suspicions of trespassing.

184.    Upon information and belief, the current training program does not include sufficient instruction on the elements of the offenses concerning trespassing in New York's Penal Law or the proper standards for and extent of frisks and searches. In particular, the current training program does not make clear that mere presence in or around a Clean Halls Building does not provide a sufficient basis to stop an individual and that mere presence in a Clean Halls building without identification that lists a matching address is insufficient to provide probable cause for arrest. Further, NYPD officers are not instructed that investigation of information provided by an individual suspected of trespassing concerning the identity or location of the resident he or she claims to be visiting is required to establish probable cause for arrest.

185.    City-Defendants have failed to supervise and discipline NYPD officers who unlawfully stop, question, seize, search, and arrest individuals for trespassing. Upon information and belief, City-Defendants do not monitor improper stops, seizures, and searches for trespassing in Clean Halls Buildings. Nor have City-Defendants instituted any follow up procedure or disciplinary action when charges are dismissed or where it is otherwise established that an individual was arrested without probable cause.

**The NYPD's Clean Halls Program Has a Disparate Impact on Blacks and Latinos**

186.    The NYPD administers Operation Clean Halls and targets its stop, question, search, citation, and arrest activities in Clean Halls Buildings in a manner that has a disparate impact on blacks and Latinos as compared to whites.

187.    The NYPD is responsible for enrolling buildings in the program in every borough, except Manhattan, where the District Attorney's office does so.  There is no centralized oversight of Operation Clean Halls by City-Defendants or their designees.  Upon information and belief, no single list of all buildings enrolled in the program exists.

188.    Although the purported purpose of Operation Clean Halls is to combat illegal activity in apartment buildings, buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime in the building.  For example, Clean Halls Buildings in the Bronx are enrolled "into perpetuity."  Therefore, residents of Clean Halls Buildings, their guests, and even people on sidewalks outside of Clean Halls Buildings are at risk of being subjected to the NYPD's practices of stopping, questioning, searching, citing, and arresting people without the requisite level of suspicion even though their buildings are not necessarily locations with sustained or substantial criminal activity.

189.    Upon information and belief, the residents of all Clean Halls Buildings are disproportionately black and Latino as compared to the population of New York City as a whole.  Further, NYPD officers are more likely to be deployed to certain Clean Halls Buildings where they aggressively stop, question, search, and arrest people they encounter in and around the buildings.  Upon information and belief, residents of those buildings are disproportionately black and Latino as compared to all residents of Clean Halls Buildings and to the population of New York City as a whole.  As a result, the NYPD's stop, question, search, citation, and arrest practices in and around Clean Halls Buildings have a significant disparate impact on blacks and Latinos in their enjoyment of housing and in their receipt of municipal services connected with housing.

190.    NYPD data reveal that the NYPD's trespass stop practices have a disparate impact on blacks and Latinos.  Blacks and Latinos are more likely than whites to be stopped by NYPD officers on suspicion of trespassing, and blacks and Latinos comprise a higher percentage of people stopped for trespassing than of people stopped on suspicion of all other crimes.

191.    From 2006 to 2010, approximately 94.4% of those stopped for trespassing were black and Latino, although blacks and Latinos comprised approximately 52% of the New York City population.  By contrast, for stops made on suspicion of all crimes other than trespassing between 2006 and 2010, 84.9% of those stopped were black and Latino.  From 2006 through 2010, only 4% of those stopped on suspicion of trespassing were white, although non-Latino whites comprised approximately 33% of the New York City population.

192.    Thus, from 2006 through 2010, blacks and Latinos in the City were six times more likely to be stopped for any reason by police than whites, Asians, and Native Americans combined, but 16 times more likely to be stopped on suspicion of trespassing than whites, Asians, and Native Americans combined.

193.    Between 2003 and 2011, a disproportionate number of blacks and Latinos were also arrested for trespass in New York City.  During that period, blacks and Latinos constituted over 90 percent of those arrested for trespassing; blacks were 12 times, and Latinos 7 times, more likely to be arrested for trespassing than whites, Asians and Native Americans combined.

194.    Upon information and belief, these data encompass a significant number of stops and arrests made in and around Clean Halls Buildings and reflect the disparate impact of the NYPD's Clean Halls practices on blacks and Latinos.

