UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JAENEAN LIGON, et al.                            :
                                                 :
                                                 :
                    Plaintiffs,                  :
                                                 :        12 Civ. 2274 (SAS)(HBP)
          -versus-                               :
                                                 :
CITY OF NEW YORK, et al.                         :
                                                 :
                                                 :
                    Defendants.                  :
-----------------------------------------------------------X


# <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'<br>MOTION FOR PRELIMINARY INJUNCTION</u>

Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion, Jr.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

Dated: September 24, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

AN INTRODUCTION TO THE CLEAN HALLS PROGRAM ............................................. 3

ARGUMENT ........................................................................................................................... 4

I.   THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................... 5

A.   Police Stops Based on a Person's Proximity to a Clean Halls Building
     Violate the Fourth Amendment. .......................................................................... 5

B.   NYPD Officers Engage in a Pattern and Practice of Unlawfully Stopping
     Individuals Outside Clean Halls Buildings ........................................................ 7

     1.   Professor Fagan's Analysis ....................................................................... 8

     2.   Bronx District Attorney's Office .............................................................. 12

     3.   The Unlawful Stops of the Plaintiffs ....................................................... 14

C.   The Plaintiffs are Likely to Establish Municipal Liability for the NYPD's
     Practice of Outdoor Trespass Stops. ................................................................. 19

II.  THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A
     PRELIMINARY INJUNCTION .................................................................................. 20

CONCLUSION ...................................................................................................................... 22

i

# TABLE OF AUTHORITIES

<u>Cases</u>

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) ......................................19

*Brown v. Texas*, 443 U.S. 47 (1979) ...............................................................................6, 10

*Floyd v. City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011) ...........................................5

*Floyd v. City of New York*, No. 08 Civ. 1034 (SAS), 2012 WL 1344514 (S.D.N.Y. Apr. 16, 2012) .........................................................................................................................10

*Floyd v. City of New York*, No. 08 Civ. 1034 (SAS), 2012 WL 3561594 (S.D.N.Y. Aug. 17, 2012) ........................................................................................................................11

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ....................................................................6, 7, 10

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ....................................................................20

*Ligon v. City of New York*, 2012 WL 3597066 (S.D.N.Y. Aug. 21, 2012) ........................1, 20

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009)..................19

*People v. Powell*, 691 N.Y.S.2d 263 (N.Y. Sup. Ct. 1999) .....................................................7

*Sorlucco v. City of New York*, 971 F.2d 864 (2d Cir. 1992) ..................................................19

*Stauber v. City of New York*, 2004 WL 1593870 (S.D.N.Y. July 16, 2004), *amended on other grounds by* 2004 WL 1663600 (S.D.N.Y. July 27, 2004) ........................20

*Strouchler v. Shah*, --- F. Supp. 2d ----, No. 12 Civ. 3216 (SAS), 2012 WL 3838159 (S.D.N.Y. Sept. 4, 2012).......................................................................................................4

*United States v. Bellamy*, 592 F. Supp. 2d 308 (E.D.N.Y. 2009).........................................7, 9

*United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005).....................................................7, 10

*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995).......................................................20

<u>Statutes</u>

42 U.S.C. § 1983.................................................................................................................19

N.Y. Penal Law § 140.00..................................................................................................5, 6

N.Y. Penal Law § 140.10 ................................................................................................5, 10

N.Y. Penal Law § 140.15 ....................................................................................................5

## PRELIMINARY STATEMENT

The New York City Police Department ("NYPD") is engaged in a widespread and unconstitutional practice of stopping New Yorkers on suspicion of trespass in the public areas outside of certain private residences. The NYPD executes this practice under the auspices of "Operation Clean Halls,"—also known as the "Trespass Affidavit Program" —a citywide program that allows police officers to patrol inside and around thousands of private residential apartment buildings across the City. Police officers stop and even arrest residents for trespass outside their own apartment buildings; family members, friends and other visitors of residents are similarly mistreated. The plaintiffs, who are twelve New York City residents, one former New York City resident, and a putative class of similarly situated individuals, seek a preliminary injunction to end these unconstitutional stop practices once and for all.

In anticipation of the hearing scheduled to start on October 15, the plaintiffs submit this memorandum to outline the facts and law bearing on their request for a preliminary injunction. They do so with the understanding that more detailed briefing will be necessary after completion of the evidentiary proceedings.

As the Court is aware, the plaintiffs do not challenge the entire Clean Halls program. Rather, they challenge certain police stops being made in conjunction with the program. More specifically, the plaintiffs allege the NYPD has a practice of stopping, questioning, frisking, and even arresting people on suspicion of trespass without any lawful basis and usually because those people—typically residents or their visitors—merely are in or near a building enrolled in the program. *See Ligon v. City of New York*, 2012 WL 3597066, at *1 (S.D.N.Y. Aug. 21, 2012) (describing allegations).

