UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAENEAN LIGON, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Mark D. Zuckerman*
*Tel: (212) 442-8248*
*Matter #: 2012-011932*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT .......................................................................................... 1

LEGAL STANDARDS ....................................................................................................... 1

    A. Standard for the Issuance of a Preliminary Injunction....................................... 1

    B.  Law Related to Stops at Issue in this Litigation................................................ 2

ARGUMENT

    POINT I

        THE NYPD HAS IMPLEMENTED
        SIGNIFICANT INITIATIVES IN POLICY,
        TRAINING AND OPERATIONS TO ENHANCE
        AND REINFORCE THE TRESPASS AFFIDAVIT
        PROGRAM IN 2012....................................................................................3

    POINT II

        THE NYPD IS NOT ENGAGED IN AN
        UNCONSTITUTIONAL PRACTICE OF
        STOPPING PERSONS ON SUSPICION OF
        TRESPASS OUTSIDE OF TAP BUILDINGS ...................................... 11

        A. Dr. Fagan's Analysis.............................................................................12

        B. The Bronx District Attorney's Office ...................................................16

        C. Testimony of the Named Plaintiffs .......................................................18

    POINT III

        PLAINTIFFS CANNOT PROVE MUNICIPAL
        LIABILITY............................................................................................. 24

        A. Standing ................................................................................................. 24

        B. Municipal Liability............................................................................... 24

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Pages**

Abdul Wali v. Coughlin,
    754 F.2d 1015 (2d Cir. 1985) ................................................................. 2

Amnesty Am. v. Town of W. Hartford,
    361 F.3d 113 (2d Cir. 2004) ................................................................. 26

Bouche v. City of Mount Vernon,
    11 Civ. 5246 (SAS), 2012 U.S. Dist. LEXIS 40246 (Mar. 23, 2012) ...................................... 25

Caidor v. Harrington,
    No. 5:05-CV-0297, 2009 U.S. Dist. LEXIS 5282 (N.D.N.Y Jan. 26, 2009)........................ 3, 18

City of Canton v. Harris,
    489 U.S. 378 (1989)................................................................. 25

City of Los Angeles v. Lyons,
    461 U.S. 95 (1983)................................................................. 24

DeShawn E. by Charlotte E. v. Safir,
    156 F.3d 340 (2d Cir. 1998) ................................................................. 24

Floyd v. City of New York,
    813 F. Supp.2d 417 (S.D.N.Y. 2011) ................................................................. 2, 5

Floyd v. City of New York,
    No. 08 Civ. 1034 (SAS), _ F. Supp. 2d __,
    2012 U.S. Dist. LEXIS 53249 (S.D.N.Y. Apr. 16, 2012)...................................... 13, 15, 16, 17

Green v. City of New York,
    465 F.3d 65 (2d Cir. 2006) ................................................................. 25

Hurley v. Toia,
    432 F. Supp. 1170 (S.D.N.Y.),
    aff'd mem., 573 F.2d 1291 (2d Cir. 1977)................................................................. 2

Illinois v. Wardlaw,
    528 U.S. 119 (2000)................................................................. 3

Latino Officers Ass'n v. Safir,
    196 F.3d 458 (2d Cir. 1999) ................................................................. 1

MacIsaac v. Town of Poughkeepsie,
    770 F. Supp. 2d 587 (S.D.N.Y. 2011) ................................................................. 24

**Cases**             **Pages**

N.Y. Civ. Liberties Union v. N.Y. City Transit Auth.,
    652 F.3d 247 (2d Cir. 2011) ............................................................. 2

New York Magazine v. Metropolitan Transp. Auth.,
    136 F.3d 123 (2d Cir. 1998) ............................................................. 1

Nicholson v. Scoppetta,
    344 F.3d 154 (2d Cir. 2003) ............................................................. 2

Peck v. Baldwinsville Central School District,
    351 Fed. Appx. 477 (2d Cir. 2009).................................................... 24

People v. Babarcich,
    166 A.D.2d 655 (2nd Dep't 1990) .................................................... 19

People v. DeBour,
    40 N.Y.2d 210 (1976) ............................................... 2, 4, 6, 9, 10, 17

People v. Hendricks,
    43 A.D.3d 361 (1st Dep't 2007) ...................................................... 18

People v. Magwood,
    260 A.D.2d 246 (1st Dep't 1999) .................................................. 3, 18

People v. Moore,
    6 N.Y.3d 496 (2006) ........................................................................ 3

People v. Thurman,
    81 A.D.2d 548 (1st Dep't 1981).......................................................16

People v. Vereb,
    122 A.D.2d 897 (N.Y. App. Div. 1986) ........................................... 16

S.C. Johnson, Inc. v. Clorox Co.
    241 F.3d 232 (3d Cir.2001) .............................................................. 1

Shain v. Ellison,
    356 F.3d 211 (2d Cir. 2004) ........................................................... 24

Sorlucco v. New York City Police Department,
    971 F.2d 864 (2d Cir. 1992) ........................................................... 25

Tom Doherty Assocs. v. Saban Entertainment,
    60 F.3d 27 (2d Cir. 1995) ................................................................. 2

**Cases**                                                                  **Pages**

United States v. McPhatter,
   No. 03 CR 911 (FB)
   2004 U.S. Dist. LEXIS 2754 (E.D.N.Y. Feb. 24, 2004)...................................................... 16

United States v. Monroe,
   No. 08 CR 609 (ENV)
   2009 U.S. Dist. LEXIS 101776 (E.D.N.Y. Nov. 2, 2009)...................................................... 16

United States v. Padilla,
   548 F.3d 179 (2d Cir. 2008) ................................................................................................. 3, 16

United States v. Swindle,
   407 F. 3d 562 (2d Cir. 2005) ................................................................................................. 2

Vann v. City of New York,
   72 F.3d 1040 (2d Cir. 1995) ................................................................................................. 25

Walker v. City of New York,
   974 F.2d 293 (2d Cir. 1992) ................................................................................................. 25

**Statutes**

N.Y. Penal Law § 140.00(1) ...................................................................................................... 19

N.Y. Penal Law §§140.05 .......................................................................................................... 3

N.Y. Penal Law §§ 140.10............................................................................................................ 3

N.Y. Penal Law §§ 140.15............................................................................................................ 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

JAENEAN LIGON, et al.,

                                   Plaintiffs,

                 -against-

CITY OF NEW YORK, et al.,

                                  Defendants.

12 Civ. 2274 (SAS)(HBP)

-------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

Defendants hereby respectfully submit their Memorandum of Law in Opposition to plaintiffs' application for a preliminary injunction. For the reasons set forth herein, plaintiffs' application must be denied in its entirety.

