UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JAENEAN LIGON, et al.                         :
                                              :
                                              :
                        Plaintiffs,           :
                                              :        12 Civ. 2274 (SAS)(HBP)
          -versus-                            :
                                              :
CITY OF NEW YORK, et al.                      :
                                              :
                                              :
                        Defendants.           :
------------------------------------------------------------X


## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion, Jr.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Sarah Lustbader
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

Dated: October 12, 2012

In devoting the first eight pages of its argument section to remedial actions the NYPD has attempted since the filing of this lawsuit, the defendants' brief confirms, as the plaintiffs suggested would be the case in their opening brief, that the real dispute before the Court centers on the appropriate scope of injunctive relief.  Though the plaintiffs will address the defendants' efforts in greater detail during the hearing and in post-hearing briefing, it is sufficient to note at this juncture that virtually nothing the defendants have done addresses the specific practice of unlawful stops of people outside Clean Halls buildings, and what little it has done is far from sufficient to obviate the need for preliminary injunctive relief.

After arguing about actions it has taken in response to this case, the defendants do challenge the factual and legal sufficiency of certain aspects of the plaintiffs' request for preliminary injunctive relief.   The plaintiffs address those challenges in order.

**I.      The Defendants' Attacks on the Evidence Demonstrating the Widespread Problem of Suspicionless Outdoor Trespass Stops at Clean Halls Buildings Are Meritless.**

**A. The Defendants' Critique of Dr. Fagan's Expert Analysis Is Without Merit.**

The defendants challenge Dr. Jeffrey Fagan's analysis as being insufficient, factually flawed, and incomplete.  The defendants are wrong on all counts.

At the outset, the defendants complain that Dr. Fagan looked only at Bronx stops "[d]espite the fact plaintiffs seek citywide injunctive relief in this case."  Defs. Br. at 12.  In fact, though there is every reason to believe the unlawful stops taking place in the Bronx are typical of stops taking place across the city, the plaintiffs' motion seeks relief expressly limited to the Bronx.  *See* Notice of Preliminary Injunction Motion (Sept. 24, 2012).

Next, the defendants argue that Dr. Fagan, by examining the universe of outdoor stops where there was an exact match between a Clean Halls building and the stop location, "wrongly concludes that a building's enrollment in TAP was a circumstance considered by the officer" in

light of the fact that the officer chose to expressly write "Clean Halls" on the UF-250 in only about 37% of those stops (417 out of 1137).  *See* Defs. Br. at 13.  But the suggestion that there is insufficient proof establishing that officers are stopping people <u>because</u> the building is enrolled in the Clean Halls program—a suggestion discussed at length in the defendants' expert report—misapprehends the plaintiffs' claim.  The plaintiffs do not challenge the program, nor do they claim that stops happening in front of Clean Halls buildings are unlawful because the officer factored the building's enrollment into the stop.  Rather, they allege that police officers routinely stop people outside Clean Halls buildings on suspicion of trespass inside the building without legal justification, and they seek preliminary relief to halt these stops.  While the fact that officers are going so far as to write "Clean Halls" on the UF-250's in over one-third of stops suggests that many officers are under the erroneous impression that the building's status provides a basis for stopping persons outside the buildings; that an officer has not annotated the UF-250 does nothing to detract from the plaintiffs' claim of unlawful stops in front of Clean Halls buildings.

The defendants also assail Dr. Fagan's reliance on the UF-250's as a basis for assessing the legality of stops, citing this Court's discussion in the *Floyd* case about limits on the ability to rely on UF-250's alone.  *See* Defs. Br. at 13-14.  Whatever might be necessary to supplement the UF-250 evidence when it comes to permanent injunctive relief, on a motion for a preliminary injunction the UF-250's are more than sufficient to establish a likelihood of success on the merits.  Moreover, the plaintiffs here will not be relying solely on UF-250's, and instead will introduce considerable additional evidence, including telling evidence making it clear the NYPD itself recognizes a serious problem with Clean Halls stops.

