UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAENEAN LIGON, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

**DEFENDANTS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Mark Zuckerman*
*Tel: (212) 442-8248*
*Matter #: 2012-011932*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................................ii

FINDINGS OF FACT AND INTRODUCTION.............................................................. 1

PLAINTIFFS HAVE FAILED TO DEMONSTRATE THE
EXISTENCE OF AN UNCONSTITUTIONAL CUSTOM
OR PRACTICE OF THE NYPD

    A.       Dr. Fagan's and Dr. Smith's Expert Testimony ...........................................1

    B.       Testimony Of Bronx ADA Jeanette Rucker .................................................6

    C.       Plaintiffs' Testimony and Sgt. Musick's Work ............................................8

ENHANCEMENTS TO TAP THAT HAVE OCCURRED IN 2012 ......................... 13

CONCLUSIONS OF LAW ............................................................................................ 22

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

California v. Hodari D.,
  499 U.S. 621, 626 (1991)................................................................................................ 21

City of Canton v. Harris,
  489 U.S. 378 (1989).......................................................................................................... 23

City of Los Angeles v. Lyons,
  461 U.S. 95 (1983)............................................................................................................ 22

Connick v. Thompson,
  131 S.Ct. 1350, 1360 (2011)........................................................................................... 23

Hurley v. Toia,
  432 F. Supp. 1170 (S.D.N.Y.),
  aff'd mem., 573 F.2d 1291 (2d Cir. 1977)..................................................................... 25

Latino Officers Ass'n v. Safir,
  196 F.3d 458 (2d Cir. 1999)............................................................................................ 25

N.Y. Civ. Liberties Union v. N.Y. City Transit Auth.,
  652 F.3d 247 (2d Cir. 2011)............................................................................................ 25

Nicholson v. Scoppetta,
  344 F.3d 154 (2d Cir. 2003)............................................................................................ 25

People v. Bora
  83 N.Y.2d 531 (1994) ..................................................................................................... 21

People v. Debour,
  40 N.Y.2d 210 (1976) ..................................................................................... 9,11,17,19,20, 22

People v. Kelta
  2011 WL 1936076 (N.Y. Sup. Ct. May 19, 2011).................................................... 21

People v. Reyes
  199 A.D.2d 153 (1st Dept. 1993), aff'd 83 N.Y.D.2d 945 (1994) ........................... 21

Reynolds v. Giuliani,
  506 F.3d 183 (2d Cir. 2007)....................................................................................... 23,24

Rizzo v. Goode,
  423 U.S. 362 (1976)......................................................................................................... 24

S.C. Johnson, Inc. v. Clorox Co.
  241 F.3d 232 (2d Cir. 2001)............................................................................................ 25

<u>Terry v. Ohio</u>
   391 U.S. 1 (1968).................................................................................. 2,4,9,19,21,22

<u>United States v. Mendenhall</u>
   446 U.S. 544 (1980)......................................................................................... 21

<u>Young v. City of Providence,</u>
   400 F.3d 4, 27 (1st Cir. 2005)......................................................................... 24

# FINDINGS OF FACT AND INTRODUCTION

1.      Plaintiffs have not met their heavy burden of proof in establishing a right to mandatory preliminary injunctive relief. Witnesses who testified about stops consistently failed to tell the whole story, and neither Dr. Fagan's testimony nor Jeanette Rucker's, alone or in combination, establishes a widespread pattern of improper stops. The NYPD's training, supervision and monitoring belies any claim of indifference on the NYPD's part. Plaintiff's request for incremental additional measures, at a time when the NYPD is already making sure that its trespass stops -- like all other stops -- are conducted lawfully, should be rejected.

2.      TAP is a valuable law enforcement program that allows the NYPD inside problematic crime-ridden buildings with the landlords' permission to alleviate conditions such as narcotics, guns, robberies and other violent crime. (Tr. p. 1225:17-1226:24, 518:19-519:7 and 1225:17-1226:6) Joseph Cicciu testified to the benefits of TAP for the residents of the buildings he owns: "So we thought it was a valuable tool to us to be able to protect the current residents in the building, as well as…post-rehabilitation to maintain a safe…environment for the families that reside in our buildings." (Tr. p. 593:25-594:3 and 592:25-593:6)

## PLAINTIFFS HAVE FAILED TO DEMONSTRATE THE EXISTENCE OF AN UNCONSTITUTIONAL CUSTOM OR PRACTICE OF THE NYPD

**A.     Dr. Fagan's and Dr. Smith's Expert Testimonies**

3.      Dr. Jeffrey Fagan's analysis in this matter is flawed and directly contradicted by Dr. Dennis Smith's analysis. Dr. Fagan conducted an analysis of UF 250 forms[1] focused on only 1,857 (1.4%) of the 135,738 stops made in the Bronx in 2011. (Tr. p. 73:2-7, 1177:16-1178:6 and Ex. 4)[2] Arrests were made in 129 of the 1,857 stops. (Tr. p. 131:9-11 and Exs. 4 and JJJJ, p. 6) These 1,857 stops, termed "Proximity Stops," were selected by Dr. Fagan

---

[1] Dr. Fagan only relies on UF 250s and UF 250s alone do not establish that a stop lacks reasonable suspicion since it is a conclusory form that does not capture all details, nuances and circumstances that may lead to a stop.

because (1) the address listed as the location of the stop was an exact match for an address on a list of buildings enrolled in TAP in 2011[3], (2) the stop occurred outdoors, and (3) the only crime suspected was criminal trespass. (Tr. p. 118:2-119:20) Dr. Fagan's analysis, however, failed to provide a valid methodology to test the purported causal connection between TAP and the stops he analyzed. (Tr. p. 1172:19-1175:10, 1175:22-1177:7 and Ex. JJJJ, pp. 7-29)

4. Dr. Fagan ignored relevant available evidence when he failed to consider the totality of circumstances contained on Side 1 and Side 2 of the UF 250 worksheets (Tr. p. 142:2-5 and 1177:8-15), yet nevertheless concluded that 1,137 of the 1,857 stops (61%) contained information **insufficient** to justify a Terry stop outdoors for criminal trespass at a TAP enrolled property. (Tr. p. 1168:10-22 and 1177:8-15) Dr. Fagan arrived at this conclusion notwithstanding the fact that: (i) he has no experience as a police officer nor did he speak with any police officers or law enforcement personnel in conducting his analysis, (ii) he has no understanding or expertise regarding police training on street stops and reasonable suspicion, and (iii) his conclusion is contradicted by NYPD training evidence which clearly identifies that its officers are instructed to include **all** circumstances leading to the stop on the worksheet. (Tr. p. 86:12-14 and 86:23-87:2) This single-sided analysis of the UF 250 worksheet was also a departure from Dr. Fagan's methodology employed in Floyd and Davis, related cases in which he analyzed the same UF 250 worksheets for the same purpose – to offer opinions on the apparent legality of stops based on information contained on the worksheets, and notwithstanding the fact that Davis also only involves trespass stops. (Ex. JJJJ p. 30-31 and Tr. p. 141:18-22, 142:25-143:22, 1188:21-1190:24 and 1195:12-22) When Dr. Smith conducted an

