UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JAENEAN LIGON, et al.                         :
                                              :
                        Plaintiffs,           :
                                              :        12 Civ. 2274 (SAS)(HBP)
        -versus-                              :
                                              :
CITY OF NEW YORK, et al.                      :
                                              :
                        Defendants.           :
------------------------------------------------------------X

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion, Jr.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

Dated: November 20, 2012

Plaintiffs submit the following proposed findings of fact and conclusions of law in relation to their Motion for a Preliminary Injunction:

## FINDINGS OF FACT

## THE NYPD'S TRESPASS AFFIDAVIT PROGRAM

1.      The NYPD operates a program known as the Trespass Affidavit Program ("TAP") or Operation Clean Halls into which building owners and managers can enroll their buildings and thereby authorize police officers to enter and patrol the building.[1] Ex. A (Interim Order 22); Ex. B (Interim Order 23); Ex. G (NYPD Trespass Crimes – Owner Affidavit (5/12)); Sweet Test., Transcript of Preliminary Injunction Hearing ("Tr.") at 518:19-519:7.

2.      When a building enrolls in TAP, a sign or signs are conspicuously posted on the front of the building and elsewhere identifying the building as being enrolled in the program.  Ex. A at 3; Exs. 27, 29, 32, 35, 36, 37 (photographs depicting signs).

3.      The NYPD has enrolled "anybody and everybody" in TAP, regardless of whether the building was a crime-ridden building or not.  Sweet Test., Tr. at 637:12-19.

4.      NYPD precincts maintain lists of buildings enrolled in TAP, and precincts target the buildings for enforcement activity by virtue of their enrollment in the program.  Ex. A (outlining enforcement activity directed at enrolled buildings); Catalina Test., Tr. at 992:14-22 (explaining that once buildings are enrolled "we will then deploy officers to do what we call vertical patrols in the buildings"); Hall Test., Tr. at 1225:20-1226:6 (noting that "TAP program really allows for us to give these problematic buildings a good, good share of visible presence in the building that ultimately benefits the residents").

5.      A July 2012 survey conducted by the NYPD reported that 8,032 buildings were enrolled in TAP, 3,261 (40.6%) of which were in the Bronx.  McCarthy Test., Tr. at 774:18-775:8.

## THE NYPD HAS A PRACTICE OF MAKING UNLAWFUL STOPS OUTSIDE OF TAP BUILDINGS IN THE BRONX

Analysis of UF-250 Forms

6.      Dr. Jeffrey Fagan is a criminologist who is an expert in statistical analysis of police-civilian interactions, including analysis of NYPD street stops and of NYPD UF-250 forms and corresponding databases.  Fagan Test., Tr. at 65:11-16.

7.      UF-250 forms have spaces for recording many details of a police stop, including the following information:  the date of the stop, the precinct of the stop, the specific street address of the stop, whether the stop took place "inside" or "outside," and the specific suspected offense that led to the stop.  *See* Ex. 4 (Fagan Report), App. B (UF-250 (Rev. 11-02)); Ex. GG (UF-250 (Rev. 5-11)).

---

[1] The terms "TAP" and "Operation Clean Halls" are used interchangeably throughout the plaintiffs' proposed findings of fact and conclusions of law.

8.      Using the NYPD's stop-and-frisk database and a list supplied by the City of buildings enrolled in the Clean Halls program in 2011, Dr. Fagan found that officers recorded 1,663 stops in the Bronx in 2011 that took place outside at the exact address of a building enrolled in TAP and where trespass was the only suspected offense.  Ex. 4 at 2-6  (discussing original 1,857 stops); Fagan Test., Tr. at 69:24-73:7 (same); 114:23-115:2 (explaining that eliminating claimed NYCHA stops reduces 1,857 stops to 1,663 stops).[2]  These stops occurred at hundreds of TAP buildings and in every Bronx precinct.  Ex. 4 at 10 (discussing original 1,857 stops).

9.      In identifying trespass-only stops that officers recorded having made outside TAP buildings in the Bronx in 2011, Dr. Fagan excluded (a) all stops where information on the UF-250 indicated the stop, though marked as having taken place "outside," in fact took place inside or took place at an outdoor space besides the front of the building (such as on a roof), Ex. 4 at 6 & n.8, Apps. D & E; Tr. at 76:17-23; (b) all stops where information on the form indicated the police officer had observed behavior inside the building, Tr. at 73:8-22; Ex. 4 at App. E.

10.     UF-250 forms have sections for identifying the "circumstances that led to stop," and "additional circumstances/factors."  Each section has nine check boxes as well as an "other" space where officers can record any information they believe provided a basis for the stop.  Ex. 4, App. B; Ex. GG.  The NYPD trains officers to record on the UF-250 all factors that led to the stop.  Shea Test., Tr. at 849:13-19; Police Student Guide, Ex. EEEE at 20 ("[I]t is important to **record** all the details that convinced the officer to stop a suspect"; emphasis in original).

11.     For the 1,663 recorded stops that Dr. Fagan identified, he analyzed all information provided by officers about "the circumstances which led to stop" on the front of the UF-250 (including information written into the "other" space) and the "additional circumstances/factors" on the back of the UF-250 (also including information written into the "other" space).  Ex. 4 at 11-15, App. F (text strings from "other" space on front of form); App. I (same for back of form). He then produced a table listing every combination of circumstances identified by officers and the number of stops in each category.  Ex. 64 (Fagan Report, App. L); Tr. at 109:8-113:13.  That table reports, for instance, that the most common combinations of justifications were "furtive movement" plus "high crime area" (91 stops); "clean halls/trespass" plus "high crime area" (72 stops); "furtive movement" plus "high crime area" and "time of day" (66 stops); and "clean halls/trespass" only (54 stops).

12.     The 1,044 stops included in Appendix L (Ex. 64) are the 1,137 stops Dr. Fagan originally identified in Table 8 of his report as lacking any recorded justification based on justifications on the front of the UF-250, less stops Dr. Smith suggested might be NYCHA stops (as well as a handful of courtyard stops), plus all justification information from the back of the UF-250. Fagan Test., Tr. at 112:15-113:13, 109:8-20.  Dr. Fagan testified that the addition of the information from the back of the form to his original analysis of justifications marked on the front of the form did not substantially change his opinion about the number and percentage of

---

[2] Dr. Fagan originally identified 1,857 such stops but reduced that number to 1,663 after Dr. Smith suggested that some of the 1,857 stops were NYCHA stops.  Dr. Fagan made this exclusion simply to remove the issue.  Tr. at 124:25-126:17.

recorded stops that lacked justification.  Tr. at 113:14-114:3; Ex. 4 at 15 (Table 8) (1,137 out of 1,857, 61.2%); Ex. 64, App. L (1,044 out of 1,663, 62.8%).[3]

13.     The single most common stop justification officers marked on the front of the UF-250s of the stops examined by Dr. Fagan was "furtive movement."  Ex. 4 at 15 (Table 8) (467 of 1,137 stops).  Dr. Fagan was concerned that police officers were marking "furtive movement" in a reflexive or indiscriminate manner, given the high percentage of stops where this was marked as a factor and given the lack of any apparent connection between a furtive movement and trespass.  Tr. at 90:15-91:14; Ex. 4 at 11 n.12.  Moreover, as the City's training witness explained, "[a] furtive movement could be anything."  Shea Test., Tr. at 854:18.

14.     The single most common "additional circumstances/factors" officers marked on the back of the UF-250s of the stops examined by Dr. Fagan was the high crime area box.  Ex. 4 at 17 (Table 11) (noting marked in 56.38% of stops).  This cannot be explained by TAP buildings themselves being high-crime areas, as the NYPD was enrolling "anybody and everybody" in TAP, regardless of whether it was a crime-ridden building or not.  Tr. at 637:12-19.  The City's training witness explained that this high-crime area box could refer to a building, a block, a sector, or even an entire borough.  Shea Test., Tr. at 862:20-863:23.  And one of the defendant officers testified that he understood all TAP buildings to be high-crime buildings. Santiago Test., Tr. at 1111:9-1112:1.

15.     Despite the fact the City's training witness offered 26 pages of testimony that purported to describe the training officers receive about completing the justification sections on the front and back of the UF-250, Tr. at 848:12-874:20, in fact he had never witnessed any such training, Tr. at 922:25-923:5, had never delivered any such training, Tr. at 923:6-9, 926:13-19, and testified that the only written instructions about this aspect of completing UF-250 forms was the single statement "Check off appropriate box," Tr. at 924:21-926:8 (discussing Ex. EEEE at 25).

The City's Attack on Dr. Fagan's Analysis Is Without Merit

16.     The City's claim that some of the stops Dr. Fagan analyzed were in fact not TAP stops because the person stopped may have exited a nearby non-TAP building and then later been stopped in front of a TAP building is without merit for the following reasons:

   a.   Despite having complete access to the UF-250 database, related department records, and department employees, the City failed to identify a single stop that Dr. Fagan analyzed where the suspected trespass took place outside a building not enrolled in TAP;

   b.   In 65% of stops analyzed by Dr. Fagan the officer indicated that he observed the person for less than one minute and in another 18% of stops the officer observed the person for between one and two minutes, Tr. at 1271:23-1272:2 (colloquy with Court).

