UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JAENEAN LIGON, et al.                          :
                                               :
                          Plaintiffs,          :
                                               :        12 Civ. 2274 (SAS)(HBP)
        -versus-                               :
                                               :
CITY OF NEW YORK, et al.                       :
                                               :
                          Defendants.          :
-----------------------------------------------------------X

### PLAINTIFFS' REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion, Jr.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

Dated: November 26, 2012
        New York, N.Y.

## THE NYPD'S TRESPASS AFFIDAVIT PROGRAM

1.      Under NYPD's Trespass Affidavit Program ("TAP") ("Operation Clean Halls" in the

Bronx), building owners authorize officers to enter and patrol the buildings.  A sign or signs are

conspicuously posted on the front of the building and elsewhere identifying the building as being

enrolled in the program.  NYPD precincts maintain lists of buildings enrolled in TAP, and

precincts target the buildings for enforcement activity by virtue of their enrollment in the

program.  Ex. A (Interim Order 22); Ex. B (Interim Order 23); Sweet Test., Tr. at 518:19-519:7

Exs. 27, 29, 32, 35, 36, 37 (signs); Catalina Test., Tr. at 992:14-22 (explaining that once

buildings are enrolled "we will then deploy officers to do . . . vertical patrols in the buildings").

2.      The NYPD has enrolled "anybody and everybody" in TAP, regardless of whether the

building was a crime-ridden building or not.  Sweet Test., Tr. at 637:12-19.

3.      A July 2012 survey conducted by the NYPD reported that 8,032 buildings were enrolled

in TAP, 3,261 (40.6%) of which were in the Bronx.  McCarthy Test., Tr. at 774:18-775:8.

## THE NYPD PRACTICE OF UNLAWFUL STOPS OUTSIDE BRONX TAP BUILDINGS

Analysis of UF-250 Forms

4.      In 2011 NYPD officers recorded 1,663 stops that took place outside at the exact address

of a Bronx TAP building where trespass was the only suspected offense (and excluding stops

where indoor behavior observed).  Ex. 4 at 2-6 & nn.2-8 (discussing original 1,857 stops); Ex. 4,

Apps. C-E (exclusions to assure only outdoor stops); Fagan Test., Tr. at 73:8-22 (removal of

outdoor stops where indoor behavior observed); 114:23-115:2 (explaining that eliminating

claimed NYCHA stops reduces original 1,857 stops to 1,663).  These stops occurred at hundreds

of TAP buildings and in every Bronx precinct.  Ex. 4 at 10 (discussing original 1,857 stops).

5.      The 1,044 stops included in Appendix L (Ex. 64) are the 1,137 stops Dr. Fagan originally

identified in Table 8 of his report as lacking any recorded justification based on all justifications

1

on the <u>front</u> of the UF-250, plus all justifications on the <u>back</u> of the UF-250, less stops Dr. Smith suggested might be NYCHA stops (as well as a handful of courtyard stops).  Fagan Test., Tr. at 112:15-113:13, 109:8-20; Ex. 4, Apps. F & I (text strings).  Dr. Fagan testified that the addition of the information from the back of the form to his original analysis of justifications marked on the front of the form did not substantially change his opinion about the number and percentage of recorded stops that lacked justification.  Tr. at 113:14-114:3; Ex. 4 at 15 (Table 8) (1,137 out of 1,857, 61.2%); Ex. 64 (App. L) (1,044 out of 1,663, 62.8%).

6.      The most common stop justification officers marked on the front of the UF-250s of the stops examined by Dr. Fagan was "furtive movement."  Ex. 4 at 15 (Table 8) (467 of 1,137 stops).  Dr. Fagan was concerned that police officers were marking "furtive movement" in a reflexive or indiscriminate manner, given the high percentage of stops where this was marked as a factor and given the lack of any apparent connection between a furtive movement and trespass.  Tr. at 90:15-91:14; Ex. 4 at 11 n.12.  Moreover, as the City's training witness explained, "[a] furtive movement could be anything."  Shea Test., Tr. at 854:18.

7.      The most common justification officers marked on the back of the UF-250s of the stops Dr. Fagan examined was the high crime area box.  Ex. 4 at 17 (Table 11) (noting marked in 56.38% of stops).  This cannot be explained by TAP buildings themselves being high-crime areas, as the NYPD was enrolling buildings regardless of whether they were crime-ridden or not.  Tr. at 637:12-19.  The City's training witness explained that this high-crime area box could refer to a building, a block, a sector, or even an entire borough.  Shea Test., Tr. at 862:20-863:23.

8.      The City's claim that some of the stops Dr. Fagan analyzed were not TAP stops because the person may have exited a nearby non-TAP building and later been stopped in front of a TAP building is without merit: (a) Despite having complete access to the UF-250 database and related

NYPD records and employees, the City failed to identify a single stop where the suspected trespass took place inside a building not enrolled in TAP; (b) In 65% of stops the officer observed the person for less than one minute and in another 18% of stops the officer observed the person for between one and two minutes, Tr. at 1271:23-1272:2, and even in those instances where a period of observation was long enough to allow a person to have moved away from a TAP building, there is no reason to believe the person did so as opposed to simply standing in front of the building, as with several of the plaintiffs, *see e.g.,* Turner Test., Tr. at 476:16-18; Grant Test., Tr. 455:7-17; K. Johnson Test., Tr. at 381:3-14; (c) Though defense counsel claimed tactical reasons might cause officers to allow a person to move away from a TAP building before making a stop, Tr. at 46:10-25, 1310:5-8, the defendants adduced no testimony on this point; (d) To the extent Dr. Fagan's exact-address methodology was overinclusive by capturing some stops where the suspected trespass occurred at a non-TAP building near the stop location, it would have been similarly underinclusive by not capturing stops where the suspected trespass occurred at a TAP building and the person was stopped in front of a nearby non-TAP building.  Thus, there is no reason to believe the exact-match methodology overstated the general number of relevant stops or the character of those stops for purposes of a preliminary injunction.  Tr. at 45:23-46:47:4 (Court noting that City argument "cuts both ways" with respect to number of stops); Ex. 4 at 5-6 (discussing underinclusiveness of exact-match methodology).

