UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAENEAN LIGON, et al.,

Plaintiffs,

- against -

CITY OF NEW YORK, et al.,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Mark D. Zuckerman*
*Tel:  (212) 442-8248*
*Matter No. 2012-011932*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT

    POINT I

        PLAINTIFFS HAVE FAILED TO MEET THE
        STANDARDS OF RULES 23(A) AND (B)(2)............................................1

        I.    Plaintiffs' Burden of Proof Upon the Instant
             Motion...................................................................................................1

        II.   Typicality and Commonality ...............................................................2

             A   Dr. Fagan's and Dr. Smith's Expert
                 Testimonies .................................................................5

             B   Testimony of Bronx ADA Jeanette Rucker ................................10

             C   Plaintiffs' Testimony and Sgt. Musick's
                 Work ...........................................................................13

             D   The NYPD's Policies, Practices and
                 Training......................................................................17

        III.  Numerosity.........................................................................................23

        IV.  Adequacy of Class Representation .....................................................23

        V.   Rule 23(b)(2)......................................................................................24

        VI.  Ascertainability .................................................................................24

    POINT II

        PLAINTIFFS LACK STANDING FOR
        INJUNCTIVE RELIEF.............................................................................25

CONCLUSION.......................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Pages**

Bakalar v. Vavra,
   237 F.R.D. 59 (S.D.N.Y. 2006) ................................................................................................. 24

Brown v. Kelly,
   609 F.3d 467 (2d Cir. 2010)................................................................................................. 1, 3

Burley v. City of New York,
   03 CV 0735 (WHP), 2005 U.S. Dist. LEXIS 4439 (S.D.N.Y. Mar. 23, 2005) ....................... 24

Central States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
   Care, LLC,
   504 F.3d 229 (2d Cir. 2007)................................................................................................. 23

Ciralo v. City of N.Y.,
   216 F.3d 236 (2d Cir. 2000)................................................................................................. 25

City of L.A. v. Lyons,
   461 U.S. 95 (1983)................................................................................................................ 25

Damassia v. Duane Reade, Inc.,
   250 F.R.D. 152 (S.D.N.Y. 2008) ............................................................................................ 2

Daniels v. City of New York,
   198 F.R.D. 409 (S.D.N.Y. 2001) ...................................................................................... 24-25

Denney v. Deutsche Bank AG,
   443 F.3d 253 (2d Cir. 2006)................................................................................................. 23

Dodge v. Cnty. of Orange,
   No. 03-7958, 103 Fed. Appx. 688 (2d Cir. July 14, 2004) ...................................................... 25

Floyd v. City of New York,
   283 F.R.D. 153 (S.D.N.Y. 2011) ............................................................... 2, 3, 6, 7, 8, 23, 24

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
   903 F.2d 176 (2d Cir. 1990)................................................................................................. 23

General Telephone Co. of Southwest v. Falcon,
   457 U.S. 147 (1982)............................................................................................................ 1-2

Haus v. City of New York, et. al.,.
   03 CV 4915 (RWS)(MHD),
   2011 U.S. Dist. LEXIS 155735 (S.D.N.Y. Aug. 31, 2011) ..................................... 1, 2, 4, 5, 23

**Cases**                                                               **Pages**

In re Flag Telecom Holdings, Ltd.,
    574 F.3d 29 (2d Cir. 2009)................................................................. 4, 23

In re Initial Public Offering,
    471 F.3d 24 (2d Cir. 2006)..................................................................... 2

In re Omnicom Group, Inc.,
    02 CV 4483, 2007 U.S. Dist. LEXIS 31963 (S.D.N.Y. Apr. 30, 2007) ................................... 23

MacNamara v. City of New York,
    275 F.R.D. 125 (S.D.N.Y. 2011) ............................................................ 2, 4

Marisol A. v. Giuliani,
    126 F.3d 372 (2d Cir. 1997)..................................................................... 4

People v. DeBour,
    40 N.Y.2d 210 (1976) ................................................................... 13, 19-22

Rahman v. Chertoff,
    530 F.3d 622 (7th Cir. 2008) ................................................................ 25

Shahrair v. Smith and Wollensky Restaurant Group, Inc.,
    659 F.3d 234 (2d Cir. 2011)..................................................................... 2

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
    546 F.3d 196 (2d Cir. 2008)..................................................................... 2

Terry v. Ohio,
    392 U.S. 1 (1968) ................................................................ 6, 8,13, 21, 22

Wal-Mart Stores v. Dukes,
    131 S. Ct. 2541 (2011)........................................................................ 1-4

**Statutes**

Fed. R. Civ. P. 23(a) ................................................................... 1, 3, 5, 24

Fed. R. Civ. P. 23(a)(2)..................................................................... 4

Fed. R. Civ. P. 23(a)(3).................................................................... 3, 4

Fed. R. Civ. P. 23(a)(4)..................................................................... 23

Fed. R. Civ. P. 23(b)(2)................................................................ 1, 3, 24

## PRELIMINARY STATEMENT

Defendants hereby respectfully submit their Memorandum of Law in Opposition to plaintiffs' motion for class certification.  For the reasons set forth herein, plaintiffs' motion must be denied.  Simply, plaintiffs cannot meet their required burden to show that there is an unconstitutional custom or practice of the City, the purported "glue" that they claim allows for class treatment.

## ARGUMENT

## POINT I

## PLAINTIFFS HAVE FAILED TO MEET THE STANDARDS OF RULES 23(A) AND (B)(2)

### I.     Plaintiffs' Burden of Proof Upon the Instant Motion

Plaintiffs recognize that Rule 23(a) of the Federal Rules of Civil Procedure, requires them to satisfy four factors, referred to as "numerosity, commonality, typicality, and adequacy."  Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010).  Plaintiffs are also moving under Rule 23(b)(2),  which applies only when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Id. at 476 (citing Fed. R. Civ. P. 23(b)(2)).

Satisfaction of these requirements depends, not on the adequacy of the moving party's pleading, but on a proffer of evidence sufficient that the case meets the foregoing criteria. Haus v. City of New York, et. al., 03 CV 4915 (RWS)(MHD), 2011 U.S. Dist. LEXIS 155735, at *293 (S.D.N.Y. Aug. 31, 2011).  "[C]ertification is proper only if the 'trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied…."  Wal-Mart Stores v. Dukes, 131 S. Ct. 2541, 2551-52 (2011)(quoting General Telephone Co. of Southwest v.

<u>Falcon</u>, 457 U.S. 147, 160 (1982)). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim….'[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiffs' cause of action.'" <u>Id</u>. (quoting <u>Falcon</u> at 160).