195.    The NYPD has a long history of conducting excessive stops in New York City neighborhoods largely populated by racial minorities.  In 1999, for example, the Office of the

New York State Attorney General reported that stops by NYPD officers in predominately minority precincts in New York City occurred at a significantly higher rate than stops in predominately white precincts. The report also found that when stops did occur in white neighborhoods, the disparity between racial minority and white stop rates in those neighborhoods was pronounced.

196.    The numbers of stops by the NYPD has continued to increase, to an all-time high of 685,724 reported stops in 2011. The racial disparities also continue. Blacks and Latinos comprised 87 percent of all reported stops and 94 percent of all reported stops on suspicion of trespassing by the NYPD in 2011.

## CLASS ACTION ALLEGATIONS

197.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs will ask the Court to certify as a class all residents of Clean Halls Buildings; all individuals, including family members, guests, and visitors of residents of Clean Halls Buildings, who seek to visit a resident of a Clean Halls Building; and all individuals who have been or are likely to be unlawfully stopped or arrested as a result of their presence in or around Clean Halls Buildings. All of these people are at risk of being stopped, questioned, searched, cited, and arrested as a result of City-Defendants' policies and practices.

198.    This action satisfies all four requirements of Rule 23(a):

a.    *Numerosity:* Joinder of all class members is impracticable because of the size of the class and the fact that the class includes some members who cannot be identified with any degree of specificity. Upon information and belief, tens of thousands of residents of Clean Halls Buildings and visitors of residents of Clean Halls Buildings have either been subjected to the

challenged policies and practices or are at risk of being subjected to the challenged policies and practices.

b.     *Commonality:* There are questions of law and fact common to all members of the class, including, but not limited to, whether City-Defendants maintain a policy and practice of unlawfully seizing, searching, citing, and arresting residents of Clean Halls Buildings, their guests and others in violation of federal and state law.

c.     *Typicality:* The claims of the Named Plaintiffs are typical of those of the class. Each named plaintiff has been subjected to the challenged policies and practices by virtue of his or her status as a resident, or visitor of a resident, of a building enrolled in Operation Clean Halls, or simply by virtue of having been in the vicinity of a Clean Halls Building.

d.     *Adequacy of Representation:* The Named Plaintiffs and class counsel will fairly and adequately represent the interests of the class. The Named Plaintiffs have no interests in this matter that are antagonistic to other class members. Class counsel has many years of experience in civil rights and class action litigation.

199.    Class-wide declaratory and injunctive relief is appropriate under Rule 23(b)(2) because City-Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## JURISDICTION AND VENUE

200.    This action is authorized by 42 U.S.C. §§ 1983 and 3613(a). Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

201.    Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the

Federal Rules of Civil Procedure authorizes injunctive relief. This Court has authority to award

costs and attorneys' fees under 42 U.S.C. §§ 1988 and 3613(c)(2).

202.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because it

is the district in which a substantial part of the events or omissions giving rise to the Plaintiffs'

claims occurred.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
### VIOLATIONS OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION

203.   As a direct and proximate result of the acts and omissions of the Defendants, the

Plaintiffs and members of the class they seek to represent have been deprived of their rights

under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION:
### INFRINGEMENTS OF THE RIGHTS OF INTIMATE ASSOCIATION, ASSEMBLY, AND
### SUBSTANTIVE DUE PROCESS IN VIOLATION OF THE FIRST AND FOURTEENTH
### AMENDMENTS TO THE U.S. CONSTITUTION

204.   As a direct and proximate result of the acts and omissions of the Defendants, the

Plaintiffs and members of the class they seek to represent have been deprived of their rights

under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §

1983.

### THIRD CAUSE OF ACTION:
### DISCRIMINATORY IMPLEMENTATION OF OPERATION CLEAN HALLS
### IN VIOLATION OF THE FAIR HOUSING ACT

205.   As a direct and proximate result of the acts and omissions of City-Defendants, the

Plaintiffs and members of the class they seek to represent have been deprived of their rights on

the basis of race or national origin in violation of the Fair Housing Act, Title VIII of the Civil

Rights Act of 1968, 42 U.S.C. §§ 3601-3617.

## FOURTH CAUSE OF ACTION:
### VIOLATIONS OF ARTICLE 1, SECTION 12 OF THE NEW YORK CONSTITUTION

206.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under Article I, Section 12 of the New York Constitution.

207.   The unlawful stops, searches, false arrests, and false imprisonments of the Plaintiffs were the direct and proximate result of a policy or practice of the City.