1

The plaintiffs' request for a preliminary injunction focuses on one subset of these stops they find particularly egregious:  the stopping of people outside of Clean Halls buildings on suspicion of having criminally trespassed inside those buildings.  Given that one cannot be guilty of trespass while standing in a public area and given that merely exiting or entering private property cannot provide a basis for stopping a person on suspicion of trespass, outdoor trespass stops are presumptively invalid absent some unusual circumstances.  Indeed, over ten years ago the NYPD expressly warned supervisors that merely entering or exiting Clean Halls buildings was not a basis for stopping a person.

Though the plaintiffs were able to engage in only limited expert and fact discovery under the expedited preliminary injunction schedule, that discovery reveals a widespread practice of unlawful stops in the Bronx, where the greatest number of Clean Halls buildings are concentrated.  Expert analysis of stop-and-frisk forms reveals the NYPD's practice of making unjustified criminal trespass stops outside hundreds of Clean Halls buildings in every precinct in the Bronx.  Consistent with this evidence of illegal police practices, the Bronx District Attorney's Office has been complaining to the NYPD for years about unlawful trespass arrests at Clean Halls buildings and has gone so far as to routinely decline to prosecute trespass arrests effected outside Clean Halls buildings.

The members of the putative plaintiff class are the victims of this unlawful activity. Many of the named plaintiffs have been unlawfully stopped in or around Clean Halls buildings in the Bronx—often their own residences—and seven of them have been stopped while doing nothing more than exiting, entering, or being near buildings enrolled in the program.

Given that there is no dispute about the unlawfulness of the narrow category outdoor trespass stops at issue in this motion—that the NYPD's own records and other evidence reveal

are happening routinely—the plaintiffs respectfully submit that the real issue before the Court

will be the appropriate scope of an injunction to halt unlawful outdoor trespass stops being made

in conjunction with the Clean Halls program.  Certain steps the NYPD initiated after the filing of

this lawsuit (which are discussed below) suggest the Court should be able to readily fashion an

injunction that will address this particular category of stops and that should meet with no

objection from the NYPD.

## AN INTRODUCTION TO THE CLEAN HALLS PROGRAM

Later in this memorandum, the plaintiffs address various details of the Clean Halls

program as they relate to the request for a preliminary injunction.  At the outset, however, they

provide a brief overview of the program.

In the 1990s the NYPD created the Trespass Affidavit Program, which is known as the

"Clean Halls" program in the Bronx.  Though there appear to be virtually no NYPD documents

describing the program, it is undisputed that under the program owners or managers of private

residential buildings give permission to the NYPD to enter their buildings to conduct patrols.  To

enroll in the program, the owner or manager must provide the NYPD with a signed affidavit.

Whatever the program's merits—and the plaintiffs do not dispute the merits of a properly run

program—for the first two decades program supervision and oversight was haphazard,

inconsistent, and largely non-existent.

Until May 2012, no written criteria existed governing enrollment or continuation in the

program, and there was no uniform enrollment practice.  Though the ostensible purpose of the

program is to increase police presence in buildings with unusual criminal activity, some precinct

commanders simply enrolled as many buildings as possible.

In May 2012—two months after this case was filed—the NYPD issued directives addressing operational and administrative aspects of the program, including enrollment.[1]  Those directives contain no express criteria for enrollment, though NYPD officials contend that certain provisions in the directive function as criteria governing participation in the program.

Until 2012 it appears that the NYPD made no regular effort to determine how many buildings were enrolled in the program, nor did it know the reason why particular buildings were enrolled.  Currently, thousands of buildings across the City are enrolled in the program.  Though it is unclear exactly how many buildings are in the program, figures provided by the City in discovery (including new figures provided in the last two weeks) indicate that over 40% of enrolled buildings are in the Bronx.  Many of those buildings have been enrolled for many years.

## ARGUMENT

The standards governing preliminary injunctive relief in a dispute such as this one are well-established.  As this Court recently explained, "When seeking a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the moving party must show: (1) it will suffer irreparable harm absent the injunction and (2) a likelihood of success on the merits."  *Strouchler v. Shah*, No. 12 Civ. 3216 (SAS), --- F. Supp. 2d ----, 2012 WL 3838159, at *6 (S.D.N.Y. Sept. 4, 2012) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999)).  The evidence adduced at the preliminary injunction hearing will establish that the plaintiffs meet both elements of this standard.  Each is addressed below.

---

[1] Attached as Exhibits A and B to the Declaration of Daniel Mullkoff, September 24, 2012.

I.      THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The specific issue presented to the Court now is whether the plaintiffs can show a likelihood of succeeding on the merits of their claim that the NYPD has a practice in the Bronx of unlawfully stopping people outside of Clean Halls buildings on suspicion of criminal trespass inside those buildings.  As discussed in the next section, the law establishes—and the NYPD agrees—that it is impermissible to stop people on suspicion of trespass who are merely exiting, entering, or in the immediate vicinity of Clean Halls buildings.  And as discussed in the following section, the evidence will demonstrate that a widespread practice of such stops exists.