## LEGAL STANDARDS

**A.**      **Standard for the Issuance of a Preliminary Injunction**

The general rule is that a party must show "irreparable harm in the absence of an injunction and a likelihood of success on the merits." Latino Officers Ass'n v. Safir, 196 F.3d 458, 462 (2d Cir. 1999) (quoting New York Magazine v. Metropolitan Transp. Auth., 136 F.3d 123, 127 (2d Cir. 1998)). Plaintiffs, however, appear to be seeking both prohibitory[1] and mandatory relief. "These equitable cousins have been differentiated by examining whether the non-moving party is being ordered to perform an act, or refrain from performing." Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985). Where a party seeks a "'mandatory' injunction, that is, [one] that it 'will alter, rather than maintain, the status quo . . . by

---

[1] As the prohibitory injunction plaintiffs seek is no more than "a simple command that the defendant obey the law," S.C. Johnson, Inc. v. Clorox Co. 241 F.3d 232 (3d Cir. 2001), plaintiffs' application should be denied for this reason alone.

commanding some positive act,' a more stringent standard must be met. <u>Nicholson v. Scoppetta</u>, 344 F.3d 154, 165 (2d Cir. 2003)(quoting <u>Tom Doherty Assocs. v. Saban Entertainment</u>, 60 F.3d 27, 33-34 (2d Cir. 1995)). "For mandatory injunctions, which 'alter rather than maintain the status quo'…'the movant must show a 'clear' or 'substantial likelihood of success' on the merits.'" <u>N.Y. Civ. Liberties Union v. N.Y. City Transit Auth.</u>, 652 F.3d 247, 255 (2d Cir. 2011). In sum, courts 'should show a greater reluctance to issue a mandatory injunction than a prohibitory injunction." <u>Hurley v. Toia</u>, 432 F. Supp. 1170, 1175 (S.D.N.Y.), <u>aff'd mem.</u>, 573 F.2d 1291 (2d Cir. 1977).

**B.     Law Related to Stops at Issue in this Litigation**

This Court has stated that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." <u>Floyd v. City of New York</u>, 813 F. Supp.2d 417, 438 (S.D.N.Y. 2011)(quoting <u>United States v. Swindle</u>, 407 F. 3d 562, 566 (2d Cir. 2005)). The New York Court of Appeals in <u>People v. DeBour</u>, 40 N.Y.2d 210 (1976), outlined four levels of police encounters, which are as follows: 1)  Request for Information;  2)  Common Law Right of Inquiry;  3)  Reasonable Suspicion;  and 4) Probable Cause. <u>Id</u>. The New York Court has also outlined the requirements for each level to be met. <u>Id</u>.[2]

---

[2] "In <u>People v. De Bour</u>, 40 N.Y.2d 210 (1976), we set forth a graduated four-level test for evaluating street encounters initiated by the police: level one permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality; level two, the common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot; level three authorizes an officer to forcibly stop and detain an individual, and requires a reasonable suspicion that the particular individual was involved in a felony or misdemeanor; level four, arrest, requires probable cause to believe that the person to be arrested has committed a crime." <u>People v. Moore</u>, 6 N.Y.3d 496, 498-99 (2006).

A person commits trespass in the State of New York when in violation of either New York Penal Law §§140.05, 140.10 or 140.15. Plaintiffs do not argue, nor could they, that a reasonable suspicion stop or arrest based on probable cause for the crime of trespass outside a TAP building would be per se improper. People v. Magwood, 260 A.D.2d 246 (1st Dep't 1999); see also Caidor v. Harrington, 05 CV 0297 (GTS), 2009 U.S. Dist. LEXIS 5282, at *14 (N.D.N.Y Jan. 26, 2009)("probable cause to arrest a person for trespass does not automatically dissipate upon the person's attempt to leave the premises").

Further, plaintiffs' discussion in their moving brief of "high-crime areas" is incomplete. Reasonable suspicion can exist in cases where the nature of known criminal activity in an area serves to inform an officer's suspicion. Illinois v. Wardlaw, 528 U.S. 119, 124 (2000) ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); United States v. Padilla, 548 F.3d 179, 188 (2d Cir. 2008)("[O]fficers are entitled to assess situations in light of their experience and familiarity with a particular area and its inhabitants").

## ARGUMENT

## POINT I

### THE NYPD HAS IMPLEMENTED SIGNIFICANT INITIATIVES IN POLICY, TRAINING AND OPERATIONS TO ENHANCE AND REINFORCE THE TRESPASS AFFIDAVIT PROGRAM IN 2012

During 2012, the NYPD has implemented significant initiatives in policy, training and operations to enhance the Trespass Affidavit Program and reinforce its officers' understanding of the law of Stop, Question and Frisk. These initiatives belie plaintiffs' claim of "deliberate indifference" on the part of defendants. Further, plaintiffs' contention that the these

initiatives "fall far short" of what is necessary, and that they will suffer "irreparable harm" without injunctive relief, are without merit.

To begin, the Trespass Affidavit Program ("TAP") merely allows NYPD officers the ability to patrol the interior of enrolled buildings. The NYPD does not contend, nor is it its policy, that the enrollment of a building in TAP allows its officers to act unconstitutionally. To the contrary, the NYPD is training its officers that the four levels of <u>DeBour</u> apply equally to encounters inside of TAP buildings as well as encounters in the street. Landlords of buildings enrolled in the Program and their residents benefit from having NYPD officers patrol enrolled buildings to attempt to alleviate crime conditions that led to the particular building to be enrolled in TAP in the first instance. Defendants will present the testimony of Joseph Cicciu, a landlord representative for a number of the buildings enrolled in the Program, who will testify to the benefits of the Program for residents of the buildings he manages/owns in the way of reduction of crime, narcotics and other illegal activity.

On or about May 21, 2012, the NYPD issued Interim Orders 22 and 23 of 2012. The issuance of IOs 22 and 23 of 2012 followed numerous focus groups held by the NYPD's Legal Bureau with its precinct commanding officers, as well as representatives of all of the various District Attorney's Offices, the first of which began in 2011. The development of IOs 22 and 23 of 2012 required the input of the various District Attorney's Offices because of certain differences among them in the administration of the Program, as well as to obtain their input regarding the Program so that it is run effectively.

In plaintiffs' complaint at paragraphs 180 through 182, plaintiffs complain that the NYPD had not issued for TAP buildings the equivalent of Interim Order 23 of 2010, which applied to vertical patrols in NYCHA buildings. (Exhibit L to Declaration of Mark D.

Zuckerman, hereinafter "Zuckerman Decl.")  Interim Order 22 of 2012, annexed to the Mullkoff Decl. in support of plaintiffs' motion as Exhibit A, cures plaintiffs' complaint in that regard.