The defendants next claim that "most fatal" to Dr. Fagan's analysis is his failure to consider in his analysis information from the "additional circumstances" portion on the back of the UF-250.  *See* Defs. Br. at 14-16.  The defendants further claim that when its expert analyzed the Clean Halls stops using the additional circumstances information and Dr. Fagan's "formula" from the *Floyd* case, he concluded that only 4.3% of stops were unlawful under that formula. *See id.*  The page limit on this reply precludes a full response now to these points, but two observations are in order.  *First,* the defendants never seem to recognize that the preliminary injunction motion deals only with trespass stops outside Clean Halls buildings, which means that the analysis of the legality of the stops at issue must be tied specifically and only to trespass under those circumstances.  The *Floyd* formula, devised to deal with the entire universe of potential offenses for which street stops might be made, simply has nothing do with this case.[1]

*Second,* as for a more detailed analysis of additional circumstances, the plaintiffs noted in their opening brief that, given the narrow trespass issue in this case, that analysis would be of limited legal relevance and further noted that Dr. Fagan would provide supplemental analysis in his testimony buttressing that point.  That remains the case.

### B.    The Defendants Mischaracterize the Evidence concerning Communications between the Bronx District Attorney's Office and the NYPD.

The defendants next challenge the plaintiffs' reliance on three letters submitted by the Bronx District Attorney's Office to "establish that the NYPD has an unconstitutional practice of arresting persons outside of TAP buildings," arguing they "establish only that the Bronx DA's Office has made certain policy decisions regarding what types of trespass cases they wish to

---

[1] Thus, to take an example highlighted by the City, while "furtive movement" plus "high crime area" might create reasonable suspicion with respect to certain offenses, it cannot create reasonable suspicion that a person observed outside a Clean Halls building was trespassing inside the building, the only category of stops at issue in this motion.

prosecute or not prosecute, regardless of the presence of probable cause for the arrests effectuated by NYPD officers . . . ."  Defs. Br. at 16-17.  Setting aside its gross mischaracterization of the position of the Bronx District Attorney's Office, the defendants misunderstand the import of the testimony the plaintiffs will present from that office.

Though some unlawful trespass stops result in unlawful arrests, the plaintiffs' claims in this case are about unlawful trespass stops, not arrests.  And, as the plaintiffs noted in their opening brief, the Bronx District Attorney's Office long has been concerned about unlawful trespass stops outside of Clean Halls buildings and has fully informed the NYPD about those concerns.  Contrary to the claims in the defendants' brief, those concerns were well-founded (as will be the subject of testimony), are additional evidence of the practice of unlawful outdoors stops documented by Dr. Fagan, and were undisputedly and unambiguously conveyed to high-level officials of the NYPD.

**C.   The Plaintiffs' Testimony Will Establish That They Were Subjected to Suspicionless Trespass Stops Outside of Clean Halls Buildings.**

At the hearing, nine of the plaintiffs, along with relatives and a friend, will testify to being unlawfully stopped for trespassing outside of Clean Halls buildings.  For nine of the eleven stops at issue, the defendants do not contend in their brief that there was in fact reasonable suspicion, and the uncontroverted testimony at the hearing will demonstrate that there was not. Instead, the defendants assert (without citing any evidence) that four of the stops occurred in "courtyards" or "gated areas"; that the plaintiffs' uncontroverted testimony should be disregarded for the nine stops because they have not identified the officers involved; and that the Court should credit the arresting officers' testimony over that of the plaintiffs to find reasonable suspicion for the remaining two stops.  Each of these arguments is wrong, and the plaintiffs will address each in turn.

*First*, the defendants assert, without citing any evidence, that the stops of Plaintiffs Letitia Ledan, Roshea Johnson, and Abdullah Turner, and non-party Antoine Ledan, should not be at issue in the preliminary injunction hearing because they "indisputably took place within a courtyard or gated area of TAP building complexes." Defs.' Mem. at 18, 21, 22. In fact, the plaintiffs vigorously dispute that assertion and will disprove it at the hearing with photographic and testimonial evidence demonstrating that the areas where those stops occurred were not fenced-in or locked, and were in fact open to the public.[2]

*Second*, the defendants assert that they have been "unfairly prejudiced" and "deprived . . . of a full and fair opportunity the defend the[] claims" with respect to nine stops at issue because the defendants have been unable to identify the officers involved. Defs.' Mem. at 19-20. The plaintiffs certainly have not withheld from the defendants any information about the dates or the officers involved. Instead, the defendants' failure to identify those officers stems in large part from their refusal to conduct an adequate search for UF-250's.[3]

The defendants intend to call Sgt. Robert Musick to testify about "efforts that he has made to identify the officers involved in these incidents without success." Defs. Mem. at 19. Sgt. Musick's testimony will only underscore the limited nature of the search the City conducted.