---

[2] 1,137 (now 1,044) alleged problematic stops relate to about 400 of 5,134 Bronx TAP buildings.

analysis of the apparent justification of the 1,857 stops using the formula that Dr. Fagan used in his <u>Floyd</u> Report (which defendants believe undercounts the stops that are "apparently justified"), Dr. Smith found that only 4.3% of these stops (79 of 1,857) would be classified as "apparently unjustified," not the 61% suggested by Dr. Fagan in <u>Ligon</u> as lacking "a basis for stopping."[4]  (Ex. JJJJ pp. 30-31 and Tr. p. 1191:20-1192:22)

5.      In the ten days before the hearing, Dr. Fagan finally conducted an analysis which purported to combine information on both the fronts and backs of the UF 250 worksheets (Tr. p. 109:8-11, 109:15-20, 140:22-141:3 and Ex. 64)  While Dr. Fagan removed 194 stops following Dr. Smith's criticisms, reducing the universe of challenged "Proximity Stops" to 1,044,  (Tr. p. 83:15-84:2, 112:23-25 and Ex. 64) Dr. Fagan did not alter his conclusions regarding the lawfulness of any of said stops. (Tr. p. 113:9-15, 113:24-114:3; 1213:13-1215:4)

6.      In addition to the totality of the UF 250 worksheets, Dr. Smith's expert report identified other relevant and available evidence that Dr. Fagan was aware of, but ignored, during his analysis of the 1,137 – now 1,044 – stops that render Dr. Fagan's conclusions unreliable.  (Ex. JJJJ and Tr. p. 130:21-23, 1183:10-23 and 1192:23-1194:4)  First, Dr. Fagan failed to include in his analysis the period of observation by the officer prior to the stop (Tr. p. 1183:10-23), a factor that could bear on reasonable suspicion, claiming that he believed it was "close to zero" on average.  (Tr. p. 80:5-11 and 133:22-135:19)  Dr. Fagan further claimed, without speaking with any officers, that what was observed by an officer was not able to be

---

[3] The use by Dr. Fagan of a list of TAP buildings from 2011 would by itself appear to contradict the contention of Mr. Dunn during his closing that "the department didn't even know how many buildings were in the program" prior to the filing of plaintiffs' lawsuit. (Tr. p. 1340:21- 1341:10)
[4] Dr. Fagan's narrow view that the basis for a trespass stop is different from the basis for other stops ignores unrebutted testimony that officers often stop potential trespassers because they are engaged in other illegal activity like drugs, weapons possession, robberies and burglaries and that trespass often precedes more violent crime.  (Tr. p. 1223:17-p. 1225:16)

interpreted, and that the period of observation added very little information to his determination of whether the stop was supported by reasonable suspicion. (Tr. 135:6-136:22 and 140:13-17) Dr. Smith's analysis (confirmed by Dr. Fagan's belatedly offered "Table 15") revealed that the average period of observation for Dr. Fagan's "Proximity Stops" was almost two minutes. (Ex. JJJJ, p. 6 and Tr. p. 134:13-18 and 1181:11-19)

7. Second, Dr. Fagan was aware of, but ignored information available regarding the circumstances leading to a stop that was located outside of the UF 250 worksheet, including 911 calls or SPRINT Reports, memobooks, arrest and complaint reports, Trespass Crimes Fact Sheets, Owner's Affidavits and/or criminal court complaints. (Tr. p. 124:3-13, 130:21-131:133-21, 140:18-21, 160:24-165:7 and Ex. 4)

8. Third, meta-categories that Dr. Fagan constructed after reviewing narratives that individual officers included in the "Other" field on the front or back of the UF 250 worksheet misrepresented the officers' entries on the UF 250 worksheets, many of which, in fact, did provide evidence of suspicious behavior arguably sufficient to justify a <u>Terry</u> stop. (Exs. JJJJ and Ex. 4 at Appendix F, and Tr. p. 155:1-157:9, 157:21-159:25, 160:24-165:7, 1199:4-9, 1200:14-1201:1, 1201:13-20, 1204:15-1205:1, 1206:10-1208:13 and 1208:19-1210:17) Dr. Fagan did this analysis notwithstanding the fact he previously declared in February 2012 in <u>Floyd</u> that he <u>did not</u> conduct such an analysis in <u>Floyd</u> because interpreting the meaning of the same or similar words by different officers would be unreliable. (Tr. p. 153:3-154:8)

9. Fourth, Dr. Fagan's conclusion that a "Furtive Movement" was not a factor that could contribute to reasonable suspicion (Tr. p. 1215:5-25 and Ex. 64) was unsupported and contrary to police testimony and Dr. Fagan's prior conclusions made in his analysis in <u>Floyd</u> and <u>Davis</u>, in which he determined that stops made based on "furtive

movements" and "high crime area" specifically, and "furtive movements" and another additional factor generally, were supported by reasonable suspicion. (Ex. JJJJ and Tr. p. 151:2-5) In Ligon, 238 of the 467 "furtive movement" "Proximity Stops" (51%) included "high crime area" as an additional circumstance supporting reasonable suspicion. (Exs. 4 at Table 8 and 64, and Tr. p. 147:5-13) Dr. Fagan also did not consider that an officer's awareness of an indoor robbery pattern (the "Ongoing Investigation" box on the UF 250 worksheet) and observations of furtive movements of a person outside a building could lead to reasonable suspicion for the crime of trespass. (Tr. p. 146:1-8 and Ex. 64) Dr. Fagan claimed that this circumstance would be a "very small number" and a "pretty rare occurrence" that would not "substantially alter the conclusions" he reached (Tr. p. 146:18-147:4), while, in fact, 41 of the 1,044 stops (4%) fit into this category. (Ex. 64)

10.     Dr. Smith's expert report identified numerous unreasonable assumptions made by Dr. Fagan during his analysis of the 1,137 – now 1,044 – stops, that also render Dr. Fagan's conclusions unreliable. (Ex. JJJJ) First, Dr. Fagan assumed that a building's enrollment in TAP was a circumstance considered by the officer supporting reasonable suspicion for all 1,857 stops, but only 417 of the UF 250 worksheets contain any affirmative indication by the officer that he or she was aware of the building's TAP enrollment. (Ex. JJJJ p. 43-44 and Tr. p. 124:18-24 and 1178:7-18) Second, Dr. Fagan assumed, without considering police tactics or interviewing any officers, that the address of the location of the stop was necessarily the address of the observed suspicious behavior. (Tr. p. 119:21-120:14) This assumption is unreasonable given the plain meaning of the language of the form – which specifically calls for inclusion of the location of the stop – and inconsistent with the NYPD's written training materials, training videos and role play scenarios, which all include circumstances in which tactical (and practical)

reasons could result in a person being stopped at a location that is not the same as the location of the observed behavior, including but not limited to (i) flight upon initial approach by officers, (ii) walking away from a crowd as officers approach, and/or (iii) officers, responding to calls (anonymous or not) that report criminal activity, do make independent observations for a period of time prior to the stop. (See Exs. S, T, RRR, pp. 21-23, EEEE., pp. 6-7, 11, 14, 16-17 and Tr. p. 818:21-821:19, 836:7-840:13, 842:15-843:16 and 896:6-18). Third, Dr. Fagan assumed a building was enrolled in TAP as of the date of the stop, even though it was possible the building was not yet enrolled. (Tr. p. 120:20-121:16) Finally, Dr. Fagan assumed that if a UF 250 worksheet which had an "Outside" box checked, (rather than the "Inside") necessarily meant that the observed suspicious behavior also took place outside (Tr. p. 73:8-15) and that the stop occurred outside the building's property line in a public space. (Tr. p. 128:1-9)