_____

[3] Dr. Fagan originally examined the "additional circumstances" on the back of the UF-250 forms for the 1,857 stops, Ex. 4 at 16-19 (Tables 10-13) & App. J; Tr. at 106:7-108:15, and concluded that a more detailed analysis of that information was not likely to substantially change the number and percentage of stops that lacked justification, Tr. at 108:17-109:7.

c. Even in those instances where a period of observation was long enough to allow a person to have moved away from a TAP building, there is no reason to believe the person actually did so as opposed to simply standing in front of the building, as was the case with several of the named plaintiffs, *see e.g.,* Turner Test., Tr. at 476:16-18; Grant Test., Tr. 455:7-17; K. Johnson Test., Tr. at 381:3-14.

d. Though defense counsel claimed in opening and closing arguments that there might be tactical reasons why officers might allow a person to move away from a TAP building before stopping a person, Tr. at 46:10-25, 1310:5-8, the defendants in fact adduced no testimony on this point from any witness;

e. To the extent Dr. Fagan's methodology of relying on an exact address match between the stop and the addresses of TAP buildings was overinclusive by capturing some stops where the suspected trespass occurred at a non-TAP building near the stop location, that methodology would have been similarly underinclusive by not capturing stops where the suspected trespass occurred at a TAP building and the person was then stopped in front of a nearby non-TAP building.  Given this, there is no reason to believe that the exact-match methodology overstated the general number of relevant stops or the character of those stops for purposes of a preliminary injunction.  Tr. at 45:23-46:47:4 (Court noting that City argument "cuts both ways" with respect to number of stops); Ex. 4 at 5-6 (discussing underinclusiveness of exact-match methodology).

17.   The City's claim that Dr. Fagan failed to establish that TAP "caused" the stops is without merit for the following reasons:

a. To the extent the City suggests that the plaintiffs challenge the legality of TAP, that is wrong because the plaintiffs do not challenge the program; rather, they challenge certain unlawful stops being made in conjunction with the program, Tr. at 6:7-18;

b. To the extent the City suggests that stops are unlawful only if "caused" by TAP, that is wrong.  What makes a stop unlawful or not for purposes of the preliminary injunction motion is whether the officer making the stop was aware of facts that provided a reasonable basis to suspect the person of having trespassed inside the building;

c. To the extent the City suggests that the stops analyzed by Dr. Fagan are unconnected to TAP, that is wrong, as every stop took place directly in front of a TAP building, every stop was on suspicion of trespass only, TAP buildings have signs posted on them, the NYPD directs patrol activity at TAP buildings, and in over 400 instances police officers actually wrote "Clean Halls" on the UF-250, even though there is no space on the form to indicate enrollment in TAP.  Tr. at 124:14-24.  Moreover, three police officers testified that they would not indicate "Clean Halls" on a UF-250 even for stops made outside TAP buildings.  Santiago Test., Tr. at 1110:23-1111:1; Rodriguez Test., 1072:91-9, Pomerantz Test., Tr. at 1058:24-1059:2.

18.   The City's claim that Dr. Fagan wrongly "assumed" that Bronx buildings enrolled in TAP according to NYPD records at some point in 2011 remained enrolled for the entire year is

wrong. As of 2011, the owner affidavits being used in the Bronx enrolled the building "into perpetuity." Ex. 76 (sample affidavits); Sweet Test., Tr. at 637:20-642:25.

19.     The City's claim that Dr. Fagan mistakenly included in his analysis stops that took place in front of NYCHA buildings is without merit. The City bases this claim on the fact 157 of the 1,857 stops Dr. Fagan identified were also included in his analysis in *Davis v. City of New York*. Dr. Fagan explained, however, that he did not use an exact-address-match methodology in *Davis* and that the map-based methodology he used in *Davis* may have captured some stops that in fact did not take place in front of NYCHA buildings. Tr. at 124:25-126:17. Nonetheless, to eliminate any issue arising out of this, Dr. Fagan removed the stops identified by Dr. Smith. Tr. at 83:15-85:7. Eliminating those stops reduces the total number of 2011 outdoors trespass-only stops in the Bronx from 1,857 to 1,663 and the stops with no apparent justification from 1,137 to 1044, increasing the rate of unjustified stops from 61.2% (1,137/1,857) to 62.8% (1,044/1,663). Tr. at 114:23-115:1; Ex. 64 (App. L).

20.     The City's claim that Dr. Fagan's coding of certain text entries in the "other" box on the UF-250 masked information that showed a stop was lawful is without merit. Dr. Smith identified a total of 36 such stops out of the 1,857. Smith Report, Ex. JJJJ at 34-39. Regardless of the coding employed by Dr. Fagan, many of the uncoded text entries Dr. Smith identified would provide no basis for suspecting criminal trespass by a person outside a building: "observed trying to enter one building when unab," "standing outside trying door," "trying to enter housing project," walking in and out," "walking into and out of bldg," "walking unto [sic] building and then walking out," "went inside building & upstairs came outside AF," "went inside building then back to sit on wall," trying to get into bldg no key," "no key or ID," "def is known not to live at location," "feft [sic] is known not to live @ location," "building history of drug sales," and "intel about drug prone location." However, even if one assumed that all 36 entries provide information to justify the stop and further assume that all 36 stops were included in the 1,044 stops, that would simply reduce the total number of unjustified stops to 1,012, which still would be 60.8% of the 1663 stops.

21.     The City's suggestion that it would be unfair to assess the legality of stops based on the UF-250 forms because they tell only a part of the story is without merit. The defendants had complete access to the UF-250 database, to related department records, and to department employees but chose not to adduce testimony from a single person suggesting that information other than that indicated on a UF-250 contributed to any stop analyzed by Dr. Fagan. In addition, officers are instructed to record on UF-250s all reasons for a stop, and the UF-250 has spaces for them to write any reasons they want. Shea Test., Tr. at 849:13-19; Ex. EEEE at 20 (Police Student Guide); Ex. 4, App. B (UF-250); Ex. GG (revised UF-250). If anything, given the likelihood that officers are over-recording purported justifications on UF-250 forms, Fagan Test., Tr. at 90:15-91:22, relying on the UF-250 forms gives the defendants every benefit of the doubt.

22.     The City's complaint that Dr. Fagan did not use the "formula" from *Floyd v. City of New York* here is without merit. Setting aside the concern the Court has expressed about legal conclusions implicit in the *Floyd* formula, that formula is irrelevant because it was designed to assess 2.8 million stops covering all possible offenses, where this case deals only with the narrow and specific category of outdoors, trespass-only stops. Fagan Test., Tr. at 142:16-24.

Information About Trespass Arrests Outside TAP Buildings Independently Supports a Finding of
a Custom and Practice of Unlawful Outdoors Trespass Stops.

23.    Jeannette Rucker is the chief of the Complaint Room/Arraignments Bureau of the Bronx
District Attorney's Office, a position she has held since 2007.  She has been in the Bronx DA's
Office for 21 years.  Rucker Test., Tr. at 168:3-169:4.  Ms. Rucker oversees the arrest-to-
arraignment process and devotes 80% to 90% of her time to addressing problems that arise out of
that process.  She trains assistant district attorneys and deals with them throughout the day.  She
also has daily dealings with police officers and since 2005 has been training new cadets with the
support of the NYPD.  Tr. at 170:3-173:20.

24.    As early as 2007 Ms. Rucker became concerned that police officers were stopping and
arresting people who were merely observed entering or entering and exiting TAP buildings in the
Bronx and, particularly by 2009, judges were dismissing such cases.  The situation worsened in
2010 as she learned of cases where arrestees were actually tenants of the buildings where they
were arrested.  Rucker Test., Tr. at 174:17-177:22.

25.    In February 2011 Ms. Rucker met with NYPD Inspector Kerry Sweet and representatives
of the other District Attorney's offices to discuss trespass arrests.  During that meeting Ms.
Rucker expressly notified Inspector Sweet about people being improperly stopped exiting TAP
buildings.  Sweet Test., Tr. at 659:20-660:17.  She also informed him of people being arrested
for trespass when the person in fact was a resident or lawful visitor and that the courts were
dismissing the cases.  Rucker Test., Tr. at 178:22-179:6.

26.    Evidencing the NYPD's agreement with the concern Jeannette Rucker expressed at the
February 2011 meeting, the bullet point contained in the Rodman's Neck training stating that
people cannot be stopped merely for exiting or entering a TAP building was designed to remedy
the very issue Ms. Rucker raised at that meeting.  Sweet Test., Tr. at 660:22-661:2.

27.    For many years, the Bronx District Attorney's Office has interviewed police officers who
made trespass arrests outside of TAP buildings instead of proceeding with the case with only a
written supporting deposition from the arresting officer.  Tr. at 236:8-237:12.

28.    In the three sample months in 2011 (January, February, and June) for which the plaintiffs
were provided decline-to-prosecute forms from the Bronx District Attorney's Office,[4] there were
at least 28 instances in which the office had declined to prosecute a trespass arrest after the office
concluded, based on an interview with the arresting officer, that the person arrested had been
stopped merely because the officer observed the person entering or exiting a TAP building.
Rucker Test., Tr. at 213:1-24, 220:1-25; Ex. 74 (decline-to-prosecute forms).[5]

---

[4] These forms were produced pursuant to order of this Court in *Davis v. City of New York* and
then produced to the plaintiffs here.  Tr. at 508:13-509:19 (colloquy with Court about sample).

[5] Exhibit 46 contains 31 decline-to-prosecute forms.  Three forms do not expressly identify the
building as a TAP building.  Rucker Test., Tr. at 214:5-9.  Though Ms. Rucker testified that the

29.     In July 2011 the Bronx DA's Office adopted a policy of declining to prosecute all TAP trespass cases where, after the officer was interviewed, it was determined the person was originally stopped merely because an officer observed the person exiting or entering a TAP building.  Tr. at 185:4-13; Ex. 7 (Rucker memo to assistant DAs).