9.      The City's claim that Dr. Fagan failed to establish that TAP "caused" the stops is without merit: (a) To the extent the City suggests the plaintiffs challenge the program's legality, that is wrong, as they only challenge certain unlawful stops being made in conjunction with TAP, Tr. at 6:7-18; (b) To the extent the City suggests stops are unlawful only if "caused" by TAP, that is wrong, as what makes a stop unlawful or not is whether the officer making the stop was aware of

facts that provided a reasonable basis to suspect the person of having trespassed inside the building; (c) To the extent the City suggests the stops analyzed by Dr. Fagan are unconnected to TAP, that is wrong, as every stop took place directly in front of a TAP building, every stop was on suspicion of trespass only, TAP buildings have signs posted on them, the NYPD directs patrol activity at TAP buildings, and in over 400 instances police officers actually wrote "Clean Halls" on the UF-250, even though there is no space on the form to indicate enrollment in TAP.  Tr. at 124:14-24.  Moreover, three police officers testified that they would not indicate "Clean Halls" on a UF-250 even for stops made outside TAP buildings.  Santiago Test., Tr. at 1110:23-1111:1; Rodriguez Test., Tr. at 1072:91-9; Pomerantz Test., Tr. at 1058:24-1059:2.

10.     The City's claim that Dr. Fagan wrongly "assumed" that Bronx buildings enrolled in TAP according to NYPD records at some point in 2011 remained enrolled for the entire year is wrong.  As of 2011, the owner affidavits being used in the Bronx enrolled the building "into perpetuity."  Ex. 76 (sample affidavits); Sweet Test., Tr. at 637:20-642:25.

11.     The City's claim that Dr. Fagan mistakenly included in his analysis NYCHA stops identified in his *Davis* report is without merit.  Tr. at 124:25-126:17 (explaining different methodologies).  But to eliminate any issue arising out of this, Dr. Fagan removed those stops, Tr. at 83:15-85:7, which reduces the 2011 Bronx outdoors trespass-only stops from 1,857 to 1,663 and the stops without justification from 1,137 to 1044, and increases the rate of unjustified stops from 61.2% (1,137/1,857) to 62.8% (1,044/1,663).  Tr. at 114:23-115:1; Ex. 64 (App. L).

12.     The City's claim that the coding of some text entries in the "other" box on the UF-250 masked information showing a stop was lawful is without merit.  Dr. Smith identified 36 such stops, yet many would provide no basis for suspecting trespass by a person outside a building. Smith Report, Ex. JJJJ at 34-39.   Even if one assumed all 36 entries provide information to

justify the stop and that all 36 were included in the 1,044 stops, that would simply reduce the unjustified stops to 1,012, which still would be 60.8% of the 1663 stops.

13.    The City's suggestion it would be unfair to assess the legality of stops based on the UF-250 forms because they tell only a part of the story is without merit.  The defendants had complete access to the UF-250 database, to related NYPD records, and to NYPD employees but did not adduce testimony from a single person suggesting that information other than that indicated on a UF-250 contributed to any stop analyzed by Dr. Fagan.  In addition, officers are instructed to record on UF-250s all reasons for a stop, and the UF-250 has spaces for them to write any reasons they want.  Shea Test., Tr. at 849:13-19; Ex. EEEE at 20 (Police Student Guide); Ex. 4, App. B (UF-250); Ex. GG (revised UF-250).  If anything, given the likelihood that officers are over-recording purported justifications on UF-250 forms, Fagan Test., Tr. at 90:15-91:22, relying on the UF-250 forms gives the defendants every benefit of the doubt.

14.    The City's complaint that Dr. Fagan did not use the "formula" from *Floyd v. City of New York* here is without merit.  Setting aside the concern the Court has expressed about legal conclusions implicit in the *Floyd* formula, that formula is irrelevant because it was designed to assess 2.8 million stops covering all possible offenses, where this case deals only with the narrow and specific category of outdoors, trespass-only stops.  Fagan Test., Tr. at 142:16-24.

Information About Trespass Arrests Outside TAP Buildings Independently Supports a Finding of a Custom and Practice of Unlawful Outdoors Trespass Stops

15.    As early as 2007 the Bronx District Attorney's Office became concerned that police officers were stopping and arresting people who were merely observed entering or entering and exiting TAP buildings in the Bronx and, particularly by 2009, judges were dismissing such cases.  The situation worsened in 2010 as the office learned of cases where arrestees were actually tenants of the buildings where they were arrested.  Rucker Test., Tr. at 174:17-177:22.

5

16.     In the three sample months in 2011 (January, February, and June) for which the plaintiffs were provided decline-to-prosecute forms from the Bronx District Attorney's Office,[1] there were at least 28 instances in which the office had declined to prosecute a trespass arrest after the office concluded, <u>based on an interview with the arresting officer</u>, that the person arrested had been stopped merely because the officer observed the person entering or exiting a TAP building. Rucker Test., Tr. at 213:1-24, 220:1-25; Ex. 74 (decline-to-prosecute forms).[2]

17.     The number of decline-to-prosecute cases from the Bronx in 2011 independently suggests a widespread practice of unlawful stops outside of TAP buildings.  The City's expert reported that approximately 13% of the 2011 Bronx stops analyzed by Dr. Fagan resulted in arrest.  Smith Report, Ex. JJJJ at 6.  The three-month sample of cases from the Bronx DA's Office (28 arrests not prosecuted) would extrapolate to 112 arrests for 2011 where the officer merely observed the person enter or exit a TAP building.  To have 112 such stops with an arrest rate of 13% would suggest 861 stops where the only thing observed by the officers was a person entering or exiting a TAP building.

18.     In response to many instances in which people were wrongly arrested for trespassing, the Bronx District Attorney's Office expanded its interview policy in July 2012 to require interviews of arresting officers in all trespass cases.  Ex. 10; Rucker Test., Tr. at 190:6-201:25.

---

[1] These forms were produced pursuant to order of this Court in *Davis v. City of New York* and then produced to the plaintiffs here.  Tr. at 508:13-509:19 (colloquy with Court about sample).

[2] Exhibit 46 contains 31 decline-to-prosecute forms.  Three forms do not expressly identify the building as a TAP building.  Rucker Test., Tr. at 214:5-9.  Though Ms. Rucker testified that the charge shown on the form indicated it likely involved a TAP building, *see* Tr. at 214:10-218:14, the plaintiffs have eliminated references to those three in an excess of caution.

Stops Without UF-250 Forms

19.     In 2011 the NYPD likely made far more outdoors trespass-only stops in the Bronx than

the 1,857 or 1,663 stops recorded on UF-250s analyzed by Dr. Fagan.  In the 11 stops about

which plaintiffs testified, officers did not complete a single UF-250.  Musick Test., Tr. at 1125-

1143 (explaining that database search did not produce any records); Ramdeen Test., Tr. at

1024:2-7; Santiago Test., Tr. at 1110:9-18.[3]   In its annual reports for 2010 and 2011, the CCRB

found that officers' not completing UF-250s was a major failure.  Ex. 78 at 13; Ex. 79 at 14.