A district judge is to certify a class "'only after making determinations that each of the Rule 23 requirements has been met' based on the resolution of any relevant factual disputes, including those factual disputes that go to the merits of the case." <u>Haus</u>, 2011 U.S. Dist. LEXIS 155735, at *294 (quoting <u>In re Initial Public Offering</u>, 471 F.3d 24, 40 (2d Cir. 2006)). "[E]ach of the Rule 23 requirements must be satisfied by a preponderance of the evidence…and the burden to prove each element is on the party seeking certification." <u>Id</u>.(quoting <u>MacNamara v. City of New York</u>, 275 F.R.D. 125, 137 (S.D.N.Y. 2011))(quoting <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.</u>, 546 F.3d 196, 202 (2d Cir. 2008)). "A district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." <u>Floyd v. City of New York</u>, 283 F.R.D. 153, 161 (S.D.N.Y. 2011)(quoting <u>Shahrair v. Smith and Wollensky Restaurant Group, Inc.</u>, 659 F.3d 234, 251 (2d Cir. 2011)).

Plaintiffs cannot meet their burden for class certification.

## II.    Typicality and Commonality

The second Rule 23(a) requirement is that plaintiffs must meet is that "there are questions of fact or law common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is not satisfied merely because there are some common issues; rather, the Rule requires "that plaintiffs identify some unifying thread among the class members' claims that warrant[s] class treatment." <u>Haus</u>, 2011 U.S. Dist. LEXIS 155735, at *300-02 (quoting <u>Damassia v. Duane Reade, Inc.</u>, 250 F.R.D. 152, 156 (S.D.N.Y. 2008)). "The [Supreme] Court [has] noted that the wording of Rule 23(a)(2)-- that 'there are questions of law and fact common to the class' -- are easy to misread,

since '[a]ny competently crafted class complaint literally raises common questions.'" <u>Id</u>. (quoting <u>Wal-Mart</u>, 131 S. Ct. at 2551)(quoting Nagareda, "Class Certification in the Age of Aggregate Proof," 84 N.Y.U. L. rev. 97, 131-132 (2009)).

"The Court went on to observe: 'Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' [internal cites omitted] [t]his does not mean merely that they have all suffered a violation of the same provision of law....Their claims must depend upon a common contention, . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id</u>. at 301-302 (citing <u>Wal-Mart</u> at 2551).

"'What matters to class certification…is not the raising of common 'questions'— even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" <u>Id</u>. (quoting <u>Wal-Mart</u> at 2551)(quoting Nagareda, supra, at 132).

As this Court has stated, "after <u>Wal-Mart</u>, Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member." <u>Floyd</u>, 283 F.R.D. at 173. Plaintiffs must demonstrate that they have been "allegedly aggrieved by a single policy of the defendants and there is 'strong commonality of the violation and the harm.'" <u>Id</u>. (quoting <u>Brown v. Kelly</u>, 609 F.3d at 468).

Fed. R. Civ. P. 23(a)(3) also requires the movant to demonstrate that, "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.

R. Civ. P. 23(a)(3). "The requirement of typicality is closely linked to that of commonality." Haus, 2011 U.S. Dist. LEXIS 155735, at *302. While commonality and typicality are two separate requirements, they "tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997). "To demonstrate typicality, the plaintiff must show that 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Haus, 2011 U.S. Dist. LEXIS 155735, at *302(quoting In re Flag Telecom Holdings, Ltd., 574 F.3d 29, 35 (2d Cir. 2009)). "A plaintiff's claims are typical of the class claims 'where the plaintiff's and the class members' 'injuries derive from a unitary course of conduct by a single system.'" Id. (quoting MacNamara v. City of New York, 275 F.R.D. at 138 (S.D.N.Y. 2011)).

In Wal-Mart, the plaintiffs in that case sought a nationwide class related to claims that Wal-Mart was engaged in a pattern or practice of gender discrimination. In rejecting the proposed class, the United States Supreme Court reasoned that the commonality prong depended on whether there was "some glue holding the alleged reasons for all those [employment] decisions together." Wal-Mart, 131 S. Ct. at 2552. The plaintiffs had argued in that case that Wal-Mart had been engaged in a widespread, nationwide practice of discriminating against female employees. However, the Supreme Court held that the parties' submissions in that case demonstrated the lack of a nationwide policy or practice, and that the plaintiffs in that case had failed to meet their burden with respect to the commonality prong of Rule 23 since the evidence would require individualized proof. Id. at 2554-55.

Similarly, in the post-Wal-Mart decision of Haus, that Court held that with respect to various classes that plaintiffs wished to certify arising out of the February 15, 2003 anti-war

demonstration in Manhattan, that plaintiffs had failed to meet their burden to show the existence of widespread policies or practices of the City of New York that gave rise to those plaintiffs' claims. As such, the Court held that the plaintiffs in <u>Haus</u> had failed to meet the commonality and typicality prongs with respect to the First Amendment, Excessive Force, Conditions of Confinement and False Arrest classes that they wished to certify. Plaintiffs' motion for class certification was therefore denied. <u>Haus</u>, 2011 U.S. Dist. LEXIS 155735, at *291-333.

In <u>Ligon</u>, the Court has a full record from the Preliminary Injunction hearing that was recently held in this case from which to make a determination as to whether plaintiffs have met their burden with respect to the commonality and typicality prongs of Rule 23(a) in this case. However, plaintiffs have cited to little of the record in their motion for class certification with respect to their allegation that an unconstitutional custom or practice of the City actually exists with respect to stops outdoors of Trespass Affidavit Program enrolled buildings where trespass is the suspected crime.[1] Plaintiffs do, however, cite to limited portions of the evidence pertaining to the testimonies of Dr. Fagan (Plaintiffs' motion for class certification at pp. 3-4), Jeannette Rucker (at p. 4, n. 3 thereof) and certain plaintiffs (at pp. 7-8 thereof) in support of their argument.

Defendants assert that based on the following evidence adduced at the PI hearing, plaintiffs have not met their burden with respect to the existence of an unconstitutional practice, therefore, as in <u>Wal-Mart</u> and <u>Haus</u>, their motion for class certification must be denied since there is no "glue" to unify the claims of the named plaintiffs with the putative class, as well as the claims of the class representatives themselves:

**A        Dr. Fagan's and Dr. Smith's Expert Testimonies**

---

[1] Plaintiffs concede that the City does not have an official policy of unconstitutionally stopping persons on suspicion of trespass outside of Trespass Affidavit Program enrolled buildings.