## FIFTH CAUSE OF ACTION:
### VIOLATIONS OF ARTICLE I, SECTION 8 OF THE NEW YORK CONSTITUTION

208.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under Article I, Section 8 of the New York Constitution.

## SIXTH CAUSE OF ACTION:
### FALSE ARREST, FALSE IMPRISONMENT, ASSAULT AND BATTERY
### IN VIOLATION OF NEW YORK COMMON LAW

209.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs and members of the class they seek to represent have been deprived of their rights under New York common law to be free from false arrest, false imprisonment, assault, and battery.

## SEVENTH CAUSE OF ACTION:
### MALICIOUS PROSECUTION IN VIOLATION OF NEW YORK COMMON LAW

210.   Police Officers John Does 5-6 charged J.G. and W.B. with trespassing falsely, maliciously, in bad faith, and without probable cause.

211.   Police Officers Johnny Blasini and John Does 9-11 charged Kieron Johnson and with trespassing falsely, maliciously, in bad faith, and without probable cause.

212.    Police Officers Lomangino and Koch charged A.O. with trespassing falsely, maliciously, in bad faith, and without probable cause.

213.    Police Officers Ramdeen and John Doe 12 charged Abudllah Turner with trespassing falsely, maliciously, in bad faith, and without probable cause.

214.    Police Officer Santiago charged Charles Bradley with trespassing falsely, maliciously, in bad faith, and without probable cause.

215.    The prosecutions of J.G., W.B., Kieron Johnson, A.O., Abdullah Turner, and Charles Bradley were terminated in their favor.

216.    The Defendants' actions violated the rights of Plaintiffs J.G., W.B., Kieron Johnson, A.O., Abdullah Turner, and Charles Bradley under New York common law to be free from malicious prosecution.

### PRAYER FOR RELIEF

WHEREFORE the Plaintiffs respectfully request that the Court:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

3.    Declare that the Defendants' actions violate the Plaintiffs' rights under the Fourth Amendment of the United States Constitution, Article I, Section 12 of the New York Constitution, and New York common law;

4.    Declare that the Defendants' actions violate the Plaintiffs' rights under the First and Fourteenth Amendments and Article I, Section 8 of the New York Constitution;

5.    Declare that the Defendants' actions in and around Clean Halls Buildings violate the Plaintiffs' rights under the Fair Housing Act;

6.    Enjoin further violations of the Plaintiffs' constitutional, statutory, and common law rights, including but not limited to an injunction that requires the Defendants to:

    a.    Refrain from unlawfully stopping and questioning individuals in or around buildings enrolled in Operation Clean Halls;

    b.    Refrain from unlawfully searching individuals in or around buildings enrolled in Operation Clean Halls;

    c.    Refrain from unlawfully arresting or otherwise charging individuals in or around buildings enrolled in Operation Clean Halls;

    d.    Establish appropriate citywide standards for enrollment of privately owned residential buildings in Operation Clean Halls;

    e.    Establish a system for tracking and monitoring NYPD practices in and around buildings enrolled in Operation Clean Halls Buildings to determine whether stops, searches, summonses and arrests have comported with legal requirements;

    f.    Establish a system for tracking and monitoring the stops, searches, summonses, and arrests made pursuant to Operation Clean Halls, including by race, national origin, building, precinct, and borough to determine whether the program is being implemented in a discriminatory manner;

    g.    Develop and implement appropriate training for members of the NYPD who patrol in or around buildings enrolled in Operation Clean Halls;

    h.    Implement a system of reporting to the Plaintiff and the Court about all steps taken to cure the violations of the Plaintiffs' rights;

7.  Award compensatory damages for injuries sustained by Named Plaintiffs;

8.  Award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. §§ 1988

and 3613(c)(2); and

9.  Grant any other relief the Court deems necessary and proper.

Dated: March 28, 2012
       New York, New York

Respectfully submitted,

Alexis Karteron (AK 8833)
Christopher Dunn (CD 3991)
Daniel Mullkoff (DM 5557)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
akarteron@nyclu.org

J. McGregor Smyth, Jr. (JS 9995)
Mariana Kovel*
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451
(718) 838-7878

Juan Cartagena (JC 5087)
Foster Maer (FM 0680)
Roberto Concepcion*
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

M. Chris Fabricant (MF 9403)
360 Clinton Avenue, #3F
Brooklyn, NY 11238
(917) 496-7859

*Not admitted in the Southern District of New York

Attorneys for Plaintiffs