A.      **Police Stops Based on a Person's Proximity to a Clean Halls Building Violate the Fourth Amendment.**

As this Court recently explained, "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause."  *Floyd v. City of New York*, 813 F. Supp. 2d 417, 438 (S.D.N.Y. 2011) (quoting *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (internal quotation marks omitted)).  In this matter, the only specific criminal activity at issue is criminal trespass.

Under New York law, a person commits criminal trespass when he or she "knowingly enters or remains unlawfully in a building or upon real property (a) which is fenced or otherwise enclosed in a manner designed to exclude intruders . . . ."  N.Y. Penal Law § 140.10; *see also id.* § 140.15 (same, but specifying trespassing in a dwelling).  "A person 'enters or remains unlawfully' in or upon premises when he is not licensed or privileged to do so."  *Id.* § 140.00(5).  Conversely, "[a] person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a

lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person." *Id.*

Given that trespass is the offense of being unlawfully present in a private building or on private property, the mere act of exiting, entering, or being near a Clean Halls building can provide no basis for suspecting that "criminal activity may be afoot" to warrant a *Terry* stop. The NYPD fully recognizes this. In a 1999 document from the department's Legal Bureau, the department warned:

> IT SHOULD BE UNDERSTOOD THAT WHEN AN OFFICER IS NOT IN THE BUILDING (E.G. SITTING ACROSS THE STREET IN AN R.M.P.), <u>MERELY OBSERVING AN INDIVIDUAL ENTERING AND EXITING THE BUILDING, OR SIMPLY EXITING THE BUILDING, IS NOT ENOUGH TO CONDUCT A STOP.</u>[2]

Similarly, a stop-and-frisk training program initiated shortly after the filing of this case contains the following warning: "Observation of an individual exiting a NYCHA/TAP Building, without more, is **not** an objective, credible reason to approach that individual."[3]

These warnings reflect the well-established law that, even if one assumes that all Clean Halls buildings are high-crime areas (which the record will show is wrong to assume), proximity to such areas alone provides no basis for stopping a person. *See Brown v. Texas*, 443 U.S. 47, 52 (1979) (no reasonable suspicion where defendant was in an alley with "high incidence of drug traffic" and officer testified that he "looked suspicious"); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that *Brown* establishes that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized

---

[2] NYPD Legal Bureau, "Legal Guidelines for Citizen Encounters in Trespass Affidavit Buildings" Powerpoint, (Jan. 1999), at 6, excerpt attached as Exhibit C to the Mullkoff Declaration (capitals and emphasis in original).

[3] NYPD Legal Bureau, "Street Encounters: Stop, Question, and Frisk," at 40, excerpt attached as Exhibit D to the Mullkoff Declaration (emphasis in original).

suspicion that the person is committing a crime") (cited in *Floyd*, 813 F. Supp. 2d at 439); *United States v. Swindle*, 407 F.3d 562, 569 (2d Cir. 2005) ("[The defendant]'s entering a known drug house does not itself suggest that a crime was afoot.").

Applying this principle directly to the Clean Halls program, Eastern District Judge Matsumoto found that an "[officer]'s understanding that the . . . building [i]s participating in the NYPD's FTAP program does not 'provide a basis to believe that a particular person present on the premises is involved in . . . criminal activity . . . any more than presence in a high crime area standing alone provides such a basis.'"[4] *United States v. Bellamy*, 592 F. Supp. 2d 308, 318 (E.D.N.Y. 2009) (quoting *People v. Powell*, 691 N.Y.S.2d 263, 268–69 (N.Y. Sup. Ct. 1999) (ellipses in original, internal quotation marks omitted)).  Thus, the *Bellamy* court—the only federal court the plaintiffs are aware of that has considered whether Clean Halls enrollment is relevant to a reasonable suspicion analysis—found no reasonable suspicion despite evidence that the defendant had been in the vestibule of a Clean Halls building with drug trafficking and trespassing problems that was located in a high-crime neighborhood, the nearby presence of a "supposed 'crack addict'" outside the building, and the defendant's "furtive gestures."  592 F. Supp. 2d at 317.[5]

## B.   NYPD Officers Engage in a Pattern and Practice of Unlawfully Stopping Individuals Outside Clean Halls Buildings.

In support of their motion for a preliminary injunction, the plaintiffs rely on three principal categories of evidence:  (1) an expert analysis by Professor Jeffrey Fagan of the NYPD UF-250's completed in conjunction with recent criminal trespass stops made without apparent

---

[4] "FTAP" is another term used to describe Operation Clean Halls.

[5] *See also Powell*, 691 N.Y.S.2d at 268 (finding that, although a trespass affidavit signed by a landlord "may authorize the police to enter on to the property, the form does not diminish the rights of the individuals who are found there").

cause directly outside of Clean Halls buildings; (2) the actions taken by the Bronx District

Attorney's Office based on serious concerns it had about the legality of trespass arrests being

made as part of the Clean Halls program; and (3) the experiences of the named plaintiffs stopped

by NYPD without cause outside of their own homes or on their way to visit friends or family.