The issuance of Interim Order 22 of 2012 underlies the fundamental misconception that plaintiffs are proceeding under with respect to their application for preliminary injunction:  TAP applies to NYPD patrols of the inside of buildings enrolled in the Program.  Although there may be street encounters that take place outside of TAP buildings based upon a person's acts inside of TAP buildings, from defendants' perspective, these are just another subset of street stops that are the subject of the <u>Floyd</u> class action litigation.[3] Significantly, plaintiffs lack any evidence to support their theory that the street stops challenged upon their instant motion are being driven by officers' TAP patrols.

Interim Order 22 of 2012 clarified the NYPD's practices and procedures with respect to its officers' patrols of TAP buildings:  the purpose of IO 22 of 2012 "is to prevent, detect and take necessary enforcement action regarding illegal activity occurring in lobbies, stairwells, basements and other common areas of multiple dwelling buildings" that are enrolled in the Program.  Paragraph 1(a) of IO 22 of 2012 makes clear that vertical patrols are to be scheduled "based on times when illegal activities are prevalent."  Paragraph 1(c)(3) thereof requires documentation of vertical patrols in officers' memobooks, and where appropriate, the completion of UF 250 Stop, Question and Frisk Report Worksheets.

IO 22 of 2012 continues in the Note on the second page thereof, essentially, that any approach and/or stop of a person on suspicion of trespass must be made based on the four

---

[3] Plaintiffs should not be able to have it both ways.  If plaintiffs are claiming that TAP is being conducted by police officers outside of and in the proximity of TAP enrolled buildings, the NYPD's practices and procedures that apply to the TAP program as set forth in IO 22 of 2012 should be considered by the Court with respect thereto, as IO 22 represents the NYPD's policy and procedures with respect to patrols made pursuant to the Program.

levels of <u>DeBour</u> and/or "reasonable suspicion," as applicable.  In the "Additional Data" section of IO 22 of 2012, said Interim Order also makes clear that all stops must be made based upon "reasonable suspicion" and states when UF 250 Stop, Question and Frisk worksheets must be prepared.  <u>See also</u> paragraph 11(d) of IO 22 of 2012, which states that the NYPD's Patrol Guide procedures governing Stop, Question and Frisk, P.G. 212-11 (annexed hereto as Exhibit A to the Zuckerman Declaration), apply.  With respect to arrests, IO 22 of 2012 is clear that the required standard of "probable cause" applies.  <u>See</u> paragraph 11(e) thereof, as well as the third paragraph of the "Additional Data" section of said Interim Order.

Plaintiffs also complain in their complaint in this matter at paragraphs 180-181 that certain provisions in the NYCHA IO 23 of 2010 (Exhibit L to Zuckerman Decl.) had not been applied to TAP buildings, i.e., 1)  the questions that should be asked by officers of persons reasonably suspected of trespassing that are now set forth in paragraph 11(a) of IO 22 of 2012; 2) the "reasonable measures" that should be taken by officers to verify a person's authority to be in the building when such authority is in question that are now set forth in paragraph 11(b) IO 22 of 2012; and 3) that the officer "may instruct the person to leave the building or be subject to arrest for trespass…if the person refuses to exit the building and does not establish a right to be in the building," that is now set forth in paragraph 11(c) of IO 22.  These practices have all been applied to officers' patrols of TAP buildings by virtue of IO 22 of 2012.

In connection with the issuance of IO 22 of 2012, uniform "Trespass Crimes-Owner's Affidavit"[4] and "Trespass Crimes-Fact Sheet" forms for use in connection with the Program (see Exhibit B to Zuckerman Decl.) were developed after consultation with the various District Attorney's Offices.   The "Trespass Crimes-Owner's Affidavit" requires that if arrests

---

[4] The Manhattan District Attorney's Office uses its own Owner's Affidavit pursuant to its own administration of the TAP program in New York County.

are made by NYPD personnel in TAP buildings, that the officers' authority to conduct law enforcement activities in the particular building at the landlord's request has been properly documented. Paragraph 2 of the "Trespass Crimes-Owner's Affidavit" requires the Owner/Managing Agent to state that he/she is "fearful that in recent months, persons who are neither tenants, nor invited guests, nor authorized personnel have occupied the above-referenced premises for the purchase and use of illegal drugs or to commit other illegal activity." The "Trespass Crimes-Fact Sheet" form requires that an officer making an arrest based on probable cause for the crime of trespass documents the pertinent facts surrounding a particular trespass arrest. Patrol Services Chief Brian McCarthy has already reviewed samples of "Trespass Crimes-Fact Sheet" forms in an effort to spot-check for proper completion.[5]

IO 23 of 2012 was promulgated in connection with IO 22 of 2012 and refutes plaintiffs' complaint in their moving papers that there is not sufficient criteria for a building's enrollment in TAP, as well as plaintiffs' implicit argument that the TAP program is overly burdening persons living in those buildings. (IO 23 of 2012 is annexed to Exhibit B to the Mullkoff Declaration) IO 23 of 2012 makes clear that "when past incidents at a residential multiple dwelling building indicate" the TAP program would "be useful," the Crime Prevention Officer in an individual precinct is to "confer with members of the community and analyze current crime trends to identify" buildings "appropriate for" TAP. He/she is also to "confer with the commanding officer to ensure that patrols can be conducted 'with positive results;'" in other words, that crime conditions are being addressed. See paragraphs 1 and 2 of IO 23 of 2012. Buildings are enrolled in TAP for an initial period of six months. IO 23 of 2012 makes clear that residents, their guests and others authorized to be in the building are not to be arrested. <u>See</u>

_____

[5] This is an example of a document that records an officer's basis for a stop/arrest that may not fully appear in a UF 250 Stop, Question and Frisk worksheet.

paragraph 3(b)(1-3) thereof. Before expiration of the initial six month period, the Crime Prevention Officer is to "evaluate" whether the building "would benefit from six more months" of officers' patrols thereof. <u>See</u> paragraph 4 thereof. A building only remains in the Program past the maximum period of one year "due to exigent circumstances and [the] presence of criminality" such that "more time may be needed to rectify the condition." <u>See</u> paragraph 4(a) thereof. The Chief of Patrol's Office must be notified when a building has been enrolled beyond the maximum one year period and quarterly reports to the Chief of the Department regarding the evaluation of buildings' statuses are required of each individual precinct. <u>See</u> paragraph 4(b) and (c) of IO 23. Captain Mark Gaudioso of the Patrol Services Bureau has been assigned to monitor said reports. (Exhibit C to Zuckerman Decl. at par. 5) A survey of the buildings presently enrolled in TAP has already taken place within the last three months.