---

[2] The grounds of River Park Towers, the housing complex where Ms. Ledan, Mr. Ledan, and Roshea Johnson were stopped, are entirely open to the public and are not "gated." Defs.' Br. at 21. Pedestrians are free to enter and exit the complex on the sidewalks on either side of a security booth. At 2249 Morris Avenue, Abdullah Turner's residence, there is a wide area leading from the sidewalk to the front door with a fence on either side. Although there is a gate there, it was open at the time of Mr. Turner's stop, and Mr. Turner testified at deposition that it is always open.

[3] The plaintiffs requested in discovery all UF-250 forms for stops of the named plaintiffs, but the defendants refused to search for them, citing undue burden. *See* Email from Mark Zuckerman to Alexis Karteron, Aug. 1, 2012 (attached as Ex. A to the Declaration of Alexis Karteron, dated October 12, 2012).

Sgt. Musick testified at deposition that the defendants only searched the electronic database of UF-250 forms using the name of the person stopped, which he eventually acknowledged only turns up UF-250's if the stop resulted in an arrest or summons.[4]  He also testified that no search of paper UF-250's—which do contain the names of those stopped even if it did not lead to arrest or summons—was undertaken for the stops at issue in this case.[5]  It is undisputed that most of the stops at issue did not result in an arrest or summons and so would not appear in a search of the electronic UF-250 database by the name of the person stopped.  In sum, the defendants cannot decide that it is too burdensome to conduct an adequate search and then seek an inference in their favor based on the inability to identify the officers.[6]

Moreover, the defendants remain entitled to test the credibility of the plaintiffs and their witnesses at the hearing.  They are free to ask the plaintiffs and witnesses about their knowledge of the specific dates or the details or the officers' appearance.[7]

---

[4] Musick Dep., at 38:13-20, 38:24-39:12, 40:6-19, Sept. 12, 2012 (excerpts attached as Ex. B to the Karteron Declaration).

[5] Musick Dep., at 115:9-11.  The defendants disclosed on Tuesday, October 9, and Thursday, October 11, that Sgt. Musick had undertaken additional efforts to locate UF-250's for the 11 stops at issues.  The scope of those additional efforts is unclear to the plaintiffs at this time.

[6] But even a search of all UF-250's may not have identified the officers for all the stops, as NYPD officers do not in practice complete UF-250's for every *Terry* stop they conduct.  As defendants' counsel informed the Court, "the UF-250s, they're not always, you know, made or written . . . I suspect for many of the incidents in the complaint, there would not be UF-250s." *See* Tr. of Court Conference, Apr. 17, 2012, at 10:13-19 (excerpt attached as Ex. C to the Karteron Declaration.)  For example, the arresting officers of Plaintiffs Abdullah Turner and Charles Bradley both acknowledged that they should have completed UF-250's for those encounters but did not do so.  Ramdeen Dep., at 87:4-17, Aug. 9, 2012; Santiago Dep., at 185:15-17, 187:5-7, July 18, 2012 (excerpts attached as Ex. D and E, respectively, to the Karteron Declaration).

[7] Many of the plaintiffs and non-parties testified at deposition about being stopped many times in recent years, so it is natural that they do not remember the every detail of each stop.

*Finally*, with respect to the other two stops at issue, the defendants contend that the testimony of the arresting officers will establish reasonable suspicion for the stops and probable cause for the arrests.  Defs.' Br. at 22-24.  The plaintiffs submit that that their testimony at the hearing will prove more credible, and that even if the Court were to accept the officers' version of events, it will be clear that the stops at issue were made without reasonable suspicion.