**B.    Testimony of Bronx ADA Jeanette Rucker**

11.    Bronx Assistant District Attorney Jeanette Rucker's testimony to the effect that there have been "problems" with certain of the NYPD's stops outside of TAP buildings in the Bronx was unreliable as well. (See generally Tr. p. 168:1-256:3)

12.    Ms. Rucker provided no statistics to support her assertion of a "problem," nor does she "work with statistics." (See generally Tr. p. 168:1-256:3 and 233:5-7) The only two specific "problematic" cases that she discussed during the hearing were 1) a case that was brought to her attention by an anonymous letter from a purported criminal defendant, which she could not even investigate because of the anonymous nature of the letter; (Tr. p. 190:17-20 and 237:17-19) and 2) an indoor arrest that was brought to her attention by the Bronx Defenders' Office (Tr. p. 196:13-15, 199:23-200:1 and 237:17-20), attorneys for the criminal defendant, as well as the plaintiffs in this litigation, and who thus have an "obvious bias." (Tr. p. 222:9-22 and 223:17-23) Ms. Rucker testified that the latter arrest "really pushed [her] over the edge," (Tr.

201:11-12) yet the ADA in the Bronx DA's Office who was handling it, David Grigoryan, testified that the "arrest was absolutely valid." (Tr. p. 611:12-17)

13.     The "decline to prosecute forms," plaintiffs' Exhibit 74, ("DPs") relied upon by Mr. Dunn in his summation as specific examples alluded to by Ms. Rucker of the "problem" to which she testified (Tr. p. 1361:1-1362:5), are not supportive of plaintiffs' argument either. (Ex. 74) The record reflects that Ex. 74 was admitted for the limited purpose of establishing that officers' observations of entries/exits were the bases for the underlying stops, a contention that defendants dispute without testimony from the assigned ADA and consideration of all relevant paperwork. For all other purposes, defendants' objection to the admission of Ex. 74 was sustained on hearsay grounds and "no other portion" of said documents came into evidence. (Tr. p. 210:9-220:24) Ex. 74 was not admitted for the purpose of establishing the reasons for said DPs, there was no testimony by Ms. Rucker to the reasons for the declines to prosecute in Ex. 74, nor from the face of the documents contained in Ex. 74 can it be determined (nor stand for the proposition) that the reasons for the DPs were stops without reasonable suspicion. (Tr. p. 210:9- 220:24 and Ex. 74) Further, there is no indication from the DPs that all of the information that forms the basis of a reasonable suspicion stop was considered, i.e., UF 250s, officer memobooks, Trespass Fact Sheets, etc. (Ex. 74)

14.     Although Mr. Dunn also contended in his summation that Ms. Rucker's credibility is supported by the proposition that the NYPD is training on issues which Ms. Rucker raised in her various letters, (Tr. p. 1363:25-1364:6) no evidence was adduced at the hearing to support a causal nexus between Ms. Rucker's letters and a decision by the NYPD to conduct training. To the contrary, Ms. Rucker's credibility is undercut by the following: 1) ADA David Grigoryan in no uncertain terms testified that as to the aforementioned arrest that he prosecuted,

he believed the arrest was "absolutely valid," (Tr. p. 611:12-17) and told Ms. Rucker such; (p. 614:17-19)  2)  Mr. Grigoryan sees no widespread problem with trespass arrests in his work at the Bronx DA's Office with respect to probable cause lacking for said arrests;  (Tr. p. 615:3-7) 3)  Ms. Rucker's advise to the NYPD in 2009 that the Bronx DA's Office will not prosecute vestibule arrests (Ex. AAAA, ¶ c and Tr. p. 225:4-7)(even where an inebriated person takes homage therein unless there is a sign in the vestibule)(Tr. p. 229:6-230:6)) is contradicted by applicable law, (Ex. L and Tr. p. 226:20-22) and the NYPD disagrees with her position on same as vestibules are private property.  (Tr. p. 561:20-563:13);  4)  The NYPD understands Ms. Rucker's position to be that the Bronx DA's Office essentially will not prosecute arrests for trespass effectuated outdoors (Tr. p. 999:10-18 and p. 724:12-725:15), and that her Office makes "blanketing" decisions not to prosecute certain types of cases such as outdoor arrests for trespass, (Tr. p. 729:18-730:5) despite Ms. Rucker's admission at the hearing that such arrests are absolutely constitutional; (Tr. p. 233:6-8)  5)  Ms. Rucker could not testify to any outdoor arrests for trespass that her office has prosecuted; (Tr. p. 254:14-255:4)  6)  The NYPD understands Mr. Rucker's position to be that she won't prosecute trespass arrests where locks or signage have either been broken, destroyed or torn down as well.  (Tr. p. 566:15-567:3)

C.    **Plaintiffs' Testimony and Sgt. Musick's Work**

15.    Sgt. Robert Musick conducted an exhaustive search to determine the officers involved in the purported incidents presented by plaintiffs at the hearing and no officers other than those involved in the two arrests presented could be ascertained.[5]  (Tr. p. 1124:1-1125:25, 1128:13-1129:9, 1131:3-1132:17, 1134:25-1136:16, 1138:14-1142:17 and 1155:2-9) Combined with plaintiffs' inability to provide specificity as to the dates of the purported stops to

which they testified as well as the officers involved in said purported incidents, plaintiffs' self serving testimony lacked credibility, deprived defendants of a full and fair opportunity to defend those challenged stops and present their side of the story, and lead to the potential conclusion that said stops may not have occurred at all. (See Tr. p. 1358:5-6) Moreover, even if the purported stops did occur, there is no evidence that the stops were of a forcible nature to rise to the level of reasonable suspicion under Terry v. Ohio, 392 U.S. 1 (1968) or People v. DeBour, 40 N.Y.2d 210 (1976). The testimony of the officers regarding the arrests of the plaintiffs Bradley and Turner underscore the importance of hearing the officers' side of the story.