30.     The number of decline-to-prosecute cases from the Bronx District Attorney's Office in 2011 independently suggests a widespread practice of unlawful stops outside of TAP buildings. The City's expert reported that approximately 13% of the Bronx 2011 stops analyzed by Dr. Fagan resulted in an arrest.  Smith Report, Ex. JJJJ at 6.  The three-month sample of arrests that the Bronx District Attorney's Office declined to prosecute in 2011 would extrapolate to 112 arrests for the year where the officer merely observed the person enter or exit a TAP building. To have 112 such stops with an arrest rate of 13% would suggest 861 stops where the only thing observed by the officers was a person entering or exiting a TAP building.[6]

31.     In July 2012 the Bronx District Attorney's Office expanded its interview policy to require interviews of arresting officers in all trespass cases.  Ex. 10 (letter from Jeannette Rucker to Kerry Sweet (July 18, 2012)).  The District Attorney's office adopted this policy in response to many instances in which people were wrongly arrested for trespassing.  Tr. at 190:6-201:25.

Stops without UF-250 Forms

32.     In 2011 the NYPD likely made far more outdoors trespass-only stops in the Bronx than the 1,857 stops recorded on UF-250 forms analyzed by Dr. Fagan.  In the 11 stops about which the plaintiffs testified, officers did not complete a single UF-250.  *See generally* Musick Test., Tr. at 1125-1143 (explaining that search of UF-250 database did not produce any records for any of the plaintiffs); Ramdeen Test., Tr. at 1024:2-7; Santiago Test., Tr. at 1110:9-18.[7]  In its annual reports for 2010 and 2011, the New York City Civilian Complaint Review Board found that police officers' not completing UF-250 forms was a major failure.  2010 CCRB Annual Report, Ex. 78 at 13; 2011 CCRB Annual Report, Ex. 79 at 14.

---

charge shown on the form indicated it likely involved a TAP building, *see* Tr. at 214:10-218:14, the plaintiffs have eliminated references to those three in an excess of caution.

[6] The number of decline-to-prosecute cases from the Bronx DA's Office also indicates that many if not most arrests made on suspicion of trespass outside Bronx TAP buildings in 2011 were unlawful.  Assuming Dr. Smith's 13% arrest figure applies to the 1,137 stops in Dr. Fagan's Table 8, that would mean there were about 149 arrests.  Projecting the 3-month sample of 28 decline-to-prosecute cases to the full year would produce 112 cases that were dismissed on the grounds the stop was unlawful because based only on having observed an exit or entry.

[7] NYPD policy requires completion of a UF-250 even when an arrest is made.  Police Student Guide, Ex. EEEE at 19-20.

**PLAINTIFFS AND THEIR FRIENDS AND RELATIVES
HAVE BEEN SUBJECTED TO UNJUSTIFIED OUTDOORS TRESPASS STOPS**

<u>J.G. & Jaenean Ligon</u>

33.      Plaintiff J.G. is 17 years old and has lived for approximately eight years at 290 East 163rd Street in the Bronx, a TAP building.  J.G. lives there with his mother, Plaintiff Jaenean Ligon, and his brothers, Jerome Grant and J.A.G.  J.G. Test., Tr. at 437:16-438:23.

34.      One evening in August 2011, around 7 or 8 p.m., J.G. left his home to purchase ketchup at a store on the corner of 163rd Street and Morris Avenue.  As he walked back after buying the ketchup, he saw two plain-clothes NYPD officers in front of his building and three additional uniformed officers across the street.  Both plain-clothes officers were Caucasian males, both had badges displayed, and one was wearing shorts and a baseball cap.  When J.G. got to his building the plain-clothes officers stopped him and asked where he was coming from.  J.G. responded that he was coming from the store at 163rd and Morris.  The officers then asked where he was headed, and J.G. responded that he was going to his apartment.  The officers asked what was in the bag, and J.G. told them it was ketchup.  One of the officers then told J.G. to raise his hands and proceeded to frisk him and search inside one of his pockets.  The officer demanded J.G. to provide identification, and J.G. gave him his school identification, and the officer wrote something on a notepad.  After asking what apartment J.G. lived in, the officers rang the bell to his apartment.  Ms. Ligon came downstairs.  The officers asked her whether J.G. was her son and what apartment they lived in.  After Ms. Ligon answered their questions, the officers handed Ms. Ligon the ketchup and allowed J.G. to leave.  Tr. at 439:4-442:25; Ex. 36 (marked photo of stop location).  As a result of this incident, J.G. felt frustrated and angry.  Tr. at 444:1-3.

35.      Plaintiff Jaenean Ligon's testimony at the hearing was entirely consistent with J.G.'s. She testified that after making dinner one evening in August 2011 at her home, she sent Plaintiff J.G., to the store for ketchup.  A few minutes later, her bell rang.  The person on the other end of the intercom asked, "can you come down and identify your son?"  Ms. Ligon ran downstairs, thinking J.G. was either dead or hurt.  She passed a Caucasian male officer dressed in plain clothes as she ran down the stairs.  she arrived at the first floor, Ms. Ligon saw J.G. standing in the doorway of the building with three male police officers: one Caucasian in plain-clothes, one Caucasian in uniform, and one Hispanic in uniform.  She collapsed on the steps from relief.  One of the officers asked Ms. Ligon whether J.G. was her son, what his name was, and what apartment she lived in.  The plain-clothes officer standing with J.G. laughed as he approached Ms. Ligon and handed her the bag with the ketchup.  The incident left Ms. Ligon feeling stressed, very nervous, and shaken up.  Ligon Test., Tr. at 428:2-433:6, 434:23-24.

<u>Jerome Grant</u>

36.      Jerome Grant, son of Plaintiff Jaenean Ligon and brother of Plaintiff J.G., also testified at the hearing about a stop that occurred last year.  One evening in July 2011, Mr. Grant played basketball at a park with his brother J.A.G., his cousin Shawn Grant, and his friend Kawane Simmons.  Afterwards, the group went to Mr. Grant's grandmother's home at 274 Bonner Place

in the Bronx, a building enrolled in TAP, to retrieve a copy of his apartment key.  Jerome Grant Test., Tr. at 451:14-454:6.

37.     J.A.G. ran ahead of the group to his grandmother's building, where he did not leave the door open.  When the rest of the group arrived, Shawn knocked on the door, but J.A.G. did not notice, so the group waited outside for J.A.G. to exit.  While they waited, two uniformed, male police officers, one Caucasian and one Asian, approached them with flashlights.  The Asian officer asked them whether they lived in the building and whether they had been trespassing.  Jerome responded that his grandmother lived there, and that he had come to get a key to his apartment.  The Asian officer instructed Jerome, Shawn, and Kawane to put their backs against the wall then ordered them to produce identification.  Jerome provided his identification, but Shawn and Kawane did not have identification on them.  After writing something down in a memobook, the Caucasian officer returned the identification to Jerome.  The Asian officer then instructed the three to turn around with their hands against the wall.  The Asian officer approached Shawn and asked him whether he had any drugs or blades on him.  After Shawn said no, the Asian officer patted him down and removing the contents of his pockets, placing them on the ground.  The Caucasian officer then searched Kawane and Jerome, patting them down and putting their hands in the teenagers' pockets.  Tr. at 454:25-459:21, 462:6-25; Ex. 37 (marked photo of 274 Bonner).  The officers then stated that they wanted to ensure that they had not been trespassing and told them to have a good night and go straight home.  The encounter lasted approximately ten to fifteen minutes.  Jerome did not feel free to leave until the officers instructed him to go home.  The incident left Jerome feeling upset and angry.  Tr. at 461:14-463:6.

Abdullah Turner

38.     Plaintiff Abdullah Turner is 25 years old.  Since 2008, he has lived in an apartment at 2249 Morris Avenue, a building that is enrolled in TAP.  Turner Test., Tr. at 471:12-473:8; 486:11-487:1.

39.     On the evening of March 26, 2011, Mr. Turner had plans to go to an engagement party on Davidson Avenue in the Bronx with his friend Anginette Trinidad.  Ms. Trinidad picked him up at his apartment and the two of them walked to the block where the party was to be held.  Before going into the party, Ms. Trinidad informed Mr. Turner that she had to go inside 2020 Davidson to return a sweater she had borrowed.  Ms. Trinidad never said anything about marijuana to Mr. Turner that night.  Tr. at 481:20-21.  Mr. Turner observed her carrying the sweater when she went inside.  Tr. at 473:9-475:15.

40.     When Ms. Trinidad entered the building, Mr. Turner made a phone call to a friend while walking around on the sidewalk outside 2020 Davidson.  While talking to his friend, his phone was taken from him.  When he turned to see who had taken his phone, Mr. Turner observed three NYPD police officers, one of whom was Kieron Ramdeen and one of whom was Hispanic.  Tr. at 477:5-478:12, 483:23-485:18; Exs. 28, 29 (marked photos of 2020 Davidson).

41.     The Hispanic officer asked Mr. Turner whether he lived at 2020 Davidson and what he was doing at the building.  Mr. Turner explained that he did not live there and was waiting for a

friend who had gone into the building to return a sweater.  The officer then demanded that Mr. Turner present identification.  Mr. Turner provided his driver's license.  At that point the Hispanic officer went inside the building with the third officer, leaving Mr. Turner outside with Officer Ramdeen, who asked him similar questions.  Shortly thereafter, Ms. Trinidad came outside the building and Mr. Turner identified her as his friend.  Officer Ramdeen then radioed to the officers who were in the building that Mr. Turner's friend had come outside.  The two officers came outside and began questioning Ms. Trinidad about what she had been doing in the building.  She stated she had gone to return a sweater.  One officer asked her whether she "had anything on her she shouldn't have," and she admitted that she had a bag of marijuana and a pocketknife.  After those items were taken from her, the Hispanic officer came to Mr. Turner and pointed at a Clean Halls sign affixed to the wall of 2020 Davidson.  He asked Mr. Turner if he knew what the sign meant, and when Mr. Turner said he did not, the officer stated that Mr. Turner was trespassing and going to jail.  The officer handcuffed him and placed him under arrest.  Ms. Trinidad was arrested as well.  Tr. at 478:13-482:18.