**UNJUSTIFIED STOPS OF PLAINTIFFS AND THEIR FRIENDS AND RELATIVES**

20.     Plaintiff J.G. is 17 and lives at 290 East 163rd Street, a TAP building, with his mother,

Jaenean Ligon, and his brothers.  J.G. Test., Tr. at 437:16-438:23.  One evening in August 2011,

J.G. left his home to buy ketchup at a nearby store.  As he walked home, he saw two plain-

clothes NYPD officers in front of his building and three uniformed officers across the street.

Both plain-clothes officers had badges displayed.  When J.G. got to his building the plain-clothes

officers stopped him and asked where he was coming from, where he was headed, and what was

in his bag.  J.G. answered their questions, responding that he was coming from the store at 163rd

Street and Morris, going to his apartment, and had ketchup in the bag.  One of the officers then

told J.G. to raise his hands; he frisked J.G. and searched one of his pockets.  The officer ordered

J.G. to provide identification.  J.G. complied.  After asking what apartment J.G. lived in, the

officers rang the bell to his apartment.  Ms. Ligon came downstairs.  The officers asked her

whether J.G. was her son and what apartment they lived in.  After Ms. Ligon answered their

questions, the officers handed Ms. Ligon the ketchup and allowed J.G. to leave.  Tr. at 439:4-

442:25; Ex. 36 (photo of stop location).

---

[3] NYPD policy requires completion of a UF-250 even when an arrest is made.  Police Student
Guide, Ex. EEEE at 19-20.

21.   <u>Plaintiff Jaenean Ligon</u> testified about the stop as well.  She testified that after making dinner one evening in August 2011 at her home, she sent J.G. to the store for ketchup.  A few minutes later, her bell rang.  The person on the intercom asked, "can you come down and identify your son?"  Ms. Ligon ran downstairs, thinking J.G. was either dead or hurt. Ms. Ligon saw J.G. standing in the doorway of the building with three male police officers.  One of the officers asked Ms. Ligon whether J.G. was her son, what his name was, and what apartment she lived in.  Once she answered the questions, the officers left. Ligon Test., Tr. at 428:2-433:6, 434:23-24.

22.   <u>Jerome Grant</u>, son of Jaenean Ligon and brother of J.G., testified about a different stop that took place in July 2011.  He played basketball with his brother J.A.G., his cousin Shawn Grant, and his friend Kawane Simmons.  The group then went to Jerome's grandmother's home at 274 Bonner Place in the Bronx, a TAP building.  Jerome Grant Test., Tr. at 451:14-454:6; Ex. 37.  J.A.G. ran ahead of the group to the building.  After knocking on the door, the rest of the group waited outside for J.A.G. to exit.  Two uniformed, male police officers, one Caucasian and one Asian, approached them with flashlights.  The Asian officer asked them if they lived in the building and if they had been trespassing.  Jerome responded that his grandmother lived there, and that he had come to get a key to his apartment.  The Asian officer instructed the teenagers to put their backs against the wall and to produce identification.  Jerome provided his; the Caucasian officer returned it after writing something down.  The Asian officer then instructed the three to turn around and place their hands against the wall.  The officer questioned Shawn about whether he had any drugs or blades on him and then searched him, removing the contents of his pockets and placing them on the ground.  The Caucasian officer then searched Kawane and Jerome.  Tr. at 454:25-459:21, 462:6-25; Ex. 37.  The officers then stated that they wanted to

ensure they had not been trespassing and told them to have a good night and go straight home.

Jerome did not feel free to leave until the officers told him to go home.  Tr. at 461:14-463:6.

23.    Plaintiff Abdullah Turner is 25 years and since 2008 has lived at 2249 Morris Avenue, a

TAP building.  Turner Test., Tr. at 471:12-473:8; 486:11-487:1.  On the evening of March 26,

2011, he had plans to go to a party on Davidson Avenue in the Bronx with his friend Anginette

Trinidad.  Before going into the party, she told Mr. Turner she had to go inside 2020 Davidson to

return a sweater she had borrowed, which Mr. Turner observed her carrying.  Ms. Trinidad never

said anything about marijuana to Mr. Turner that night.  Tr. at 473:9-475:15, 481:20-21.

24.    When Ms. Trinidad entered the building, Mr. Turner made a phone call while on the

sidewalk outside.  Shortly thereafter, his phone was taken from him.  When he turned around, he

observed three NYPD officers, one of whom was Kieron Ramdeen and one of whom was

Hispanic.  Tr. at 477:5-478:12, 483:23-485:18; Exs. 28, 29.  The Hispanic officer asked Mr.

Turner whether he lived at 2020 Davidson and what he was doing at the building.  Mr. Turner

said that he did not live there and was waiting for a friend.  The officer then ordered Mr. Turner

to present identification.  Mr. Turner complied.  The Hispanic officer went inside the building,

and Officer Ramdeen began questioning Mr. Turner.  Shortly thereafter, Ms. Trinidad came

outside the building and Mr. Turner identified her as his friend.  Officer Ramdeen radioed to the

other officers, and the two came outside and began questioning Ms. Trinidad about her business

in the building.  She stated she had gone to return a sweater.  One officer asked her whether she

"had anything on her she shouldn't have," and she admitted she had a bag of marijuana and a

pocketknife.  Shortly thereafter, the Hispanic officer asked Mr. Turner if he knew what the TAP

sign on the building meant, and when Mr. Turner said he did not, the officer stated that he was

trespassing.  Mr. Turner and Ms. Trinidad were then both arrested.  Tr. at 478:13-482:18.

25.     Mr. Turner was charged with trespassing.  His case was dismissed.  Tr. at 483:16-21.

26.     Anginette Trinidad's testimony about March 26, 2011 was consistent with Mr. Turner's.
She testified that she and Mr. Turner planned to attend a party.  Trinidad Test., Tr. at 619:23-
620:3; 621:16-25.  Before they went to the party, she went to 2020 Davidson to return a sweater
to a friend.  Tr. at 623:8-22.  When Ms. Trinidad exited the building, she saw several police
officers standing near Mr. Turner.  She never saw Mr. Turner enter 2020 Davidson, and she
never said anything to Mr. Turner about purchasing marijuana there.  Tr. at 626:20-628:6.