The expert testimonies presented by Dr. Fagan and Dr. Smith clearly demonstrate that there is not sufficient "glue" to allow class treatment, but rather that individualized determinations are necessary to decide the claims of class representatives and putative class members.

Dr. Fagan conducted a flawed analysis of UF 250 forms[2] focused on only 1,857 (1.4%) of the 135,738 stops made in the Bronx in 2011. (Tr. p. 73:2-7, 1177:16-1178:6 and Ex. 4)[3] Arrests were made in 129 of the 1,857 stops. (Tr. p. 131:9-11 and Exs. 4 and JJJJ, p. 6) These 1,857 stops, termed "Proximity Stops," were selected by Dr. Fagan because (1) the address listed as the location of the stop was an exact match for an address on a list of buildings enrolled in TAP in 2011, (2) the stop occurred outdoors, and (3) the only crime suspected was criminal trespass. (Tr. p. 118:2-119:20) Dr. Fagan's analysis, however, failed to provide a valid methodology to test the purported causal connection between TAP and the stops he analyzed. (Tr. p. 1172:19-1175:10, 1175:22-1177:7 and Ex. JJJJ, pp. 7-29)

Dr. Fagan also ignored relevant available evidence when he failed to consider the totality of circumstances contained on Side 1 and Side 2 of the UF 250 worksheets (Tr. p. 142:2-5 and 1177:8-15), yet nevertheless concluded that 1,137 of the 1,857 stops (61%) contained information *insufficient* to justify a <u>Terry</u> stop outdoors for criminal trespass at a TAP enrolled property. (Tr. p. 1168:10-22 and 1177:8-15) Dr. Fagan arrived at this conclusion notwithstanding the fact that: (i) he has no experience as a police officer nor did he speak with any police officers or law enforcement personnel in conducting his analysis, (ii) he has no understanding or expertise regarding police training on street stops and reasonable suspicion, and

---

[2] Dr. Fagan only relies on UF 250s and UF 250s alone do not establish that a stop lacks reasonable suspicion since it is a conclusory form that does not capture all details, nuances and circumstances that may lead to a stop.

[3] 1,137 (now 1,044) alleged problematic stops relate to about 400 of 5,134 Bronx TAP buildings.

(iii) his conclusion is contradicted by NYPD training evidence which clearly identifies that its officers are instructed to include **all** circumstances leading to the stop on the worksheet. (Tr. p. 86:12-14 and 86:23-87:2) This single-sided analysis of the UF 250 worksheet was also a departure from Dr. Fagan's methodology employed in Floyd and Davis, related cases in which he analyzed the same UF 250 worksheets for the same purpose – to offer opinions on the apparent legality of stops based on information contained on the worksheets, and notwithstanding the fact that Davis also only involves trespass stops. (Ex. JJJJ p. 30-31 and Tr. p. 141:18-22, 142:25-143:22, 1188:21-1190:24 and 1195:12-22) Dr. Fagan's work is flawed for this reason as well.

When Dr. Smith conducted an analysis of the apparent justification of the 1,857 stops using the formula that Dr. Fagan used in his Floyd Report (which defendants believe undercounts the stops that are "apparently justified"), Dr. Smith found that only 4.3% of these stops (79 of 1,857) would be classified as "apparently unjustified," not the 61% suggested by Dr. Fagan in Ligon as lacking "a basis for stopping."[4] (Ex. JJJJ pp. 30-31 and Tr. p. 1191:20-1192:22) Thus, Dr. Smith's work evidences that there is not sufficient evidence to demonstrate an unconstitutional custom or practice as alleged by plaintiffs.

In addition to the totality of the UF 250 worksheets, Dr. Smith's expert report identified other relevant and available evidence that Dr. Fagan was aware of, but ignored, during his analysis of the 1,137 – now 1,044 – stops that render Dr. Fagan's conclusions unreliable. (Ex. JJJJ and Tr. p. 130:21-23, 1183:10-23 and 1192:23-1194:4) First, Dr. Fagan failed to include in his analysis the period of observation by the officer prior to the stop (Tr. p. 1183:10-

---

[4] Dr. Fagan's narrow view that the basis for a trespass stop is different from the basis for other stops ignores unrebutted testimony that officers often stop potential trespassers because they are engaged in other illegal activity like drugs, weapons possession, robberies and burglaries and that trespass often precedes more violent crime. (Tr. p. 1223:17-p. 1225:16)

23), a factor that could bear on reasonable suspicion, claiming that he believed it was "close to zero" on average. (Tr. p. 80:5-11 and 133:22-135:19) Dr. Fagan further claimed, without speaking with any officers, that what was observed by an officer was not able to be interpreted, and that the period of observation added very little information to his determination of whether the stop was supported by reasonable suspicion. (Tr. 135:6-136:22 and 140:13-17) Dr. Smith's analysis (confirmed by Dr. Fagan's belatedly offered "Table 15") revealed that the average period of observation for Dr. Fagan's "Proximity Stops" was almost two minutes. (Ex. JJJJ, p. 6 and Tr. p. 134:13-18 and 1181:11-19)

Second, Dr. Fagan was aware of, but ignored information available regarding the circumstances leading to a stop that was located outside of the UF 250 worksheet, including 911 calls or SPRINT Reports, memobooks, arrest and complaint reports, Trespass Crimes Fact Sheets, Owner's Affidavits and/or criminal court complaints. (Tr. p. 124:3-13, 130:21-131:133-21, 140:18-21, 160:24-165:7 and Ex. 4)

Third, meta-categories that Dr. Fagan constructed after reviewing narratives that individual officers included in the "Other" field on the front or back of the UF 250 worksheet misrepresented the officers' entries on the UF 250 worksheets, many of which, in fact, did provide evidence of suspicious behavior arguably sufficient to justify a Terry stop. (Exs. JJJJ and Ex. 4 at Appendix F, and Tr. p. 155:1-157:9, 157:21-159:25, 160:24-165:7, 1199:4-9, 1200:14-1201:1, 1201:13-20, 1204:15-1205:1, 1206:10-1208:13 and 1208:19-1210:17) Dr. Fagan did this analysis notwithstanding the fact he previously declared in February 2012 in Floyd that he did not conduct such an analysis in Floyd because interpreting the meaning of the same or similar words by different officers would be unreliable. (Tr. p. 153:3-154:8)