Taken together, this evidence demonstrates that the NYPD is engaged in a practice of unlawfully

stopping people on suspicion of trespass outside of Clean Halls buildings.

          1.   Professor Fagan's Analysis

     The plaintiffs' expert, Dr. Jeffrey Fagan, conducted a review of the information recorded

by officers in UF-250 forms for *Terry* stops made in the Bronx in 2011.  Unlike the complicated

methodology that Dr. Fagan performed in *Floyd v. City of New York* and *Davis v. City of New

York*—an analysis that may ultimately be performed in this case, as well, when the full range of

claims are litigated—the questions presented to Dr. Fagan by the discrete issue in the plaintiffs'

preliminary injunction motion were straightforward:  (1) How frequently do officers record *Terry*

stops of individuals being made outdoors at Clean Halls-enrolled buildings only on suspicion of

criminal trespass?; and (2) Does the information recorded by officers in the paperwork indicate

that the stops were lawful or unlawful when criminal trespass was the only suspected crime at

issue?

     Dr. Fagan's analysis, reflected in an expert report,[6] found that in the Bronx in 2011,

officers recorded no fewer than 1,857 stops where the officers indicated that the stop of an

individual was made (1) only on suspicion of criminal trespass; (2) that the officer suspected

trespass in a Clean Halls-enrolled property, and; (3) the individual was seized outdoors.  After

examining the factors identified by the officers as the reason for suspicion, <u>including a detailed</u>

---

[6] Report of Plaintiffs' Expert Dr. Jeffrey Fagan, dated July 27, 2012, is attached as Exhibit E to
the Mullkoff Declaration.

analysis of the text strings included in the "Other" category of the UF-250, Dr. Fagan identified more than 1,100 stops where the information contained in the paperwork appeared insufficient to justify a *Terry* stop outdoors for criminal trespass at Clean Halls-enrolled property.

Table 8 of Dr. Fagan's expert report (at page 15) identifies the stop factors (alone or in combination) recorded by officers on side 1 of the UF-250 form for these 1,137 trespass stops directly outside of a Clean Halls building.[7]  As a threshold matter, in over 300 stops examined by Dr. Fagan, officers did not record any stop factor at all other than writing some variation of "Clean Halls" or "Trespass" in the "Other" field option on side 1 of the UF-250 form.  Not only does this information plainly fail to provide any legitimate justification for an outdoor *Terry* stop based on suspicion of criminal trespass inside a Clean Halls-enrolled property, the fact that officers actually put "Clean Halls" in writing as the sole basis for the stop evidences the widespread and mistaken belief of NYPD officers that building enrollment, by itself, is enough to seize an individual and interrogate them about suspected criminal trespass.

Similarly, other factors provided by officers cannot be lawful under any interpretation. For instance, NYPD officers cited "Furtive Movement" as the sole stop factor for 467 stops of the 1,137 that Dr. Fagan identified.  Even in a general street stop context, where any and all crimes may be suspected by the officer, "furtive movement" standing alone is an insufficient reason to conduct a stop.  *See Bellamy*, 592 F. Supp. 2d at 318 ("[F]urtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion.").  In the narrow context of the plaintiffs' preliminary injunction motion—where the stop occurred

---

[7] The plaintiffs expect that these numbers may reflect slightly revised counts by the time of the evidentiary hearing.  As discussed further below, the plaintiffs anticipate that Dr. Fagan will present testimony at the hearing showing that the objections raised by the defendants' expert do not alter the conclusion that the data shows a widespread pattern of unconstitutional outdoor trespass stops in 2011.

outdoors and the only suspected crime is criminal trespass inside a Clean Halls property—any argument that alleged "furtive movements" could justify a seizure is clearly foreclosed.

Similarly, "Observed Exit" was listed as the sole stop factor for 74 stops; "Observed Outside" listed for 30 stops; and "Observed Entry" for 11.  As the NYPD has itself repeatedly acknowledged, exiting, entering, or simply being near a building is consistent with lawful behavior and not suspicious.  Similarly, mere presence in a "high crime area," another stop factor for the stops identified by Dr. Fagan, is not suspicious behavior by definition.  *See Wardlow*, 528 U.S. at 124; *Brown*, 443 U.S. at 52; *Swindle*, 407 F.3d at 569.  Likewise, case law makes clear that by itself, "keyless entry" or "keyless exit," the sole stop factor for two dozen stops, does not give rise to reasonable suspicion.  *See Floyd*, No. 08 Civ. 1034 (SAS), 2012 WL 1344514, at *15 (S.D.N.Y. Apr. 16, 2012) ("[S]tanding on its own a keyless entry is not suspicious behavior . . . ." (citation omitted)).  The legality of these otherwise suspicionless factors fares no better when they are simply piled on in combination.[8]