In conjunction with the issuance of IOs 22 and 23 of 2012, there has been training of NYPD officers at all levels[6] to reinforce the above referenced Interim Orders and the law relevant to Stop, Question and Frisk. Thus, plaintiffs' allegations in paragraphs 183 and 184 of their Complaint are simply unwarranted after all of the training efforts that have taken place in 2012.

At the forefront of training efforts in 2012 in the area of Stop, Question and Frisk is the full day course being conducted at Rodman's Neck in the Bronx by members of the NYPD's Training and Legal Bureaus. (Zuckerman Decl. as Exhibit E, course syllabus) All NYPD uniformed personnel will be required to take the course and the officers most likely to encounter the issues that are the subject of the course, i.e., IMPACT officers (officers assigned to

_____

[6] This, of course, is in addition to the training that each officer receives in the Police Academy prior to being sworn in as an NYPD police officer. Pertinent portions of the Police Student's Guide that are presently part of the written materials upon which students in the Academy are tested are annexed to the Zuckerman Decl. as Exhibit D.

high crime IMPACT zones), have been prioritized as far as being taught the course first. The course includes an in depth presentation from members of the NYPD's Legal Bureau on the law relating to Stop, Question and Frisk and the four levels of <u>DeBour</u>. Pertinent pages from the Powerpoint Presentation by the Legal Bureau are annexed to the Zuckerman Decl. as Exhibit F. The presentation includes instruction on the policing of TAP buildings and the it is taught that the four levels of <u>DeBour</u> apply to the policing of TAP buildings.

The Rodman's Neck training also includes a lesson on the proper preparation of a Stop, Question and Frisk UF 250 worksheet. Additionally, there are role play simulations where officers taking the course face live situations that they may encounter in the field. The officers are critiqued on their performance in these live role-play scenarios as a learning mechanism. There is also a segment of the course dedicated to the characteristics of armed suspects and a lecture that emphasizes the importance of proper and appropriate interactions with the citizenry. Recently, various representatives of the District Attorney's Offices, including Jeanette Rucker, have been invited to, and attended the Rodman's Neck training. The Bronx District Attorney's Office was so impressed with the training that they have asked the NYPD to have other ADAs from their Office attend the ongoing training. (Exhibit G to Zuckerman Decl.)

Further, in a June 18, 2012 memorandum from the Chief of the Department to the Chief of Patrol (Exhibit C to Zuckerman Decl.), at paragraph 6, the Chief of Patrol "Field Training Unit Guide" (Exhibit H to Zuckerman Decl.), was to be distributed to all IMPACT supervisors to continue the training of probationary police officers. Said "Field Training Unit Guide" has sections on the law of Stop, Question and Frisk and the Trespass Affidavit Program.

Additionally, the Training Bureau has developed a five-part video series on Stop, Question and Frisk, which includes training on the four levels of <u>DeBour</u>. The fifth part in the

video series, was developed earlier this year. All police officers have been required to view all five parts of the video series, usually at the precinct. Each precinct has its own training personnel who were trained by members of the Training Bureau prior to them training officers at the precinct level on Stop, Question and Frisk issues in connection with this video series. (Exhibits M and N to the Zuckerman Decl.)

Precinct training personnel also met in groups with ranking members of the Patrol Services Bureau, where Legal Bureau personnel were also present, to be trained on IOs 22 and 23 of 2012 and law of arrest as it relates to trespass. The precinct training personnel, in turn, were to train all uniform personnel within their various precincts and report to the Patrol Services Bureau as to their compliance with said directive. (Exhibit C to Zuckerman Decl. at par. 4) That training was to include the law as it relates to criminal trespass. (Exhibit C to Zuckerman Decl. at par. 3) At least 94% of uniformed officers have already been trained on IOs 22 and 23 of 2012 in accordance with this directive. (Exhibit O to Zuckerman Decl.)

Additionally, borough commanding officers received a memorandum from the Chief of Patrol dated June 12, 2012, annexing and outlining IOs 22 and 23 of 2012. (Exhibit B to Zuckerman Decl.) In that same memorandum, patrol borough commanders were to ensure that that precinct commanding officers follow IO 23 of 2012 so that buildings are properly enrolled in TAP based upon the need to alleviate criminality in said buildings. (Exhibit B, par. 4) Precinct commanding officers and borough commanding officers met with ranking members of the Patrol Services Bureau, where Legal Bureau members were often present, to be trained on IOs 22 and 23 of 2012.

From an operational standpoint, a Memorandum of Chief of Patrol James Hall to the Commanding Officers of each precinct dated August 20, 2012, reiterates the requirements for

arrests and stops related to TAP.  (Exhibit I to Zuckerman Dec.)  Significantly, said requirements include the following:  Patrol and IMPACT Supervisors must, when possible 1)  review the circumstances of and verify arrests at the location of arrest;  2)  discuss the circumstances of each such arrest with the arresting police officer with an emphasis on training[7];  3)  respond to locations where verticals and warrant checks are being conducted and "manage" any related street encounters; 4)  platoon commanders must critique all situations where there were "interior or exterior street encounters" which required a UF 250 form to be prepared;  5)  platoon commanders must ensure that such encounters based upon reasonable suspicion are in accordance with Patrol Guide provision 212-11;  6)  commanding officers are to  identify their most problematic TAP locations and include said locations in the Command's Conditions Reports.  (Exhibit I to Zuckerman Decl.)

### POINT II

### THE NYPD IS NOT ENGAGED IN AN UNCONSTITUTIONAL PRACTICE OF STOPPING PERSONS ON SUSPICION OF TRESPASS OUTSIDE OF TAP BUILDINGS

Plaintiffs have identified "three principal categories of evidence" that they contend support their claim that the NYPD is engaged in an unconstitutional practice of stopping persons on the suspicion of trespass outside of TAP buildings and that they are therefore likely to succeed on the merits in this action.  Defendants vehemently dispute that the analysis of Dr. Fagan, the "evidence" related to letters written by a single ADA in the Bronx District Attorney's

---

[7] NYPD officers remain subject to discipline if complaints against them are substantiated by the Civilian Complaint Review Board or the Internal Affairs Bureau of the NYPD.  Plaintiffs' footnote 12 is completely misleading as the cited "many instances" of officers misstating the proper standard for a stop and question was limited to a review of no more than "**several**" CCRB files.  See Exhibit K to Mullkoff Declaration.  Further, arrests that result in declines to prosecute by a District Attorney's Office are also reviewed at the borough and precinct levels and officers may face discipline at the command level in connection with arrests that result in such outcomes.

Office, Jeanette Rucker, and/or the testimony of the named plaintiffs establish that plaintiffs can meet the level of proof necessary to prevail upon their instant preliminary injunction application.