## II.    The Defendants' Arguments that the Plaintiffs Will Be Unable to Establish Municipal Liability Are Mertiless.

### A.    The Plaintiffs Have Standing to Pursue a Preliminary Injunction.

The defendants argue that the plaintiffs do not have standing to pursue preliminary injunctive relief because "[a]t most, each plaintiff will testify to one past 'outdoor' stop of which they will complain."  Defs. Br. at 24.  This is factually and legally wrong.

Two of the plaintiffs will testify that they have each been subjected to two outdoor stops because they were merely near Clean Halls buildings, and this Court already has recognized that two stops are sufficient to establish standing for injunctive relief.  *See Davis v. City of New York*, No. 10 Civ. 699 (SAS)(HBP), 2012 WL 4761494, at *25-26 (S.D.N.Y. Oct. 4, 2012) (finding that a plaintiff who had been stopped inside a NYCHA building twice and arrested once had standing to seek injunctive relief concerning stop and arrest practices in NYCHA buildings); *Floyd v. City of New York*, No. 08 Civ. 1034 (SAS), 2012 WL 1868627, at *10 (S.D.N.Y. May 16, 2012) (finding that a plaintiff who had been stopped multiple times had standing to seek injunctive relief concerning the NYPD's stop practices).  As for the plaintiffs who have been stopped "only" once, they also have standing given that they challenge a specific and narrow program that they are particularly likely to encounter.  *See Battle v. City of New York*, No. 11 Civ. 3599(RMB), 2012 WL 112242, at *3-4 (S.D.N.Y., Jan. 12, 2012) (holding that two plaintiffs who each had been unlawfully stopped and questioned once pursuant to the NYPD's

Taxi/Livery Inspection Program had standing to seek injunctive relief given that program was discrete and one they were likely to encounter in the future given their use of livery cars); *Aguilar v. Immigration & Customs Enforcement Div.*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011) (finding that plaintiffs who feared repeat injury had standing where they alleged that illegal searches by defendants were "condoned, widespread, and ongoing"); *Nat'l Congress of Puerto Rican Rights ex rel. Perez v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (finding that the frequency of alleged injuries reflected by the NYPD's stop practices created a likelihood of future injury).

Moreover, the defendants' stop practices at Clean Halls buildings are targeted at the residents of Clean Halls buildings and others present at Clean Halls buildings, a "relatively narrow community." *Davis*, 2012 WL 4761494, at *25-26 (explaining that standing to seek injunctive relief against unlawful trespass arrests in NYCHA buildings was supported by the fact that "defendants' policies are targeted at NYCHA residents and people present on NYCHA property"). Consequently, the plaintiffs who live in or visit Clean Halls buildings are at risk of being subjected to an outdoor trespass stop in the future.

### B.      The Plaintiffs Will Be Able to Establish Municipal Liability.

The defendants also contend that the plaintiffs cannot establish municipal liability, arguing that the plaintiffs have not established that the NYPD's practice of outdoor trespass stops at Clean Halls buildings is "so persistent or widespread as to constitute a custom or usage with the force of law," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (internal quotation marks and citations omitted), or that the practice or custom is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Bouche v. City of Mount Vernon*, 11 Civ. 5246 (SAS), 2012 WL 987592, at *3 (S.D.N.Y. Mar. 23, 2012). (Defs. Br. at 24.) The

defendants make this assertion without any explanation.  For the reasons stated in the plaintiffs'

opening brief, the plaintiffs will be able to establish municipal liability.  *See* Pls. Br. at 19-20.[8]

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that the Court grant their

motion for a preliminary injunction.

---

[8] The defendants also contend that the evidence will be insufficient to establish that the City of New York has been deliberately indifferent to the practice of outdoor trespass stops at Clean Halls buildings.  Defs. Br. at 25.  This argument should be rejected as well.  The plaintiffs will establish that numerous high-level NYPD officials were aware of the practice but did not act to remediate it.  The plaintiffs will therefore be able to establish deliberate indifference.  *See Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012) (noting that a plaintiff might have been able to establish municipal liability by making "a showing of deliberate indifference on the part of supervisory personnel to abuse of the rights of black people, which was communicated to line officers so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences").

Respectfully submitted,

s/  Alexis Karteron
Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
akarteron@nyclu.org

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion, Jr.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Sarah Lustbader
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

*Attorneys for Plaintiffs*

Dated: October 12, 2012