16.     Plaintiff Jovan Jefferson testified that his alleged stop may have occurred in "April, May, or June of 2012." (Tr. p: 369:17-18) When asked at his deposition on August 6, 2012, shortly after plaintiffs' lawsuit was filed, about any stops by the NYPD, Jefferson did not even identify the stop to which he testified at the hearing. (Tr. p. 370:24-371:10).

17.     Plaintiff Kieron Johnson testified that he was allegedly stopped by "truancy" officers in "2010,"[6] (Tr. p. 388:3-389:11) as opposed to a trespass stop.

18.     Plaintiff J.G., who testified at his deposition that he considers it a stop any time a police officer says "hello" to him or any time a police officer even speaks to him, (Tr. p. 444:9-446:7), could not remember the exact date or time of his purported August 2011 stop. (Tr. 446:8-447:12) J.G. gave varying accounts as to how many officers were present during this purported stop, and could not remember any physical characteristics of the officers present, except to note that two of the officers were Caucasian males. (Tr. p. 447:15-448:20)

---

[5] Plaintiffs could not identify the date of eight of the eleven purported incidents at issue with any specificity. (Tr. p. 317:18-25, 320:1-4, 343:17-19, 350:7-11, 369:12-18, 388:7-389:7, 446:8-447:12 and 453:6-8)

[6] When deposed, he testified that the stop "occurred…a few years ago." (Tr. p. 388:7-389:7)

19.     Non-party Jerome Grant could not remember the exact date of his purported July 2011 stop. (Tr. p. 453:6-8 and 467:14-19)  Grant testified that he was walking with his brother Jarren, his cousin Shawn Grant, and Kawane Simmons towards his grandmother's apartment building, when Jarren "ran" from the group into the building's open front door.  (Tr. p. 463:17-464:1)  Grant testified that Jarren closed the front door behind him, preventing the group from entering the building.  (Tr. p. 464:9-18)  Grant testified that Shawn became agitated, and the group repeatedly knocked on the front door, which subsequently caused two police officers, who he could only identify by gender and race,  (Tr. p. 467:1-2) to approach them. (Tr. p.464:9-466:22 and 455:15-22)  The officers' approach appears to have been based on the foregoing acts of the individuals, not on the suspicion of trespass.

20.     Plaintiff Letitia Ledan testified that despite having lived in the River Park Towers complex[7] for eleven years, she has only been "stopped by NYPD officers at River Park Towers while outdoors" on two occasions, neither one of which is necessarily indicative of a stop based on suspicion of trespass, even based on her accounts thereof.  (Tr. p. 297:7-8 and 300:25-301:2)  With respect to the first purported stop in 2009,[8] which Ledan conceded occurred *on the premises* of River Park Towers, Ledan could not describe any of the officers purportedly involved (Tr. p. 318:5-13 and 319:16-22) nor is there any indication that Ledan was stopped by the NYPD on the suspicion of trespass, as the officers only purportedly requested her identification after asking her if she lived in the Complex.  (Tr. p. 302:4-14)  With respect to her second purported stop in the summer of 2011, (Tr. p. 320:1-4) which also "occurred within the

---

[7] River Park Towers is an enclosed "complex that contains four large towers" and "has stores on the property."  (Tr. p. 297:16-19; and Ex. YY)  River Park Towers features a security booth in its front entrance staffed by guards twenty four hours a day (Tr. p. 313:13-23 and Ex. YY).
[8] The year "2009 is as precise a date" as plaintiff could provide to the Court as to when this purported stop occurred.  (Tr. p. 317:18-25)

River Park Towers complex," (Tr. p. 325:3-5) Ledan testified that she could have avoided approaching an already <u>existing</u> encounter between NYPD officers and three other individuals, including her husband,[9] by taking a different route into her building. (Tr. p. 323:17-19) Ledan, however, was interested in "finding out why [the three individuals] were stopped." (Tr. p. 330:16-23) In any event, Ledan could only describe the race and gender of the officers allegedly involved. (Tr. p. 325:23-326:16) There is no indication that the existing encounter involving her husband nor her interaction had anything to do with suspicion for the crime of trespass.

21. Plaintiff Roshea Johnson testified that he was stopped by the NYPD "on the premises of River Park Towers" on "Father's Day 2010." (Tr. p. 420:8-19) At the time of this purported stop, Johnson was unable to do enter his sister's apartment, as Ledan had taken away his key because she was tired of him entering her apartment late at night. (Tr. p. 421:1-22) Johnson has no direct knowledge as to why the officers purportedly approached him, but testified that they "kept on asking [him] where the drugs and guns [were] at." (Tr. p. 426:7-13)

22. Plaintiff Fernando Moronta testified that his purported stop occurred "in the wintertime of 2008 between January and March, around there" and possibly even December 2007 (Tr. p. 343:17-19 and 350:7-11).[10] Moronta could only remember the race and gender of the five to six uniformed male NYPD officers present, and could not describe any other characteristics of the officers. (Tr. p. 353:15-354:22)

23. With respect to plaintiff Abdullah Turner's arrest on March 26, 2011, defendant P.O. Ramdeen and his partner, P.O. Pomerantz, observed Mr. Turner in the lobby of 2020 Davidson Avenue, a known drug-prone TAP building. (Tr. p. 1011:4-1015:5) P.O.

---

[9] Ledan's husband, Antoine, was on plaintiff's witness list for the hearing, but he did not want to attend the hearing and did not testify, as plaintiffs failed to subpoena him. (Tr. p. 505:23-508:4)
[10] Plaintiffs' complaint, however, alleges that this incident occurred in 2010. (Compl. ¶ 129)

Ramdeen observed Turner "for approximately two to three minutes *inside the lobby*[11] pacing back and forth, seemingly aimlessly, just wandering around looking up the stairs, looking back down the stairs, continually pacing." (Tr. p.1017:9-19)  P.O. Ramdeen asked Turner (who had exited the building) if he lived in the building or knew anyone in the building, to which Turner replied, "no." (Tr. p. 1017:9-19 and 1021:16-20)  P.O. Ramdeen then asked Turner what he was doing in the building, and "in sum and substance, [Turner] responded with, 'I am not going to lie, Officer, I just came with my friend [Anginette Trinidad].  She went upstairs to buy weed.  I don't know what floor she is on.  I don't know what apartment she's in.'" (Tr. p. 1021:16-25 and 1051:14-21)  Trinidad later volunteered an illegal gravity knife and marijuana to the officers, (Tr. p. 500:9-11) and ultimately pled guilty to charges arising therefrom.  (Tr. p. 626:3-12)[12]

24.     Turner also testified at the hearing that he was purportedly stopped in either December 2011 or January 2012, but only testified at his deposition that the stop occurred sometime in "2012." (Tr. p.501:9-502:2)[13]  Turner's purported stop took place in the courtyard and on the premises of his building.   (Tr. p. 502:20-503:7)

25.     With respect to the arrest of plaintiff Charles Bradley on May 3, 2011, defendant P.O. Miguel Santiago was parked in an unmarked vehicle in front of a TAP building located at 1527 Taylor Avenue, which he knew to be a drug and shooting prone location.   (Tr. p. 1081:4-21)  P.O. Santiago observed Bradley walking "back and forth in front" of 1527 Taylor

---

[11] Turner testified that he never went inside the building before encountering the officers, even though it was "freezing cold" outside, Turner was not wearing a jacket or hat, and Turner was aware that the front door to the building was unlocked.  (Tr. p. 495:5-18 and 497:1-25)

[12] Contrary to plaintiffs' assertions during summations that an officer named P.O. Montanez was present during Turner's arrest, P.O. Ramdeen testified that only he and Pomerantz were in their vehicle at the time of the incident. (Tr. p. 1012:24-25)  Plaintiffs never deposed P.O. Montanez.