42.     Ms. Trinidad was placed in the three officers' marked police car and Mr. Turner was placed in a police van that arrived separately.  He was driven to the precinct and charged with trespassing.  After returning to court eight to ten times, Mr. Turner's criminal case was dismissed.  Tr. at 483:16:21.  The stop and arrest made him feel defenseless.  Tr. at 486:1-8.

43.     Anginette Trinidad's testimony about the events of March 26, 2011 was entirely consistent with Mr. Turner's.  She testified that she and Mr. Turner were going to go to a party on Davidson Avenue in the Bronx on March 26, 2011.  Trinidad Test., Tr. at 619:23-620:3; 621:16-25.  Before they went to the party, she went to an apartment inside 2020 Davidson to return a sweater to Luis Garcia, a friend.  Tr. at 623:8-22.  When Ms. Trinidad exited the building, she saw several police officers standing near Mr. Turner, and was ultimately arrested herself.  Ms. Trinidad never saw Mr. Turner enter the building at 2020 Davidson, and she never said anything to Mr. Turner about purchasing marijuana at 2020 Davidson.  Tr. at 626:20-628:6.

44.     Officer Kieron Ramdeen testified that on March 26, 2011, he and Officer Michael Pomerantz patrolled the 46th Precinct in a marked police vehicle.  Ramdeen Test., Tr. at 1012:15-23.  They reached Davidson Avenue between approximately 8:00 and 8:20 pm.  Tr. at 1014:1-2.; Pomerantz Test., Tr. at 1049:2-7.  Officer Ramdeen testified that when they initially drove by, he observed Mr. Turner "wandering" or "pacing" inside the lobby of 2020 Davidson via two narrow windows in the door of 2020 Davidson.  Tr. at 1017:9-1019:15; Ex. 28 (photo of stop location).  When he first saw Mr. Turner, Officer Ramdeen stated that he was "approximately five to thirty" feet from 2020 Davidson, but "probably more close to thirty."  Tr. at 1019:19-1020:1.  Officer Ramdeen did not observe Mr. Turner do anything other than "wander" or "pace" before he and Officer Pomerantz approached him.  Tr. at 1028:11-17.

45.     According to Officer Ramdeen, Mr. Turner exited the building as they approached, and the officers encountered Mr. Turner directly in front of 2020 Davidson, at which point Officer Ramdeen claims to have asked Mr. Turner if he lived in the building, and if he knew anyone in the building.  Mr. Turner said that he did not.  Officer Ramdeen then asked Mr. Turner what he was doing in the building.  Officer Ramdeen claims that "in sum and substance" Mr. Turner responded "I am not going to lie, Officer, I just came with my friend.  She went upstairs to buy weed.  I don't know what floor she is on.  I don't know what apartment she's in."  Officer

Ramdeen testified that he then asked Mr. Turner to enter 2020 Davidson, where he asked him again his reason for being in the building, and, upon receiving the same answer, placed Mr. Turner under arrest.  Tr. at 1021:1-1022:18.

46.     Officer Ramdeen's testimony about Mr. Turner's stop and arrest was not credible.  He could not remember numerous facts concerning Mr. Turner's stop and arrest and provided only vague descriptions of key facts.  He did not remember that Ms. Trindad was arrested at the same time as Mr. Turner, anything Officer Pomerantz did or said during the encounter, nor what Mr. Turner looked like until he saw him in the courtroom during the hearing in this matter.  Tr. at 1030:25-1035:2.  Officer Ramdeen claimed that no other officer was with him and Officer Pomerantz.  1027:19-1028:1.  Officer Pomerantz's memobook, however, indicates that just two hours before the arrests (at 6 pm) he resumed patrol with Officer Ramdeen and a third officer, Officer Primativo Montanez.  Ex. HHHH; Pomerantz Test., Tr. at 1059:17-25.  Officer Primativo Montanez is Hispanic and works in the 46th Precinct.  Tr. at 1059:24-1060:3; 1061:1-6.

47.     Further, the paperwork that Officer Ramdeen filled out either fails to mention important facts, or contradicts his own testimony.  Exs. ZZ, CCC, AAA; Ramdeen Test., Tr. at 1029:16-23,1038:19-1043:16.  Neither the arrest report nor Officer Ramdeen's memobook contained any mention of the statement concerning marijuana Mr. Turner allegedly made.  Exs. ZZ, AAA; Tr. at 1038:19-1041:24.  The supporting deposition Officer Ramdeen signed contains two important details which directly contradict his testimony.  First, Officer Ramdeen testified that the door to 2020 Davidson Avenue was unlocked, but the supporting deposition stated that the door was locked.  Tr. at 1042:7-8; 1043:8-16; Ex. CCC.  Second, Officer Ramdeen testified that he only saw Mr. Turner inside the building, yet the supporting deposition stated that he saw Mr. Turner enter and exit the building.  Tr. at 1029:16-23; 1043:8-16; Ex. CCC.

48.     Officer Pomerantz's testimony about the events of that evening was also not credible, as he failed to remember important details about the events of that evening.  For example, he could not remember whether the officers' initial conversation with Mr. Turner took place inside or outside of the building.  Pomerantz Test., Tr. at 1051:4-12.  Officer Pomerantz was also unable to explain his memobook entry indicating that Officer Montanez was on patrol with him and Officer Ramdeen on March 26, 2011.  He testified that it was possible that Officer Montanez was present at some point during the encounter at 2020 Davidson Avenue, but could not recall in what way Officer Montanez was involved with his patrol that evening.  Tr. at 1059:3-1061:17.

49.     The failure of Officer Ramdeen and Officer Pomerantz to take any steps to combat drug sales inside 2020 Davidson Avenue on March 26, 2011 further renders their testimony incredible.  Accepting their version of events, Mr. Turner told them that he was waiting for his friend who was in the building to buy marijuana, that friend emerged from the building with marijuana, she said she had gone inside the building to buy marijuana—and their only response was to arrest Mr. Turner and Ms. Trinidad.  Pomerantz Test., Tr. at 1064:5-1065:12.

50.     One night during December 2011 or January 2012, two NYPD officers stopped Mr. Turner outside of his own building.  As he exited his building, walking on the public pathway toward the sidewalk, he saw a police car pull up.  He also saw his neighbor Lamont, who was standing with his 13-year-old nephew and Mr. Turner's 13-year-old brother.  Mr. Turner spoke with the group.  A young, white, female uniformed police officer then got out of the car and

asked Mr. Turner if the people standing outside the building lived there. Mr. Turner responded that they all did. The officer requested identification, which Mr. Turner provided. The officer then stated that they could not stand in front of their building. Mr. Turner did not feel free to leave while the officer was talking to him. The stop outside his apartment building made Mr. Turner feel "angry" because he "can't even stand in front of my building without being harassed by the cops." Turner Test., Tr. at 487:13-493:15; Ex. 31 (marked photo of location).

<u>Charles Bradley</u>

51.    Plaintiff Charles Bradley is 52 years old and lives in the Bronx. From September 2009 to June 2010, Mr. Bradley lived with his fiancée, Lisa Rappa, at 1527 Taylor Avenue in the Bronx, a building enrolled in TAP. He moved out in June 2010 but continued to visit Ms. Rappa frequently. Bradley Test., Tr. at 257:10-260:7.

52.    On May 3, 2011, Mr. Bradley went to 1527 Taylor Avenue after he finished work, having made arrangements with Ms. Rappa to visit her that day. Mr. Bradley arrived at the building at approximately 5 p.m. and was let into the front door by a resident who was an acquaintance of Mr. Bradley's. Mr. Bradley went straight up to the fifth floor and knocked on Ms. Rappa's apartment door, but no one answered. After waiting a minute or two, he went back downstairs and exited the building. Tr. at 261:15-264:2.

53.    Once he got outside, Mr. Bradley looked up at Ms. Rappa's window. While he was standing on the sidewalk a green van pulled up. An NYPD officer seated in the passenger seat, Defendant Miguel Santiago, gestured to Mr. Bradley and told him to "come on over, come here." Mr. Bradley walked over to the van and said, "Excuse me, Officer, hi. What can I do for you?" Tr. at 264:13-265:13. Officer Santiago got out of the van, searched inside Mr. Bradley's pockets, and said, "What are you doing here?" Mr. Bradley said, "Well, I'm here to see my young lady." He then tried to explain that he was a security officer. In response, Officer Santiago said, "I'm trying to talk to you like a gentleman and you want to act like a fucking animal? You going in." He then handcuffed Mr. Bradley and put him in the van with two other officers. At the precinct, Mr. Bradley was strip-searched by Officer Santiago, placed in a cell for several hours, and eventually released with a Desk Appearance Ticket charging him with criminal trespass. Tr. at 264:7-269:1; *see* Ex. 27 (marked photograph). Mr. Bradley did not feel free to leave from the time Officer Santiago called him over to the van until he was released from the precinct. Tr. at 275:1-6.

54.    Mr. Bradley provided the Bronx District Attorney's office with a notarized letter from Ms. Rappa stating that Mr. Bradley had been visiting her on May 3, 2011. Tr. at 272:3-273:7; Ex. 17 (letter from Lisa Rappa). The District Attorney's office declined to prosecute the case. Ex. 18 (declined prosecution affidavit). The incident made Mr. Bradley feel "[e]xtremely, extremely violated, to say the least." Tr. at 275:7-8.

55.    Defendant Police Officer Miguel Santiago's testimony about Mr. Bradley's arrest on May 3, 2011 confirmed Mr. Bradley's account in several respects. He testified that he arrived at 1527 Taylor Avenue, seated in the passenger seat of a green, unmarked van. Santiago Test., Tr. at 1079:16-18, 1081:1-3. Officer Santiago called Mr. Bradley over to the van and questioned him about why he was in the building. Tr. at 1102:1-3. In response, Mr. Bradley said he had gone to

visit his girlfriend who lived in the building.  Tr. at 1088:17-18, 1102:9-11.  Officer Santiago later handcuffed Mr. Bradley, placed him in the van, and arrested him for criminal trespass.  Tr. at 1097:1-5; 1102:12-14.  Officer Santiago acknowledged that he was required to complete a UF-250 form for his stop of Mr. Bradley but that he did not do so.  Tr. at 1110:9-18.