27.     Officer Kieron Ramdeen testified that on March 26, 2011, he and Officer Michael
Pomerantz were assigned to patrol the 46th Precinct.  Ramdeen Test., Tr. at 1012:15-23. Officer
Ramdeen testified that when they initially drove by 2020 Davidson that night, he observed Mr.
Turner "wandering" or "pacing" inside the lobby of 2020 Davidson via two windows in the door
of 2020 Davidson.  Tr. at 1017:9-1019:15; Ex. 28. Officer Ramdeen did not observe Mr. Turner
do anything else before approaching him.  Tr. at 1028:11-17.

28.     According to Officer Ramdeen, Mr. Turner exited the building as they approached.
Standing in front of 2020 Davidson, Officer Ramdeen claims to have then asked Mr. Turner if he
lived in the building, and if he knew anyone in the building.  Mr. Turner said that he did not.
Officer Ramdeen then asked Mr. Turner what he was doing in the building.  Officer Ramdeen
claims that Mr. Turner responded "I am not going to lie, Officer, I just came with my friend.  She
went upstairs to buy weed.  I don't know what floor she is on.  I don't know what apartment
she's in."  Shortly thereafter, Officer Ramdeen arrested Mr. Turner.  Tr. at 1021:1-1022:18.

29.     Officer Ramdeen's testimony was not credible. He did not remember that Ms. Trinidad
was arrested, what Officer Pomerantz did or said that night, or what Mr. Turner looked like.  Tr.
at 1030:25-1035:2.  Officer Ramdeen claimed that no third officer was present, but Officer

10

Pomerantz's memobook states that Officer Montanez was on patrol with them.  Ex. HHHH;

Ramdeen Test., Tr. at 1027:19-1028:1; Pomerantz Test., Tr. at 1059:17-1060:3; 1061:1-6.[4]

30.     Officer Pomerantz's testimony about the events of that evening was also not credible.  He

could not remember where the officers' initial conversation with Mr. Turner took place.

Pomerantz Test., Tr. at 1051:4-12.  He was unable to explain his memobook entry indicating that

Officer Montanez was on patrol with them.  Tr. at 1059:3-1061:17.[5]

31.     One night during December 2011 or January 2012, two NYPD officers stopped Mr.

Turner outside of his own building.  As he exited his building, walking on the public pathway

toward the sidewalk, he saw a police car pull up.  He also saw his brother, his neighbor Lamont,

and Lamont's nephew.  Mr. Turner spoke with the group.  A uniformed police officer then got

out of the car and asked if the people standing outside the building lived there.  Mr. Turner

responded that they all did.  The officer demanded identification, which Mr. Turner provided.

The officer then stated that they could not stand in front of their building.  Mr. Turner did not

feel free to leave until the officer left.  Turner Test., Tr. at 487:13-493:15; Ex. 31.

32.     Plaintiff Charles Bradley is 52 years old and lives in the Bronx.  From September 2009 to

June 2010, Mr. Bradley lived with his fiancée, Lisa Rappa, at 1527 Taylor Avenue in the Bronx,

---

[4] Further, the paperwork that Officer Ramdeen filled out undermines his credibility.  Exs. ZZ,
CCC, AAA; Ramdeen Test., Tr. at 1029:16-23,1038:19-1043:16.  Neither the arrest report nor
Officer Ramdeen's memobook contained any mention of Mr. Turner's alleged statement
concerning marijuana.  Exs. ZZ, AAA; Tr. at 1038:19-1041:24.  Officer Ramdeen testified that
the door to 2020 Davidson Avenue was unlocked, but the supporting deposition stated that the
door was locked.  Tr. at 1042:7-8; 1043:8-16; Ex. CCC.  Officer Ramdeen testified that he saw
Mr. Turner inside the building, yet the supporting deposition stated that he saw Mr. Turner enter
and exit the building.  Tr. at 1029:16-23; 1043:8-16; Ex. CCC.

[5] The failure of Officer Ramdeen and Officer Pomerantz to take any steps to combat drug sales
inside 2020 Davidson Avenue further renders their testimony incredible.  Although they
allegedly learned that someone had just sold marijuana inside the building, their only response
was to arrest Mr. Turner and Ms. Trinidad.  Pomerantz Test., Tr. at 1064:5-1065:12.

a TAP building.  Bradley Test., Tr. at 257:10-260:7.  On May 3, 2011, Mr. Bradley went to 1527

Taylor Avenue to visit Ms. Rappa.  Mr. Bradley arrived at approximately 5 p.m. and was let into

the front door by a resident who was an acquaintance of his.  Mr. Bradley went to the fifth floor

and knocked on Ms. Rappa's apartment door, but no one answered.  After waiting a minute or

two, he went back downstairs and exited the building.  Tr. at 261:15-264:2.

33.      Once he got outside, a green van pulled up.  Officer Miguel Santiago, who was seated in

the van, gestured to Mr. Bradley and told him to "come on over, come here."  Mr. Bradley

walked over to the van and said, "Excuse me, Officer, hi. What can I do for you?"  Tr. at 264:13-

265:13.  Officer Santiago got out of the van, searched inside Mr. Bradley's pockets, and asked

Mr. Bradley what he was doing at the building.  Mr. Bradley said, "I'm here to see my young

lady."  He then tried to explain that he was a security officer.  In response, Officer Santiago

cursed at him and arrested him for trespassing.   Tr. at 264:7-269:1; Ex. 27.

34.      Mr. Bradley provided the Bronx District Attorney's office with a notarized letter from

Ms. Rappa stating that Mr. Bradley had been visiting her on May 3, 2011.  Tr. at 272:3-273:7;

Ex. 17.  The District Attorney's office declined to prosecute the case.  Ex. 18 (declined

prosecution affidavit); Tr. at 275:7-8.

35.      Most of Officer Santiago's testimony about the circumstances surrounding Mr. Bradley's

arrest was not credible.  Officer Santiago claims to have observed Mr. Bradley walking back and

forth at the end of the hallway inside 1527 Taylor Avenue, but to do so he would have had to

look 20 or 30 feet across the street, through the front door and vestibule, up several steps,

through a second interior door, and to the end of a hallway.  Tr. at 1084:21-1087:11; 1101:23-25;

1105:18-1106:17; Exs. HHH, KKK, LLL, MMM, NNN, OOO (photos of 1527 Taylor Avenue).