Fourth, Dr. Fagan's conclusion that a "Furtive Movement" was not a factor that could contribute to reasonable suspicion (Tr. p. 1215:5-25 and Ex. 64) was unsupported and contrary to police testimony and Dr. Fagan's prior conclusions made in his analysis in <u>Floyd</u> and <u>Davis</u>, in which he determined that stops made based on "furtive movements" and "high crime area" specifically, and "furtive movements" and another additional factor generally, were supported by reasonable suspicion. (Ex. JJJJ and Tr. p. 151:2-5) In <u>Ligon</u>, 238 of the 467 "furtive movement" "Proximity Stops" (51%) included "high crime area" as an additional circumstance supporting reasonable suspicion. (Exs. 4 at Table 8 and 64, and Tr. p. 147:5-13) Dr. Fagan also did not consider that an officer's awareness of an indoor robbery pattern (the "Ongoing Investigation" box on the UF 250 worksheet) and observations of furtive movements of a person outside a building could lead to reasonable suspicion for the crime of trespass. (Tr. p. 146:1-8 and Ex. 64) Dr. Fagan claimed that this circumstance would be a "very small number" and a "pretty rare occurrence" that would not "substantially alter the conclusions" he reached (Tr. p. 146:18-147:4), while, in fact, 41 of the 1,044 stops (4%) fit into this category. (Ex. 64)

Dr. Smith's expert report identified numerous unreasonable assumptions made by Dr. Fagan during his analysis of the 1,137 – now 1,044 – stops, that also render Dr. Fagan's conclusions unreliable. (Ex. JJJJ) First, Dr. Fagan assumed that a building's enrollment in TAP was a circumstance considered by the officer supporting reasonable suspicion for all 1,857 stops, but only 417 of the UF 250 worksheets contain any affirmative indication by the officer that he or she was aware of the building's TAP enrollment. (Ex. JJJJ p. 43-44 and Tr. p. 124:18-24 and 1178:7-18) Second, Dr. Fagan assumed, without considering police tactics or interviewing any officers, that the address of the location of the stop was necessarily the address of the observed

suspicious behavior. (Tr. p. 119:21-120:14) This assumption is unreasonable given the plain meaning of the language of the form – which specifically calls for inclusion of the location of the stop – and inconsistent with the NYPD's written training materials, training videos and role play scenarios, which all include circumstances in which tactical (and practical) reasons could result in a person being stopped at a location that is not the same as the location of the observed behavior, including but not limited to (i) flight upon initial approach by officers, (ii) walking away from a crowd as officers approach, and/or (iii) officers, responding to calls (anonymous or not) that report criminal activity, do make independent observations for a period of time prior to the stop. (See Exs. S, T, RRR, pp. 21-23, EEEE., pp. 6-7, 11, 14, 16-17 and Tr. p. 818:21-821:19, 836:7-840:13, 842:15-843:16 and 896:6-18). Third, Dr. Fagan assumed a building was enrolled in TAP as of the date of the stop, even though it was possible the building was not yet enrolled. (Tr. p. 120:20-121:16) Finally, Dr. Fagan assumed that if a UF 250 worksheet which had an "Outside" box checked, (rather than the "Inside") necessarily meant that the observed suspicious behavior also took place outside (Tr. p. 73:8-15) and that the stop occurred outside the building's property line in a public space. (Tr. p. 128:1-9)

Thus, the work of Dr. Fagan cannot lead to the conclusion that there is an unconstitutional custom or practice of the City that provides the necessary "glue" for class treatment as alleged by plaintiffs. In the absence of same, only individualized determinations can lead to a resolution of the claims of the named plaintiffs and putative class members.

**B      Testimony of Bronx ADA Jeanette Rucker**

Bronx Assistant District Attorney Jeanette Rucker's testimony to the effect that there have been "problems" with certain of the NYPD's stops outside of TAP buildings in the Bronx was unreliable as well, (See generally Tr. p. 168:1-256:3), and also does not support the existence of the alleged custom or practice.

Ms. Rucker provided no statistics to support her assertion of a "problem," nor does she "work with statistics." (See generally Tr. p. 168:1-256:3 and 233:5-7) The only two specific "problematic" cases that she discussed during the hearing were 1) a case that was brought to her attention by an anonymous letter from a purported criminal defendant, which she could not even investigate because of the anonymous nature of the letter; (Tr. p. 190:17-20 and 237:17-19) and 2) an indoor arrest that was brought to her attention by the Bronx Defenders' Office (Tr. p. 196:13-15, 199:23-200:1 and 237:17-20), attorneys for the criminal defendant, as well as the plaintiffs in this litigation, and who thus have an "obvious bias." (Tr. p. 222:9-22 and 223:17-23) Ms. Rucker testified that the latter arrest "really pushed [her] over the edge," (Tr. 201:11-12) yet the ADA in the Bronx DA's Office who was handling it, David Grigoryan, testified that the "arrest was absolutely valid." (Tr. p. 611:12-17)

The "decline to prosecute forms," plaintiffs' Exhibit 74, ("DPs") relied upon by Mr. Dunn in his summation as specific examples alluded to by Ms. Rucker of the "problem" to which she testified (Tr. p. 1361:1-1362:5), are not supportive of plaintiffs' argument either. (Ex. 74) The record reflects that Ex. 74 was admitted for the limited purpose of establishing that officers' observations of entries/exits were the bases for the underlying stops, a contention that defendants dispute without testimony from the assigned ADA and consideration of all relevant paperwork. For all other purposes, defendants' objection to the admission of Ex. 74 was sustained on hearsay grounds and "no other portion" of said documents came into evidence. (Tr. p. 210:9-220:24) Ex. 74 was not admitted for the purpose of establishing the reasons for said DPs, there was no testimony by Ms. Rucker to the reasons for the declines to prosecute in Ex. 74, nor from the face of the documents contained in Ex. 74 can it be determined (nor stand for the proposition) that the reasons for the DPs were stops without reasonable suspicion. (Tr. p. 210:9-

220:24 and Ex. 74)  Further, there is no indication from the DPs that all of the information that forms the basis of a reasonable suspicion stop was considered, i.e., UF 250s, officer memobooks, Trespass Fact Sheets, etc.  (Ex. 74)