Finally, Dr. Fagan has also identified many other categories of stops where no case law is even necessary to conclude that the stop factors cannot justify a stop for criminal trespass.  Dr. Fagan has uncovered stops where officers seized individuals outside of Clean Halls-enrolled buildings on purported justifications that simply bear no relationship to the elements of criminal trespass.  For example, Dr. Fagan identified 33 stops where an individual was alleged to have a "suspicious bulge"—a justification which could not justify a seizure on suspicion that an individual had or was about to "enter[] or remain[] unlawfully in a building or upon real property."  N.Y. Penal Law § 140.10.  In addition, Dr. Fagan identified stops where officers

---

[8] For example, "Furtive Movement" and text entries equivalent to "Clean Halls/Trespass" were identified as the reasons for 55 stops; "Furtive Movement" and text entries equivalent to "Observed Exit" were listed for 18 stops; and "Furtive Movement" and text entries equivalent to "Observed Entry and Exit" were listed for 5 stops.

indicated the basis for suspicion was that the person was "not a resident"—an unlawful justification for seizing the friends, family members, and/or invited guests of individuals who live in Clean Halls-enrolled buildings.

In response to Dr. Fagan's analysis, the defendants have engaged Dr. Dennis Smith as a rebuttal expert.  The expert opinions offered by Dr. Smith, contained in a report disclosed to the plaintiffs, fundamentally misconstrue the nature of the plaintiffs' preliminary injunction motion. The bulk of Dr. Smith's report reflects his opinion that that Dr. Fagan should have applied the same manner of methodology and analysis that was performed in the context of *Floyd* and *Davis*, an analysis that would have been inappropriate, if not irrelevant, given the narrow question at issue in this expedited preliminary injunction process focused solely on criminal trespass stops at Clean Halls Buildings that occurred outdoors.  Dr. Smith also opines that Dr. Fagan's testimony does not establish racial bias in violation of the Fourteenth Amendment, a claim not even at issue in this lawsuit.  As a result of Dr. Smith's misapprehension of the limited matter at issue in this motion, the expert opinions he offers are largely irrelevant, if not also inadmissible. Furthermore, as was the case of Dr. Smith's opinions in *Floyd*, he attempts to offer opinions on the rationale, value, and efficacy of the Clean Halls program—opinions that are wholly irrelevant to the plaintiffs' constitutional claims and that were similarly offered and ruled inadmissible in *Floyd.  See Floyd*, No. 08 Civ. 1034 (SAS), 2012 WL 3561594, at *5 (S.D.N.Y. Aug. 17, 2012).

To the limited extent that Dr. Smith engages Dr. Fagan's expert opinions on the subjects that are actually at issue in the current motion, the testimony presented at the hearing will show that his opinions are both inaccurate and unpersuasive.  For example, Dr. Smith alleges that some 157 of the total 1,857 stops, all of which are undisputedly exact address matches for Clean Halls-enrolled buildings (based on lists supplied by the City), were nevertheless improperly

11

included in Dr. Fagan's analysis. Dr. Smith speculates, improbably, that these 157 stops were "misclassified" because officers recorded the wrong address on the UF-250 paperwork for a *different* building rather than the address of the building where the person was believed to have just committed criminal trespass.

In addition, Dr. Smith opines that Dr. Fagan should have conducted a different type of analysis of the "additional circumstances" contained on side 2 of the UF-250 forms. Dr. Smith speculates that a different type of analysis of these "additional circumstances" might have shown, in combination with certain side 1 stop factors, that there was reasonable suspicion for some particular stops. Dr. Smith does not conduct this analysis himself, however, and perhaps more importantly he fails to explain how the side 2 "additional circumstances"—while perhaps marginally relevant in a context where any and all crimes may be suspected by the officer— could possibly constitute reasonable suspicion, in any combination, when a stop occurs outdoors solely on suspicion of criminal trespass in a Clean Halls property. In any event, the testimony will show that even if the side 2 circumstances are considered as Dr. Smith suggests, it does not disturb the fundamental conclusion that the UF-250 data analyzed by Dr. Fagan evidences a widespread pattern of unconstitutional trespass stops directly outside of Clean Halls buildings throughout the Bronx in 2011.

## 2. Bronx District Attorney's Office

Consistent with Dr. Fagan's detailed analysis of UF-250 forms, the Bronx District Attorney's Office for years has warned the NYPD about unlawful trespass arrests being made in conjunction with the Clean Halls program, including trespass arrests being made outside Clean Halls buildings. In April 2009 the District Attorney's Office wrote to the chief of the NYPD's Housing Bureau to alert her to problems with arrests being made in conjunction with New York

City Housing Authority ("NYCHA") and Clean Halls buildings, noting that vestibules were public areas where trespass could not be established.[9]  In meetings starting in February 2011, the Bronx District Attorney's Office expressly informed the NYPD's Legal Bureau that there was a problem with unlawful stops and arrests outside of Clean Halls buildings.  A July 2011 letter from the Bronx District Attorney's Office to Bronx precinct commanders opens with the comment, "In the past I have addressed the issue concerning Trespass cases where the defendant was observed merely exiting a Clean Halls building . . . ."[10]

By July 2011 the District Attorney's Office became so concerned about outdoor Clean Halls stops that it started routinely to decline to prosecute trespass arrests effected outside Clean Halls buildings.  And just two months ago, the office notified the NYPD that, because investigations had revealed that tenants and visitors had been arrested for trespass, it no longer would accept Clean Halls or NYCHA trespass cases without personally interviewing the arresting officer.[11]  The District Attorney's Office explained, "This is being done in hopes of eliminating tenants and invited guest [sic] from being prosecuted unlawfully."[12]

_____

[9] Letter from Jeannette Rucker, Bronx District Attorney's Office, to Chief Joan Jaffe (Apr. 15, 2009), attached as Exhibit F to the Mullkoff Declaration.