## A.    Dr. Fagan's Analysis

Plaintiffs' contend that the analysis of Dr. Jeffrey Fagan[8] supports their claim that the NYPD has an unconstitutional practice of stopping individuals on the suspicion of criminal trespass outside a TAP building *for no reason other than an individual's proximity* to a TAP location.  However, as set forth in detail by defendants' expert, Dr. Dennis Smith, in his report,[9] and as Dr. Smith will testify in more detail at the upcoming hearing,  Dr. Fagan's  conclusion suffers from a fatal flaw in that Dr. Fagan fails to provide a valid methodology to test the purported causal connection between TAP and the stops he analyzes.

Dr. Fagan's analysis of stop data is also flawed and unreliable.  In 2011, the NYPD made 685,724 Terry stops in New York City, documented by UF 250 forms; 135,738 of these stops occurred in the Bronx.  Despite the fact plaintiffs seek citywide injunctive relief in this case, Dr. Fagan, focuses his analysis only on 1,857 (1.4%) of the 135,738 stops made in the Bronx in 2011.  These 1,857 stops are "stops made by officers directly outside of buildings enrolled in the Operation Clean Halls program based *only* on suspicion that the individual stopped was engaged in criminal trespass in that building" and are referred to by Dr. Fagan as "Proximity Stops."  *See* Mullkoff Decl., Ex. E, pp. 1-2.  Dr. Fagan concludes that UF 250 forms for 720 of the 1,857 stops (39%) contain information sufficient to justify a Terry stop outdoors

---

[8] For the same reasons that defendants argued in Floyd v. City of New York, 08 CV 1034 (SAS) at Dockets 178-181 and 191-194 therein, as well as the Daubert hearing held on March 8, 2012, defendants move to exclude Dr. Fagan from testifying in this matter.  Although the Court stated during the telephonic conference held in this matter of June 28, 2012, that it would not entertain a new Daubert challenge to Dr. Fagan in this matter, defendants incorporate the foregoing arguments made in Floyd by reference in support of excluding Dr. Fagan's proposed testimony.

[9]  The report of Defendants' Expert Dr. Dennis Smith, dated September 18, 2012, is attached as Exhibit J to the Zuckerman Declaration.

for criminal trespass at a TAP enrolled property, which further limited his analysis to challenges of the remaining 1,137 stops. As Dr. Smith will testify at the upcoming hearing, Dr. Fagan's analysis regarding these 1,137 stops, as well as Dr. Fagan's conclusion that they are unlawful, are unreliable, contrary to the law and fail to support the contentions made by plaintiffs in this case.

As an initial matter, Dr. Fagan's method of identifying Proximity Stops is flawed. Dr. Fagan wrongly concludes that a building's enrollment in TAP was a circumstance considered by the officer supporting reasonable suspicion merely because the stop location listed on the UF 250 form is a TAP address. Of the 1,137 Proximity Stops Fagan challenges, 720 stops (63%) were selected based solely on the address of the stop, and there is no indication by the officer that the building's TAP enrollment was a factor contributing to reasonable suspicion. While defendants vehemently challenge plaintiffs' claim that any of the 1,137 stops lack reasonable articulable suspicion, at most, the universe of stops properly challenged by plaintiffs in this case should be limited to the 417 stops in which the officer indicated by populating a narrative caption of the UF 250 form that TAP was a factor or circumstance contributing to his/her reasonable articulable suspicion. As Dr. Smith will testify, inclusion of stops beyond the aforementioned 417 stops as Proximity Stops greatly is improper. Defendants further assert that whether the universe of challenged stops is 1,137 or 417, Dr. Fagan's conclusion on the basis of paperwork alone that any number of these stops are "without justification" or "unlawful" is wholly improper and contrary to prior rulings of the Court. See Floyd, et al. v. City of New York, et al., _ F. Supp. 2d _, 2012 U.S. Dist. LEXIS 53249, *42, *48 (S.D.N.Y. Apr. 16, 2012)("[I]t would be improper to declare [as Dr. Fagan had done] certain stops "unjustified" and others "justified" on the basis of paperwork alone…" because such classification "may

improperly suggest that the (il)legality of a stop can be conclusively determined on the basis of paperwork alone").

Perhaps most fatal to the reliability of Dr. Fagan's analysis is the fact he failed to consider in his analysis the information contained on Side 2 of the UF 250 forms that he reviewed. Notwithstanding the misleading representation by Dr. Fagan in report that he was asked to "examine the stop factors for each of these [1,857] Proximity Stops to determine whether any stop factor (or combination of stop factors) identified would provide a reasonable suspicion basis for an officer to stop a person outdoors for allegedly having trespassed inside of a Clean Halls building" (Mullkoff Decl., Ex. E, p. 2) and plaintiffs' claim that Dr. Fagan's analysis reflects the same (Plaintiffs' PI Mem. at 9), Dr. Fagan's analysis, as confirmed by his Stata coding instructions, does not combine the totality of circumstances contained on **Side 1 and Side 2** of the UF 250 forms. At best, Dr. Fagan presented tables with "counts" of combinations of additional circumstances from Side 2, which were never combined with the factors listed on Side 1 to determine if the stops were based on reasonable articulable suspicion. Dr. Smith will testify at the upcoming hearing that he conducted an analysis of the apparent justification of the 1,857 stops using the formula Dr. Fagan used in his <u>Floyd</u> Report (which defendants believe undercounts the stops that are "apparently justified"), and found that only 4.3% of these stops (79 of 1,857) would be classified as "apparently unjustified," not the 61% suggested by Dr. Fagan as lacking "a basis for stopping." The failure by Dr. Fagan to consider Side 2 of the UF 250 forms that he analyzed is significant and renders his conclusions baseless.

As "evidence" supporting their claim of a widespread pattern of unconstitutional outdoor stops, plaintiffs repeatedly represent that Dr. Fagan's analysis identifies "factors" – categories constructed by Dr. Fagan after reviewing narratives included by officers completing

the UF 250 form and grouping stops under innocuous titles – that serve as the "sole" basis for a number of the 1,137 stops. For example, plaintiffs claim that "Observed Exit," "Observed Outside," and "Observed Entry" is the sole factor for 74, 30 and 11 stops, respectively, and that "keyless entry" or "keyless exit" is the sole factor for 24 stops. See Plaintiffs' PI Mem. at 10. However, as Dr. Smith will testify at the upcoming hearing, nearly all (84.2%) of the aforementioned stops contained one or more additional circumstance on Side 2; information that was disregarded by Dr. Fagan in his analysis.[10] Furthermore, Dr. Smith's close examination of the actual information contained in the narrative field suggests that Dr. Fagan's simplification of these stops (including the 15.8% of stops which do not contain an additional circumstance on Side 2) into innocuous categories, results in a misreading of the entries on the UF 250 form and that the entries, in fact, provide evidence of suspicious behavior arguably sufficient to support a Terry stop.