[13] Despite alleging that the stop occurred in either December or January, Turner testified that it was "warm outside" and Turner claimed that he was leaving his building wearing only his pajamas.  (Tr. p. 502:5-19)

12

Avenue. (Tr. p. 1084:1-4) P.O. Santiago then observed, through "all glass" doors, Bradley in the vestibule for two-to-three minutes "going back and forth, disappear[ing] for one or two seconds, come back [again] and disappear and exit out the building." (Tr. p. 1086:21-1087:9, 1108:12-17) After Bradley exited the building, P.O. Santiago asked Bradley what he was doing in the building. (Tr. p. 1088:12-22) Bradley stated that he "went to visit his girlfriend." (Tr. p. 1088:12-21) When asked what apartment he was visiting and on what floor his girlfriend lived, Bradley responded that "he doesn't know." (Tr. p. 1088:12-21) Bradley informed P.O. Santiago that he did not live in the building, and could not produce identification. (Tr. p. 1088:12-21) Mr. Bradley, who testified that his girlfriend took away his keys when they were arguing, did not have keys to her apartment on the date of his arrest. (Tr. p. 285:11-13 and 291:2-5)

## ENHANCEMENTS TO TAP THAT HAVE OCCURRED IN 2012

26.     On or about May 21, 2012, the NYPD issued Interim Orders 22 and 23 of 2012.[14] (Ex. A and Tr. p. 522:14-17) Interim Order 22 of 2012 clarified the NYPD's practices and procedures with respect to "operations" and patrols of TAP buildings: the stated purpose of IO 22 of 2012 "is to prevent, detect and take necessary enforcement action regarding illegal activity occurring" in buildings that are enrolled in the Program. (Ex. A, "Purpose" and Tr. p. 523:1-7 and 551:2-7) Interim Order 22 of 2012 was a revision to Patrol Guide 212-59, "Vertical Patrol," that became effective in 2000.[15] (Ex. FFFF and Tr. p. 678:19-680:2)

27.     A focus group was conducted by Insp. Kerry Sweet, Esq. of the NYPD's Legal Bureau with precinct sergeants and lieutenants in the "late summer of 2010" so that Insp. Sweet could "get their input," evaluate the needs for TAP going forward and create a uniform

---

[14] Interim Orders represent the policy of the NYPD. (Tr. p. 522:2-11)
[15] The existence of P.G. 212-59 by itself belies the claim made by Mr. Dunn in his summation that "there was not a single department official policy or procedure that related to enforcement activity around the clean halls program,…" (Tr. p. 1340:24-p. 1341:1)

approach citywide.  (Tr. p. 523:8-525:14 and p. 526:17-531:5)  Insp. Sweet also held meetings with representatives of the various DA's Offices in February and April of 2011 to ascertain their needs and further the goal of a uniform approach citywide.  (Tr. p. 524:10-23 and 531:6-534:21)  Following same, IOs 22 and 23 of 2012 were drafted.  (Tr. p. 524:23-525:1)  A follow up meeting with the various DA's Office representatives took place in July, 2012.  (Tr. p. 535:14-536:1)  In fact, Insp. Sweet has always listened to the various DA's concerns and even Ms. Rucker has "applauded him" for trying to improve TAP.  (Tr. p. 249:4-13)

28.     IO 22 of 2012 sets forth when an officer may approach, stop and/or arrest a person in connection with TAP patrols, and primarily addresses the crime of trespass.  (Tr. p. 548:19-549:1 and Ex. A)  IO 22 of 2012 states in the Note on the second page thereof that a "uniformed member of the service may approach and question persons if they have an objective credible reason to do so.  However, a uniformed member may not stop (temporarily detain) a suspected trespasser unless the uniformed member <u>reasonably</u> <u>suspects</u> that the person is in the building without authorization."   (Ex. A and Tr. p. 553:1-16)  At paragraph 11(d) of IO 22 of 2012, it is stated that "[w]hen reasonable suspicion develops that a person has committed, is committing or is about to commit a felony or a Penal Law misdemeanor, [the uniformed member is to] take appropriate police action as per P.G. 212-11, "Stop and Frisk.'"  (Ex. A and Tr. p. 554:4-21)(See also P.G. 212-11, Exs. K and CC, that also belie Mr. Dunn's assertion that there was no department policy for stop and frisk pre-dating the promulgation of IO 22 of 2012)  In the "Additional Data" section of IO 22 of 2012, the aforesaid portion of the Note is repeated and goes on to state:  "Some factors which may contribute to "reasonable suspicion" that a person is trespassing, in addition to those factors set forth in P.G. 212-11, "Stop and Frisk," are contradictory assertions made to justify presence in the building and/or assertions lacking

credibility made to justify presence in the building." (Ex. A at p. 3) The Additional Data section of IO 22 also states that, "[a] uniformed member of the service may arrest a person for trespass when he or she has <u>probable cause</u> to believe the person is not a resident, and is not authorized to be in the building." (Ex. A and Tr. p. 556:8-557:6)

29.     Other standardized practices that officers are to follow with respect to their patrols of TAP buildings are set forth in IO 22 of 2012 as well, i.e., 1) questions that should be asked by officers of persons reasonably suspected of trespassing that are in paragraph 11(a) thereof; 2) the "reasonable measures" that should be taken by officers to verify a person's authority to be in the building when such authority is in question that are in paragraph 11(b) thereof; and 3) that the officer "may instruct the person to leave the building or be subject to arrest for trespass…if the person refuses to exit the building and does not establish a right to be in the building," that are in paragraph 11(c) thereof. These practices are geared toward enforcement of the crime of trespass. (Exs. A, BB and Tr. p. 549:11-20 and 557:7-559:23)[16]

30.     In connection with the issuance of IOs 22 and 23 of 2012, uniform "Trespass Crimes-Owner's Affidavit" (Ex. G) and "Trespass Crimes-Fact Sheet" (Ex. H) forms for use in connection with TAP were developed after consultation with the various District Attorney's Offices. (Tr. p. 543:13-544:24 and p. 532:6- 534:20) The purpose of the "Trespass Crimes-Owner's Affidavit" is that if arrests are made by NYPD personnel in TAP buildings, the executed form facilitates the prosecution of individuals for trespass by preventing the necessity of obtaining affidavits from landlords/owners repeatedly. (see Tr. p. 526:21-528:7) From May, 2012 onward, it has been required that the "Trespass Crimes-Fact Sheet" form be completed:  an