56.     Officer Santiago's other testimony about the circumstances surrounding Mr. Bradley's arrest is not credible.  Officer Santiago claims to have observed Mr. Bradley walking back and forth at the end of the hallway inside 1527 Taylor Avenue, but to do so he would have had to look past the driver of the van, 20 or 30 feet across the street, through the front door, through the vestibule and up several steps, through a second interior door, and to the end of a hallway.  Tr. at 1084:21-1087:11; 1101:23-25; 1105:18-1106:17; Exs. HHH, KKK, LLL, MMM, NNN, OOO (photos of 1527 Taylor).  Officer Santiago testified that he observed Mr. Bradley inside the building for about two or three minutes, but indicated on the arrest paperwork that he observed him inside the building for seven minutes.  Tr. at 1101:11-15; Ex. 39.  Officer Santiago testified that Mr. Bradley could not identify an apartment number, but indicated on the arrest paperwork that Officer Santiago went to the apartment Mr. Bradley indicated.  Tr. at 1104:8-11; Ex. 39.  Officer Santiago testified that he stopped Mr. Bradley outside the building, but indicated on the arrest paperwork that he stopped him inside the building.  Tr. at 1102:1-3; Ex. 39.  Officer Santiago testified that Mr. Bradley could not identify an apartment, a floor, or anyone he was visiting in the building, but that is not credible given Mr. Bradley's testimony that he lived in the building for nine months and that his fiancée lived in the building at the time.  Tr. at 1102:4-11; Bradley Test., Tr. at 258:24-260-7.  At one point while he was an NYPD officer, Officer Santiago was disciplined for issuing a summons that he knew contained false statements of fact. Santiago Test., Tr. at 1107:17-20; 1099:17-1100:6.

57.     Even if the Court were to find Officer Santiago's testimony credible, he stopped Mr. Bradley for trespassing without reasonable suspicion.  Officer Santiago testified that he observed Mr. Bradley before he entered the building, but nothing about Mr. Bradley appeared suspicious at that point.  Tr. at 1108:1-9.  Officer Santiago admitted that he did not see Mr. Bradley enter the building.  Tr. at 1108:10-11.  Officer Santiago testified that he observed Mr. Bradley inside the building walking back and forth and disappearing in the stairwell, then exiting the building. Tr. at 1108:12-20.  Officer Santiago testified that he approached Mr. Bradley on suspicion of criminal trespass, but that his suspicion rested on only the fact that Mr. Bradley had been in the lobby.  Tr. at 1108:21-1109:7.  Officer Santiago testified that when he questioned Mr. Bradley he was standing in front of Mr. Bradley, one or two feet away, another NYPD officer was standing to the right side of Mr. Bradley, one or two feet away, and the police van was in front of Mr. Bradley.  Tr. at 1109:13-1110:2.

Roshea Johnson

58.     Plaintiff Roshea Johnson is 36 years old and lives in Schenectady, New York.  Until the end of 2010, Mr. Johnson lived at River Park Towers in the Bronx with his sister, Letitia Ledan, in Building 30 and with a friend in Building 40.  R. Johnson Test., Tr. at 394:2-395:2.

59.     The River Park Towers complex consists of four towers, which contain approximately 1600 apartments, as well as stores that are open to the public.  Ledan Test., Tr. at 297:16-298:10;

Ex. YY at 7:53-8:08, 19:09-21:12 (video of complex); Ex. 22 (photo of stores).)  River Park
Towers is enrolled in TAP.  Tr. at 298:11-19; Ex. 76 (TAP affidavits).  Pedestrians enter the
complex by walking on public sidewalks and do not pass through any gate or security check to
enter the complex.   Tr. at 298:22-299:5, 303:18-23; 304:18-305:2; 313:24-314:2; 316:12-25;
Exs. 19-20 (photos of entrance to River Park Towers); R. Johnson Test., Tr. 398:7-13, 416:8-
417:8; Ex. YY.  There are no closed gates or "No Trespassing" signs visible to individuals
entering the complex or walking on the sidewalks and streets within the complex.  Ex. YY;
Sweet Test., Tr., at 666:23-675:15; Ledan Test., Tr. at 1254:22-1260:5; Ex. 92-97 (photos of
signs depicted in Ex. YY at 4:22, 6:10, and 9:40).

60.     Mr. Johnson continues to visit Ms. Ledan at River Park Towers every two or three
months.  Mr. Johnson has been stopped by NYPD officers in and around River Park Towers on
numerous occasions.  R. Johnson Test., Tr. at 393:25-396-13.

61.     On the morning of Father's Day of 2010, Mr. Johnson went to Ms. Ledan's apartment to
change into clothes he was storing there.  Mr. Johnson arrived at River Park Towers at
approximately 10:30 or 11 a.m.  He "just walk[ed] in" to the complex, and did not pass through
any security or any closed gate.  Mr. Johnson went to Ms. Ledan's apartment in Building 30 and
knocked on the door, but no one answered.  Mr. Johnson then exited the building to call her from
a payphone near the entrance to the complex.  Tr. at 396:17-399-14.

62.     As Mr. Johnson was crossing the street outside of Building 30, two NYPD officers pulled
up in a black van with tinted windows.  The officer in the passenger seat asked Mr. Johnson
where he was coming from; Mr. Johnson said he was coming from his sister's house but that she
wasn't home.  The officer mentioned trespassing, and Mr. Johnson tried to tell the officer that he
had mail in his pocket with his sister's address on it to demonstrate that he was allowed to be
there.  The officer then handcuffed Mr. Johnson and placed him in the van.  Tr. at 399:21-402:3;
Ex. 22 (marked photo of stop location).

63.     The officers drove Mr. Johnson to another area of River Park Towers, where a third
officer got into the van.  The officers interrogated Mr. Johnson about guns and drugs, and he
repeatedly responded that he not know anything about guns or drugs.  The officers then drove
Mr. Johnson around the neighborhood surrounding the complex, continuing to ask him about
guns and drugs.  After 15 or 20 minutes, they pulled over near the Bronx Task Force building
near 167th Street and Sedgwick Avenue.  At that point, the officers said to Mr. Johnson, "maybe
you don't know nothing," took off his handcuffs, and let him out of the van.  Tr. at 403:2:3
403:20.  Mr. Johnson was never taken to a police station or charged with a crime as a result of
this encounter.  He did not feel free to leave from the time the officers first approached him in
the van until they took the handcuffs off of him.  The encounter made him feel angry and
helpless.  Tr. at 417:9-23.

Letitia Ledan

64.     Plaintiff Letitia Ledan has lived for the past 11 years in Building 30 of the River Park
Towers apartment complex in the Bronx.  Ledan Test., Tr. at 296:20-297-22.

65.     One day in 2009, Ms. Ledan was leaving the River Park Towers complex when she was approached by two NYPD officers.  Both officers were male, Caucasian, and in uniform.  The officers asked Ms. Ledan if she lived there and she said yes. They asked her if she had identification and she gave them her identification.  The officers looked at her identification and eventually handed it back to her.  This encounter lasted approximately three minutes.  Ms. Ledan did not feel free to leave until the officers returned her identification. Tr. at 301:5-302:25; Ex. 23 (marked photo of stop location).

66.     One afternoon in the summer of 2011, Ms. Ledan was returning from work when she encountered NYPD officers outside of her building.  As she approached her building, she saw her husband, Antoine Ledan, and two friends standing with four NYPD officers.  Three of the officers were Caucasian and one was African-American, and all were in uniform.  When Ms. Ledan approached, one officer was patting down one of her friends, one was patting down Mr. Ledan and going through his pockets, and one officer was standing next to the other friend.  When Ms. Ledan approached her building, she asked the officers, "What's going on?"  One of the officers then approached her and said, "Just be quiet," then asked if she lived there.  Ms. Ledan said yes, and the officer asked her to show identification.  Ms. Ledan gave the officer her identification and he looked at it and gave it back.  Ms. Ledan remained at the scene for approximately three more minutes until the officers stopped searching Mr. Ledan and their friends and walked away.  Ms. Ledan did not feel free to leave from the time the officer approached her until he returned her identification, turned his back and walked away because the officer blocked the entrance to her building and held her identification.  Tr. at 306:16-309:13; 327:6-19; 329:25-330:4; Ex. 24 (photo of stop location); Ex. 25 (marked photo of stop location).

Fernando Moronta

67.     Fernando Moronta is 36 years old and lives at 2035 Marmion Avenue, a TAP building in the Bronx.  Moronta Test., Tr. at 340:24-341:4.  One evening during the winter of 2008, Mr. Moronta went with his brother, Eladio Vasquez, to his brother's apartment building at 1453 Walton Avenue in the Bronx, a TAP building.  After visiting his brother for about two hours, Mr. Moronta left the building.  Once Mr. Moronta reached the sidewalk, six uniformed officers, one African American and five Caucasian, stopped and exited an NYPD van.  The officers asked Mr. Moronta where he was going and what he was doing in the building.  He responded that he had been in his brother's house.  One of the police officers asked him whether he had anything sharp in his pockets and then proceeded to pat him down and search his pockets.  The officer then asked Mr. Moronta whether they could go upstairs to confirm that he had been telling the truth.  Mr. Moronta agreed.  One of the Caucasian officers also asked him for identification.  Tr. at 342:10-346:11.  Mr. Moronta entered the building with the officers and rode the elevator with them.  During the elevator ride, the African-American officer told Mr. Moronta that he better be telling the truth because if his brother did not live there he would be arrested for trespassing.  After they reached Mr. Vasquez's apartment, the African-American officer knocked on the door.  Mr. Vasquez answered the door and confirmed his brother's identity.  One of the Caucasian officers then returned Mr. Moronta's identification to him.  The officers explained to him that he had been stopped because the neighborhood was bad.  The entire encounter lasted approximately ten to fifteen minutes.  Mr. Moronta did not feel free to leave until they exited his brother's

building. The encounter left him feeling violated, uncomfortable, and disrespected. Tr. at 346:12-349:1.