Officer Santiago's testimony contradicted the arrest paperwork.  He testified that he observed

Mr. Bradley inside the building for 2-3 minutes, but the paperwork indicates an observation time of seven minutes. Tr. at 1101:11-15; Ex. 39 (certain arrest paperwork). Officer Santiago testified that Mr. Bradley could not identify an apartment number, but the arrest paperwork states that he went to the apartment Mr. Bradley indicated. Tr. at 1104:8-11; Ex. 39. Officer Santiago testified that he stopped Mr. Bradley outside the building, but the arrest paperwork indicates that the stop occurred inside. Tr. at 1102:1-3; Ex. 39. Officer Santiago's testimony that Mr. Bradley could not identify an apartment, a floor, or anyone he was visiting in the building is not credible given that Mr. Bradley lived in the building for nine months and his fiancée lived in the building. Tr. at 1102:4-11; Bradley Test., Tr. at 258:24-260-7. Officer Santiago has previously been disciplined for issuing a summons that he knew contained false statements of fact. Santiago Test., Tr. at 1107:17-20; 1099:17-1100:6.[6]

36.   Plaintiff Roshea Johnson is 36 years old and lives in Schenectady, New York. Until late 2010, Mr. Johnson lived at River Park Towers in the Bronx with his sister, Letitia Ledan, and with another friend. R. Johnson Test., Tr., at 394:2-395:2. Mr. Johnson continues to visit Ms. Ledan at River Park Towers every two or three months. Tr. at 393:25-396-13.

37.   The River Park Towers complex consists of four towers, which contain approximately 1600 apartments, as well as stores that are open to the public. Ledan Test., Tr., at 297:16-298:10; Ex. YY (video footage of complex) at 7:53-8:08, 19:09-21:12; Ex. 22. River Park Towers is enrolled in TAP. Tr. at 298:11-19; Ex. 76 (TAP affidavits). Pedestrians enter the complex by walking on public sidewalks and do not pass through any gate or security check. Tr. at 298:22-

---

[6] Even if the Court were to find Officer Santiago's testimony credible, he stopped Mr. Bradley for trespassing without reasonable suspicion. Officer Santiago initially suspected Mr. Bradley of trespass only because Mr. Bradley had been in the lobby. Tr. at 1108:21-1109:7. Officer Santiago testified that when he questioned Mr. Bradley he was standing in front of Mr. Bradley, one or two feet away, another NYPD officer was standing to the right side of Mr. Bradley, one or two feet away, and the police van was in front of Mr. Bradley. Tr. at 1109:13-1110:2.

299:5, 303:18-23; 304:18-305:2; 313:24-314:2; 316:12-25; Exs. 19-20 (photos of complex); R.

Johnson Test., Tr. 398:7-13, 416:8-417:8; Ex. YY.  There are not any "No Trespassing" signs

visible to individuals on the sidewalks and streets within the complex.  Ex. YY; Sweet Test., Tr.

at 666:23-675:15; Ledan Test., Tr. at 1254:22-1260:5; Ex. 92-97 (photos of signs depicted in Ex.

YY at 4:22, 6:10, and 9:40).

38.      At approximately 10:30 a.m. or 11 a.m. of Father's Day of 2010, Mr. Johnson went to

Ms. Ledan's apartment to change into clothes he had left there.  After he knocked on the door

and no one answered, he left so he could call her from a payphone.  Tr. at 396:17-399-14.  As

Mr. Johnson was crossing the street, two NYPD officers pulled up in a black van.  One officer

asked Mr. Johnson where he was coming from; Mr. Johnson said he was coming from his sister's

house but that she wasn't home.  The officer mentioned trespassing, and Mr. Johnson tried to tell

the officer that he had mail in his pocket with his sister's address on it.  The officer then

handcuffed Mr. Johnson and placed him in the van.  Tr. at 399:21-402:3; Ex. 22.

39.      The officers drove Mr. Johnson to another area of the complex, where a third officer got

into the van.  The officers interrogated Mr. Johnson about guns and drugs, and he repeatedly

responded that he did not know anything.  The officers then drove Mr. Johnson around for 15 or

20 minutes, continuing to question him.  They eventually pulled over and said "maybe you don't

know nothing," and released him.  Tr. at 403:2:3 403:20.  Mr. Johnson was never taken to a

police station or charged with a crime. Tr. at 417:9-23.

40.      Plaintiff Letitia Ledan has lived for the past 11 years in Building 30 of the River Park

Towers apartment complex in the Bronx.  Ledan Test., Tr. at 296:20-297-22.

41.      One day in 2009, two uniformed NYPD officers approached Ms. Ledan as she was

leaving River Park Towers.  They asked if she lived there and she said yes.  They ordered her to

produce identification; she complied and the officers took her identification.  Ms. Ledan did not

feel free to leave until the officers returned her identification.  Tr. at 301:5-302:25; Ex. 23.

42.     One afternoon in the summer of 2011, Ms. Ledan approached her building and saw her

husband, Antoine Ledan, and two friends standing with four uniformed NYPD officers.  One

officer was patting down one of her friends, one was patting down Mr. Ledan and going through

his pockets, and one officer was standing next to the other friend.  She asked the officers,

"What's going on?"  One of the officers then approached her, said, "Just be quiet," and asked if

she lived there.  Ms. Ledan said yes, and the officer ordered her to show identification.  Ms.

Ledan did not feel free to leave from the time the officer approached her until he walked away

because the officer blocked the entrance to her building and held her identification.  Tr. at

306:16-309:13; 327:6-19; 329:25-330:4; Exs. 24, 25 (photos of stop location).

43.     Plaintiff Fernando Moronta is 36 and lives at 2035 Marmion Avenue, a TAP building in

the Bronx.  Moronta Test., Tr. at 340:24-341:4.  One evening during the winter of 2008, he went

with his brother, Eladio Vasquez, to his brother's apartment building at 1453 Walton Avenue in

the Bronx, also a TAP building.  After Mr. Moronta left the building, six uniformed officers

approached him on the sidewalk.  The officers asked him where he was going and what he was

doing in the building.  He responded that he had been in his brother's house.  One of the police

officers patted him down and searched his pockets.  He then asked Mr. Moronta if they could go

upstairs to confirm that he had been telling the truth.  Mr. Moronta agreed.  One officer ordered

him to produce identification.  Tr. at 342:10-346:11.  On their way to Mr. Vasquez's apartment,

one officer told Mr. Moronta he would be arrested for trespassing if he was not telling the truth.

After they reached Mr. Vasquez's apartment, Mr. Vasquez answered the door and confirmed his

brother's identity.  One of the officers then returned Mr. Moronta's identification to him.  Mr. Moronta did not feel free to leave until they exited his brother's building.  Tr. at 346:12-349:1.