Although Mr. Dunn also contended in his summation that Ms. Rucker's credibility is supported by the proposition that the NYPD is training on issues which Ms. Rucker raised in her various letters,  (Tr. p. 1363:25-1364:6) no evidence was adduced at the hearing to support a causal nexus between Ms. Rucker's letters and a decision by the NYPD to conduct training.  To the contrary, Ms. Rucker's credibility is undercut by the following:  1)  ADA David Grigoryan in no uncertain terms testified that as to the aforementioned arrest that he prosecuted, he believed the arrest was "absolutely valid," (Tr. p. 611:12-17) and told Ms. Rucker such; (p. 614:17-19)  2)  Mr. Grigoryan sees no widespread problem with trespass arrests in his work at the Bronx DA's Office with respect to probable cause lacking for said arrests;  (Tr. p. 615:3-7) 3)  Ms. Rucker's advise to the NYPD in 2009 that the Bronx DA's Office will not prosecute vestibule arrests (Ex. AAAA, ¶ c and Tr. p. 225:4-7)(even where an inebriated person takes homage therein unless there is a sign in the vestibule)(Tr. p. 229:6-230:6)) is contradicted by applicable law, (Ex. L and Tr. p. 226:20-22) and the NYPD disagrees with her position on same as vestibules are private property.  (Tr. p. 561:20-563:13);  4)  The NYPD understands Ms. Rucker's position to be that the Bronx DA's Office essentially will not prosecute arrests for trespass effectuated outdoors (Tr. p. 999:10-18 and p. 724:12-725:15), and that her Office makes "blanketing" decisions not to prosecute certain types of cases such as outdoor arrests for trespass, (Tr. p. 729:18-730:5) despite Ms. Rucker's admission at the hearing that such arrests are absolutely constitutional; (Tr. p. 233:6-8)  5)  Ms. Rucker could not testify to any outdoor arrests for trespass that her office has prosecuted; (Tr. p. 254:14-255:4)  6)  The NYPD understands Mr.

Rucker's position to be that she won't prosecute trespass arrests where locks or signage have either been broken, destroyed or torn down as well.  (Tr. p. 566:15-567:3)

Thus, Ms. Rucker's testimony, by itself, or in combination with plaintiffs' other evidence, does not lead to the conclusion that there is an unconstitutional custom or practice as alleged.

### C    Plaintiffs' Testimony and Sgt. Musick's Work

The testimony of plaintiffs does not provide sufficient evidence of the alleged custom or practice either, especially in light of the work performed by Sgt. Robert Musick in attempt to identify the officers who may have been involved in the subject incidents.

Sgt. Robert Musick conducted an exhaustive search to determine the officers involved in the purported incidents presented by plaintiffs at the hearing and no officers other than those involved in the two arrests presented could be ascertained.[5]  (Tr. p. 1124:1-1125:25, 1128:13-1129:9, 1131:3-1132:17, 1134:25-1136:16, 1138:14-1142:17 and 1155:2-9)  Combined with plaintiffs' inability to provide specificity as to the dates of the purported stops to which they testified as well as the officers involved in said purported incidents, plaintiffs' self serving testimony lacked credibility, deprived defendants of a full and fair opportunity to defend those challenged stops and present their side of the story, and leads to the potential conclusion that said stops may not have occurred at all or have been to the level of a Terry or Debour level three stop. (See Tr. p. 1358:5-6)

Plaintiff Jovan Jefferson testified that his alleged stop may have occurred in "April, May, or June of 2012."  (Tr. p: 369:17-18)  When asked at his deposition on August 6, 2012, shortly after plaintiffs' lawsuit was filed, about any stops by the NYPD, Jefferson did not

---

[5] Plaintiffs could not identify the date of eight  of the eleven purported incidents at issue with any specificity.  (Tr. p. 317:18-25, 320:1-4, 343:17-19, 350:7-11, 369:12-18, 388:7-389:7, 446:8-447:12 and 453:6-8)

even identify the stop to which he testified at the hearing. (Tr. p. 370:24-371:10). Jefferson did not provide an adequate explanation as to why he failed to even mention this stop at this deposition.

Plaintiff Kieron Johnson testified that he was allegedly stopped by "truancy" officers in "2010," (Tr. p. 388:3-389:11) as opposed to a trespass stop.

Plaintiff J.G., who testified at his deposition that he considers it a stop any time a police officer says "hello" to him or any time a police officer even speaks to him, (Tr. p. 444:9-446:7), could not remember the exact date or time of his purported August 2011 stop. (Tr. 446:8-447:12) J.G. gave varying accounts as to how many officers were present during this purported stop, and could not remember any physical characteristics of the officers present, except to note that two of the officers were Caucasian males. (Tr. p. 447:15-448:20) This casts doubt on the credibility of his testimony as well.

Non-party Jerome Grant could not remember the exact date of his purported July 2011 stop. (Tr. p. 453:6-8 and 467:14-19) Grant testified that he was walking with his brother Jarren, his cousin Shawn Grant, and Kawane Simmons towards his grandmother's apartment building, when Jarren "ran" from the group into the building's open front door. (Tr. p. 463:17-464:1) Grant testified that Jarren closed the front door behind him, preventing the group from entering the building. (Tr. p. 464:9-18) Grant testified that Shawn became agitated, and the group repeatedly knocked on the front door, which subsequently caused two police officers, who he could only identify by gender and race, (Tr. p. 467:1-2) to approach them. (Tr. p. 464:9-466:22 and 455:15-22) The officers' approach appears to have been based on the foregoing acts of the individuals, not on the suspicion of trespass, which is the "glue" that plaintiffs allege upon the instant motion.

Plaintiff Letitia Ledan testified that despite having lived in the River Park Towers complex for eleven years, she has only been "stopped by NYPD officers at River Park Towers while outdoors" on two occasions, neither one of which is necessarily indicative of a stop based on suspicion of trespass, even based on her accounts thereof. (Tr. p. 297:7-8 and 300:25-301:2) With respect to the first purported stop in 2009, which Ledan conceded occurred *on the premises* of River Park Towers, Ledan could not describe any of the officers purportedly involved (Tr. p. 318:5-13 and 319:16-22) nor is there any indication that Ledan was stopped by the NYPD on the suspicion of trespass, as the officers only purportedly requested her identification after asking her if she lived in the Complex. (Tr. p. 302:4-14) With respect to her second purported stop in the summer of 2011, (Tr. p. 320:1-4) which also "occurred within the River Park Towers complex," (Tr. p. 325:3-5) Ledan testified that she could have avoided approaching an already <u>existing</u> encounter between NYPD officers and three other individuals, including her husband, by taking a different route into her building. (Tr. p. 323:17-19) Ledan, however, was interested in "finding out why [the three individuals] were stopped." (Tr. p. 330:16-23) In any event, Ledan could only describe the race and gender of the officers allegedly involved. (Tr. p. 325:23-326:16) There is no indication that the existing encounter involving her husband nor her interaction had anything to do with suspicion for the crime of trespass either.

Plaintiff Roshea Johnson testified that he was stopped by the NYPD "on the premises of River Park Towers" on "Father's Day 2010." (Tr. p. 420:8-19) Johnson has no direct knowledge as to why the officers purportedly approached him, but testified that they "kept on asking [him] where the drugs and guns [were] at." (Tr. p. 426:7-13) Thus, this purported stop may have had nothing to do with suspicion of trespass either.