[10] Letter from Jeannette Rucker, Bronx District Attorney's Office, to Deputy Inspector William McSorley (July 7, 2011), attached as Exhibit G to the Mullkoff Declaration.

[11] Letter from Jeannette Rucker, Bronx District Attorney's Office, to Inspector Kerry Sweet, Executive Officer of the NYPD Legal Bureau (July 18, 2012), attached as Exhibit H to the Mullkoff Declaration.

[12] *See* Exhibit H at 1.  In addition, high-level NYPD officials were aware by 2010 of "many instances" of officers misstating the required standard for stops in Clean Halls and NYCHA buildings, including incorrectly believing that "as 'custodian' of the building they were entitled to Stop and Question anyone inside the building."  Memorandum from Meera Joshi, First Deputy Executive Director of the Civilian Complaint Review Board (Feb. 16, 2010), attached as Exhibit I to the Mullkoff Declaration.  *See also* Deposition of Deputy Commissioner Julie Schwartz, *Davis v. City of New York*, at 258:23-259:9 (Dec. 6, 2011) (describing "training issues" in which

3.  The Unlawful Stops of the Plaintiffs

The widespread pattern of unconstitutional seizures evidenced by Dr. Fagan's report and

the complaints of Bronx District Attorney's Office is vividly illustrated by the experiences of the

plaintiffs and other witnesses who themselves have been subject to unlawful trespass stops

outside of Clean Halls buildings throughout the Bronx.  Plaintiffs Jaenean Ligon, J.G., Letitia

Ledan, Roshea Johnson, Jovan Jefferson, Kieron Johnson, Abdullah Turner, Fernando Moronta,

and Charles Bradley will offer testimony at the preliminary injunction hearing.  Non-parties

Jerome Grant, Antoine Ledan, and Anginette Trinidad, who are family members or friends of

some plaintiffs, will testify as well.  A brief description of their anticipated testimony is provided

below.

Plaintiff Jaenean Ligon is a 40-year-old African American woman who resides at 290 E.

163rd Street in the Bronx with her three sons, including Plaintiff J.G., who is 17.  In August

2011, Ms. Ligon sent J.G. to a local store to purchase ketchup to accompany the family's dinner.

Upon his return, two NYPD officers in plainclothes stopped J.G. as he attempted to enter his

Clean Halls building.  They asked him why he was attempting to enter the building and frisked

him.  Two uniformed officers then approached J.G. as well.  One of the officers buzzed Ms.

Ligon's apartment, where her oldest son, Jerome Grant, answered.  The officer asked Ms. Ligon

---

"officers have a misconception because it was a NYCHA property or a TAP building that they
didn't need to follow reasonable suspicion to make a stop.  They could stop anyone."), excerpt
attached as Exhibit J to the Mullkoff Declaration; Memorandum from Meera Joshi, First Deputy
Executive Director of the Civilian Complaint Review Board (Sept. 28, 2010) (noting that, at
meeting with Deputy Commissioner Schwartz and other NYPD officials, "[w]e raised our
concern that officers are misstating the appropriate standards for stops and questions in trespass
buildings," and "discussed the idea of developing a retraining program on the issues of
encounters in trespass affidavit buildings; Deputy Schwartz was receptive to the idea"), attached
as Exhibit K to the Mullkoff Declaration.

to come downstairs and identify her son.  Ms. Ligon rushed downstairs and found J.G. surrounded by three officers.

NYPD officers have also subjected Jerome Grant to a trespass stop without cause outside of a Clean Halls building.  In July of 2011, Mr. Grant, his other brother, their cousin, and a friend went to Mr. Grant's grandmother's building to get a spare key from his grandmother.  His grandmother's apartment is located two blocks away from Ms. Ligon's home, at 274 Bonner Place, a Clean Halls building.  Mr. Grant's brother proceeded ahead of the group into the building, and when Mr. Grant and the others arrived, they knocked on the door, trying to get his brother's attention so he would open the door.  The group never entered the building.  As they waited for Mr. Grant's brother to emerge, two NYPD officers approached the group and ordered them to stand against the wall of the building with their hands up.  The officers took their IDs and frisked them, and one officer told them that they could be arrested on suspicion of trespassing.  Mr. Grant explained that his grandmother lived in the building, and the group was released with a warning not to return to the building.