Another significant blow to plaintiffs' meager "evidence" of allegedly unlawful conduct supporting the injunctive relief sought is the falsity of Dr. Fagan's claim that furtive movements is the sole factor for 467 of the 1,137 stops, when in fact the data reflects that 416 of 467 (89%) of these UF 250s had one or more additional circumstance contained on Side 2 of the UF 250 form, and 184 of 467 (39%) had two or more additional circumstances. While furtive movements alone[11] may not support reasonable articulable suspicion, case law supports a finding of reasonable articulable suspicion for stops based on a combination of "furtive movements" and

---

[10] The data reflects that 64 of 74 "Observed Exit" stops, 21 of 30 "Observed Outside" stops, all 11 "Observed Entry" and 21 of 24 "keyless entry" or "keyless exit" stops contained one or more additional circumstance.

[11] Defendants assert that the totality of the circumstances approach required for analysis of reasonable suspicion requires consideration of the entirety of the UF 250 form (not only the check-boxes on Side 1 and Side 2), in addition to information outside of the form, as has been articulated by the Court in Floyd. See Floyd, _ F. Supp. 2d _, 2012 LEXIS 53249, *42, *48.

as few as one other additional factor.[12]  Of the 467 "furtive movement" stops identified by Dr. Fagan, 238 (51%) included "high crime area" as an additional circumstance supporting reasonable suspicion.  The fact that stops made based on "furtive movements" and "high crime area" specifically, and "furtive movements" and another additional factor generally, are constitutional was specifically acknowledged by Dr. Fagan in his report and analysis in <u>Floyd</u> when he classified all stops based on a combination of these factors as "justified".  <u>See</u> Fagan Report at 50, App. D (available in <u>Floyd</u>, 08 CV 1034, at Dkt # 132); Fagan Declaration at ¶ 14 (available in <u>Floyd</u>, 08 CV 1034, at Dkt # 189).  Accordingly, defendants intend to offer evidence at the hearing through the testimony of Dr. Smith that Dr. Fagan's prior analysis in <u>Floyd</u> eviscerates the reliability of his conclusions in <u>Ligon</u> that 467 stops were based *solely* on "furtive movements", and further renders baseless his ultimate conclusion "that the data shows a widespread pattern of unconstitutional outdoor trespass stops in 2011."  Plaintiffs' PI Mem. at n.7.

## B.    The Bronx District Attorney's Office

Plaintiffs annex three letters of Bronx ADA Jeanette Rucker[13] to their moving papers and contend that these letters establish that the NYPD has an unconstitutional practice of arresting persons outside of TAP buildings.  Defendants respectfully submit that ADA Rucker's letters and expected testimony fall far short of proving a systemic unconstitutional deficiency in the NYPD's outdoor trespass arrests or stops.  Rather, if anything, ADA Rucker's letters

---

[12] <u>See</u>, <u>e.g.</u>, <u>United States v. Padilla</u>, 548 F.3d 179, 189 (2d Cir. 2008); <u>United States v. Monroe</u>, 08 CR 609 (ENV), 2009 U.S. Dist. LEXIS 101776, at *14-19 (E.D.N.Y. Nov. 2, 2009); <u>United States v. McPhatter</u>, 03 CR 911 (FB), 2004 U.S. Dist. LEXIS 2754, at *5-6 (E.D.N.Y. Feb. 24, 2004); <u>People v. Vereb</u>, 122 A.D.2d 897 (2d Dep't 1986); <u>People v. Thurman</u>, 81 A.D.2d 548 (1st Dep't 1981).

[13] As evidence of the NYPD's efforts to coordinate with the Bronx DA's office, Ms. Rucker and other members of the Bronx DA's office are permitted to lecture NYPD probationary officers on the Bronx DA's Office's procedures and the four levels of <u>DeBour</u>.

establish only that the Bronx DA's Office has made certain policy decisions regarding what types of trespass cases they wish to prosecute or not prosecute, regardless of the presence of probable cause for the arrests effectuated by NYPD officers, i.e. in the cases of vestibule arrests.[14]

The first letter of Ms. Rucker referenced by plaintiffs (to NYPD Housing Bureau Chief Jaffe) is annexed to the Mullkoff Declaration as Exhibit F and dated April 15, 2009. Plaintiffs contend that it applies to their claims in this case because it references the situation where a person is in a vestibule of a building and states that the Bronx District Attorney's Office will not prosecute arrests under that fact scenario. First, a vestibule is inside a building and is not an "outdoor" stop on which plaintiffs had indicated that they were proceeding throughout this litigation. Second, plaintiffs do not cite any law that establishes that vestibule arrests are per se improper. To the contrary, New York cases reflect that arrests for trespass in vestibules can be valid. People v. Hendricks, 43 A.D.3d 361 (1st Dep't 2007). Thus, the Bronx DA's decision not to prosecute trespass arrests in vestibules per se does not support the proposition that arrests are being made without probable cause outside of TAP buildings.

The second letter that plaintiffs annex to their moving papers as Exhibit G to the Mullkoff Declaration is a letter of Ms. Rucker to an Inspector McSorley of the 48th Precinct of July 7, 2011. To the extent that said letter raises the issue that a person should not be stopped for

---

[14] Defendants note that for the years 2011 and 2012, the number of patrol services bureau criminal trespass arrests that the district attorneys have declined to prosecute have been on a downward trend. Upon information and belief, Citywide the decline to prosecute rate declined from about 15.9% in 2011 to about 8.7% in 2012. Specifically as to the Bronx, upon information and belief, the decline to prosecute rate from 2011 to 2012, has dropped by half to approximately 12.5%. Given the policy of the Bronx DA not to prosecute certain arrests regardless of the presence of probable cause, any contention by plaintiffs that the declines to prosecute in the Bronx demonstrate a systematic lack of probable cause for arrests must be rejected.

simply entering and exiting a TAP building without more of an indicia of criminality, this is not a statement that defendants disagree with and reflects what is being taught to NYPD officers. However, defendants understood the Bronx DA's Office's position to be that they would not prosecute arrests for trespass outside of buildings per se.[15]   However, there can be probable cause for an arrest for trespass that is effectuated outdoors.  People v. Magwood, 260 A.D.2d 246 (1st Dep't 1999);  see also Caidor v. Harrington, 2009 U.S. Dist. LEXIS 5282, at *14 (N.D.N.Y Jan. 26, 2009)("probable cause to arrest a person for trespass does not automatically dissipate upon the person's attempt to leave the premises").  In any event, ADA Rucker has been unable to in any way quantify or from first hand knowledge identify improper arrests/stops that fall in this limited category of street encounters.  As such, said letter adds little to plaintiffs' argument.