---

[16] Ms. Karteron in her closing statement complained about the "remarkable similarity" of the questions that were purportedly posed by police officers to plaintiffs during the incidents

officer making an arrest based on probable cause for the crime of trespass must document the pertinent facts surrounding a particular trespass arrest. (Tr. p. 545:15-547:10 and 997:14-998:1 and Ex. H) UF 250 Stop, Question and Frisk worksheets continue to be required if a stop is made upon reasonable suspicion.[17] (Ex. A at p. 3 and Tr. p. 559:24-560:7)

31.    IO 23 of 2012, promulgated in connection with IO 22 of 2012, addresses "administrative" issues in connection with TAP, including procedures for buildings' enrollment in TAP, and the reporting requirements with respect to same. (Ex. B and Tr. p. 523:2-7, 536:11-539:21 and 541:3-12) IO 23 of 2012 also specifically states that residents, their guests and others authorized to be in the buildings are not to be arrested. (Ex. B and Tr. p. 540:19-25)

32.    A comprehensive "Plan to Ensure all Uniformed Members of the Service Have a Working Knowledge of Criminal Trespass Offenses," was issued by a Report of the Chief of Patrol to the Chief of the Department on or about June 18, 2012. (Tr. p. 690:17-697:16 and Ex. D) Pursuant thereto, a written report from the Chief of Patrol to Commanding Officers (Tr. p. 687:11-690:7 and Ex. C) was issued to "give a brief synopsis of the new procedures and…the changes in the new interim orders. (Ex. D, ¶ 2 and Tr. p. 687:11-20 and p. 788:2-21) Training personnel, including training sergeants and special operations lieutenants from each precinct, were instructed on Interim Orders 22 and 23 of 2012, with Legal Bureau personnel present for instruction on legal issues, and said training personnel were to train uniformed members at the precinct level on the new procedures. (Ex. D, ¶ 3 and Tr. p. 691:16-695:12) 94% of uniformed personnel had already been trained on IOs 22 and 23 of 2012 as of the hearing

---

testified to by plaintiffs at the hearing. (E.g. Tr. p. 1329:13-29) Defendants contend that any similarity in the interactions demonstrates that officers are being uniformly trained.

[17] Plaintiffs were only able to point out at the hearing isolated instances where UF 250s should have been filled out in conjunction with other arrest paperwork documenting the stop and arrest

date.  (Ex. D, ¶ 4, Tr. p. 695:22-697:4)  Quarterly reviews to ensure that buildings are properly enrolled in TAP are required "to measure the success of the program as well as see if we're having an impact on any of the buildings that we're receiving complaints about."  (Ex. D, ¶ 5 and Tr. p. 703:4-25)  The Chief of Patrol Field Training Guide of 2012 (Ex. N), forms of which had existed for "a number of years" (Tr. p. 1230:11-22), was distributed to IMPACT Supervisors to continue the training of Probationary Police Officers.  (Ex. D, ¶ 6, Ex. N and Tr. p. 697:5-703:3) Precinct commanders complied with the requirements set forth in the aforesaid Plan.  (Tr. p. 995:3-996:8 and Tr. p. 789:8-797:8)

33.    Borough and precinct commanders were separately trained on IOs 22 and 23 of 2012, with legal bureau personnel present.  (Tr. p. 711:24-714:11 and p. 1230:23-1233:8) The four levels of DeBour and the applicability of DeBour to both indoor and outdoor stops were also discussed at said training sessions.  (Tr. p. 713:24-714:11, 807:11-808:5 and 1233:1-6)

34.    From an operational standpoint, a Memorandum of the Chief of Patrol to the Commanding Officers of each precinct dated August 20, 2012, reiterates the requirements for arrests and stops related to TAP.  (Ex. E and Tr. p. 705:2-711:1)  Significantly, said requirements include the following:  Patrol and IMPACT Supervisors must, when possible 1) review the circumstances of and verify arrests at the location of arrest;  (Ex. E, ¶ 2 and Tr. p. 705:8-706:12) 2) discuss the circumstances of each such arrest with the arresting police officer with an emphasis on training;  (Ex. E, ¶ 2 and Tr. p. 707:12-21)  3) respond to locations where verticals and warrant checks are being conducted and "manage" any related street encounters;  (Ex. E, ¶ 2 and Tr. p. 707:22-709:12)  4)  platoon commanders must critique all situations where there were "interior or exterior street encounters" which required a UF 250 form to be prepared;  (Ex. E, ¶ 3

_____

but were not.  Otherwise, there was no evidence presented by plaintiffs that UF 250s should have

and Tr. p. 710:1-711:1) 5) platoon commanders must ensure that such encounters based upon reasonable suspicion are in accordance with P.G. 212-11 and IO 22 of 2012 (Ex. E, ¶ 3 and Tr. p. 710:1-711:1) 6) commanding officers are to identify their most problematic TAP locations and include said locations in the Command's Conditions Reports. (Ex. E, ¶ 4) Steps are being taken by the NYPD to ensure that the requirements set forth in Ex. E are being followed, including the COMSTAT process. (Tr. p. 711:2-23) Precinct commanders are ensuring compliance with the requirements of Ex. E as well. (Tr. p. 996:9-21 and 801:23-807:10)

35.     NYPD officers receive extensive training throughout their careers, beginning with the more than six months that each newly hired officer spends at the accredited NYPD Police Academy recruit training school ("Academy")(Tr. p. 817:11-818:20 and 982:1-13), and continuing post-graduation in the form of INTAC, command-level, promotional, and specialized training. (Tr. p. 884:6-886:11)

36.     At the Academy and continuing during their employment, NYPD officers at all levels receive extensive training regarding the laws governing an officer's ability to Stop, Question and Frisk, which includes instruction on the law, department policies and procedures, the completion of department forms (including the UF 250 worksheet and Trespass Crimes Fact Sheet), and police tactics. (Tr. p. 818:21-821:19, 825:16-829:17, 830:7-15, 830:18-832:2, 840:14-17, 842:6-848:18, 848:24-854:10, 854:16-856:7, 856:12, 856:15-858:23, 861:1-872:23, 874:9-20, 877:7-879:5, 879:17-880:25, 881:4-882:1, 882:22-884:5 and Exhibits K, CC, EE, FF, GG, HH, RRR, and EEEE) Officers also receive extensive instruction regarding the penal law and pertinent changes thereto, including trespass crimes. (Tr. p. 823:14-824:16, 832:3-15, 833:16-834:6 and Ex. RRR )

---

been completed, but were not.