Kieron Johnson

68.     Plaintiff Kieron Johnson is 21 years old and lives at 1515 Selwyn Avenue in the Bronx. He lives in a TAP building, as do most of his friends and family members in the neighborhood. His closest friend, Jovan Jefferson, lives across the street from Mr. Johnson, at 1546 Selwyn Avenue. K. Johnson Test., Tr. at 377:11-379:22.

69.     Mr. Johnson has been stopped by NYPD officers inside or near TAP buildings approximately 7 or 8 times. Tr. at 379:2-11. As a result of these stops, for the past three years, Mr. Johnson has barely gone outside. When he wants to see friends, he asks them to come visit him for fear of being stopped or arrested if he leaves his home. Tr. at 384:17-23.

70.     On a warm day in 2010, at approximately noon, Mr. Johnson received a phone call from Mr. Jefferson inviting him to play basketball. They decided to meet in front of Mr. Jefferson's building, so Mr. Johnson went across the street and stood in front of Mr. Jefferson's building. Mr. Johnson waited alone for approximately two minutes when he saw a police car pull up. Two police officers jumped out of the car and surrounded him. The officers were male, light-skinned, and in uniform. They asked Mr. Johnson whether he had been inside of 1546 Selwyn Avenue. Mr. Johnson responded, no, he was waiting for his friend to meet him. One of the officers demanded his identification, while the other one patted him down, searched inside of his back pocket, removed his wallet, and looked through the wallet before returning it to Mr. Johnson. The first officer then handed Mr. Johnson his identification back and told him he could leave. Mr. Johnson did not feel free to leave until the officer returned his identification to him and told him to leave. As a result of this encounter, Mr. Johnson felt worried and embarrassed. Tr. at 380:1-384:16; Ex. 32 (marked photo of location).

Jovan Jefferson

71.     Plaintiff Jovan Jefferson is a student at an automotive technician school. He has lived at 1546 Selwyn Avenue in the Bronx his entire life, a building that is enrolled in TAP. Mr. Jefferson has been stopped three to four times inside of various TAP buildings in his neighborhood, and seven to eight times outside of TAP buildings in his neighborhood. Jefferson Test., Tr. at 359:17-361:14.

72.     Mr. Jefferson was most recently stopped outside of 1515 Selwyn Avenue, a building where two close friends live. One day sometime between April and June 2012, Mr. Jefferson visited his friend Brandon Muriel at Mr. Muriel's apartment at 1515 Selwyn Avenue. As Mr. Muriel and Mr. Jefferson exited the building around 12:30 pm, Mr. Jefferson noticed a police van driving along Selwyn Avenue. The van stopped and three police officers got out and approached the two men as they reached the bottom of the front steps. Mr. Jefferson recognized two of the officers, Defendants Jimmy Marquez and Luis Rodriguez. Mr. Jefferson was familiar with these two officers because they had stopped him three times before and because they once arrested his friend, Plaintiff Kieron Johnson, inside Mr. Jefferson's lobby. Mr. Jefferson

described the other officer, who he had seen around his neighborhood, as an older "Spanish" male in his late 40's or early 50's with salt and pepper hair.  Tr. at 360:9-364:19.

73.     While they were all standing on the sidewalk, Officer Rodriguez asked Mr. Muriel and Mr. Jefferson where they were coming from and why they had been inside 1515 Selwyn.  Mr. Jefferson and Mr. Muriel explained to the officers that they had come from Mr. Muriel's apartment.  The officers asked Mr. Muriel for identification.  At that point, Mr. Jefferson's mother drove by and stopped her car to ask the police officers what was going on.  In response, Officer Rodriguez stated that Mr. Jefferson was free to go.  Mr. Jefferson left, but Mr. Muriel remained with the officers.  While the officers were talking to him, Mr. Jefferson did not feel free to leave.  The stop outside 1515 Selwyn Avenue made Mr. Jefferson feel that he gets stopped frequently just because of the type of neighborhood he lives in and made him feel limited in visiting his friends and going outside.  Tr. at 364:20-369:4.

Sgt. Robert Musick

74.     The City's claim that it was prejudiced because it could not identify the officers involved in nine of the stops about which the plaintiffs and other witnesses testified is without merit.  Sgt. Robert Musick undertook an investigation that was reduced to two steps to identify those officers: searching for UF-250s and reviewing precinct rosters.  He acknowledged, however, that the fact that no UF-250 was filled out for an incident does not mean that no stop occurred, and that for two of the incidents at issue in this case UF-250s were required to be completed but were not.  Musick Test., Tr. at 1158:8-14.

75.     Sgt. Musick did not take other reasonable steps to identify certain officers.  He did not review the memobooks of two officers who were present during Abdullah Turner's arrest, so he did not know that a third officer was listed as being on patrol with Officer Ramdeen and Pomerantz on the date of the arrest.  Tr. at 1147:4-1149:7.  Although Jerome Grant identified one of the officers who stopped him as Asian, he did not identify all of the Asian officers assigned to the 44th Precinct in July 2011.  Tr. at 1153:4-1154:8.  Although J.G. identified two of the officers who stopped him in August 2011 as wearing plain-clothes, Sgt. Musick could not recall making any effort to identify how many officers were operating in plain clothes in the 44th precinct that month, and had no idea how many such officers there were.  Tr. at 1156:11-1157:9.  Sgt. Musick never showed any photo arrays or spoke with anyone who witnessed any of the incidents at issue as part of his investigation.  Tr. at 1158:1-7.

### THE NYPD HAS FAILED TO TRAIN, SUPERVISE, AND MONITOR TAP AND HAS BEEN DELIBERATELY INDIFFERENT TO WARNINGS ABOUT UNLAWFUL STOPS BEING MADE IN CONJUNCTION WITH THE PROGRAM

76.     Despite starting TAP in the early 1990's, it was not until May 2012, when it issued Interim Orders 22 and 23, that the NYPD had any written policies or procedures specifically addressing any aspect of the program.  Smith Report, Ex. JJJJ at 10-11; Sweet Test., Tr. at 633:13-17 (stating that Interim Orders 22 and 23 were first written policies regarding TAP).

77.     It was not until June and July 2012 that the NYPD conducted any training or created any training materials specific to TAP.  O'Keefe Test., Tr. at 988:7-10 (no training in 1990s);

McCarthy Test., Tr. at 775:18-776:5, 690:19-693:10 (first identified training); Shea Test., Tr. at 885:20-887:7 (same); Ex. D para. 3 (June 18, 2012 memo describing training); Ex. N (Field Training Unit Guide at 60 (July 2012)); Ex. RRR (Police Student Guide at 30-34 (July 2012).[8]

78.     Prior to July 2012 the NYPD had no accurate and complete count of buildings enrolled in the program.  McCarthy Test., Tr. at 775:9-14.

79.     The NYPD has never had any system for supervising or monitoring stops being made in conjunction with TAP.

80.     In June or July 2010, NYPD officials, including the personal counsel to NYPD Commissioner Raymond Kelly, knew that police officers were unlawfully approaching people entering or inside TAP building to demand their identity and an explanation for their presence. Sweet Test., Tr. at 648:18-651:17.

81.     In February 2011 NYPD officials, including the executive officer of the Patrol Bureau, were warned by the Bronx District Attorney's Office that police officers were unlawfully stopping people merely because they were observed entering or exiting TAP buildings.  Sweet Test., Tr. at 659:20-660:17.

82.     The NYPD did not respond to a July 2011 written notice from the Bronx District Attorney's Office that it would no longer prosecute cases where it determined the person was originally stopped merely because an officer observed the person exiting or entering a TAP building.  Rucker Test., Tr. at 186:16-19; 180:19-183:8; Ex. 6 (sample letter to NYPD).

83.     The NYPD has been on notice that the Bronx District Attorney's Office has been declining to prosecute cases where a police officer stopped a person merely for entering or exiting a TAP building, as all decline-to-prosecute forms go to the department.  Rucker Test., Tr. at 256:8-13.

84.     The NYPD knew as early as 1999 that it was unlawful for police officers to stop a person merely for entering and exiting a TAP building.  Sweet Test., Tr. at 683:3-684:4.

The Efforts Made by the NYPD Since the Filing of this Lawsuit Have Been Insufficient

85.     NYPD Interim Order 22 (Ex. A), issued two months after the filing of this case, provides no guidance about stops conducted outside of TAP buildings and provides no meaningful guidance even about stops conducted inside of TAP buildings.  The only information in the order that even bears on the basis for stops is a "note" on page 2 (repeated *verbatim* at page 3 in the "additional data" section), which addresses only stops inside of buildings and simply states than an officer may not stop a suspected trespasser "unless the uniformed member *reasonably suspects* that the person is in the building without authorization" (emphasis in original).  Beyond that, the Interim Order states that certain "contradictory statements" by the person might provide

---

[8]Nothing in the "Policing Legally: Street Encounters" section of the Police Student Guide, Ex. EEEE, contains any information specific to TAP.  Shea Test., Tr. at 914:21-915:6.  None of the stop-and-frisk films created prior to the filing of this case, Ex. S, deals specifically with TAP or with trespass stops, Shea Test., Tr. at 902: 1-16, 945:1-22.

further grounds for detaining the person, but that only addresses information the officer might learn after having stopped the person.  Ex. A at 2-3; Sweet Test., Tr. at 553:1-557:6.[9]

86.    Because Interim Order 22 is of such limited value, the training provided to NYPD officers about Interim Order 22 is of similar limited value.