44.    <u>Plaintiff Kieron Johnson</u> is 21 and lives at 1515 Selwyn Avenue, a Bronx TAP building. His closest friend, Jovan Jefferson, lives across the street at 1546 Selwyn Avenue.  K. Johnson Test., Tr. at 377:11-379:22.  On a warm day in 2010, at approximately noon, Mr. Johnson received a call from Mr. Jefferson inviting him to play basketball.  Having decided to meet in front of Mr. Jefferson's building, Mr. Johnson went across the street and stood there.  After waiting alone for about two minutes, a police car pulled up and two uniformed officers jumped out.  They asked Mr. Johnson if he had been inside of 1546 Selwyn Avenue.  Mr. Johnson said, no, he was waiting for his friend to meet him.  One officer demanded identification, while the other patted him down, searched inside of his back pocket, removed his wallet, and looked through it.  The first officer then handed Mr. Johnson his identification back and told him he could leave.  Mr. Johnson did not feel free to leave until that point.  Tr. at 380:1-384:16; Ex. 32.

45.    <u>Plaintiff Jovan Jefferson</u> has lived at 1546 Selwyn Avenue in the Bronx, a TAP building, his entire life.  Jefferson Test., Tr. at 359:17-361:14.  Mr. Jefferson was stopped outside of 1515 Selwyn Avenue sometime between April and June 2012 after visiting his friend Brandon Muriel there.  As Mr. Muriel and Mr. Jefferson exited the building around 12:30 pm, a police van stopped in front of the building.  Three police officers, including Defendants Jimmy Marquez and Luis Rodriguez, got out and approached them.  Tr. at 360:9-364:19.  Officer Rodriguez asked them where they were coming from and why they had been inside 1515 Selwyn.  Mr. Jefferson and Mr. Muriel explained that they had come from Mr. Muriel's apartment.  The officers demanded Mr. Muriel's identification.  At that point, Mr. Jefferson's mother drove by and stopped to ask what was going on. Officer Rodriguez then stated that Mr. Jefferson was free

to go.  Mr. Jefferson left, but Mr. Muriel remained with the officers.  While the officers were

talking to him, Mr. Jefferson did not feel free to leave.  Tr. at 364:20-369:4.

46.     <u>Sgt. Robert Musick</u>- The City's claim that it was prejudiced because it could not identify

the officers involved in nine of the stops about which the plaintiffs and other witnesses testified

is without merit.  Sgt. Musick only searched for UF-250s and reviewed precinct rosters to

identify officers, even though he acknowledged that the lack of a UF-250 does not mean that no

stop occurred.  Musick Test., Tr. at 1158:8-14.  He did not take other reasonable steps to identify

certain officers, such as reviewing memo books, Tr. at 1147:4-1149:7, 1153:4-1154:8, 1156:11-

1157:9, and he never showed any photo arrays or spoke with any witness.  Tr. at 1158:1-7.

### THE NYPD'S FAILURE TO TRAIN, SUPERVISE, AND MONITOR TAP AND ITS DELIBERATE INDIFFERENCE

47.     Despite starting TAP in the early 1990's, it was not until May 2012, when it issued

Interim Orders 22 and 23, that the NYPD had any written policies or procedures specifically

addressing any aspect of the program.  Smith Report, Ex. JJJJ at 10-11; Sweet Test., Tr. at

633:13-17 (stating that Interim Orders 22 and 23 were first written policies regarding TAP).

48.     It was not until June and July 2012 that the NYPD conducted any training or created any

training materials specific to TAP.  O'Keefe Test., Tr. at 988:7-10 (no training in 1990s);

McCarthy Test., Tr. at 775:18-776:5, 690:19-693:10 (first identified training); Shea Test., Tr. at

885:20-887:7 (same); Ex. D para. 3 (June 18, 2012 memo describing training); Ex. N (Field

Training Unit Guide at 60 (July 2012)); Ex. RRR (Police Student Guide at 30-34 (July 2012)).[7]

---

[7]Nothing in the "Policing Legally: Street Encounters" section of the Police Student Guide, Ex.
EEEE, contains any information specific to TAP.  Shea Test., Tr. at 914:21-915:6.  None of the
stop-and-frisk films created prior to the filing of this case, Ex. S, deals specifically with TAP or
with trespass stops, Shea Test., Tr. at 902: 1-16, 945:1-22.

49.     Prior to July 2011 the NYPD had no accurate and complete count of buildings enrolled in the program.  McCarthy Test., Tr. at 775:9-14.  The NYPD has never had any system for supervising or monitoring stops being made in conjunction with TAP.

50.     In June or July 2010, NYPD officials, including the counsel to Commissioner Raymond Kelly, knew officers were unlawfully approaching people entering or inside TAP buildings to demand their identity and an explanation for their presence.  Sweet Test., Tr. at 648:18-651:17.

51.     In February 2011 NYPD officials, including the Patrol Bureau's executive officer, were warned by the Bronx DA's Office that officers were unlawfully stopping people merely because they were observed entering or exiting TAP buildings.  Sweet Test., Tr. at 659:20-660:17.[8]

52.     The NYPD has been on notice that the Bronx District Attorney's Office has been declining to prosecute cases where a police officer stopped a person merely for entering or exiting a TAP building, as all decline-to-prosecute forms go to the NYPD.  Rucker Test., Tr. at 256:8-13.

53.     The NYPD knew as early as 1999 that it was unlawful for police officers to stop a person merely for entering and exiting a TAP building.  Sweet Test., Tr. at 683:3-684:4.

The Efforts Made by the NYPD Since the Filing of this Lawsuit Have Been Insufficient

54.     NYPD Interim Order 22 is largely devoted to the conduct of vertical patrols inside buildings and provides no guidance about stops outside TAP buildings (and provides no detailed guidance even about trespass stops inside TAP buildings).  Ex. A at 2-3; Sweet Test., Tr. at 553:1-557:6 (reviewing sections City claims to be relevant).  Because Interim Order 22 is so narrow, the NYPD training about Interim Order 22 is of little or no value for outdoor stops.

---

[8] Evidencing NYPD agreement with the concern Jeannette Rucker expressed at the meeting, the bullet point contained in the Rodman's Neck training stating that people cannot be stopped merely for exiting or entering a TAP building was designed to remedy the very issue Ms. Rucker raised at that meeting.  Sweet Test., Tr. at 660:22-661:2.