Plaintiff Fernando Moronta testified that his purported stop occurred "in the wintertime of 2008 between January and March, around there" and possibly even December 2007 (Tr. p. 343:17-19 and 350:7-11). Moronta could only remember the race and gender of the five to six uniformed male NYPD officers present, and could not describe any other characteristics of the officers. (Tr. p. 353:15-354:22) Thus, Moronta's testimony lacked credibility.

With respect to plaintiff Abdullah Turner's arrest on March 26, 2011, defendant P.O. Ramdeen and his partner, P.O. Pomerantz, observed Mr. Turner in the lobby of 2020 Davidson Avenue, a known drug-prone TAP building. (Tr. p. 1011:4-1015:5) P.O. Ramdeen observed Turner "for approximately two to three minutes *inside the lobby*[6] pacing back and forth, seemingly aimlessly, just wandering around looking up the stairs, looking back down the stairs, continually pacing." (Tr. p.1017:9-19) P.O. Ramdeen asked Turner (who had exited the building) if he lived in the building or knew anyone in the building, to which Turner replied, "no." (Tr. p. 1017:9-19 and 1021:16-20) P.O. Ramdeen then asked Turner what he was doing in the building, and "in sum and substance, [Turner] responded with, 'I am not going to lie, Officer, I just came with my friend [Anginette Trinidad]. She went upstairs to buy weed. I don't know what floor she is on. I don't know what apartment she's in.'" (Tr. p. 1021:16-25 and 1051:14-21) Trinidad later volunteered an illegal gravity knife and marijuana to the officers, (Tr. p. 500:9-11) and ultimately pled guilty to charges arising therefrom. (Tr. p. 626:3-12) Thus, there was reasonable suspicion for the stop that led to Turner's arrest.

---

[6] Turner testified that he never went inside the building before encountering the officers, even though it was "freezing cold" outside, Turner was not wearing a jacket or hat, and Turner was aware that the front door to the building was unlocked. (Tr. p. 495:5-18 and 497:1-25)

Turner also testified at the hearing that he was purportedly stopped in either December 2011 or January 2012, but only testified at his deposition that the stop occurred sometime in "2012." (Tr. p.501:9-502:2) Turner's purported stop took place in the courtyard and on the premises of his building. (Tr. p. 502:20-503:7) Thus, this purported stop was not "outside" of a TAP building and Turner's testimony as to same lacked credibility.

With respect to the arrest of plaintiff Charles Bradley on May 3, 2011, defendant P.O. Miguel Santiago was parked in an unmarked vehicle in front of a TAP building located at 1527 Taylor Avenue, which he knew to be a drug and shooting prone location. (Tr. p. 1081:4-21) P.O. Santiago observed Bradley walking "back and forth in front" of 1527 Taylor Avenue. (Tr. p. 1084:1-4) P.O. Santiago then observed, through "all glass" doors, Bradley in the vestibule for two-to-three minutes "going back and forth, disappear[ing] for one or two seconds, come back [again] and disappear and exit out the building." (Tr. p. 1086:21-1087:9, 1108:12-17) After Bradley exited the building, P.O. Santiago asked Bradley what he was doing in the building. (Tr. p. 1088:12-22) Bradley stated that he "went to visit his girlfriend." (Tr. p. 1088:12-21) When asked what apartment he was visiting and on what floor his girlfriend lived, Bradley responded that "he doesn't know." (Tr. p. 1088:12-21) Bradley informed P.O. Santiago that he did not live in the building, and could not produce identification. (Tr. p. 1088:12-21) Thus, there was reasonable suspicion for the stop that led to Bradley's arrest.

**D      The NYPD's Policies, Practices and Training**

The NYPD's policies, practices and training with respect to stop, question and frisk also belie plaintiffs' allegation of an unconstitutional custom or practice. On or about May 21, 2012, the NYPD issued Interim Orders 22 and 23 of 2012.[7] (Ex. A and Tr. p. 522:14-17) Interim Order 22 of 2012 clarified the NYPD's practices and procedures with respect to

---

[7] Interim Orders represent the policy of the NYPD. (Tr. p. 522:2-11)

"operations" and patrols of TAP buildings.  (Ex. A, "Purpose" and Tr. p. 523:1-7 and 551:2-7)  Interim Order 22 of 2012 was a revision to Patrol Guide 212-59, "Vertical Patrol," that became effective in 2000.  (Ex. FFFF and Tr. p. 678:19-680:2)

IO 22 of 2012 sets forth when an officer may approach, stop and/or arrest a person in connection with TAP patrols, and primarily addresses the crime of trespass and makes reference to Patrol Guide 212-11 on Stop and Frisk, which predated it.  (Tr. p. 548:19-549:1, Exs. A, K and CC)  Other standardized practices that officers are to follow with respect to their patrols of TAP buildings are set forth in ¶11 IO 22 of 2012 as well.  These practices are geared toward enforcement of the crime of trespass and plaintiffs do not even argue that such required practices are unconstitutional.  (Exs. A, ¶11 and Tr. p. 549:11-20 and 557:7-559:23)

Required paperwork is intended to document police activities and thus ensure proper stops/arrests.  The uniform "Trespass Crimes-Fact Sheet" (Ex. H) forms for use in connection with TAP were developed after consultation with the various District Attorney's Offices.   (Tr. p. 543:13-544:24 and p. 532:6- 534:20)  From May, 2012 onward, it has been required that the "Trespass Crimes-Fact Sheet" form be completed:  an officer making an arrest based on probable cause for the crime of trespass must document the pertinent facts surrounding a particular trespass arrest.  (Tr. p. 545:15-547:10 and 997:14-998:1 and Ex. H)  UF 250 Stop, Question and Frisk worksheets continue to be required if a stop is made upon reasonable suspicion.[8]  (Ex. A at p. 3 and Tr. p. 559:24-560:7)

IO 23 of 2012, promulgated in connection with IO 22 of 2012, addresses "administrative" issues in connection with TAP, including procedures for buildings' enrollment

---

[8] Plaintiffs were only able to point out at the hearing isolated instances where UF 250s should have been filled out in conjunction with other arrest paperwork documenting the stop and arrest but were not.  Otherwise, there was no evidence presented by plaintiffs that UF 250s should have been completed, but were not.

in TAP, and the reporting requirements with respect to same. (Ex. B and Tr. p. 523:2-7, 536:11-539:21 and 541:3-12)  IO 23 of 2012 also specifically states that residents, their guests and others authorized to be in the buildings are not to be arrested.  (Ex. B and Tr. p. 540:19-25)