Plaintiff Letitia Ledan is a 41-year-old African American woman who lives in River Park Towers, a large residential apartment complex in the Bronx enrolled in Operation Clean Halls.  She has resided there for over 11 years.  Ms. Ledan has been stopped without cause by NYPD officers in and around River Park Towers at least six times, including two trespass stops directly outside of her building.  In 2009, two NYPD officers stopped her while she was walking alone on a sidewalk near the grocery store on the complex.  One of the officers ordered her to stop, asked her whether she lived in the complex, and demanded identification.  In 2011, NYPD officers stopped Ms. Ledan while she was in front of her building chatting with her husband, Antoine Ledan, and two male friends.  The officers demanded identification from all four.  The

15

officers ordered all of the men to stand against the wall of the building and then frisked them.

When Ms. Ledan asked why they were being stopped, an officer told her to "be quiet."[13]

Plaintiff Roshea Johnson is a 36-year-old African American man and Ms. Ledan's

brother.  Mr. Johnson currently resides in Schenectady, New York, but he is a regular visitor to

his sister's home at River Park Towers, where he used to reside.  NYPD officers have stopped

Mr. Johnson without cause in and around River Park Towers at least twelve times, including a

trespass stop outside his sister's building.  Officers stopped Mr. Johnson on the street outside Ms.

Ledan's building on June 20, 2010.  They accused Mr. Johnson of trespassing but refused to let

him verify that he was coming from his sister's building.  The officers handcuffed him, searched

him, placed him in an unmarked van, and drove him around the neighborhood surrounding River

Park Towers for approximately half an hour.  He was released a few blocks away without being

formally processed.

Plaintiff Jovan Jefferson is a 20-year-old African American man who resides at 1546

Selwyn Avenue in the Bronx, a building that is enrolled in Operation Clean Halls.  NYPD

officers have stopped Mr. Jefferson without cause in and around his own building on numerous

occasions, and officers also stopped him for trespass without justification outside of a friend's

Clean Halls building.  In April or May of 2012, Mr. Jefferson visited his friend Brandon at his

building at 1515 Selwyn Avenue, which is enrolled in Operation Clean Halls.  Mr. Jefferson and

his friend exited the building together, and were stopped on the sidewalk by three NYPD

officers, including Defendant Police Officer Luis Rodriguez.  The officers demanded that they

show identification and asked what Mr. Jefferson and Brandon were doing in the building.  Mr.

Jefferson and Brandon provided their IDs and explained that Brandon lived there, but Brandon's

---

[13] Antoine Ledan will also offer testimony at the hearing about this stop.

ID listed a different address and the officers continued to question them.  Only after Mr. Jefferson's mother saw them on the sidewalk and spoke to the officers did they allow Mr. Jefferson to leave.

Plaintiff Kieron Johnson is a 21-year-old African American man who also resides at 1515 Selwyn Avenue in the Bronx.  NYPD officers have illegally stopped Mr. Johnson in and around his own building and at his friend Mr. Jefferson's building on numerous occasions, including at least one outside trespass stop.  One day in approximately 2010, Mr. Johnson went to the door of 1546 Selwyn Avenue to wait for Mr. Jefferson to come outside so they could play basketball.  After Mr. Johnson had been waiting for a minute or two, two NYPD officers stopped him.  The officers asked if he had been inside the building, asked for identification, and then frisked him, although he said that he had not gone inside the building.

Plaintiff Abdullah Turner is a 24-year-old African American man who resides at 2249 Morris Avenue.  On March 26, 2011, NYPD officers unlawfully arrested Mr. Turner for trespassing while standing on the sidewalk in front of 2020 Davidson Avenue, another Clean Halls building in the Bronx—even though he never entered the building.  Mr. Turner was waiting on the sidewalk for a friend, Anginette Trinidad, who had gone inside the building to return a sweater to a friend of hers.[14]  Mr. Turner attended approximately eight court appearances over 10 months to contest the charges, which were eventually dismissed.

NYPD officers have also stopped Mr. Turner outside his own building, which is also enrolled in Operation Clean Halls.  One night in the winter of 2011, Mr. Turner walked outside of his building, saw his brother, a friend, and the friend's nephew standing in the front of the building, and stopped to talk to them.  Shortly thereafter, three NYPD officers approached them

---

[14] Ms. Trinidad will testify at the hearing as well.

17

and asked if they lived there.  The officers searched inside the men's pockets and checked their

IDs.  As the officers were leaving, they told the men that they could not stand in front of the

building.

Plaintiff Fernando Moronta is a 36-year-old Latino man who resides in the Bronx.

NYPD officers stopped Mr. Moronta without cause for trespass in the winter of 2007-2008

outside his brother's home at 1453 Walton Avenue in the Bronx, a Clean Halls apartment

building.  Approximately six NYPD officers stopped Mr. Moronta on the sidewalk outside of his

brother's building immediately after he exited.  When Mr. Moronta explained that he had just

visited his brother and told them the apartment number, one of the officers asked whether they

could accompany him to his brother's apartment to confirm his story.  Mr. Moronta, surrounded

by the officers, then accompanied them up the elevator to his brother's apartment on the sixth

floor, where the officers spoke with Mr. Moronta's brother.  He confirmed that Mr. Moronta was

his brother and had just left there, and the officers accompanied Mr. Moronta out of the building,

apologized, and allowed him to leave.