The third letter of Ms. Rucker that plaintiffs annex to their moving papers as Exhibit H is her letter of July 18, 2012 to Inspector Sweet, in which the Bronx DA's office is requiring NYPD officers to be interviewed by ADAs for all trespass arrests.  Defendants challenge the factual basis that Ms. Rucker provides as a basis for the change in procedures. Regardless, defendants have complied with the directive, continue to endeavor to improve upon the quality of its arrests and hope that the new procedure will help toward that goal.

## C.     Testimony of the Named Plaintiffs

Plaintiffs intend to present evidence at the upcoming hearing of eleven stops of named plaintiffs that they contend support their claim that the NYPD is engaged in an unconstitutional practice of stopping persons on suspicion of trespass outside of TAP buildings. At the outset, four of the purported stops that plaintiffs propose to present indisputably took place within a courtyard or gated area of TAP building complexes.  This is contrary to plaintiffs'

---

[15] Interestingly, there does not appear to be evidence reflecting that the DA offices in other counties have a per se rule not to prosecute vestibule or outdoor arrests for criminal trespass.

continued assertions throughout this litigation that they are moving for preliminary relief with respect to "outdoor stops" only. In fact, during the August 9, 2012 telephonic conference held in this matter, the Court stated as to these stops were "tantamount to inside." (Exhibit K to Zuckerman Decl.)[16] Thus, four of the eleven purported stops do not support the claim that the NYPD is engaged in unconstitutional conduct "outside" of TAP buildings and plaintiffs' attempt to bolster their case in this regard should be rejected.

Further, nine of the eleven challenged stops[17] indisputably did not result in arrests and plaintiffs have been unable to provide sufficient information as to the dates and times thereof, or the officer(s) involved, to enable defendants to identify the officers who allegedly engaged plaintiffs. Sgt. Robert Musick will testify for defendants of efforts that he has made to identify the officers involved in these incidents without success. Plaintiffs' inability to provide specificity in connection with these purported incidents has deprived defendants of a full and fair opportunity to defend these claims. Only two of the challenged stops, which did result in the arrests of the plaintiffs Abdullah Turner and Charles Bradley, have been specified by date, thus allowing the officers involved to be identified. As will be seen when these two arrests are discussed by witnesses at the upcoming hearing, there are sharp disputes of fact between the plaintiffs' and officers' versions. Defendants raise this issue because without being able to present the officers' sides of events as to the other nine purported incidents, defendants have been unfairly prejudiced in their defense with respect to these incidents, since there may very well be factual disputes as to the versions of events that defendants are presently unable to

---

[16] Under New York Penal Law, "[P]remises" are defined to include the exterior of buildings. New York Penal Law § 140.00(1). Additionally, persons can be found to trespass in courtyards. People v. Babarcich, 166 A.D.2d 655 (2nd Dep't 1990). Thus, courtyards and gated communities are the functional equivalent of the insides of buildings as the Court has previously stated.

[17] The incidents raised appear to be from plaintiffs' entire residencies at the buildings in question and not limited to the period of 2011 that Dr. Fagan analyzed.

present.[18]  Defendants submit that even small differences between versions of events can lead to very different legal conclusions by the Court.

Turning to the individual incidents, with respect to the alleged stop of plaintiff J.G. outlined on page 14 of plaintiffs' moving brief, J.G. can only testify that the purported stop occurred in August 2011.  J.G. cannot not remember the date, time, or the day of the week of the purported incident.  J.G. testified that five officers - two plainclothes officers and three uniformed officers – were involved in this incident, while his mother, plaintiff Jaenean Ligon, testified at her deposition that only three officers – one plainclothes and two uniformed officers – were involved in the alleged stop.  Neither J.G., nor Ms. Ligon, could not provide *any* physical descriptions of any of the officers.

With respect to the alleged stop of Jerome Grant described on page 15 of plaintiffs' brief, Mr. Grant can only testify that the stop allegedly occurred in the evening of an unidentified date in July of 2011.  Mr. Grant testified that he was walking with his brother J.A.G., his cousin Shawn Grant ("Shawn"), and possibly his friend Kawane towards his grandmother's apartment building.  Mr. Grant testified that as he approached the building, J.A.G. ran away from Mr. Grant, Shawn, and Kawane.  J.A.G. then ran directly into the building. J.A.G. immediately closed the front door behind him, preventing Mr. Grant, Shawn, or Kawane from entering the building.  Mr. Grant testified that he, Shawn, and Kawane were forced to wait in front of his grandmother's building.  Shawn became agitated, and Mr. Grant, Shawn, and Kawane repeatedly knocked on the door.  Seconds later, Mr. Grant, Shawn, and Kawane were

---

[18]  Aside from plaintiffs' motives to succeed in this lawsuit, many of the plaintiffs have long arrest histories, in some cases up to 21 arrests, which defendants submit affect the credibility of their testimonies.  Given their past interactions with the NYPD, plaintiffs obviously have certain biases and motivations to testify the way the will as well.  As such, hearing just one side of the story when plaintiffs have been unable to provide sufficient specificity as to events so that any officers involved can be identified is less than fair to defendants.

stopped by two police officers on a sidewalk. Mr. Grant testified that these officers observed this entire incident unfold, though he could not identify the officers with any specificity.

With respect to purported 2009 stop of plaintiff Letitia Ledan on page 15 of plaintiffs' brief that occurred **inside of her gated housing complex**, Ms. Ledan can only testify as to the year of the purported stop, and that it occurred in the early afternoon. Ms. Ledan cannot even provide an exact location within the River Park Towers complex as to where the incident occurred. While Ms. Ledan testified that two officers were involved in the incident, she could not describe either officer.

With respect to the purported 2011 incident involving Ms. Ledan, Antoine Ledan, and two male friends **inside the same gated River Park Towers complex** that is described on page 15 of plaintiffs' brief, Ms. Ledan can only testify that the incident occurred in the summer of 2011, while Mr. Ledan could not even state the date of the stop with any specificity. Ms. Ledan testified that four male officers were allegedly involved in the incident, but could not describe their physical characteristics or names. Further, Ms. Ledan and Mr. Ledan identified different friends as being present for this alleged incident without any specificity.

With respect to the purported incident involving plaintiff Roshea Johnson that is described on page 16 of plaintiffs' brief and **occurred on the premises of the River Park Towers complex**, Mr. Johnson stated that the incident occurred "on Father's Day in the year 2010." Mr. Johnson could only describe the gender and race of the officers involved in this incident. Significantly, Mr. Johnson did not live in Ms. Ledan's building at the time of the alleged incident, that Ms. Ledan would frequently not permit Mr. Johnson to enter her apartment, and that Ms. Ledan took away Mr. Johnson's key to the apartment prior to this incident, all of which call into question Mr. Johnson's authority to be in the building at that time.