37. The NYPD has developed a refresher course on Stop, Question and Frisk that is being conducted at Rodman's Neck in the Bronx.[18] (Tr. p. 571:25-572:12) Chief James Shea began to develop the course in January-February, 2012. (Tr. p. 888:1-2) All NYPD uniformed personnel will be required to take the course and the officers most likely to encounter the issues that are the subject of the course, i.e., IMPACT officers (officers assigned to high crime IMPACT zones), have been prioritized as far as being taught the course first. (Tr. p. 889:24-890:8 and 896:24-897:19) More than 3000 officers had attended the Rodman's Neck training as of the end of September 2012. (Tr. p. 955:8-19).

38. The NYPD's Legal Bureau is presenting an hour and a half to two hours long portion of the Rodman's Neck course on the law of Stop, Question and Frisk and its Powerpoint presentation is in evidence as Exhibit J. (Tr. p. 572:13-573:3) It includes comprehensive instruction on the four levels of DeBour and Terry, and what level of police actions are appropriate at each level. (Ex. J, pp. 6-37) Segments of the presentation specifically address TAP buildings and the crime of trespass (Ex. J, pp. 38-42 and Tr. p. 573:18-579:4), and the Powerpoint presentation specifically states that the four levels of DeBour apply to the "public areas of…TAP buildings." (Ex. J, p. 39) The Powerpoint presentation also specifically states that "observation of an individual exiting a NYCHA/TAP Building, without more, is not an objective, credible reason to approach that individual," (Ex. J, p. 40 and Tr. p. 577:6-578:12), which is consistent with NYPD policy that "stopping an individual outside of [a] Clean Halls

---

[18] Insp. Sweet testified that in 2010-2011, all officers also received training in some form in connection with the promulgation of IO 23 of 2010 on the four levels of DeBour and which also addressed the crime of trespass. (Tr. p. 515:25-517:11 and 518:17-18) However, Mr. Dunn's contention in his summation that Insp. Sweet knew of a widespread problem with the types of stops at issue in this litigation (Tr. p. 1341:18-1342:3) is belied by Insp. Sweet's testimony that he was unaware of a "systemic problem," but only of "isolated cases." (Tr. p. 682:1-13)

building simply because they are exiting a building, without more…, that is something we do not want the officer doing…and we have made that clear to them." (Tr. p. 1244:6-12)

39.     Trespass crimes are also regularly used in scenarios and role plays attendant to trainings regarding Stop, Question and Frisk, including at the tactical village at Rodman's Neck. (Tr. p. 836:7-837:14 and 837:22-839-17, 896:1-18, 887:8-18 and Ex. M)

40.     The Rodman's Neck training also includes a lesson on the proper preparation of a Stop, Question and Frisk UF 250 worksheet, including stops for trespass, which is consistent with the training recruit officers receive at the Academy. (Tr. p. 894:21-895:1, 898:3-12, 898:21-899:6, 971:1-19, 973:6-19 and Exs. V and W) Additionally, there are role play simulations where officers taking the course face live situations that they may encounter in the field. (Tr. p. 895:15-19 and 896:1-18) The role play simulations include an outdoor stop as well as a stop inside a building on suspicion of trespassing, after which the officers are critiqued. (Tr. p. 964:5-16) There are also segments of the course dedicated to the characteristics of armed suspects and a lecture that emphasizes the importance of proper and appropriate interactions with the citizenry. (Tr. p. 895:1-8, 895:20-25, 899:15-23, 900:4-20 and Exs. MM and LL)

41.     Representatives of the various District Attorney's Offices were invited to attend the Rodman's Neck training course and did attend in August, 2012. (Tr. p. 579:24-580:6) The Bronx District Attorney's Office, including Ms. Rucker, thought the course was "excellent" and the Bronx DA wants more of its ADAs to be able to attend it. (Ex. I and Tr. p. 251:4-8)

42.     The Training Bureau has developed a five-part video series on Stop, Question and Frisk, which includes training on the four levels of DeBour and Terry. (Tr. p. 902:2-22, 903:19-904:20 and Exs. S and T) The fifth part was developed earlier this year. (Tr. p. 900:21-901:8, 902:24-903:15 and Exs. T, Q and U) All police officers have been required to

view all five parts of the video series, usually at the precinct.  (Tr. p. 942:10-24 and Ex. Q)  The fifth part instructs officers, consistent with recruit training and applicable law[19], that usually, verbal commands such as "Stop, police!" will not constitute a seizure, however a verbal command, <u>plus other actions</u> may be considered a seizure.  (Exs. T and U)

43.     The 2012 Chief of Patrol Field Training Unit Guide contains a comprehensive analysis of the law of stop, question and frisk as well.  (Ex. N, pp. 10-24 and Tr. p. 700:20-701:18)  At p. 65, the Training Guide specifically addresses TAP and repeats IO 22 as follows:  "A uniformed member of the service <u>may not</u> stop (temporarily detain) a suspected trespasser unless the uniformed member reasonably suspects that the person is in the building without authority."  (Ex. N, p. 65)  It also includes an insert for officers' memobooks on the four

---

[19] First, not every police encounter requires reasonable suspicion and may be consensual. Contrary to plaintiffs' counsel's assertions during closing arguments (Tr. p. 1366:22-1367:6), New York Law applies.  See People v. Kelta, 2011 WL 1936076, at *6 (N.Y. Sup. Ct. May 19, 2011)("While Federal Courts narrowed the definition of seizure to physical restraint, New York has adopted the broader "reasonable person" test, which is 'whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom.'  Such a determination typically involves considering and individually weighing all of the facts and circumstances, including…whether verbal commands were given, and their number, content and tone.")(internal citations omitted).  Second, under New York law, "[m]erely issuing a verbal command, however, does not by itself constitute a seizure."  Id.  See also People v. Bora, 83 N.Y.2d 531, 535 (1994); People v. Reyes, 199 A.D.2d 153 (1st Dept. 1993), aff'd 83 N.Y.2d 945 (1994).  Third, even under federal law, verbal commands of "Stop, Police!" alone would be insufficient to constitute a seizure.  See, e.g., California v. Hodari D., 499 U.S. 621, 626 (1991)( "[a]n arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority."); United States v. Mendenhall, 446 U.S. 544 (1980). Therefore, the NYPD's training materials and instruction to officers on this point of law – which are that verbal commands such as "Stop, Police!" alone will not usually constitute a seizure, however verbal commands <u>plus other actions</u> may be considered a seizure – are entirely consistent with the law.  The mere fact that someone does not subjectively feel free to leave in response to a police request for information or approach does not convert every voluntary police encounter into a forcible Terry stop.  The fact that an individual voluntarily provides information to a police officer does not turn the encounter into a forcible stop while that person is waiting for the return of his identification.

levels of <u>DeBour</u> and <u>Terry</u> that must be carried by NYPD officers as a point of reference as they perform their duties.  (Ex. N, Appendix 21 and Tr. p. 701:19-703:3)