87.    The new material added to the Police Student Guide in July 2012 is simply material about Interim Orders 22 and 23 and contains no information specific to stops outside TAP buildings. Ex. RRR at 30-34; Shea Test., Tr. at 915:7-916:2.[10]

88.    The new chapter added to the Patrol Bureau's Field Training Unit Guide was distributed only to supervisors of IMPACT officers and provides no standards about the circumstances in which a person may be stopped on suspicion of trespass at a building enrolled in TAP.  Ex. N at 10; McCarthy Test., Tr. at 740:3-742:10; Hall Test., Tr. at 1252:1-3 (describing distribution).

89.    Nothing in the NYPD Stop-and-Frisk training film #5 (Ex. T) that was shown in commands around the City after the filing of this case deals specifically with TAP or with trespass stops.  Shea Test., Tr. at 942:25-943:9, 944:4-25; Ex. T (video); Ex. Q (video lesson plan).

90.    The only training being provided to police officers about stops outside TAP buildings consists of a single bullet point contained in a lengthy PowerPoint presentation that is part of the "refresher course" being provided at Rodman's Neck.  Ex. J at 40; Sweet Test., Tr. at 663:10-664:1; Shea Test., Tr. at 948:13-951:11 (testifying that other parts of training do not address TAP or trespass stops).  That training began in April 2012 and is to be taken by more than 20,000 officers but only about 3,000 had taken it as of September 2012.  Sweet Test., Tr. at 664:24-25 (start date); Sweet Test., Tr. at 665:5-14 (numbers to take); Hall Test., Tr. at 1220:20-23 (number officers assigned to Patrol); Shea Test., Tr. at 955:5-19 (number of officers who have been trained).  The only handouts being given to officers participating in the training are a blank UF-250 and a tear-off receipt officers can provide to people who are stopped.  Shea Test., Tr. at 948:7-12.  Both of the police officers who testified at the preliminary injunction hearing about having attended the "refresher course" testified they had no recollection of the training covering outdoors trespass stops.  Ramdeen Test., Tr. at 1043:17-1044:13; Santiago Test., Tr. at 1111:2-8.

91.    Though the NYPD issued a memorandum in August 2012 (Ex. E) stating that "Platoon Commanders will critique (P.G. 202-13) all situations in which either an interior or exterior street encounter occurred," the Executive Officer of the Patrol Services Bureau stated he did not know whether any such reviews had taken place.  McCarthy Test., Tr. at 759:1-15.

92.    Despite testimony that the CompStat process was a "process to monitor criminal trespass activity" and related stops, Hall Test., Tr. at 1243:10-1244:5, neither Chief Hall nor Chief

---

[9] The text of Interim Order contains a paragraph about reasonable suspicion and stop and frisk generally, Ex. A ¶ 11(d), but that paragraph says nothing about trespass specifically.

[10] There are no other Training Bureau materials that address any aspect of TAP, including stops outside buildings enrolled in the program.  Shea Test., Tr. at 918:24-919:21.

McCarthy knew of a single instance in which they had reviewed a stop they knew to be made in conjunction with TAP, Hall Test., Tr. at 1251:2-10; McCarthy Test., Tr. at 783:22-784:3.

93.     Nothing in the portion of the August 2012 memorandum issued by the Chief of Patrol's office (Ex. E) addressing arrests has any bearing on situations in which a trespass stop is made and the person is not arrested. McCarthy Test., Tr. at 755:4-7. Moreover, that office had no knowledge of whether any arrests had been verified as specified in the memo and testified that no system was in place for the office to receive reports about such reviews and verifications. McCarthy Test., Tr. at 752:17-754:3. Finally, it already is standard procedure to verify all arrests when a person is brought into a precinct. McCarthy Test., Tr. at 754:4-11.

94.     The only testimony adduced about NYPD review of stops made outside of buildings enrolled in TAP came from Chief Brian McCarthy, who testified he reviewed two trespass arrests that took place outside TAP buildings in Queens. McCarthy Test., Tr. at 763:11-766:21.

95.     Figures offered by the City about a reduction in trespass enforcement activity in 2012 was only about arrests, not stops, and was only about trespass arrests generally, and not about arrests connected to TAP. Hall Test., Tr. at 1249:7-17.


## CONCLUSIONS OF LAW

96.     The plaintiffs are entitled to a preliminary injunction that will end the NYPD's practice of making unjustified stops of individuals who are outdoors in public areas on suspicion of trespassing inside TAP buildings in the Bronx. They have established a risk of irreparable harm in the absence of an injunction and a likelihood of success on the merits. *See Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999).

Plaintiffs Are Likely to Prevail on Their Fourth Amendment Claim

97.     For the reasons discussed in the plaintiffs' brief, the 1,044 stops identified in Appendix L of the Fagan Report (Ex. 64) were unjustified, as there was no reasonable suspicion that the person stopped outdoors had trespassed inside a TAP building. Memo of Law in Support of Plaintiffs' Motion for Preliminary Injunction at 6-11 (Sept. 24, 2012). Even if some portion of the 1,044 stops were justified, the number and percentage of unlawful stops is more than sufficient to establish the likelihood of a custom and widespread practice of unlawful outdoors trespass stops in the Bronx.

98.     A stop based on an alleged furtive movement by a person exiting a TAP building is unlawful, regardless of whether the building had a history of crime or was in a high-crime area. *United States v. Bellamy*, 592 F. Supp. 2d 308, 317-18 (E.D.N.Y. 2009). Moreover, there is every reason to discount the significance of either factor in the stops at issue in this case. *See* ¶ 3, *supra* (noting that many buildings enrolled regardless of crime condition in building).

99.     The stops identified by the Bronx District Attorney's Office, *see* ¶¶ 24, 25, 28, 29, 30, *supra*, were unlawful because they were based solely on a person having exited or having entered and exited a TAP building. *See United States v. Swindle*, 407 F.3d 562, 569 (2d Cir.

2005) (holding that police officers unreasonably ordered defendant to stop when the defendant entered and exited a known "drug house," was black like a known criminal suspect but did not otherwise fit the description of the suspect, and drove away in a car of the type the officers associated with the suspect).

100.    Finally, the testimony of nine plaintiffs and two non-party witnesses established the occurrence of 11 separate unjustified outdoor stops made on suspicion of trespassing inside TAP buildings.  *See* ¶¶ 33-73, *supra*.  Plaintiffs J.G., Charles Bradley, Abdullah Turner, Fernando Moronta, Kieron Johnson, Jovan Jefferson, Letitia Ledan, and Roshea Johnson (collectively, the "Named Plaintiffs") were subjected to such stops.  In each stop about which they and non-parties Anginette Trinidad and Jerome Grant testified, an NYPD officer seized the stopped person or persons without reasonable suspicion.

101.    In each case, a reasonable person would not have felt free to leave under the same circumstances.  All were directed in sum and substance to stop by uniformed police officers or police officers in plain-clothes who displayed their badges.  *Cf. United States v. Simmons*, 560 F.3d 98, 106-07 (2d Cir. 2009) (holding person was seized when officer told him to "hold on" and blocked his exit from apartment building); *United States v. McCargo*, 464 F.3d 192, 195-96 (2d Cir. 2006) (holding that "initial *Terry* stop" took place when two officers in a patrol car followed the defendant, who was walking on a public street, "drew along side the defendant, and told him to stop and approach the car"); *Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 2000) (holding that person was seized when police officer said "[w]hat, are you stupid? Come here. I want to talk to you" and then asked person to show his hands).  J.G., Fernando Moronta, Kieron Johnson, Roshea Johnson, and Jerome Grant were all physically restricted from moving when they were searched.  *See, e.g.*, *United States v. Crump*, 62 F. Supp. 2d 560, 564 (D. Conn. 1999) (holding that encounter rose to level of *Terry* stop when officer frisked defendant).  A reasonable person in the shoes of Letitia Ledan would not have felt free to leave, as in both stops about which she testified, NYPD officers held her identification and blocked her from moving. *See Davis v. City of New York*, 2012 WL 4813837, at *6 (S.D.N.Y. Oct. 9, 2012) (noting that plaintiff was seized when officer held his identification and asked him to step into the lobby from the stairwell).

102.    Despite the NYPD's direction to officers in Stop-and-Frisk Film #5 (Ex. T), Second Circuit precedent dictates that a person is stopped under Fourth Amendment law when a police officer says "Stop, Police!" and the person stops.  *See Simmons*, 560 F.3d at 106-07.  State court decisions to the contrary are not controlling on this Court.  *Davis*, 2012 WL 4813837 at *14 (rejecting City's citation of decisions of the New York Court of Appeals and Appellate Division in same context; citing *People v. Reyes*, 199 A.D.2d 153 (1st Dep't 1993), *aff'd,* 83 N.Y.2d 945 (1994), and *People v. Mitchell,* 223 A.D.2d 729, (2d Dep't 1996)).

103.    "The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop."  *United States v. Medina*, 301 F. Supp. 2d 322, 328 (S.D.N.Y. 2004) (suppression hearing); *United States v. Torres*, 11 Cr. 762, 2012 WL 2830020 (S.D.N.Y. July 3, 2012) ("[I]t is the Government's burden to prove that the officer had reasonable suspicion to make an investigatory stop of the vehicle.") (Scheindlin, J.)); *see also Dickerson v. Napolitano*, 604 F.3d 732,751 (2d Cir. 2010) (noting in false-arrest case that where

"an arrest is not made pursuant to a judicial warrant, the defendant bears the burden of proving probable cause as an affirmative defense").