55.     The material added to the Police Student Guide in July 2012 is only about Interim Orders 22 and 23 and contains no information specific to stops outside TAP buildings.  Ex. RRR at 30-34; Shea Test., Tr. at 915:7-916:2.  No other Training Bureau materials address any aspect of TAP, including stops outside TAP buildings.  Shea Test., Tr. at 918:24-919:21.

56.     The new chapter added to the Patrol Bureau's Field Training Unit Guide was distributed only to supervisors of IMPACT officers and provides no standards about the circumstances in which a person may be stopped on suspicion of trespass at a building enrolled in TAP.  Ex. N at 10; McCarthy Test., Tr. at 740:3-742:10; Hall Test., Tr. at 1252:1-3 (describing distribution).

57.     Nothing in the NYPD Stop-and-Frisk training film #5 (Ex. T) shown in commands around the City after the filing of this case deals specifically with TAP or with trespass stops.  Shea Test., Tr. at 942:25-943:9, 944:4-25; Ex. T (video); Ex. Q (video lesson plan).

58.     The only training being provided to police officers about stops outside TAP buildings consists of a single bullet point contained in a lengthy PowerPoint presentation that is part of the "refresher course."  Ex. J at 40; Sweet Test., Tr. at 663:10-664:1.  Both officers who testified about having attended the course stated they had no recollection of it covering outdoors trespass stops.  Ramdeen Test., Tr. at 1043:17-1044:13; Santiago Test., Tr. at 1111:2-8.

59.     Though the NYPD issued a memorandum in August 2012 (Ex. E) stating that "Platoon Commanders will critique (P.G. 202-13) all situations in which either an interior or exterior street encounter occurred," the Executive Officer of the Patrol Services Bureau stated he did not know whether any such reviews had taken place.  McCarthy Test., Tr. at 759:1-15.

60.     Despite testimony that the CompStat process was a "process to monitor criminal trespass activity" and related stops, Hall Test., Tr. at 1243:10-1244:5, neither Chief Hall nor Chief

McCarthy knew of a single instance in which they had reviewed a stop they knew to be made in conjunction with TAP, Hall Test., Tr. at 1251:2-10; McCarthy Test., Tr. at 783:22-784:3.

61.     Nothing in the portion of the August 2012 memorandum issued by the Chief of Patrol's office (Ex. E) addressing arrests has any bearing on situations in which a trespass stop is made and the person is not arrested.  McCarthy Test., Tr. at 755:4-7.  Moreover, that office had no knowledge of whether any arrests had been verified as specified in the memo and testified that no system was in place for the office to receive reports about such reviews and verifications. McCarthy Test., Tr. at 752:17-754:3.  Finally, it already is standard procedure to verify all arrests when a person is brought into a precinct.  McCarthy Test., Tr. at 754:4-11.

62.     The only testimony adduced about NYPD review of stops made outside of buildings enrolled in TAP came from Chief Brian McCarthy, who testified he reviewed two trespass arrests that took place outside TAP buildings in Queens.  McCarthy Test., Tr. at 763:11-766:21.

63.     Figures offered by the City about a reduction in trespass enforcement activity in 2012 were only about arrests, not stops, and were only about trespass arrests generally, and not about arrests connected to TAP.  Hall Test., Tr. at 1249:7-17.

## CONCLUSIONS OF LAW

Plaintiffs Are Likely to Prevail on Their Fourth Amendment Claim

64.     For the reasons discussed in the plaintiffs' brief, the 1,044 stops identified in Appendix L (Ex. 64) were unjustified, as there was no reasonable suspicion that the person stopped outdoors had trespassed inside a TAP building.  Memo of Law in Support of Plaintiffs' Motion for Preliminary Injunction at 6-11 (Sept. 24, 2012).  Even if some of the 1,044 stops were justified, the number and percentage of unlawful stops is more than sufficient to establish the likelihood of a custom and widespread practice of unlawful outdoors trespass stops in the Bronx.

20

65.     A stop based on an alleged furtive movement by a person exiting a TAP building is

unlawful, regardless of whether the building had a history of crime or was in a high-crime area.

*United States v. Bellamy*, 592 F. Supp. 2d 308, 317-18 (E.D.N.Y. 2009).  Moreover, there is

every reason to discount the significance of either factor in the stops at issue in this case.  *See* ¶

2, *supra* (noting that many buildings enrolled regardless of crime condition in building).

66.     The stops identified by the Bronx District Attorney's Office, *see* ¶¶ 15-18, *supra*, were

unlawful because they were based solely on a person having exited or having entered and exited

a TAP building.  *See United States v. Swindle*, 407 F.3d 562, 569 (2d Cir. 2005) (holding officers

unreasonably ordered stop of defendant to stop who had entered and exited known "drug house,"

was black like a known suspect but did not otherwise fit suspect description, and drove away in a

car of the type the officers associated with the suspect).

67.     The nine plaintiffs who testified (collectively, the "Named Plaintiffs"), as well as non-

party Jerome Grant, were unlawfully stopped.  *See supra* ¶¶ 20-48.  In every instance, a

reasonable person would not have felt free to leave.  *E.g., Davis v. City of New York*, 2012 WL

4813837, at *6 (S.D.N.Y. Oct. 9, 2012) (noting that plaintiff was seized when officer held his

identification and asked him to step into the lobby from the stairwell); *United States v. Simmons*,

560 F.3d 98, 106-07 (2d Cir. 2009) (holding person was seized when officer told him to "hold

on" and blocked his exit from apartment building); *United States v. McCargo*, 464 F.3d 192,

195-96 (2d Cir. 2006) (holding that "initial *Terry* stop" took place when two officers in a patrol

car followed the defendant, who was walking on a public street, "drew along side the defendant,

and told him to stop and approach the car"); *Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d

Cir. 2000) (holding that person was seized when police officer said "[w]hat, are you stupid?

Come here. I want to talk to you" and then asked person to show his hands); *United States v.*

*Crump*, 62 F. Supp. 2d 560, 564 (D. Conn. 1999) (holding that encounter rose to level of *Terry* stop when officer frisked defendant). Contrary to the NYPD's direction to officers in Stop-and-Frisk Film #5 (Ex. T), a person is stopped under Fourth Amendment law when a police officer says something like "Stop, Police!" and the person stops. *See, e.g., Davis*, 2012 WL 4813837, at *14 (citing *Simmons*); Shea Test., Tr. at 939:19-941:22.