A comprehensive "Plan to Ensure all Uniformed Members of the Service Have a Working Knowledge of Criminal Trespass Offenses," was issued by a Report of the Chief of Patrol to the Chief of the Department on or about June 18, 2012.  (Tr. p. 690:17-697:16 and Ex. D)  Pursuant thereto, a written report from the Chief of Patrol to Commanding Officers (Tr. p. 687:11-690:7 and Ex. C) was issued to "give a brief synopsis of the new procedures and…the changes in the new interim orders.  (Ex. D, ¶ 2 and Tr. p. 687:11-20 and p. 788:2-21)  Training personnel, including training sergeants and special operations lieutenants from each precinct, were instructed on Interim Orders 22 and 23 of 2012, with Legal Bureau personnel present for instruction on legal issues, and said training personnel were to train uniformed members at the precinct level on the new procedures.  (Ex. D, ¶ 3 and Tr. p. 691:16-695:12)  94% of uniformed personnel had already been trained on IOs 22 and 23 of 2012 as of the hearing date.  (Ex. D, ¶ 4, Tr. p. 695:22-697:4)  The Chief of Patrol Field Training Guide of 2012 (Ex. N), forms of which had existed for "a number of years" (Tr. p. 1230:11-22), was distributed to IMPACT Supervisors to continue the training of Probationary Police Officers.  (Ex. D, ¶ 6, Ex. N and Tr. p. 697:5-703:3)  Precinct commanders complied with the requirements set forth in the aforesaid Plan.  (Tr. p. 995:3-996:8 and Tr. p. 789:8-797:8)

Borough and precinct commanders were separately trained on IOs 22 and 23 of 2012, with legal bureau personnel present.  (Tr. p. 711:24-714:11 and p. 1230:23-1233:8)  The four levels of <u>DeBour</u> and the applicability of <u>DeBour</u> to both indoor and outdoor stops were also discussed at said training sessions.  (Tr. p. 713:24-714:11, 807:11-808:5 and 1233:1-6)

From an operational standpoint, a Memorandum of the Chief of Patrol to the Commanding Officers of each precinct dated August 20, 2012, reiterates the requirements for arrests and stops related to TAP. (Ex. E and Tr. p. 705:2-711:1) Steps are being taken by the NYPD to ensure that the requirements set forth in Ex. E are being followed, including the COMSTAT process. (Tr. p. 711:2-23) Precinct commanders are ensuring compliance with the requirements of Ex. E as well. (Tr. p. 996:9-21 and 801:23-807:10)

NYPD officers receive extensive training throughout their careers, beginning with the more than six months that each newly hired officer spends at the accredited NYPD Police Academy recruit training school ("Academy")(Tr. p. 817:11-818:20 and 982:1-13), and continuing post-graduation in the form of INTAC, command-level, promotional, and specialized training. (Tr. p. 884:6-886:11)

At the Academy and continuing during their employment, NYPD officers at all levels receive extensive training regarding the laws governing an officer's ability to Stop, Question and Frisk, which includes instruction on the law, department policies and procedures, the completion of department forms (including the UF 250 worksheet and Trespass Crimes Fact Sheet), and police tactics. (Tr. p. 818:21-821:19, 825:16-829:17, 830:7-15, 830:18-832:2, 840:14-17, 842:6-848:18, 848:24-854:10, 854:16-856:7, 856:12, 856:15-858:23, 861:1-872:23, 874:9-20, 877:7-879:5, 879:17-880:25, 881:4-882:1, 882:22-884:5 and Exhibits K, CC, EE, FF, GG, HH, RRR, and EEEE) Officers also receive extensive instruction regarding the penal law and pertinent changes thereto, including trespass crimes. (Tr. p. 823:14-824:16, 832:3-15, 833:16-834:6 and Ex. RRR )

The NYPD has developed a refresher course on Stop, Question and Frisk that is being conducted at Rodman's Neck in the Bronx.[9] (Tr. p. 571:25-572:12) All NYPD uniformed personnel will be required to take the course and the officers most likely to encounter the issues that are the subject of the course, i.e., IMPACT officers (officers assigned to high crime IMPACT zones), have been prioritized as far as being taught the course first. (Tr. p. 889:24-890:8 and 896:24-897:19) More than 3000 officers had attended the Rodman's Neck training as of the end of September 2012. (Tr. p. 955:8-19).

The NYPD's Legal Bureau is presenting an hour and a half to two hours long portion of the Rodman's Neck course on the law of Stop, Question and Frisk and its Powerpoint presentation is in evidence as Exhibit J. (Tr. p. 572:13-573:3) It includes comprehensive instruction on the four levels of <u>DeBour</u> and <u>Terry</u>, and what level of police actions are appropriate at each level. (Ex. J, pp. 6-37) Segments of the presentation specifically address TAP buildings and the crime of trespass (Ex. J, pp. 38-42 and Tr. p. 573:18-579:4), and the Powerpoint presentation specifically states that the four levels of <u>DeBour</u> apply to the "public areas of…TAP buildings." (Ex. J, p. 39) The Powerpoint presentation also specifically states that "observation of an individual exiting a NYCHA/TAP Building, without more, is not an objective, credible reason to approach that individual," (Ex. J, p. 40 and Tr. p. 577:6-578:12), which is consistent with NYPD policy that "stopping an individual outside of [a] Clean Halls building simply because they are exiting a building, without more…, that is something we do not want the officer doing…and we have made that clear to them." (Tr. p. 1244:6-12)

_____

[9] Insp. Sweet testified that in 2010-2011, all officers also received training in some form in connection with the promulgation of IO 23 of 2010 on the four levels of <u>DeBour</u> and which also addressed the crime of trespass. (Tr. p. 515:25-517:11 and 518:17-18) However, Mr. Dunn's contention in his summation that Insp. Sweet knew of a widespread problem with the types of stops at issue in this litigation (Tr. p. 1341:18-1342:3) is belied by Insp. Sweet's testimony that he was unaware of a "systemic problem," but only of "isolated cases." (Tr. p. 682:1-13)

Trespass crimes are also regularly used in scenarios and role plays attendant to trainings regarding Stop, Question and Frisk, including at the tactical village at Rodman's Neck. (Tr. p. 836:7-837:14 and 837:22-839-17, 896:1-18, 887:8-18 and Ex. M)