Plaintiff Charles Bradley is a 53-year-old African American man who resides in the

Bronx.  On May 3, 2011, he was stopped on the sidewalk outside of his then-fiancée's apartment

building, which is located at 1527 Taylor Avenue in the Bronx and is enrolled in Operation

Clean Halls.  NYPD officers stopped Mr. Bradley on the sidewalk as soon as he exited the

building.  NYPD Officer Miguel Santiago then arrested Mr. Bradley for trespassing, even though

he was an invited guest to the building.  Following receipt of a letter from Mr. Bradley's fiancée

indicating that he was an invited guest, the Bronx District Attorney's Office declined to

prosecute the case.

18

C.  The Plaintiffs Are Likely to Establish Municipal Liability on the NYPD's Practice of Unlawful Outdoor Trespass Stops.

The evidence described above will be sufficient to establish a likelihood that the plaintiffs will prevail on the merits of their municipal liability claim under 42 U.S.C. § 1983.  In particular, the plaintiffs are likely to prevail on their claim that the practice of unlawful outdoor trespass stops in the Bronx is so widespread as to constitute an official policy, and that the NYPD has been deliberately indifferent to the practice of unlawful outdoor trespass stops.  *See Sorlucco v. City of New York*, 971 F.2d 864, 871 (2d Cir. 1992) (explaining that a plaintiff may establish municipal liability if "the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (explaining that to establish deliberate indifference, a plaintiff must demonstrate that "the policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction" (internal quotation marks and citation omitted)).

The hundreds of stops identified by Dr. Fagan and complaints to high-level NYPD officials by the Bronx District Attorney's Office are more than sufficient to establish that the plaintiffs are likely to prevail on their claim that unlawful outdoor trespass stops constitute the customary practice of the NYPD to which senior NYPD officials have acquiesced.  *See Okin v. Vill. of Cornwall-on-Hudson Police Dep't.*, 577 F.3d 415, 440 (2d Cir. 2009) (holding that summary judgment was not appropriate where plaintiff proffered evidence of at least a dozen instances of unconstitutional conduct, some involving "high-ranking officials").  Further, the plaintiffs are likely to prevail on their deliberate indifference claim because although senior

19

NYPD officials received complaints concerning unlawful outdoor trespass stops in the Bronx, they were "followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). Thus, the plaintiffs will establish a likelihood of success on the merits of their claim for municipal liability regarding unlawful outdoor trespass stops.

## II.   THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

A preliminary injunction is necessary to prevent the plaintiffs from suffering further deprivations of their Fourth Amendment right to be free from unlawful seizures. As the Court has recognized, "[t]he violation of a constitutional right, particularly on an ongoing basis, constitutes irreparable harm for the purpose of a preliminary injunction." *Ligon*, 2012 WL 3597066, at *1; *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (noting "the presumption of irreparable injury that flows from a violation of constitutional rights"). The plaintiffs' claim that their Fourth Amendment rights will continue to be violated absent a preliminary injunction satisfies this requirement. *See, e.g.*, *Stauber v. City of New York*, 2004 WL 1593870, at *25 (S.D.N.Y. July 16, 2004) ("The law is well-settled that plaintiffs establish irreparable harm through 'the allegation of fourth amendment violations.'" (quoting *Doe v. Bridgeport Police Dep't,* 198 F.R.D. 325, 335 (D. Conn. 2001)), *amended on other grounds by* 2004 WL 1663600 (S.D.N.Y. July 27, 2004).

The plaintiffs recognize that the NYPD, following the filing of this lawsuit, has undertaken certain efforts that appear designed to address some of the problems in the Clean Halls program. Those steps include the issuance of two new policies, the inclusion in ongoing training of some information about the program, a survey of buildings in the program, and some meetings with commanders about the program.

Though these efforts—a clear sign the NYPD itself recognizes problems in the Clean Halls program—may have some beneficial effect, they do little to address the specific issue of unlawful outdoor trespass stops and fall far short of the actions needed to assure those unlawful stops end.  They do suggest, however, a set of remedial measures the Court could order to end those stops.  These would include specific training about the conduct of outdoor trespass stops, detailed tracking and review of all such stops, closer supervision of all such stops when they occur, and detailed reporting (to supervisors, the parties, and the Court) about all such stops.

Preliminary injunctive relief is appropriate in these circumstances. As the plaintiffs will establish a likelihood of success on the merits and that they will suffer irreparable harm without an injunction, the plaintiffs respectfully request that the Court issue a preliminary injunction to halt this unconstitutional conduct.

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

Respectfully submitted,


_____/s/  Alexis Karteron_____
Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
akarteron@nyclu.org

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022