With respect to the alleged incident involving plaintiff Jovan Jefferson that he can only narrow down to April or May of 2012 (**despite the fact that this lawsuit had been filed at by that time and plaintiff is a class representative**) described on page 16 of plaintiffs' brief, Mr. Jefferson was asked at his August 6, 2012 deposition to describe **all** of the times he has been stopped by the NYPD, but failed to testify to this incident.

With respect to the incident involving plaintiff Kieron Johnson described at page 17 of plaintiffs' brief, Mr. Johnson cannot testify as to the date/time of the incident, except to the extent that it occurred a few years ago. Mr. Johnson could only testify that the officers involved were truant officers, and provided no further details about these officers.

With respect to the incident involving plaintiff Abdullah Turner **in the courtyard in his building** described at page 17 of plaintiffs' brief, Mr. Turner testified at his deposition that this stop allegedly occurred on a weekend in 2012, and not in 2011. In any event, Mr. Turner's description of the three uniformed officers allegedly involved in this incident was limited to their race, their gender, and that they appeared to look in their mid-twenties or thirties in age.

With respect to the incident involving Fernando Moronta on page 18 of plaintiffs' brief, Mr. Moronta will testify that the incident occurred in the winter of either 2007 or 2008, which would be outside the statute of limitations period for said claim, and belies any claim of imminent harm. Mr. Moronta testified that five-to-six officers were present for the incident, but Mr. Moronta could only provide the race and gender of the officers as descriptions.

With respect to the arrest of the plaintiff Abdullah Turner that occurred on March 26, 2011 that is described on page 18 of plaintiffs' brief, defendant P.O. Ramdeen, while on patrol with his partner, P.O. Pomerantz, observed Mr. Turner in the lobby of 2020 Davidson Avenue, a known, drug-prone TAP building located on a street with a history of drug sales,

robberies, and shootings. P.O. Ramdeen observed Mr. Turner for two-to-three minutes pacing back and forth in the lobby, looking up a stairwell, and then continuing to pace back and forth. As the officers exited their vehicle to approach the building, Mr. Turner left the building. P.O. Ramdeen then asked Mr. Turner if he knew anyone in the building. Mr. Turner denied knowing anyone in the building, but that he was there with his friend, Anginette Trinidad, who was in the building trying to buy marijuana. Ms. Trinidad came downstairs and informed P.O. Pomerantz that she was indeed at 2020 Davidson to buy marijuana. Marijuana and an illegal knife were found on her person and she was eventually convicted of disorderly conduct. There was thus reasonable suspicion for the stop and probable cause for the arrest of the plaintiff Turner.

   With respect to the arrest of plaintiff Charles Bradley on May 3, 2011 that is described on page 18 of plaintiffs' brief, defendant P.O. Santiago was parked in an unmarked vehicle in front of a TAP building located at 1527 Taylor Avenue, which he knew to be a drug-prone and shooting-prone location. P.O. Santiago observed Mr. Bradley walking back and forth outside of 1527 Taylor Avenue for approximately two-to-three minutes. Shortly thereafter, P.O. Santiago observed Mr. Bradley *inside* 1527 Taylor Avenue, whereby Mr. Bradley would alternate being present in the vestibule and lobby area, disappear for two-to-three seconds, and then return to the vestibule and lobby area. Mr. Bradley then exited the building, and P.O. Santiago immediately asked him what he was doing in the building and who, if anyone, he was visiting. Mr. Bradley stated that his girlfriend lived in the building, but that he did not know what apartment she lived in. He produced no identification upon request. Mr. Bradley has admitted at deposition that he did not have keys to 1527 Taylor Avenue on May 3, 2011, because Mr. Bradley's ex-girlfriend had actually taken his set of keys back, following physical

altercations and arguments between them.  There was thus reasonable suspicion for the stop and probable cause for the arrest.

**POINT III**

**PLAINTIFFS CANNOT PROVE MUNICIPAL LIABILITY**

**A.      Standing**

To establish standing for injunctive relief, plaintiffs must demonstrate "both a likelihood of future harm and the existence of an official policy or its equivalent."  Peck v. Baldwinsville Central School District, 351 Fed. Appx. 477, 479 (2d Cir. 2009) (quoting and adopting the reasoning of Shain v. Ellison, 356 F.3d 211, 216 (2d Cir. 2004) ("Shain II")).  "A plaintiff 'cannot rely on past injury . . . but must show a likelihood that he . . . will be injured in the future.'"  Shain II, 356 F.3d at 215 (quoting DeShawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998)).  One past incident involving a particular plaintiff and the police has been found to be insufficient to confer standing.  City of Los Angeles v. Lyons, 461 U.S. 95 (1983);  MacIsaac v. Town of Poughkeepsie, 770 F. Supp. 2d 587, 601 (S.D.N.Y. 2011).  At most, each plaintiff will testify to one past "outdoor" stop of which they complain.  This is insufficient to meet the standard of "likelihood of future harm."

**B.      Municipal Liability**

Plaintiffs do not appear to take issue with the NYPD's official  policies.  Plaintiffs must therefore prove that a municipal practice "was so 'persistent or widespread' as to 'constitute a custom or usage with the force of law,'" Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006), or "that a practice or custom of subordinate employees was 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  Bouche v. City of Mount Vernon, 11 Civ. 5246 (SAS), 2012 U.S. Dist. LEXIS 40246, at *10 (Mar. 23, 2012)

(quoting <u>Sorlucco v. New York City Police Department</u>, 971 F.2d 864, 871 (2d Cir. 1992)). Defendants submit that plaintiffs have fallen far short of the evidence necessary to meet this demanding standard.

Plaintiffs also seem to be moving on the theory that one or more "policymakers" of the NYPD have been "deliberatively indifferent," though plaintiffs fail to identify the particular "policymakers" responsible for the violations they allege. "To prove such deliberate indifference, the plaintiff[s] must show that the need for more or better supervision to protect against constitutional violations was obvious." <u>Vann v. City of New York</u>, 72 F.3d 1040, 1049 (2d Cir. 1995)(citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (1989)). To demonstrate deliberate indifference, a plaintiff to show: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992). "The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 128 (2d Cir. 2004). Plaintiffs' "evidence" falls far short of meeting this standard as well.

## CONCLUSION

For the foregoing reasons, plaintiffs' application for a preliminary injunction must be denied.

Dated:      New York, New York
            October 6, 2012

MICHAEL A. CARDOZO
Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street, Room 3-133b
New York, New York 10007
(212) 442-8248


By: _____/s/_____
Mark Zuckerman
Heidi Grossman
Joseph Marutollo
Brenda Cooke
Richard Weingarten
Judson Vickers