44.     In 2011, declines to prosecute for criminal trespass arrests in the Bronx numbered 1,358 out of 5,542 arrests for a rate of approximately 25%.  (Tr. p. 726:18-25)  In 2012, as of September 30th, declines to prosecute for criminal trespass numbered 333 out of 2,626 arrests for a rate of 12.5%.  (Tr. p. 727:1-4)  In the most recent quarter ending in September, 2012, the decline to prosecute rate for criminal trespass in the Bronx fell to 5 ½%. (Tr. p. 1235:4-23)  Ms. Rucker conceded that arrests for trespass and declines to prosecute are "way down" in the Bronx for 2012.  (Tr. p. 248:3-7)  The Bronx DA's policy decision in late 2011 to allow officers to correct their paperwork reduced declines to prosecute.  (Tr. p. 1236:5-12, 998:14-999:9 and 252:24-253:8)  Additionally,  for certain categories of arrests, such as outdoor arrests for trespass, where the Bronx DA has indicated that it generally will not prosecute, officers have responded by not making such arrests.  (Tr. p. 727:25-728:7)

45.     There are many reasons for a decline to prosecute other than the lack of probable cause for the arrest.  (Tr. p. 248:15-17)  For instance, Ms. Rucker identified problems with officers' paperwork and prosecutorial discretion as two such reasons.  (Tr. p. 248:18-21) Other reasons are the failure of an officer to be available as necessary (Tr. p. 809:9-12), and/or a witness or complainant being unavailable.  (Tr. p. 809:15-17)

46.     No evidence was presented by plaintiffs on an aggregate/statistical basis as to why declines to prosecute occurred and plaintiffs' further ignored 2012 data.

## CONCLUSIONS OF LAW

47.     Plaintiffs lack standing to seek injunctive relief as one past incident involving a particular plaintiff and the police has been found to be insufficient to confer standing. <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95 (1983).  Of the 9 plaintiffs who testified about stops

to which they were subjected, 7 were stopped only once. 2 were stopped twice. Of said stops, all but one occurred between 2007 and 2011.

48. Plaintiffs do not object to the NYPD's official policies. Rather plaintiffs are moving under a "custom" type theory.[20] "Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful action." Reynolds v. Giuliani, 506 F.3d 183, 191 (2d Cir. 2007). "[A] city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989)). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011). It requires a *deliberate choice* to retain a program of training or supervision despite actual or constructive notice that a *particular omission* in such program causes constitutional violations. Id.

49. No evidence was adduced at the hearing to establish an unconstitutional policy or practice by the City, nor did the evidence establish a pattern of misconduct or acquiescence or tacit authorization of subordinates' alleged unlawful conduct by the City either.

50. Regardless, plaintiffs still bear the "heavy burden of proof in showing that the [City's] response was so patently inadequate to the task as to amount to deliberate indifference." Reynolds, at 192-193; see also 197. For example, "[a] training program must be

---

[20] Although plaintiffs stated in the opening brief that they were alleging "deliberate indifference" of a policymaking official as a basis for municipal liability (p. 19), plaintiffs never identified who this official was at the hearing or developed this theory.

quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." Id. at 193(quoting Young v. City of Providence, 404 F.3d 4, 27 (1st Cir. 2005)). The same standard applies to supervision and monitoring.

51.    The training, supervision and monitoring undertaken by the NYPD before and after the promulgation of IOs 22 and 23 of 2012 as outlined in ¶¶26-43 above reflect that the City has not been deliberately indifferent or that plaintiffs are in danger of "imminent harm." The legal standards that apply to the outdoor stops challenged by plaintiffs apply equally to stops generally.  Further, the law relating to stops on suspicion of trespass applies to stops for other crimes.  Plaintiffs have also failed to prove that the NYPD's training, supervision and monitoring on stop, question and frisk is "meaningless" or "obviously inadequate" as required.  Id. at 196. Although plaintiffs have advocated different training, supervision and monitoring programs, i.e., that TAP or trespass be discussed more, or that supervisors discuss all trespass stops with their subordinates, such is inadequate to prove municipal liability and improperly invites judicial second-guessing of the City's managerial decisions and priorities.  Id. at 193, 198.  In fact, Mr. Dunn praised the City's stop, question and frisk training in summation.  (Tr. p. 1372)

52.    "The authority to issue an injunction is an extraordinary and powerful one that is to be used sparingly and cautiously and only in a 'clear and plain' case."  Id. at 197-98(quoting Rizzo v. Goode, 423 U.S. 362, 378 (1976)).  "Even greater caution is appropriate where a federal court is asked to interfere by means of injunctive relief with a state's executive functions, a sphere in which states typically are afforded latitude."  Id. at 197-98(quoting Rizzo at 378-80).

53.     Further, the injunctive relief that plaintiffs seek (See Tr. p. 1371:8-1383:11) was presented solely in Mr. Dunn's summation, and was unaccompanied by competent testimony of an expert or otherwise as to the need for said relief based on legal deficiencies in the City's training, supervision or monitoring with respect to stops in or around TAP buildings.

54.     The general rule for the issuance of a preliminary injunction is that a party must show "irreparable harm in the absence of an injunction and a likelihood of success on the merits." Latino Officers Ass'n v. Safir, 196 F.3d 458, 462 (2d Cir. 1999). Plaintiffs, however, are seeking just mandatory relief (See Tr. p. 1371:8-1383:11), as opposed to prohibitory[21] relief. Where a party seeks a "'mandatory' injunction, that is, [one] that it 'will alter, rather than maintain, the status quo . . . by commanding some positive act,' a more stringent standard must be met. Nicholson v. Scoppetta, 344 F.3d 154, 165 (2d Cir. 2003). "For mandatory injunctions,…'the movant must show a 'clear' or 'substantial likelihood of success' on the merits.'" N.Y. Civ. Liberties Union v. N.Y. City Transit Auth., 652 F.3d 247, 255 (2d Cir. 2011). "In sum, courts 'should show a greater reluctance to issue a mandatory injunction than a prohibitory injunction." Hurley v. Toia, 432 F. Supp. 1170, 1175 (S.D.N.Y.), aff'd mem., 573 F.2d 1291 (2d Cir. 1977). Plaintiffs are unable to meet the foregoing standards for the "mandatory" injunctive relief that they seek.

## CONCLUSION

55.     For the foregoing reasons, plaintiffs' application for a preliminary injunction must be denied.

---

[21] Prior to the hearing, plaintiffs had stated that they generally sought to prohibit stops outside of TAP buildings that lacked reasonable suspicion for the crime of trespass, but appear to have abandoned same, as they now seem to recognize that "a simple command that the defendant obey the law" is not legally cognizable. S.C. Johnson, Inc. v. Clorox Co. 241 F.3d 232 (2d Cir. 2001).

Dated:      New York, New York
                November 20, 2012

                        MICHAEL A. CARDOZO
                        Corporation Counsel of the
                         City of New York
                        Attorney for Defendants
                        100 Church Street, Room 3-133b
                        New York, New York 10007
                        (212) 442-8248

                        By:                   /s/
                            Mark Zuckerman
                            Heidi Grossman
                            Brenda Cooke
                            Joseph Marutollo
                            Richard Weingarten
                            Judson Vickers