104.    The unlawful stops identified by Dr. Fagan and Jeannette Rucker and the unlawful stops of the Named Plaintiffs and Jerome Grant establish that the plaintiffs are likely to succeed on their claim that the defendants have a custom and practice of unlawful outdoors stops on suspicion of trespassing in TAP buildings in the Bronx.  *See Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (holding that summary judgment was not appropriate where plaintiff proffered evidence of roughly one dozen instances of unconstitutional conduct); *Sorlucco v. City of New York*, 971 F.2d 864, 871 (2d Cir. 1992) (explaining that a plaintiff may establish municipal liability if "the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers").  The fact that high-level NYPD officials were on notice of the practice as early as 2010 and took no steps to remedy the problem indicates that they acquiesced to the practice.

105.    The plaintiffs are also likely to prevail on their claim that the City of New York has been deliberately indifferent to the practice of unlawful outdoors stops on suspicion of trespassing in TAP buildings in the Bronx.  *See Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).  To establish deliberate indifference, the plaintiffs must show (i) that the City "knows to a moral certainty" that its employees will confront the situation at issue, *id.* at 297; (ii) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" *id.* at 297; and (iii) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  *Id.* at 298.

106.    The plaintiffs meet all of *Walker*'s requirements.  First, the evidence demonstrates that the City "knows to a moral certainty," *id.*, that NYPD officers will encounter people outside of TAP buildings and be forced to decide whether a stop is appropriate.  NYPD officers are frequently deployed to TAP buildings.  *See* ¶ 14, *supra*.  Second, there is a history of NYPD officers conducting stops of the type challenged here, including over 1,000 last year.  *See* ¶¶ 11-14, 24, 25, 28-30, 97-100, *supra*.  *Cf. Connick v. Myers*, 131 S. Ct. 1350, 1360 (2011) (plaintiff failed to establish deliberate indifference where alleged pattern of misconduct consisted of only four cases similar to the plaintiff's).  Further, Jeannette Rucker informed high-level NYPD officials of the problem of NYPD officers conducting unlawful outdoors stops on suspicion of trespassing inside TAP buildings on multiple occasions.  *See* ¶¶ 25, 29, 81-83, *supra*.  The personal counsel to Commissioner Kelly was aware of the practice in 2010.  *See* ¶ 80, *supra*.  Third, when NYPD officers make such stops, the stopped person's Fourth Amendment rights are, by definition, violated.

107.    The City has failed to train and supervise officers on the specific circumstances under which they may stop individuals outdoors on suspicion of trespassing inside TAP buildings.  *See* ¶¶ 77-79, 85-95, *supra*.  As described in paragraphs 111-14, which lay out the plaintiffs' proposed remedy, the City could take numerous steps to train and supervise NYPD officers that would combat this unconstitutional practice, but failed to do so.  The City has therefore caused the violation of the rights of people who live in, visit, or are simply proximate to TAP buildings by failing to train and supervise NYPD officers who have, or are likely to, conduct such stops.  *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128-30 (2d Cir. 2004).

The Named Plaintiffs Have Suffered Irreparable Harm and Are At Risk of Future Harm

108.     All of the Named Plaintiffs have standing to pursue injunctive relief, as they have been subjected to stops of the type challenged here and are all at risk of being subjected to such stops in the future.  *See* Reply Memo of Law in Support of Plaintiffs' Motion for Preliminary Injunction at 8-9 (Oct. 12, 2012).

109.     The prevalence of unjustified outdoors trespass stops in the Bronx further establishes that the Named Plaintiffs are at risk of being subjected to such stops in the future.  Dr. Fagan identified over one thousand apparently unjustified stops of this kind in the Bronx in 2011 alone.[11]

110.     "The violation of a constitutional right, particularly on an ongoing basis, constitutes irreparable harm for the purpose of a preliminary injunction."  *Ligon v. City of New York*, 2012 WL 3597066, at *1 (S.D.N.Y. Aug. 21, 2012).  The Named Plaintiffs' claims that their Fourth Amendment rights will continue to be violated absent a preliminary injunction meets this standard.  *See Stauber v. City of New York*, 2004 WL 1593870, at *25 (S.D.N.Y. July 16, 2004).

## TO REMEDY THE CITY'S LACK OF POLICIES, TRAINING, SUPERVISION, AND MONITORING, NUMEROUS MEASURES ARE NECESSARY AND APPROPRIATE

111.     Policies and Procedures- To remedy the NYPD's failure to have in place policies governing the stopping of people outside of buildings enrolled in TAP, the NYPD should be required to develop and adopt formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside of a TAP building on suspicion of having trespassed inside the building and specifying that merely entering, exiting, or being near a TAP building provides no justification for stopping the person.

112.     Training- To remedy the NYPD's failure to train officers about the circumstances in which it is legally permissible to stop a person outside of a TAP building on suspicion of having trespassed inside the building, the NYPD should be required to undertake the following measures:

   a.  Designate an official in the Training Bureau who will assume personal responsibility for ensuring that the training specified below is completed and provide that person with the authority needed to ensure the training specified below is completed;

   b.  In the same manner it distributed Interim Order 22, distribute to each member of the department in the Bronx the written policy described in paragraph 111 and repeat the distribution two additional times at six-month intervals;

---

[11] The Court may consider facts related to the putative class in determining whether the plaintiffs are at risk of future proximity stops.  *See Strouchler v. Shah*, 2012 WL 3838159, at *8-9 (S.D.N.Y. Sept. 4, 2012) (citing *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004)).

c.   In the same manner it conducted command-based training about Interim Order 22, conduct such training to inform members of the department in the Bronx about the written policy described in paragraph 111;

d.   In the same manner it created and distributed Stop-and-Frisk Films ##1-5, create and then have shown to all members of the NYPD in the Bronx a Film #6 that expressly addresses stops being made in conjunction with TAP, including the specific standards governing such stops as spelled out in the written policy described in paragraph 111;

e.   Add to the Police Student Guide for new recruits a section that expressly addresses stops being made in conjunction with TAP, including the specific standards governing such stops as spelled out in the written policy described in paragraph 111;

f.   Add to Chapter 16 of the Field Training Unit Guide (which generally addresses TAP) a section that expressly addresses the stops being made in conjunction with TAP, including the specific standards governing such stops as spelled out in the written policy described in paragraph 111;

g.   Require the NYPD to continue the Rodman's Neck "refresher course" for all members assigned to commands in the Bronx and to modify the course to include a more detailed presentation about TAP stops, to provide a handout to officers about TAP stops, and to include a scenario that specifically deals with an outdoors trespass stop; and

h.   Institute procedures for confirming that members of the NYPD in the Bronx receive the training specified in paragraphs 112(a)-(g) and for assessing individual officers who have received the training to ensure the training has been effective.  Plaintiffs' counsel are to be provided with written reports about completion of the training and are to be provided with all assessments.

113.   <u>Supervision</u>- To remedy the NYPD's failure to supervise stops being made in conjunction with TAP, the NYPD should be required to undertake the following measures:

a.   Institute a system, like the one suggested by paragraph 3 of Exhibit E, by which supervisory personnel in each Bronx precinct on a frequent (daily or weekly) basis review every UF-250 completed for a trespass stop taking place outside of a TAP building to determine (1) whether the stops are being made in conformity with the policy described in paragraph 111 and the training described in paragraph 111 and (2) to the extent that review reveals nonconformity, take specific steps to retrain the officer in accordance with the policy described in paragraph 111 and the training described in paragraph 112;

b.   Institute a system by which the results of the reviews described in paragraph 112(a) are reported in writing to the relevant Bronx precinct commander and a designated member of the borough command and by which they are required periodically to review those reports and take steps to address noncompliance revealed by those reports.  In conjunction with these reports, precinct commanders and the designated official in the borough command office shall be provided with copies of all the reviewed UF-250s.

114.    <u>Monitoring</u>- To remedy the NYPD's failure to monitor stops being made in conjunction with TAP, the NYPD should be required to undertake the following measures:

    a.    Designate an official in the Chief of Patrol's office who is personally responsible for ongoing monitoring of and reporting about stops being made in conjunction with TAP in the Bronx and who has the authority to fulfill this responsibility;

    b.    Institute a system by which the designated official in the Chief of Patrol's office receives and reviews on a regular basis every UF-250 completed for a trespass stop taking place outside of Bronx TAP buildings to determine whether the stops are being made in conformity with the policy described in paragraph 111 and the training described in paragraph 111;

    c.    Provide copies of all reports created under paragraph 114(b), including copies of all relevant UF-250 forms, to plaintiffs' counsel on a monthly basis;

    d.    Require, whenever a police officer interacts with a person suspected of trespass (regardless of whether the encounter rises to a stop requiring a UF-250) outside a Bronx TAP building, that the officer provide the person with written notice identifying the name and badge number of the officer, the date and time of the interaction, a phone number the person can call if they wish to register a complaint about the interaction; and a copy of any UF-250 completed by the officer or, if the person does not wish to wait for the form, the serial number of any UF-250 the officer plans to complete;

    e.    Require as a condition of continued enrollment in TAP that property owners provide to tenants written notice about the building's enrollment in the program, the authority of police officers conducting enforcement activity pursuant to the program, and a phone number they can call to register a complaint about law-enforcement activity related to the program.

    f.    Requires as a condition of continued enrollment in TAP that property owners amend the publicly posted signs on or inside the building to inform residents and visitors of a number they can call to register a complaint about law-enforcement activity related to the program.

115.    <u>Other Relief</u>- To remedy the NYPD's lack of policies, training, supervision, and monitoring, the Court should order any additional measures it deems necessary and appropriate.

116.    <u>Attorneys' Fees and Costs</u>- The Court should grant reasonable attorneys' fees and costs to the plaintiffs. *See, e.g., Casale v. Kelly*, 710 F.Supp.2d 347 (S.D.N.Y. 2010).

Respectfully submitted,


     /s/  Alexis Karteron                    
Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
akarteron@nyclu.org

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

Dated:  November 20, 2012
          New York, N.Y.