68.   "The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." *United States v. Medina*, 301 F. Supp. 2d 322, 328 (S.D.N.Y. 2004) (suppression hearing); *United States v. Torres*, 11 Cr. 762, 2012 WL 2830020 (S.D.N.Y. July 3, 2012) ("[I]t is the Government's burden to prove that the officer had reasonable suspicion to make an investigatory stop of the vehicle.") (Scheindlin, J.)); *see also Dickerson v. Napolitano*, 604 F.3d 732,751 (2d Cir. 2010) (noting burden in false-arrest cases).

69.   The plaintiffs are likely to prevail on their claim that the defendants have a pattern and practice of unlawful stops on suspicion of trespassing outside TAP buildings in the Bronx. *See supra* ¶¶ 4-14, 64-65 (Fagan stops); ¶¶ 15-18, 66 (Bronx DA stops); ¶¶ 20-46, 67 (plaintiff and related stops); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (holding that summary judgment was not appropriate where plaintiff proffered evidence of roughly one dozen instances of unconstitutional conduct); *Sorlucco v. City of New York*, 971 F.2d 864, 871 (2d Cir. 1992) (explaining that a plaintiff may establish municipal liability if "the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers").

70.   The Named Plaintiffs are also likely to prevail on their claim that the City of New York has been deliberately indifferent to the practice of unlawful outdoors stops on suspicion of trespassing in TAP buildings in the Bronx by failing to supervise and train. *See supra* ¶¶ 47-49

(pre-filing inaction); 50-53 (pre-filing express notice); 54-62 (insufficient post-filing actions); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127-30 (2d Cir. 2004) (setting out standards); *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (same). Here, the evidence shows the NYPD knew officers would encounter people outside of TAP buildings and be forced to decide whether a stop on suspicion of trespass was appropriate, that the NYPD failed to provide any supervision or training for this situation, and that these failures were closely related to unlawful stops so as to be fairly considered the cause of the unlawful action.

The Named Plaintiffs Have Suffered Irreparable Harm and Are At Risk of Future Harm

71.     All of the Named Plaintiffs have standing to pursue injunctive relief, as they have been subjected to stops of the type challenged here and are all at risk of being subjected to such stops in the future. *See* Reply Memo of Law in Support of Plaintiffs' Motion for Preliminary Injunction at 8-9 (Oct. 12, 2012). The Court may consider facts related to the putative class (here, the evidence from UF-250 database and the Bronx District Attorney's Office) in determining if the plaintiffs are at risk of future proximity stops. *See Strouchler v. Shah*, 2012 WL 3838159, at *8-9 (S.D.N.Y. Sept. 4, 2012) (citing *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004)).

## NECESSARY AND APPROPRIATE REMEDIES

72.     Policies and Procedures- To remedy the NYPD's failure to have policies in place, the NYPD should be required to develop and adopt formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside of a TAP building on suspicion of having trespassed inside the building, and specifying that merely entering, exiting, or being near a TAP building provides no justification for stopping the person.

73.   <u>Training</u>- To remedy the NYPD's failure to train: (a) Distribute to each Bronx NYPD member the written policy described in paragraph 72 and repeat the distribution two additional times at six-month intervals; (b) Similar to the command-based training about Interim Order 22, conduct training for NYPD Bronx members about the policy described in paragraph 72; (c) Create and have shown to all Bronx NYPD members a Film #6 that addresses stops being made in conjunction with TAP, including the policy described in paragraph 72; (d) Create training for new recruits that expressly addresses TAP stops, including the policy described in paragraph 72; (e) Add to Chapter 16 of the Field Training Unit Guide about TAP a section that addresses the specific standards governing such stops as spelled out in the policy described in paragraph 72; (f) Require continuation of the Rodman's Neck "refresher course" for all Bronx officers and modify the course to include the specific standards in the policy described in paragraph 72 and a scenario that specifically deals with an outdoors trespass stop; and (g) Institute procedures for confirming and reporting to plaintiffs' counsel that members of the NYPD in the Bronx receive the training specified and for assessing individual officers who have received the training to ensure the training has been effective.

74.   <u>Supervision</u>- To remedy the NYPD's failure to supervise: (a) Institute a system, like the one suggested by paragraph 3 of Exhibit E, by which supervisory personnel in each Bronx precinct routinely review every UF-250 completed for a trespass stop taking place outside of a TAP building to determine whether stops are being made in conformity with the policy described in paragraph 72 and the training described in paragraph 73; and, to the extent that review reveals nonconformity, take specific steps to retrain the officer; and (b) Institute a system by which the results of the reviews described in paragraph 74(a) and any resulting retraining are reported in writing to the relevant precinct commander, a designated member of the Bronx Borough

Command, a designated member of the Chief of Patrol's Office, and plaintiffs' counsel.  In conjunction with these reports, copies of all the reviewed UF-250s shall be provided.

75. <u>Monitoring</u>- To remedy the NYPD's failure to monitor: (a) Designate an official in the Chief of Patrol's office to receive and review the reports described in paragraph 74 and to take all appropriate actions to remedy problems revealed in those reports; (b) Require, whenever an officer interacts with a person suspected of trespass (regardless of whether the encounter rises to a stop requiring a UF-250) outside a Bronx TAP building, that the officer provide the person written notice with the officer's name and badge number, the date and time of the interaction, a phone number the person can call to register a complaint about the interaction; and a copy of any UF-250 completed by the officer or, if the person does not wish to wait for the form, the serial number of any UF-250 the officer plans to complete; (c) Require as a condition of continued enrollment in TAP that owners provide to tenants written notice about the building's enrollment in TAP, the authority of officers conducting enforcement activity pursuant to the program, and a phone number to register complaints about law-enforcement activity related to the program; (d) Require as a condition of continued enrollment in TAP that owners amend publicly posted signs on or inside the building to inform residents and visitors of a number they can call to register complaints about law-enforcement activity related to the program.

76. <u>Other Relief</u>- To remedy the NYPD's lack of policies, training, supervision, and monitoring, the Court should order any additional measures it deems necessary and appropriate.

77. Grant reasonable attorneys' fees and costs to the plaintiffs.  *See, e.g., Casale v. Kelly*, 710 F. Supp. 2d 347 (S.D.N.Y. 2010).

Respectfully submitted,

_____/s/  Alexis Karteron_____
Alexis Karteron
Christopher Dunn
Taylor Pendergrass
Daniel Mullkoff
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
akarteron@nyclu.org

J. McGregor Smyth, Jr.
Mariana Kovel
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

Juan Cartagena
Foster Maer
Roberto Concepcion
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, New York 10013

John A. Nathanson
Tiana Peterson
Mayer Grashin
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022

Dated:  November 26, 2012
         New York, N.Y.