The Rodman's Neck training also includes a lesson on the proper preparation of a Stop, Question and Frisk UF 250 worksheet, including stops for trespass, which is consistent with the training recruit officers receive at the Academy. (Tr. p. 894:21-895:1, 898:3-12, 898:21-899:6, 971:1-19, 973:6-19 and Exs. V and W) Additionally, there are role play simulations where officers taking the course face live situations that they may encounter in the field. (Tr. p. 895:15-19 and 896:1-18) Said simulations include an outdoor stop on the suspicion of trespassing, after which the officers are critiqued. (Tr. p. 964:5-16)

The Training Bureau has developed a five-part video series on Stop, Question and Frisk, which includes training on the four levels of <u>DeBour</u> and <u>Terry</u>. (Tr. p. 902:2-22, 903:19-904:20 and Exs. S and T) The fifth part was developed earlier this year. (Tr. p. 900:21-901:8, 902:24-903:15 and Exs. T, Q and U) All police officers have been required to view all five parts of the video series, usually at the precinct. (Tr. p. 942:10-24 and Ex. Q)

The 2012 Chief of Patrol Field Training Unit Guide contains a comprehensive analysis of the law of stop, question and frisk as well. (Ex. N, pp. 10-24 and Tr. p. 700:20-701:18) At p. 65, the Training Guide specifically addresses TAP and repeats IO 22 as follows: "A uniformed member of the service <u>may not</u> stop (temporarily detain) a suspected trespasser unless the uniformed member reasonably suspects that the person is in the building without authority." (Ex. N, p. 65) It also includes an insert for officers' memobooks on the four levels of <u>DeBour</u> and <u>Terry</u> that must be carried by NYPD officers as a point of reference as they perform their duties. (Ex. N, Appendix 21 and Tr. p. 701:19-703:3)

Thus, the steps that the NYPD has taken in training, monitoring and supervision belie any claim of an unconstitutional custom or practice.

In sum, the evidence at the PI hearing showed that there was no unconstitutional custom or practice, without which there would be no "glue" for commonality and typicality.

## III.    Numerosity

"The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." Floyd, 283 F.R.D. at 161 (quoting Central States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d Cir. 2007). In the absence of commonality and typicality, plaintiffs cannot establish numerosity either. Haus, 2011 U.S. Dist. LEXIS 155735, at *291-333.

## IV.    Adequacy of Class Representation

Adequacy demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursing the claims of the class, and must have no interests antagonistic to the interests of other class members." Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006). Conflicts must be "'fundamental.'" Floyd at 175 (citing  In re Flag Telecom Holdings, Ltd. Secs. Litig., 574 F.3d 29, 35 (2d Cir. 2009)). Defenses unique to and that will defeat the named representatives' claims is a reason to deny certification. Id. at 176 (citing In re Omnicom Group, Inc., 02 CV 4483, 2007 U.S. Dist. LEXIS 31963 (S.D.N.Y. Apr. 30, 2007)). [T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)

Defendants note that plaintiffs have failed to even submit declarations in support of their "adequacy" argument. Further, it appears from plaintiffs' complaint that they are all seeking monetary damages in this matter. There are several unique defenses to the named plaintiffs' claims that defendants submit will defeat said claims and will subsume this litigation concerning said claims, i.e., the failure to specify the dates of incident and identify the officers involved, as well as in some cases whether the purported stop was even for trespass or outside of the premises of TAP enrolled buildings. Due to these unique defenses that may very well defeat plaintiffs' claims, the "adequacy" prong of Rule 23(a) is not met.

## V.     Rule 23(b)(2)

Because plaintiffs have not met their burden of demonstrating an unlawful custom or practice as alleged, they cannot demonstrate that the City "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2)

## VI.    Ascertainability

Defendants are mindful that this Court has previously rejected the applicability of the requirement of "ascertainability" to Rule 23(b)(2) classes in Floyd,[10] supra. However, "'Rule 23 contains an implicit requirement that the proposed class be precise, objective and presently ascertainable.'" Bakalar v. Vavra, 237 F.R.D. 59, 64 (S.D.N.Y. 2006)(quoting Burley v. City of New York, 03 CV 0735 (WHP), 2005 U.S. Dist. LEXIS 4439, at *25 (S.D.N.Y. Mar. 23, 2005). In this regard, "a proposed class must be clearly defined so that it is 'administratively feasible for a court to determine whether a particular individual is a member.'" Burley, 2005 U.S. Dist. LEXIS, at *25 (quoting Daniels v. City of New York, 198 F.R.D. 409, 414 (S.D.N.Y.

---

[10] Defendants also wish to point out that plaintiffs would seemingly be class members in the class certified by this Court in Floyd, which could lead to the risk of conflicting results.

2001)); see also Rahman v. Chertoff, 530 F.3d 622 (7th Cir. 2008)(Vague class definition does not lend itself to injunctive relief).

Defendants respectfully submit that plaintiffs' proposed class be denied on this ground for three reasons: first, plaintiffs' definition is so vague, particularly the portion that reads, "all individuals who have been or are at risk of being stopped outdoors without legal justification…," that it can never be determined who is a class member. Second, should the Court determine that the size of the class affects the relief sought, the proposed definition could be important. Third, mini-trials would be required to determine who is properly a class member.

## POINT II

### PLAINTIFFS LACK STANDING FOR INJUNCTIVE RELIEF

A § 1983 plaintiff cannot obtain injunctive relief unless he can show that he is likely to be subjected to the same conduct in the future, "a showing that can be very difficult to make." Ciralo v. City of N.Y., 216 F.3d 236, 248 (2d Cir. 2000) (citation omitted). Named plaintiffs must have standing to seek injunctive relief for the class. See Dodge v. Cnty. of Orange, No. 03-7958, 103 Fed. Appx. 688, 690 (2d Cir. July 14, 2004). Plaintiffs have the burden of establishing that "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." City of L.A. v. Lyons, 461 U.S. 95, 101-02 (1983). One past incident involving a plaintiff is sufficient to confer standing. Id.

Plaintiffs lack standing for two reasons: First, no plaintiff can demonstrate more than one past improper stop of the type raised by plaintiffs upon this motion and only two plaintiffs, Abdullah Turner and Letitia Ledan, even testified to two incidents. For the reasons set forth above at Point I(II)C, neither of these plaintiffs can demonstrate the requisite two or more improper stops of the type raised by plaintiffs upon their motion.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification must be denied.

Dated:      New York, New York
                December 4, 2012

                          MICHAEL A. CARDOZO
                          Corporation Counsel of the
                           City of New York
                          Attorney for Defendants
                          100 Church Street, Room 3-133b
                          New York, New York 10007
                          (212) 442-8248

                          By:              /s/
                                Mark Zuckerman
                                Heidi Grossman
                                Joseph Marutollo
                                Brenda Cooke
                                Richard Weingarten
                                Judson Vickers