UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

──────────────────────────────── X

JAENEAN LIGON, individually and on
behalf of her minor son, J.G.; FAWN
BRACY, individually and on behalf of her
minor son, W.B.; JACQUELINE YATES;
LETITIA LEDAN; ROSHEA JOHNSON;
KIERON JOHNSON; JOVAN JEFFERSON;
A.O., by his parent DINAH ADAMES;
ABDULLAH TURNER; FERNANDO
MORONTA; and CHARLES BRADLEY,
individually and on behalf of a class of all
others similarly situated,

                    Plaintiffs,

              - against -

CITY OF NEW YORK; RAYMOND W.
KELLY, COMMISSIONER OF THE NEW
YORK CITY POLICE DEPARTMENT;
POLICE OFFICER JOHNNY BLASINI;
POLICE OFFICER GREGORY
LOMANGINO; POLICE OFFICER
JOSEPH KOCH; POLICE OFFICER
KIERON RAMDEEN; POLICE OFFICER
JOSEPH BERMUDEZ; POLICE OFFICER
MIGUEL SANTIAGO; and POLICE
OFFICERS JOHN DOE 1–12,

                    Defendants.

──────────────────────────────── X



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/14/13

**AMENDED
OPINION & ORDER**

12 Civ. 2274 (SAS)

1

I.      INTRODUCTION.................................................. 4

II.     LEGAL STANDARD FOR PRELIMINARY INJUNCTION............ 10

III.    APPLICABLE LAW................................................ 12

        A.      Sources of Liability....................................... 12
        B.      The Fourth Amendment, Stops, and Reasonable Suspicion........ 16
        C.      Criminal Trespass under New York State Law................. 20
        D.      *De Bour*.................................................. 21

IV.     FINDINGS OF FACT............................................. 23

        A.      Evidence of an Unconstitutional Practice or Custom of the NYPD. . 23

                1.      Findings of Fact Regarding Testimony of ADA Rucker and
                        Decline to Prosecute Forms. ......................... 24
                2.      Findings of Fact Regarding Plaintiffs' Stops. ............. 32
                        a.      Charles Bradley's Stop......................... 35
                        b.      Abdullah Turner's Stops........................ 41
                        c.      J.G.'s Stop. ................................. 49
                        d.      Jerome Grant's Stop........................... 52
                        e.      Roshea Johnson's Stop......................... 54
                        f.      Letitia Ledan's Stops. ........................ 57
                        g.      Fernando Moronta's Stop....................... 61
                        h.      Kieron Johnson's Stop. ........................ 62
                        i.      Jovan Jefferson's Stop. ........................ 64
                3.      Expert Testimony Regarding UF-250 Forms. ............. 67

        B.      Steps Taken by the NYPD in 2012......................... 82

                1.      NYPD Recognition of a Problem in TAP.................. 84
                2.      Interim Orders 22 and 23 of 2012...................... 85
                3.      Absence of Steps Meaningfully Addressing Outdoor TAP
                        Stops. ...................................... 90

V.      DISCUSSION.................................................. 94

A.    Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

B.    Preliminary Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 96

       1.    Clear or Substantial Likelihood of Success on the Merits. . . 97

           a.    Deliberate Indifference. . . . . . . . . . . . . . . . . . . . . . 98

               i.    ADA Rucker's Testimony. . . . . . . . . . . . . . . 98

               ii.    Plaintiffs' Stops. . . . . . . . . . . . . . . . . . . . . . . 99

               iii.    Decline to Prosecute Forms. . . . . . . . . . . . . 104

               iv.    Dr. Fagan's Analysis. . . . . . . . . . . . . . . . . . . 107

               v.    Notice to Defendants. . . . . . . . . . . . . . . . . . . 117

               vi.    Legal Analysis. . . . . . . . . . . . . . . . . . . . . . . . 118

           b.    Failure to Rebut Deliberate Indifference Claim Based on Steps Taken by NYPD in 2012. . . . . . . . . . . . . . . . . . 121

       2.    Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

       3.    Balance of Equities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

       4.    Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

C.    Appropriate Scope of Injunctive Relief. . . . . . . . . . . . . . . . . . . 141

       1.    Immediate Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

       2.    Proposed Additional Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 144

           a.    Policies and Procedures. . . . . . . . . . . . . . . . . . . . . 146

           b.    Supervision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

           c.    Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

           d.    Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

VI.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

APPENDIX A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

APPENDIX B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.     INTRODUCTION

This case, filed in 2012, is one of three cases currently before this Court challenging aspects of the New York City Police Department's "stop and frisk" practices.[1]  Of the three cases, this case is the most narrow.  It deals only with stops made by the police on suspicion of trespass outside of certain privately-owned buildings in the Bronx.  But the legal issues raised by this case have roots that stretch back decades.

In 1964, New York adopted the first version of its stop and frisk law, which has since been amended several times.  The essence of the law is that a police officer may stop a person in a public place when he reasonably suspects that such person is committing, has committed, or is about to commit a crime, and the

---

[1]     *Floyd v. City of New York*, filed in 2008, challenges the NYPD's stop and frisk practices in general, arguing among other things that the NYPD is systematically violating the rights of New York City's residents and visitors under the Fourth Amendment to be free from unreasonable searches, and under the Fourteenth Amendment to be free from discrimination on the basis of race.  *See Floyd v. City of New York*, 283 F.R.D. 153, 159 (S.D.N.Y. 2012) (granting class certification).  *Davis v. City of New York*, filed in 2010, focuses on stop and frisk practices at public housing properties run by the New York City Housing Authority ("NYCHA").  Plaintiffs in *Davis* argue that the NYPD uses unlawful stops, searches, and arrests to enforce the prohibitions against trespassing on public housing property.  *See Davis v. City of New York*, — F. Supp. 2d —, 2012 WL 4813837, at *1 (S.D.N.Y. Oct. 9, 2012) (granting in part and denying in part defendants' motions for summary judgment regarding individual plaintiffs' arrests and tenancies).

officer may demand of him his name, his address, and an explanation of his conduct.  Upon stopping a person, if the police officer reasonably suspects that he is in danger of physical injury, he may search the person for a deadly weapon.[2]

This law and the policing practices associated with it have raised a host of difficult questions, including:  (1) what is reasonable suspicion; (2) what constitutes a stop; (3) what is a public place; (4) when is a stopped person free to walk away from the police; and (5) when does an officer have grounds to reasonably suspect that he is danger of physical injury.  None of these questions are easily answered.

In 1968, the United States Supreme Court heard a challenge to New York's stop and frisk statute in the context of two criminal convictions, and made some important points that bear repeating today.[3]  *First*, the Court held that although states may develop their own laws on stop and frisk, they may not "authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct."[4]  The Court stated, in no

---

[2]      *See generally* New York Criminal Procedure Law ("CPL") § 140.50.

[3]      *See generally Sibron v. State of New York*, 392 U.S. 40 (1968) (reversing conviction for failure to suppress evidence seized in an unlawful stop, and affirming conviction in a related appeal, finding that the seizure in latter case was reasonable under the Fourth Amendment).

[4]      *Id.* at 61.

uncertain terms, that the question is not whether a particular search was authorized by state law but "'whether the search was reasonable under the Fourth Amendment.'"[5] *Second*, the Court held that it would not judge the constitutionality of the New York statute on its face, but rather as applied to the particular facts of the two cases it was reviewing.[6] *Third*, the Court stressed that a police officer must have reasonable grounds before he seizes a person.  In that regard the Court stated: "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries."[7]

In confronting the issues addressed in this Opinion, I am keenly aware that this Court does not stand in the shoes of the Police Department and is in no way qualified or empowered to engage in policy determinations.  The sole role of the Court is to interpret and apply the law — in this case the Fourth Amendment of the United States Constitution as interpreted by the Supreme Court of the United States and the United States Court of Appeals for the Second Circuit — to the

---

[5]     *Id.* (quoting *Cooper v. State of California*, 386 U.S. 58, 61 (1967)).

[6]     *See id.* ("Our constitutional inquiry would not be furthered here by an attempt to pronounce judgment on the words of the statute.  We must confine our review instead to the reasonableness of the searches and seizures which underlie these two convictions.").

[7]     *Id.*  The Court continued:  "Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so."  *Id.*

specific facts before it.  I have endeavored faithfully to carry out that limited role.

My object here is only to clarify what the law permits — and does not permit — an

officer to do when initiating and conducting a stop or stop and frisk of people in

the public areas outside of certain privately owned buildings in the Bronx.

Plaintiffs, all of whom are African-American or Latino residents of

New York,[8] argue that the Police Department has a widespread practice of making

unlawful stops on suspicion of trespass outside buildings in the Bronx that are

enrolled in the Trespass Affidavit Program ("TAP"), which was formerly known in

the Bronx as Operation Clean Halls.[9]  This program allows "police officers to

patrol inside and around thousands of private residential apartment buildings

throughout New York City."[10]  Plaintiffs argue that the NYPD's trespass stops

outside TAP buildings are often made without reasonable suspicion, and thus

---

[8]       *See* Complaint ¶¶ 11–23.

[9]       *See Ligon v. City of New York*, No. 12 Civ. 2274, 2012 WL 3597066,
at *1 (S.D.N.Y. Aug. 21, 2012) (allowing preliminary injunction hearing to
proceed).  For the history of TAP, see *infra* Part IV.B.  Plaintiffs' Complaint
concerns stops in and around TAP buildings throughout New York City, but
plaintiffs' motion for preliminary injunction focuses solely on outside stops in the
Bronx.  *See Ligon*, 2012 WL 3597066, at *3–4; Memorandum of Law in Support
of Plaintiffs' Motion for Class Certification ("Class Mem.") at 1 n.1.

[10]      *See Ligon*, 2012 WL 3597066, at *1.

violate the Fourth Amendment.[11]  Plaintiffs stated that such stops have caused them to feel "violated,"[12] "disrespected,"[13] "angry,"[14] and "defenseless."[15]  As the Supreme Court noted in *Terry v. Ohio*, even limited stops and searches represent "an annoying, frightening, and perhaps humiliating experience,"[16] and thus must be based on reasonable suspicion.

On September 24, 2012, plaintiffs filed a motion for a preliminary injunction, seeking an order requiring the NYPD to create and implement new policies, training programs, and monitoring and supervisory procedures that specifically address the problem of unconstitutional trespass stops outside TAP buildings.[17]  The preliminary injunction hearing took place between October 15 and November 7, 2012.[18]  This Opinion addresses plaintiffs' motion.

---

[11]     *See* Plaintiffs' Revised Proposed Findings of Fact and Conclusions of Law ("Pl. Findings") ¶¶ 64–67, 69–70.

[12]     Transcript of Preliminary Injunction Hearing ("Tr.") 10/16 at 275:8.

[13]     *Id.* at 349:1.

[14]     Tr. 10/17 at 444:2.

[15]     *Id.* at 486:1.

[16]     392 U.S. 1, 25 (1968).

[17]     *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction at 21; Pl. Findings ¶¶ 72–75.

[18]     *See* Tr. 10/15 at 1; Tr. 11/7 at 1282.

I begin by summarizing the relevant legal standards, then state my findings of fact and conclusions of law.  Based on all the evidence presented at the hearing, I conclude that plaintiffs have shown a clear likelihood of proving that defendants have displayed deliberate indifference toward a widespread practice of unconstitutional trespass stops by the NYPD outside TAP buildings in the Bronx. This conclusion is based on five categories of evidence, briefly summarized here and fully explored below:  (1) the testimony of Bronx Assistant District Attorney Jeannette Rucker ("ADA Rucker"), who concluded that the NYPD frequently made trespass stops outside TAP buildings in the Bronx for no reason other than that the officer had seen someone enter and exit or exit the building; (2) a sample of "decline to prosecute" forms prepared by the Bronx District Attorneys' Office, which revealed the alarming frequency of unlawful trespass stops in the vicinity of TAP buildings in the Bronx; (3) the testimony of eight plaintiffs and a non-party witness, who described remarkably similar encounters with the police when stopped in the vicinity of TAP buildings in the Bronx; (4) the analysis by Dr. Jeffrey Fagan, plaintiffs' expert, of an NYPD database of recorded stops, which provided further evidence of the frequency of apparently unlawful trespass stops outside TAP buildings in the Bronx; and (5) NYPD training materials that continue to misstate the minimal constitutional standards for making stops.

In sum, while it may be difficult to say where, precisely, to draw the line between constitutional and unconstitutional police encounters, such a line exists, and the NYPD has systematically crossed it when making trespass stops outside TAP buildings in the Bronx.  For those of us who do not fear being stopped as we approach or leave our own homes or those of our friends and families, it is difficult to believe that residents of one of our boroughs live under such a threat.[19] In light of the evidence presented at the hearing, however, I am compelled to conclude that this is the case.

As a result, plaintiffs are entitled to a preliminary injunction. However, with one exception, I am not yet ordering relief pending a further hearing on the appropriate scope of such relief.

## II.  LEGAL STANDARD FOR PRELIMINARY INJUNCTION

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'"[20]  In general, to obtain a preliminary injunction, the moving party

---

[19]  To echo language quoted by Justice Thurgood Marshall, the evidence in this case "has evoked images of other days, under other flags, when no man traveled . . . without fear of unwarranted interruption." *Florida v. Bostick*, 501 U.S. 429, 443 (1991) (Marshall, J., dissenting) (quotation marks and citation omitted).

[20]  *UBS Fin. Servs., Inc. v. West Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

must establish:  (1) "that [it] is likely to succeed on the merits," (2) "that [it] is

likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the

balance of equities tips in [its] favor," and (4) "that an injunction is in the public

interest."[21]  The Second Circuit has held that the moving party may be entitled to a

preliminary injunction even if the party is unable to establish a likelihood of

success on the merits, provided that the party demonstrates "'a serious question

going to the merits to make them a fair ground for trial, with a balance of hardships

tipping decidedly in the plaintiff's favor.'"[22]  In addition, when the moving party

seeks a "mandatory" injunction, that is, an injunction that commands action rather

than merely prohibiting it, the standard is higher:  "[W]here 'the injunction sought

will alter rather than maintain the status quo,' the movant must show [a] 'clear' or

---

[21]     *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689–90
(2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger
v. Romero–Barcelo*, 456 U.S. 305, 311–12 (1982)).  *See also* Fed. R. Civ. P. 65(a)
(preliminary injunctions).

[22]     *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)
(quoting *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152,
156 (2d Cir. 2010)).  *Accord Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, — F.
Supp. 2d —, 2012 WL 2540234, at *3 (S.D.N.Y. June 29, 2012) (recognizing that
the Supreme Court in *Winter* "cast some doubt on the continuing viability" of the
Second Circuit's "serious questions" prong, but noting that "the Second Circuit has
since held that 'our venerable standard for assessing a movant's probability of
success on the merits remains valid'" (quoting *Citigroup Global Mkts., Inc. v. VCG
Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010))).

'substantial' likelihood of success."[23]

Because plaintiffs seek mandatory injunctive relief including the drafting and distribution of new policies, the development and implementation of new training programs, and the implementation of new monitoring and supervision procedures,[24] they must establish a clear or substantial likelihood that they will succeed at trial.

## III.   APPLICABLE LAW

### A.   Sources of Liability

Plaintiffs bring a claim under 42 U.S.C. § 1983 alleging violations of their Fourth Amendment rights by the City of New York and several of its employees.[25]  As the Supreme Court established in *Monell v. New York City*

---

[23]     *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 473–74 (2d Cir. 1996)).  The Second Circuit has recognized that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics, and that in a close case an injunction can be framed in mandatory or prohibitory terms."  *Jolly*, 76 F.3d at 474 (quotation marks and citations omitted).

[24]     *See* Pl. Findings ¶¶ 72–75.

[25]     *See* Compl. ¶¶ 1, 203.  42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

*Department of Social Services*,[26] in order to have recourse against a municipality or other local government under section 1983, plaintiffs "must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury."[27] In general, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."[28]

One way to establish an official policy is through a showing of "deliberate indifference" by high-level officials. "'[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that

---

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[26]   436 U.S. 658 (1978).  Interpreting the language of section 1983 and the legislative history surrounding its passage in the Civil Rights Act of 1871, the Court in *Monell* held that local governing bodies could be held liable either on the basis of formally approved policy or on the basis of "'customs'" or "'usages.'"  *Id.* at 690–91 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). Later cases have "considerably broadened the concept of official municipal action."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).

[27]   *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011), in turn quoting *Monell*, 436 U.S. at 691).

[28]   *Connick*, 131 S.Ct. at 1359 (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); *Adickes*, 398 U.S. at 167–68).

13

acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983.'"[29]  "Deliberate indifference" requires "'proof that a municipal actor disregarded a known or obvious consequence of his action.'"[30]

Recognizing that "deliberate indifference" is "a stringent standard of fault," the Second Circuit requires "that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'"[31]  The Second Circuit has held that municipal liability can be established "by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the *constructive* acquiescence of senior policymakers."[32]

---

[29]     *Cash*, 654 F.3d at 334 (quoting *Amnesty*, 361 F.3d at 126).

[30]     *Connick*, 131 S.Ct. at 1359 (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).

[31]     *Cash*, 654 F.3d at 334 (quoting *Connick*, 131 S.Ct at 1360; *Amnesty*, 361 F.3d at 128).

[32]     *Sorlucco v. City of New York*, 971 F.2d 864, 871 (2d Cir. 1992) (emphasis added), quoted with approval by *Amnesty*, 361 F.3d at 126; *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009). Though the Second Circuit has not explicitly reaffirmed the "constructive acquiescence" theory of *Monell* liability articulated in *Sorlucco* since the Supreme Court decided *Connick*, the Second Circuit noted in *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012), that the plaintiff there could have established municipal liability by showing:

> a sufficiently widespread practice among police officers of abuse
> of the rights of black people to support reasonably the conclusion
> that such abuse was the custom of the officers of the Department

A municipality may incur *Monell* liability based on deliberate indifference through its training practices.  Although "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train,"[33] the Supreme Court has held that "[w]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."[34]  "[D]eliberate indifference may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs[.]'"[35]

---

and that supervisory personnel must have been aware of it but took no adequate corrective or preventive measures (or some combination of the two).

*Jones*, 691 F.3d at 82.  The Second Circuit thus continues to hold that if a practice of misconduct is sufficiently widespread, the municipality may be assumed to have acquiesced in it, even in the absence of direct evidence of such acquiescence.

[33]    *Connick*, 131 S.Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion)).

[34]    *Id.* (citing *Bryan Cty.*, 520 U.S. at 407).

[35]    *Cash*, 654 F.3d at 334 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). *Cash* reaffirmed the validity of the three-part framing of the failure-to-train inquiry

### B.     The Fourth Amendment, Stops, and Reasonable Suspicion

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment,[36] states:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ."[37] As interpreted by the courts, the Fourth Amendment prohibits arrest without probable cause, but allows the police to "'stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by

---

in *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), summarized as:

> (1) policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either situation presents employees with difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling situation; and (3) wrong choice by employees will frequently cause deprivation of constitutional rights.

*Cash*, 654 F.3d at 334.  "Where the plaintiff establishes all three elements, then . . . the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Walker*, 974 F.2d at 298 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

     [36]     *See Maryland v. Pringle*, 540 U.S. 366, 369 (2003) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

     [37]     U.S. CONST. amend. IV.

articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.'"[38]  "This form of investigative detention is now known as a *Terry* stop."[39]

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."[40]  "'The officer [making a *Terry* stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'"[41]  "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant."[42]

---

[38]     *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Under New York law, the justifications required for different levels of police intrusion were established in *People v. De Bour*, 40 N.Y.2d 210 (1976).  *See infra* Part III.D.  States may impose greater restrictions on police conduct than those established by the Fourth Amendment, but "may not . . . authorize police conduct which trenches upon Fourth Amendment rights."  *Sibron*, 392 U.S. at 61.

[39]     *Davis*, 2012 WL 4813837, at *2 (citing *Terry*, 392 U.S. at 88).

[40]     *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[41]     *Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *Sokolow*, 490 U.S. at 7) (certain quotation marks omitted).  Courts are divided over whether reasonable suspicion must be of a particular crime, or may be of criminality in general.  *See* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.5(c) (5th ed. 2012).

[42]     *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

It is sometimes the case that a police officer may observe "a series of acts, each of them perhaps innocent in itself, but which taken together warrant[] further investigation."[43]  "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[44]  However, "the fact that the stop occurred in a 'high crime area' [may be] among the relevant contextual considerations in a *Terry* analysis."[45]

Courts reviewing stops for reasonable suspicion "must look at 'the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[46]  "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing."[47]

The test for whether a *Terry* stop has taken place outdoors is whether

---

[43]    *Terry*, 392 U.S. at 22.

[44]    *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).

[45]    *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 144 (1972)).

[46]    *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[47]    *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).

"a reasonable person would feel free 'to disregard the police and go about his business.'"[48]  "'[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.'"[49]  "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded."[50]  The Second Circuit has held that "[a] seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained."[51]  Both *Terry* stops and

---

[48]    *Bostick*, 501 U.S. at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).  *Accord United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  In an enclosed space, such as a bus, this test may be rephrased as "'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. Drayton*, 536 U.S. 194, 202 (2002) (quoting *Bostick*, 501 U.S. at 436). *Bostick* also notes that "the 'reasonable person' test presupposes an *innocent* person." *Bostick*, 501 U.S. at 438.  For a comprehensive summary of the "free to leave" test as it has been interpreted and applied, see LAFAVE, SEARCH & SEIZURE § 9.4(a).

[49]    *Brown*, 443 U.S. at 50 (quoting *Terry*, 392 U.S. at 16).

[50]    *INS v. Delgado*, 466 U.S. 210, 216 (1984).

[51]    *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009) (citing *Swindle*, 407 F.3d at 572).

arrests constitute "seizures" under the Fourth Amendment.[52]

### C.     Criminal Trespass under New York State Law

Criminal trespass is defined under section 140 of the New York Penal Law.  As the Appellate Division, First Department, of the Supreme Court of New York recently stated in a case concerning alleged trespass in a Clean Halls building:

> A person is guilty of criminal trespass in the second degree when, in pertinent part, he "knowingly enters or remains unlawfully in a dwelling" (Penal Law § 140.15[1]).  A person "enters or remains unlawfully" in or upon premises "when he is not licensed or privileged to do so" (Penal Law § 140.00[5]).  "In general, a person is 'licensed or privileged' to enter private premises when he has obtained the consent of the owner or another whose relationship to the premises gives him authority to issue such consent" (*People v. Graves*, 76 N.Y.2d 16, 20 . . . [1990]).  The prosecution bears the burden of proving the absence of such license or privilege (*People v. Brown*, 25 N.Y.2d 374, 377 . . . [1969]).[53]

The trespass law also states:

> A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part

---

[52]     *See Terry*, 392 U.S. at 16–20.

[53]     *In re Lonique M.*, 939 N.Y.S.2d 341, 343 (1st Dep't 2012).

of the building which is not open to the public.[54]

**D.      *De Bour***

In *People v. De Bour*, the New York Court of Appeals established a four-level test for determining the legality of encounters between police officers and civilians under New York state law.  The more intrusive the encounter, the more justification required:

- Level 1:  Approach to Request Information:  "If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality."[55]

- Level 2:  The Common-Law Right of Inquiry:  "Once the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is [engaged in] a common-law inquiry that must be supported by a *founded suspicion that criminality is afoot.*"[56]

- Level 3:  Forcible Stop:  "Where a police officer has *reasonable suspicion that a particular person was involved in a felony or misdemeanor*, the officer is authorized to forcibly stop and detain that person."[57]   A Level 3 stop is legally equivalent to a *Terry*

---

[54]      N.Y. Penal Law § 140.00.

[55]      *People v. Hollman*, 79 N.Y.2d 181, 184 (1992) (reaffirming *De Bour* despite case law suggesting that the Fourth Amendment does not protect against police-initiated encounters falling short of seizures).

[56]      *Id.* at 184–85 (emphasis added).

[57]      *Id.* at 185 (emphasis added).

stop, and New York state court opinions generally refer to Level 3 *De Bour* stops and *Terry* stops interchangeably.[58]

- Level 4: Arrest: "Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized."[59]

At least in the context of police encounters *inside* TAP and NYCHA buildings, New York courts have often identified requests for name and purpose in the building as Level 1 questions.[60] Mere presence in a drug-prone NYCHA building with a history of trespassing has been identified as an objective, credible reason justifying Level 1 questioning.[61] Level 1 questioning of someone *exiting* a

---

[58]    *See, e.g.*, *People v. Reyes*, 651 N.Y.S.2d 431, 432–33 (1st Dep't 1996); *People v. Francis*, 847 N.Y.S.2d 398, 401 (Sup. Ct. Bronx Co. 2007).

[59]    *Hollman*, 79 N.Y.2d at 185.

[60]    *See, e.g.*, *People v. Hendricks*, 841 N.Y.S.2d 94, 94 (1st Dep't 2007) (holding that NYCHA building's "history of drug activity and trespassing" provided "objective, credible reason" for Level 1 inquiry "to determine if defendant was legitimately in the building"); *People v. Anderson*, 759 N.Y.S.2d 676, 676 (1st Dep't 2003) (holding that group of nine or ten people descending staircase in drug-prone TAP building provided objective credible reason to ask defendant whether he lived there, "'which constituted a level one request for information and not a common-law inquiry'" (quoting *People v. Tinort*, 709 N.Y.S.2d 511, 511 (1st Dep't 2000))).

[61]    *See Hendricks*, 841 N.Y.S.2d at 94. Level 1 questioning of a person in a NYCHA building requires "[a]t a minimum, . . . evidence of prior criminality" in the building. *People v. Ventura*, 913 N.Y.S.2d 543, 546–47 (Sup. Ct. N.Y. Co. 2010). "To the extent that . . . in public housing the police routinely engage in random, unjustified questioning — and there is evidence that they do — the practice would amount to a systematic violation of *De Bour*." *Id.* at 547 (citing

TAP building, on the other hand, appears to require more than a history of drug activity in the building.[62]

## IV.   FINDINGS OF FACT

### A.   Evidence of an Unconstitutional Practice or Custom of the NYPD

At the hearing, plaintiffs offered three categories of evidence in support of their contention that the NYPD has a practice of making unconstitutional trespass stops outside Clean Halls buildings in the Bronx. *First*, plaintiffs offered the testimony of ADA Rucker regarding her concerns about trespass stops and arrests at Clean Halls buildings, corroborated by "decline to prosecute" forms from the Bronx District Attorney's office. *Second*, plaintiffs offered testimony regarding their personal experiences of having been stopped outside Clean Halls buildings.[63] *Third*, plaintiffs offered the expert testimony of

———————————————

Adam Carlis, *The Illegality of Vertical Patrols*, 109 COLUM. L. REV. 2002 (2009)).

[62]       *See, e.g.*, *People v. Kojac*, 671 N.Y.S.2d 949, 953–54 (Sup. Ct. N.Y. Co. 1998) ("The police are not justified in approaching an individual merely because he exits [a TAP building] known for its high incidence of drug activity."). *See also People v. Almonte*, No. 0209/2009, 2011 WL 864940, at *2 (Sup. Ct. Bronx Co. Mar. 8, 2011) (suggesting that decisions upholding Level 1 questioning of individuals exiting TAP buildings have "noted some additional factor" other than location, such as defendant's conduct not being innocuous).

[63]       Plaintiffs introduced testimony regarding eleven stops. *See infra* Part IV.A.2. All of the stops were of named plaintiffs except the July 2011 stop of non-party witness Jerome Grant, a relative of two named plaintiffs. *See infra* Part IV.A.2.d. For convenience, when making general statements about the personal

Dr. Jeffrey Fagan regarding the number and nature of trespass stops outside Clean Halls buildings.

I address each of these categories of evidence in turn.

### 1.    Findings of Fact Regarding Testimony of ADA Rucker and Decline to Prosecute Forms

Since 2007, ADA Rucker has been chief of the complaint and arraignments bureau at the Bronx DA.  In this position, she oversees the arrest to arraignment process, ensuring "that we evaluate all cases that are coming through and making sure we are doing the right thing."  ADA Rucker testified that around 2007 she started to become concerned about cases in which people were being stopped and then arrested based solely on their having entered or exited a Clean Halls building.  Especially in 2009, judges began dismissing these cases frequently, sometimes saying that the police had no right to approach the arrested person in the first place.[64]

ADA Rucker also started to receive a steady stream of complaints about trespass arrests from the defense bar, the Legal Aid Society, and the Bronx

---

testimony of stops offered at the hearing, I will often refer to named plaintiffs and non-party witness Jerome Grant collectively as "plaintiffs."

[64]    *See* Tr. 10/15 at 168–75.

Defenders.[65]  At first, she ignored the complaints.  But in 2010, her staff began

telling her that judges were not only dismissing trespass cases, but were finding

evidence that the defendant lived in the building where the trespass was said to

have occurred.[66]

Finally, in 2011, ADA Rucker investigated the law governing trespass

stops based on entry to and exit from a Clean Halls building, and she determined

that the office's position on the prerequisites for a legal stop had been wrong.[67]

She sent memos to a number of commanders and other police officials clarifying

that, contrary to previous statements, observing someone exiting a Clean Halls

building is not by itself a sufficient justification for a stop.[68]  ADA Rucker testified

that she sent the memos in her official capacity, and that the memos expressed the

views of the Bronx DA's office.[69]

---

[65]    *See id.* at 175:20–22.  The Bronx Defenders are co-counsel for
plaintiffs in this case.

[66]    *See id.* at 175:21–25, 176:2–8.

[67]    *See id.* at 176:9–23.

[68]    *See id.* at 176:14–177:22, 180:19–181:21; 7/7/11 Letter from ADA
Rucker to Deputy Inspector William McSorley ("7/7/11 Rucker Letter"), Plaintiffs'
Exhibit ("Pl. Ex.") 6.  *See also* Tr. 10/15 at 184:7–185:17; 7/13/11 Memo from
ADA Rucker to ADAs, Pl. Ex. 7 at 2 (explaining that Bronx DA would decline to
prosecute trespass cases where stop was based on nothing more than entry and exit
from Clean Halls building).

[69]    *See* Tr. 10/15 at 182:11–183:8.

I find ADA Rucker's testimony credible.  It is no small matter when an ADA publicly suggests that the NYPD has been engaged in a recurring pattern of unlawful stops.  Such testimony is entitled to significant weight.  A prosecutor has professional and institutional incentives to be skeptical of allegations that the police are making stops and arrests without a legal basis.   That ADA Rucker overcame her skepticism says a great deal about the severity of the problem she came to recognize.  I also note that the NYPD itself found ADA Rucker sufficiently trustworthy to allow her to train police officers regarding procedures in the complaint room.[70]

Yet defendants argue that ADA Rucker's impression that a problem existed regarding unlawful trespass stops at Clean Halls buildings was unfounded, and in fact rested only on the two specific cases she discussed in detail at the hearing.[71]  Defendants' argument is without merit.  ADA Rucker made clear that

---

[70]     *See id.* at 170:12–173:17.  Throughout this opinion, for convenience, I will refer to NYPD trainees as "officers," though in some cases the training involves "recruits."  *See* Tr. 10/19 at 839:18–24.

[71]     *See* Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. Findings") ¶¶ 11–14.  One case involved an anonymous letter whose author claimed to have been arrested for trespass while leaving a friend's building with the friend.  *See* Tr. 10/15 at 190:17–20; Tr. 10/16 at 239:1–240:22; 3/13/12 Anonymous Letter to ADA Rucker, Pl. Ex. 11.  The other involved a stop inside a Clean Halls building, and was brought to ADA Rucker's attention by the Bronx Defenders.  *See* Tr. 10/15 at 196:13–198:15; Tr. 10/16 at 241:5–243:2.  In the latter case, according to ADA David Grigoryan, who performed an investigation at ADA

over the years she learned of "many" cases involving unlawful trespass stops at

Clean Halls buildings,[72] that "the judges kept dismissing" them,[73] that "[a]t least

five" judges had dismissed Clean Halls trespass cases based on lack of probable

cause,[74] and that her concerns were also based on complaints from other ADAs,

phone calls from the arraignment parts, and ADAs coming to her after leaving

court, or when sent to her by their supervisors.[75]   ADA Rucker explicitly stated on

cross-examination that her concerns were not based only on the anonymous letter

---

Rucker's request, the defendant was stopped and questioned for no specified reason at his sister's building, where he was apparently staying, and then the defendant was arrested because he failed to provide his sister's name or apartment number. *See* Tr. 10/18 at 609:7–614:19, 617:25–619:9.  ADA Grigoryan testified that in his opinion this arrest was "absolutely valid." *Id.* at 611:14.

[72]     Tr. 10/15 at 176:7–8.

[73]     *Id.* at 176:10–11.

[74]     Tr. 10/16 at 234:9.

[75]     *See id.* at 237:13–238:8, 239:11–24, 240:6–7, 243:13–18, 244:6–12. Further support for ADA Rucker's criticisms can be found in the opinions of New York state courts. *See, e.g.*, *Almonte*, 2011 WL 864940, at *1 (criticizing police officer who was apparently "operating under the assumption that he had the authority to identify anyone leaving a trespass affidavit building").  Other cases describe problems with stops and arrests inside TAP buildings. *See, e.g.*, *People v. Ruiz*, No. 056832C-2006, 2007 WL 1428689, at *3–4 (Sup. Ct. Bronx Co. May 15, 2007) (chastising NYPD after apparently unlawful trespass arrest inside Clean Halls building, and concluding:  "One hopes the New York City Police Department will better train its officers in the realm of Criminal Trespass so that only true trespassers will be arrested, and innocents will be spared.").

27

and the indoor stop highlighted by defendants.[76]

To the extent that ADA Rucker's concerns were based partly on statements made by non-parties who did not testify at the hearing and whose statements do not fall under any hearsay exception, I give no weight to the truth of those statements. I do not accept, however, the insinuation that ADA Rucker invented the problem of unlawful Clean Halls trespass stops in order to lessen the Bronx DA's caseload,[77] or that she imagined the dismissed trespass cases under pressure from the Bronx Defenders.[78] ADA Rucker's concerns are independently corroborated by numerous "decline to prosecute" affidavit forms. As ADA Rucker explained, the Bronx DA's office produces these affidavits after a police officer or witness is interviewed and the office declines to prosecute the case.[79]

The decline to prosecute forms are an important source of information and I have reviewed each of them. Plaintiffs entered into evidence twenty-six

---

[76]    *See* Tr. 10/16 at 237:13–16. *Accord* Tr. 10/15 at 202:22–203:20 (ADA Rucker rejecting mischaracterization of her views in 9/6/12 Letter from Police Commissioner Raymond W. Kelly to Bronx County District Attorney Robert Johnson, Pl. Ex. 12); Tr. 10/16 at 235:3–7 (ADA Rucker explaining that she had orally conveyed details of other cases to the NYPD).

[77]    *See* Tr. 10/16 at 246:8–248:14.

[78]    *See id.* at 222:9–224:2.

[79]    *See id.* at 213:5–7.

forms generated by the Bronx DA's office in support of its decision not to prosecute cases involving arrests for trespass outside TAP buildings in the Bronx over three sample months in 2011.[80]   Without giving weight to the truth of any hearsay statements attributed to arrestees in the decline to prosecute forms, the forms persuasively show that ADA Rucker was not alone in the Bronx DA's office in perceiving a recurring problem involving legally unjustified trespass stops and arrests outside Clean Halls buildings.[81]   Defendants concede that the forms are, at minimum, admissible "for the limited purpose of establishing that officers' observations of entries/exits were the bases for the underlying stops," though defendants question whether the forms can support this finding in the absence of

----

[80]     *See* Pl. Findings ¶ 16 n.1; Tr. 10/16 at 210:17–220:25; Tr. 10/17 at 508:11–509:20; Bronx DA Decline to Prosecute Affidavits ("Decline Prosecute Affs."), Pl. Ex. 74.  Plaintiffs' Exhibit 74 contains thirty-one forms, but plaintiffs later conceded that only twenty-eight forms expressly identify the building outside of which the stop took place as a TAP building.  *See* Pl. Findings ¶ 16 n.2 (referring to Decline Prosecute Affs. at 4425, 5001, 5055).  In addition, two of the forms are revisions of other forms.  *Compare* Decline Prosecute Affs. at 2996, 3088, *with id.* at 3174, 3086.

[81]     ADA Rucker confirmed that the types of cases described in the decline to prosecute forms were, in part, what motivated the Bronx DA's office to adopt a policy in July 2011 of declining to prosecute cases where the arresting officer had only observed someone exiting or entering and exiting a Clean Halls building.  *See* Tr. 10/16 at 218:16–219:8.  *Accord* Tr. 10/15 at 180:13–182:18; 7/7/11 Rucker Letter.

testimony from the assigned ADA and further paperwork.[82]  Defendants were free

to elicit such testimony and introduce such paperwork.  They did not.[83]  I decline to

draw inferences in defendants' favor based on the speculative possibility that

further testimony would have revealed persuasive legal justifications for the stops

described in the forms.

In an Appendix to this Opinion, I have collected excerpts from the

twenty-six narratives of stops and arrests that appear in the decline to prosecute

forms.[84]  One of the shorter and less redacted narratives reads:

> On January 5, 2011 the defendants were observed exiting a
> [C]lean [H]alls building.  The defendants stated they were there
> to visit a tenant in the building.  After being arrested[,] a tenant
> from the building did corroborate the defendant[s'] statements and
> the tenant stated that both defendants were in the building as his
> guests.
>
> Therefore, the People are declining to prosecute this case at this
> time [redacted].[85]

Based solely on a review of these forms, *none* of the stops leading to the arrests

described in the forms were based on a reasonable suspicion of trespass.  All were

---

[82]     Def. Findings ¶ 13.

[83]     Neither party attempted to determine whether the stops described in
the decline to prosecute forms were recorded in UF-250s.

[84]     *See infra* Appendix A ("App. A").

[85]     Decline Prosecute Affs. at 4407, excerpted at App. A ¶ 2.

based merely on exit or entry and exit from a Clean Halls building.[86]  Thus, over
the course of three months in 2011, there were at least twenty-six arrests for
trespass outside Clean Halls buildings in the Bronx that resulted from stops lacking
reasonable suspicion.  As will be discussed in greater detail below, these arrests
independently suggest a widespread practice of unlawful stops.[87]

   In sum, ADA Rucker's testimony and the supporting exhibits,
including the decline to prosecute forms, contained more than enough evidence to
support the conclusion that there is a clear and substantial likelihood that plaintiffs
will be able to prove at trial that NYPD officers in the Bronx repeatedly stopped
and questioned people on suspicion of trespass simply because they were observed
exiting or entering and exiting a Clean Halls building.  ADA Rucker's testimony
and the supporting exhibits show that a nexus existed between the Clean Halls
program and the kinds of unlawful trespass stops described by plaintiffs and
quantified by Dr. Fagan, as discussed in the sections below.  That is, the stops of
people exiting or entering and exiting Clean Halls buildings took place *because* the
buildings were enrolled in Operation Clean Halls.

---

   [86]  Some of the forms describe stops in which an officer eventually
obtained probable cause for an arrest.  *See, e.g.*, App. A ¶ 23.  But the instant case
concerns the legal basis for stops, not arrests.

   [87]  *See infra* Part V.B.1.a.

## 2.    Findings of Fact Regarding Plaintiffs' Stops

Plaintiffs offered testimony at the preliminary injunction hearing regarding their experiences in having been stopped on suspicion of trespass outside Clean Halls buildings in the Bronx.  Sometimes plaintiffs' accounts were corroborated by other plaintiffs and witnesses.  In a few cases, the parties were able to identify officers who took part in the stops, and these officers testified.  In other cases, neither plaintiffs nor defendants were able to identify the officers.

Defendants argue that plaintiffs failed to provide sufficient information to identify the John Doe officers in the case, and that as a result this Court should not credit plaintiffs' testimony.[88]  Defendants go so far as to suggest that the stops about which plaintiffs testified "may not have occurred at all."[89]  Based on the testimony described below, I reject this contention.  Perhaps the strongest sign of the credibility of plaintiffs' testimony is the striking similarities among plaintiffs' stops.  A person approaches or exits a Clean Halls building in the Bronx; the police suddenly materialize, stop the person, demand identification, and question the person about where he or she is coming from and what he or she is doing; attempts at explanation are met with hostility; especially if the person is a

---

[88]    *See* Tr. 11/7 at 1298:19–22 (defendants' summation).

[89]    Def. Findings ¶ 15.

young black man, he is frisked, which often involves an invasive search of his pockets; in some cases the officers then detain the person in a police van in order to carry out an extended interrogation about the person's knowledge of drugs and weapons; and in some cases the stop escalates into an arrest for trespass, with all of the indignities, inconveniences, and serious risks that follow from an arrest even when the charges are quickly dropped.

Nevertheless, while I found plaintiffs' testimony credible, it would obviously have been valuable to hear from the unnamed officers involved in plaintiffs' stops. The officers were never identified. I find that this was due in part to the lack of specificity in some of plaintiffs' memories of their encounters. At the same time, I also find that defendants made inadequate efforts to identify officers based on the information plaintiffs did provide.

Defendants claim that Sgt. Robert Musick of the NYPD's Special Litigation Support Unit "conducted an *exhaustive* search to determine the officers involved in the purported incidents presented by plaintiffs at the hearing."[90] Sgt. Musick's reference to his "limited attempts" to identify the officers is closer to the mark.[91] A large part of Sgt. Musick's investigation involved searches of the

---

[90]   *Id.* (emphasis added). *See also* Tr. 10/23 at 1113:24–1114:19.

[91]   Tr. 10/23 at 1115:16.

33

electronic UF-250 database, which contained only the addresses and birthdates —
not the names — of individuals stopped after July 2010 when the stop did not
result in a summons or arrest.[92] Sgt. Musick conceded that he is "definitely not an
expert" at using the database.[93] For example, he was only able to narrow down the
potential list of officers who might have stopped Jerome Grant in the summer of
2011 (discussed below) to a list of three hundred. Yet this list included officers of
all ethnicities, while Grant had testified that one of the two officers was Asian. On
cross-examination, Sgt. Musick explained that he had not searched for Asian
officers within the list of three hundred because Grant's description of the *other*
officer did not specify an ethnicity.[94] This makes no more sense than refusing to
search a drawer for a pair of striped socks because one cannot remember which
color shoes they match: there was no reason to make the search for the Asian
officer contingent on obtaining more information about his partner. In the end,

---

[92]     *See* Chart by Sgt. Musick ("Musick Chart"), Defendants' Exhibit
("Def. Ex.") UU; Tr. 10/23 at 1123:23–1128:11. Officers are required to complete
a UF-250 form, also known as a "Stop, Question and Frisk Report Worksheet,"
after each stop. *See* Tr. 10/15 at 67:4–21, 69:24–70:6; Tr. 10/23 at 1110:9–11; UF-
250 Form, App. B to 7/27/12 Report of Plaintiffs' Expert Dr. Jeffrey Fagan
("Fagan Report"), Pl. Ex. 4. UF-250s are discussed at greater length below. *See
infra* Part V.B.1.a. I have attached a copy of a blank UF-250 form as Appendix B
to this Opinion.

[93]     Tr. 10/23 at 1145:1, 1158:19–25.

[94]     *See id.* at 1153:4–1154:8.

34

Sgt. Musick was unable to locate a single UF-250 for any of the eleven stops to which plaintiffs testified.[95]

Because I find it extremely implausible that any plaintiff simply invented the stop or stops to which he or she testified, because defendants failed to make a sufficiently persuasive effort to identify the officers involved, and because the officers who did testify failed to undermine any plaintiff's credibility, I decline to draw speculative inferences in defendants' favor regarding the reasons that unidentified officers might have provided for their stops.

### a.    Charles Bradley's Stop

On May 3, 2011, after finishing his work for the day as a security guard, Charles Bradley, a black fifty-one year old resident of the Bronx, took the subway to visit his fiancée, Lisa Michelle Rappa, as they had arranged the evening before.[96]   Rappa lived in the Bronx at 1527 Taylor Avenue.[97]   Bradley formerly lived with Rappa and had keys to her apartment, but following a disagreement Bradley had returned his keys.[98]   1527 Taylor Avenue is a Clean Halls building.[99]

---

[95]      *See id.* at 1125–1143.

[96]      *See* Tr. 10/16 at 257:17–258:22, 259:10–19, 261:1–24, 272:6.

[97]      *See id.* at 258:23–24, 259:23.

[98]      *See* Tr. 10/15 at 258:23–260:21.

[99]      *See* Tr. 10/16 at 260:3–7.

35

When Bradley arrived at Rappa's apartment building, a young man who lived on the first floor and knew of Bradley's and Rappa's relationship let Bradley into the building.  Bradley then walked up the stairs to Rappa's apartment on the fifth floor and knocked.  Because Rappa is deaf in one ear, Bradley waited a minute or two.  When there was still no response, he returned downstairs and left the building.  Outside, he looked up toward Rappa's window.[100]

While Bradley was standing on the sidewalk, an unmarked green police van approached and an officer in the passenger seat — later identified as Officer Miguel Santiago — gestured for Bradley to come over.[101]  After Bradley approached the van, the officer got out and asked, "What are you doing here?"[102]  Bradley explained he was there to see Rappa, and that he worked as a security guard.  Bradley testified that the officer responded to his attempts to explain his presence by suggesting Bradley was acting "like a fucking animal,"[103] searched Bradley's pockets,[104] then told Bradley to place his hands behind his back.  Once

---

[100]     *See id.* at 262:4–264:12.

[101]     *See id.* at 264:14–265:9; Tr. 10/22 at 1079:18–19.

[102]     Tr. 10/16 at 266:3.

[103]     *Id.* at 266:8.

[104]     Though plaintiffs have not focused their arguments on the legal standard for frisks, I note that a frisk requires an additional justification beyond the reasonable suspicion for the stop.  The Supreme Court held in *Terry*:

36

Bradley was handcuffed, the officer placed him in the van, where there were two other officers.  While the van drove away, the officers began to question Bradley: "When was the last time you saw a gun? When was the last time you got high? When was the last time you bought some drugs?"[105]

After twenty or thirty minutes in the van, the officers stopped at the station house.  Bradley was taken into a room, stripped, and told to wait.[106]  He was searched in "inappropriate areas."[107]  For the next two hours, he waited in a cell with other people who had been arrested.  He was then fingerprinted and given a

---

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot *and that the persons with whom he is dealing may be armed and presently dangerous*; . . . he is entitled for the protection of himself and others in the area to conduct a carefully *limited search of the outer clothing* of such persons in an attempt to discover weapons which might be used to assault him.

*Terry*, 392 U.S. at 30 (emphasis added).  If the officer who searched Bradley had no reason to conclude that Bradley posed a danger, the officer's frisk violated Bradley's rights under the Fourth Amendment.  *See also People v. Driscoll*, — N.Y.S.2d —, 2012 N.Y. Slip Op. 09097, 2012 WL 6699161, at *1 (3d Dep't Dec. 27, 2012) ("To conduct a protective pat frisk, an officer must have knowledge of some fact or circumstance that supports a reasonable suspicion that the suspect is armed or poses a threat to safety[.]" (quotation marks and citation omitted)).

[105]   Tr. 10/16 at 265:20–22, 266:1–267:17.

[106]   *See id.* at 267:16–268:1.

[107]   *Id.* at 268:5–6.  Bradley later stated that his experiences on May 3 made him feel "extremely violated, to say the least."  *Id.* at 275:8.

desk appearance ticket and a date to appear in court to answer the criminal charge

of trespassing.  Later, Bradley's defense attorney provided the Bronx DA's office

with a notarized letter from Rappa stating that Bradley had been visiting her.[108]

"[A]t that point in time," Bradley testified, "paperwork was submitted to me stating

that the People of New York declined to prosecute."[109]

Officer Santiago also testified at the hearing, explaining that he

worked two tours on May 3, 2011, the first from 4 a.m. to 12:35 p.m. and the

second from 1 p.m. to 9:30 p.m.  Bradley's arrest took place around 5:20 p.m.,

after Officer Santiago had been patrolling with his partner, Officer Landro Perez,

for a few hours without incident.[110]  Officer Santiago emphasized that 1527 Taylor

Avenue is in "a drug prone location" with "a lot of robberies, a lot of shootings" in

the area.[111]  It is a "high crime neighborhood."[112]

Officer Santiago's account of Bradley's arrest differed from Bradley's

in several respects.  Officer Santiago claimed that before stopping Bradley, he had

---

[108]    *See id.* at 268:9–25, 269:1, 12–13, 272:3–273:7; 7/7/11 Notarized
Letter from Rappa ("Rappa Letter"), Pl. Ex. 17.

[109]    Tr. 10/16 at 269:2–270:4.

[110]    *See* Tr. 10/22 at 1076:8–10, 1077:3–11, 1078:16–18, 1079:5–7.

[111]    *Id.* at 1081:5–6, 1082:24–25.

[112]    *Id.* at 1082:24.

observed Bradley at the end of a hallway inside the building "suspiciously walking back and forth" for two or three minutes and "disappearing."[113]  Officer Santiago claimed that he was able to see Bradley's suspicious behavior even though he was inside a police van parked across the street, twenty to thirty feet from the front door, separated from Bradley not only by the street but by the windows of the front door, a vestibule, the windows of an inner door, and the hallway.[114]

Officer Santiago testified that he approached Bradley after Bradley exited the building and said: "Excuse me, sir, could you come over here?"[115]  In response to Officer Santiago's questioning, Bradley could not tell him the name of his girlfriend or her apartment number, and could not produce any identification.[116] After he arrested Bradley for criminal trespass, they drove five or ten minutes to the precinct.[117]  There was only one other officer in the van.[118]  Officer Santiago did not ask Bradley any questions along the way, and Bradley was not strip-searched

---

[113]   *Id.* at 1086:21–1087:1; Tr. 10/23 at 1097:8–9, 1101:13–15.

[114]   *See* Tr. 10/22 at 1087:2–11; Tr. 10/23 at 1101:20–25.

[115]   Tr. 10/22 at 1088:15–16.

[116]   *See id.* at 1088:11–1089:1; Tr. 10/23 at 1097:1–9.

[117]   *See* Tr. 10/23 at 1098:11–1099:1.

[118]   *See* Tr. 10/22 at 1080:23–25; Tr. 10/23 at 1098:19–1099:1.

upon arrival at the station.[119]

The paperwork Officer Santiago completed with regard to Bradley's stop and arrest contained numerous, self-serving errors.[120]  In direct contradiction to his testimony at the hearing, Officer Santiago made the following statements on the arrest fact sheet:  *first*, that he observed Bradley in the building for seven minutes; *second*, that he stopped Bradley inside the building; *third*, that he went to the apartment Bradley said he was visiting; and *fourth*, that the apartment was occupied.[121]  By all accounts, each of these statements was false.  Officer Santiago's credibility was further called into question by the fact that in 2002 or 2003 he lied within the scope of his police work by creating two improper summonses to help a friend.[122]  Finally, Officer Santiago failed to complete the UF-250 form he was required to fill out for Bradley's stop.[123]

---

[119]     *See* Tr. 10/23 at 1098:11–1099:1.

[120]     Officer Santiago admitted that by the time he completed the paperwork, he had worked fourteen or fifteen hours straight and was "a little tired." *Id.* at 1099:11–12.  *See also id.* at 1105:8–16.

[121]     *See* 5/3/11 Clean Halls Fact Sheet for Charles Bradley Arrest ("Bradley Fact Sheet"), Pl. Ex. 39.

[122]     *See* Tr. 10/23 at 1099:17–1100:2.  Officer Santiago testified that he was trying to help a landlord friend who was having problems with a tenant, "so I issued two improper summons, one in the bus stop and one in the fire hydrant, and the car was never there." *Id.* at 1099:24–1100:2.

[123]     *See id.* at 1110:9–11.

I find Bradley's account credible.  Bradley entered a Clean Halls building based on an invitation from a tenant, walked upstairs to the tenant's residence, found the tenant not home, then returned outside and waited on the sidewalk while considering what to do.  In response to Officer Santiago's questions, Bradley offered reasonable and unsuspicious answers.  Bradley's conduct provided no further basis for a stop.

### b.    Abdullah Turner's Stops

On the evening of March 26, 2011, Abdullah Turner, a black twenty-four year old, had plans to go to an engagement party in the Bronx with his close friend Anginette Trinidad.[124]  Both Turner and Trinidad testified at the hearing that Trinidad was carrying a sweater in a plastic bag.[125]  When the two had nearly arrived at the party, Trinidad told Turner she had to return the sweater to someone in the next building, 2020 Davidson Avenue, which is a Clean Halls building.[126]

While Trinidad went inside, Turner remained outside and called another close friend, Felisha Black, on his cell phone.  During the call, he paced in

---

[124]    *See* Tr. 10/17 at 472:14–15, 473:9–474:9.

[125]    *See id.* at 475:8–15; Tr. 10/18 at 622:25–623:4.

[126]    *See* Tr. 10/17 at 474:13–475:7, 481:23–25.

41

a circle on the sidewalk, trying to stay warm.[127]  It was "freezing cold" that night,

but Turner was wearing only a cardigan sweater and t-shirt with no coat or hat.[128]

　　　　After Turner had been pacing and talking on the phone for about five

minutes, someone "snatched the phone out of my hand."[129]  When Turner turned,

he saw three police officers:  one who was Hispanic and a little stocky; one who

was Indian, tall and slim; and a third officer that Turner did not "get a good look

at."[130]  One of the officers, Kieron Ramdeen, testified that he was only with one

other officer, Michael Pomerantz.[131]  Officer Ramdeen's testimony on this point

---

[127]　　*See id.* at 475:21–476:25.

[128]　　*Id.* at 495:5–18 (Turner's testimony).  Defendants suggest that it is
implausible that Turner did not go inside the building, because he knew that the
door was unlocked.  *See* Def. Findings ¶ 23 & n.11; Tr. 10/17 at 476:7–10.  But
Turner testified that he liked the cold and did not need a coat.  *See* Tr. 10/17 at
477:2–4.  *Accord id.* at 487:20–21, 502:5–19.  While Turner's winter-weather
clothing choices and apparent tolerance for the cold may be idiosyncratic, they do
not undermine his credibility.  There is also a facial inconsistency in defendants'
apparent attempt to suggest both that any reasonable person in Turner's
circumstances would have entered the building to warm up, and that if Turner did
so, he would have provided legal grounds for a *Terry* stop.  A reasonable person
would presumably want to avoid being stopped and frisked, and thus would prefer
standing in the cold to going inside, if doing so would create a reasonable
suspicion of criminal trespass.

[129]　　Tr. 10/17 at 477:8.  I note that a reasonable person would not feel free
to leave when his personal property has been seized by the police.

[130]　　*Id.* at 477:19–23.

[131]　　*See* Tr. 10/22 at 1008:20, 1012:5–25.

was not credible, as Officer Pomerantz's own memobook stated that he was patrolling on the night of March 26 with Officer Ramdeen and Premativo Montanez, a Hispanic officer.[132]

Turner testified that the Hispanic officer who took his phone began questioning him about what he was doing and whether he lived at 2020 Davidson. Turner explained that his friend was returning a sweater and they were on their way to a party in the next building. The officer asked for identification, and Turner gave him his driver's license. After the officer saw that Turner did not live on the block, he asked again what Turner was doing at 2020 Davidson, and Turner explained again.[133] Then the officer asked: "So you don't know anybody who lives in this building?"[134] When Turner said no, the officer asked him to stand against the wall.[135]

While Turner stood against the wall, the Hispanic officer entered 2020 Davidson with Turner's driver's license and cell phone still in his possession. Officer Ramdeen, now alone with Turner, continued asking Turner the same

---

[132]   *See id.* at 1059:11–1061:6; Page from Memobook of Officer Michael Pomerantz, Def. Ex. HHHH.

[133]   *See* Tr. 10/17 at 478:13–22, 479:8–11.

[134]   *Id.* at 479:11–12.

[135]   *See id.* at 479:12–13.

questions as before.  Eventually, Trinidad emerged from the building, no longer carrying the plastic bag, and Turner pointed to her as proof of what he had been saying.  Trinidad confirmed Turner's story while the other officers returned.  The Hispanic officer asked for Trinidad's ID, and Trinidad gave it to him.[136]  Then the officer asked her if she had "anything on her that she shouldn't have," and in response, Trinidad said she had "a little pocketknife that her husband gave her for protection and a bag of marijuana."[137]

After confiscating these items, the Hispanic officer approached Turner and pointed to a sign on 2020 Davidson and asked him if he knew what the sign meant.  Turner said he did not.  The sign stated that 2020 Davidson was enrolled in Operation Clean Halls.  The officer told Turner that he was trespassing and was going to jail.  Turner asked how he could be trespassing if he was outside.  The officer repeated that Turner was going to jail and placed him in handcuffs.[138]

After being driven to the precinct in a paddy wagon, Turner spent several hours waiting, was fingerprinted, and then was transferred to central booking, where he spent several more hours.  It was not until the next day that a

---

[136]  *See id.* at 479:13–24, 480:12–24.

[137]  *Id.* at 481:1–3.

[138]  *See id.* at 481:7–25, 482:1–8.

judge released Turner.  He was then obligated to return to court eight to ten times before the charges were dismissed.[139]  Turner testified that the events on March 26 made him feel "defenseless."[140]  Trinidad's testimony at the hearing supported Turner's account of the stop.[141]

Officer Ramdeen testified to a different version of events.  He testified that he and Officer Pomerantz were driving past 2020 Davidson when he saw Turner in the lobby.  Officer Pomerantz stopped the car and Officer Ramdeen watched as Turner paced aimlessly in the lobby for two to three minutes, occasionally looking up the stairs.  Aware that 2020 Davidson was a Clean Halls building, Officer Ramdeen approached Turner, who then exited the lobby.  In response to Officer Ramdeen's brief questioning, Turner volunteered that his

---

[139]    *See id.* at 482:21–483:10, 483:14–21.

[140]    *Id.* at 486:1.  Turner continued:

It's like when you're a kid, when someone is bothering you or someone is like threatening you, you run to your parents for protection, and when you're an adult, you're supposed to run to the police.  But who are you supposed to run to when like the police are harassing you or like threatening you . . ., who are you supposed to run to then?

*Id.* at 486:3–8.

[141]    *See* Tr. 10/18 at 619:23–628:6.

friend was engaged in a drug deal.[142]  "I asked him what he was doing in the building and, in sum and substance, he responded with, I am not going to lie, Officer, I just came with my friend.  She went upstairs to buy weed."[143]  Officer Ramdeen did not record this alleged confession in his arrest report.[144]

Officer Ramdeen then arrested Turner for trespassing, basing "the charges on the fact that he had no lawful reason to be in the building and that he knowingly was there to buy marijuana."[145]  Officer Ramdeen could not recall having arrested Trinidad.  He conceded that neither he nor Officer Pomerantz took any steps to investigate or arrest the drug dealer who, according to their version of events, was operating that night a few stories above them at 2020 Davidson.[146]

---

[142]    *See* Tr. 10/22 at 1016:17–1017:14, 1020:11–1021:25.

[143]    *Id.* at 1021:21–24.

[144]    Officer Ramdeen's arrest report only states that Turner was inside a Clean Halls building without permission or authority to be there.  *See id.* at 1038:19–1041:24; 3/26/11 Arrest Report of Plaintiff Abdullah Turner ("Turner Arrest Report"), Def. Ex. ZZ.  The confession does appear in Officer Ramdeen's supporting deposition, signed on the following day.  *See* 3/27/11 Officer Ramdeen Supporting Deposition in *State v. Turner*, Def. Ex. CCC.  Like Officer Santiago after Bradley's stop, Officer Ramdeen also failed to complete the required UF-250 form for his stop of Turner.  *See* Tr. 10/22 at 1024:2–7.  In fact, Officer Ramdeen marked "NO" next to the field "Stop And Frisk" on Turner's arrest report.  *See* Turner Arrest Report at 1.

[145]    Tr. 10/22 at 1022:20–22.  *See also id.* at 1025:14–1026:4.

[146]    *See id.* at 1026:21–22, 1064:13–1065:12.

I find Turner's testimony to be credible.  Turner stopped briefly at 2020 Davidson so that Trinidad could allegedly return a sweater.  While Trinidad went inside, Turner talked on his cell phone outside for a few minutes.  Officers Ramdeen, Pomerantz, and likely Montanez saw him standing outside the building in the cold, stopped him, and questioned him.  Turner's responses to the officers' questions were reasonable and unsuspicious.  Turner provided no other grounds for suspicion.  I did not find credible Officer Ramdeen's testimony concerning Turner's spontaneous confession.  Turner persuasively denied that he made the confession,[147] and the officers took no steps to investigate or stop the drug dealer who (according to Officer Ramdeen's testimony) was operating several floors above them.   I also did not find credible Officer Ramdeen's testimony concerning his observation of Turner's suspicious pacing inside the building before the officers approached.  Based on the totality of the evidence presented at the hearing, I do not believe that Turner entered the building.[148]

---

[147]     *See* Tr. 10/17 at 500:12–23.

[148]     I note, however, that even if Turner entered the building, paced in the lobby, looked up the stairs, and then exited the building to make his call, a stop would still have been unjustified.  This behavior is innocuous and would not, without something more, provide reasonable suspicion of criminal trespass, or of any other crime.  As in Bradley's and Roshea Johnson's cases, entering and exiting a Clean Halls building under ordinary circumstances does not establish reasonable suspicion.  *See infra* Part V.B.1.a.

Finally, Turner credibly testified to having been stopped on another night during December 2011 or January 2012 outside of his own building, 2249 Morris Avenue, which is also a Clean Halls building in the Bronx. As Turner was exiting the building, a police car pulled up. Turner's thirteen-year-old brother, a friend, and the friend's nephew were talking at the front of the courtyard. When Turner began to step out of the courtyard, a female officer got out of the car and asked whether they all lived in the building, and they all responded yes. Then the officer asked for Turner's identification, and he gave it to her.[149] Finally, the officer "told us that we can't stand in front of our building, so when they come back we would need to be gone."[150] Turner testified that he did not feel free to leave while the officer talked to him: "[S]he had my ID, and I don't know anyone . . . who ever just walked away from a cop in the middle of a conversation."[151] In this encounter as well, I find that Turner's behavior provided no grounds for suspicion of trespass or any other crime.

As to whether Turner's second stop was based on the suspicion of

---

[149]   *See* Tr. 10/17 at 486:9–490:25.

[150]   *Id.* at 491:4–5.

[151]   *Id.* at 491:6–8, 22–23.

*trespass*, the evidence is less clear.[152]  Nevertheless, because I found Turner's

testimony credible, because the officer's questions concerned the right of Turner

and the others to be on Clean Halls property, because there is no indication that the

officers suspected Turner of any other crime, and because the parties were unable

to locate a UF-250 or any other documentation showing otherwise, I find it more

likely than not that Turner's second stop was based on the suspicion of trespass.

### c.    J.G.'s Stop

J.G. is the son of plaintiff Jaenean Ligon and the brother of J.A.G. and

Jerome Grant.  The family lives in a Clean Halls building in the Bronx.[153]

J.G., who is black and seventeen years old, testified that the first time

he remembered being stopped around his apartment building was on an evening in

August 2011.  He had gone to a nearby store to buy ketchup for dinner.  On his

way back, he saw two plainclothes officers with badges in front of his building and

three uniformed officers across the street.  When J.G. reached his building, the

officers stopped him and began asking him questions, such as where he was

---

[152]    Defendants' post-hearing brief does not challenge whether Turner's second stop was based on suspicion of trespass, but does challenge whether five of the other unrecorded stops described by plaintiffs were for trespass.  *See* Def. Findings ¶¶ 17 (Kieron Johnson), 19 (Jerome Grant), 20 (both of Letitia Ledan's stops), 21 (Roshea Johnson).  I address each of defendants' challenges below.

[153]    *See* Tr. 10/17 at 438:4–25.

coming from, where he was headed, and what he had in his bag.  After J.G.

answered that he had ketchup in the bag, one of the officers asked him to raise his

hands, then asked him what he had in his pockets.  The officer started to frisk him,

first shaking J.G.'s pockets, then putting a hand in J.G.'s left pocket,[154] then patting

J.G.'s arms down.  After the search, the officer asked for J.G.'s ID and took his

name down on a notepad.  Then the other officer looked in J.G.'s bag and

inspected the ketchup.  The officers asked for J.G.'s apartment number and rang

the bell.  Finally, after Ligon had come downstairs and confirmed that J.G. was her

son, the officers handed her the ketchup and let them go.[155]

      Ligon's testimony supported J.G.'s account.  Ligon testified that she

sent J.G. to the store for ketchup one evening when she was cooking chicken and

---

[154]    As I noted above, plaintiffs have not focused on the issue of frisks in the instant litigation.  Nevertheless, it is worth emphasizing that the officer's placement of his hand in J.G.'s pocket goes beyond "a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him."  *Terry*, 392 U.S. at 30.  If the officer had no reasonable basis for believing J.G.'s pocket contained a dangerous weapon that J.G. might use to harm the officer, the officer's search of J.G.'s pocket violated J.G.'s rights under the Fourth Amendment.  *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (reaffirming that *Terry* frisk "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby'" (quoting *Terry*, 392 U.S. at 26)).

[155]    *See* Tr. 10/17 at 437:17, 439:4–443:2.

french fries.  A few minutes after he left, she heard her bell ring.[156]  Jerome Grant

answered the bell and an unfamiliar voice said:  "[C]an you please come down and

identify your son."[157]  Hearing these words, Ligon thought J.G. was dead or hurt.

She ran downstairs and collapsed on the steps when she saw J.G. standing,

uninjured, beside the officers.  The plainclothes officer who was standing with J.G.

approached Ligon, laughing, and handed her the ketchup.[158]

       I find J.G.'s and Ligon's testimony credible.  J.G. provided no

grounds for suspicion of trespass — or indeed of any other crime — as he

approached his building.  He also provided no grounds for suspicion in his

responses to the officers' questions.  J.G. provided no further basis for a stop,

much less a frisk.  Because the officers did not ask J.G. whether he lived in the

building, it is unclear whether J.G.'s stop was based on the suspicion of trespass.

Nevertheless, because J.G. was only stopped as he approached a Clean Halls

building, because the officers' questions indicate no suspicion of any other crime

other than trespass, and because the parties have been unable to locate a UF-250

indicating otherwise, it remains more likely than not that J.G. was stopped on

---

[156]   *See id.* at 429:7–430:4.

[157]   *Id.* at 430:4–14.

[158]   *See id.* at 430:16–433:1.

suspicion of trespass — if his stop was indeed based on a particularized suspicion of any crime at all.

### d.    Jerome Grant's Stop

Jerome Grant, J.G.'s older brother and Ligon's son, testified that his grandmother, Betty Ligon, lives at 274 Bonner Place in the Bronx.[159]  274 Bonner Place is a Clean Halls building.[160]

Grant, who is black and nineteen years old, testified that the first time the police stopped him at his grandmother's building was in July 2011.  He had been playing basketball with his little brother J.A.G., his cousin, and a friend.  In the evening, the group needed to pick up a key from Grant's grandmother's house, so they began walking toward it and sent J.A.G. to run ahead.  J.A.G. went inside the building without leaving the door open, so the others knocked loudly on the door.[161]  Grant's cousin was "a little upset" by being locked out.[162]

Two uniformed male police officers, one white and one Asian, approached with flashlights and asked if Grant, his cousin, and his friend lived in

---

[159]    *See id.* at 452:13–25.

[160]    *See* Photo of 274 Bonner Place, Pl. Ex. 37.

[161]    *See* Tr. 10/17 at 451:21, 453:6–19, 454:17–455:17, 464:19–466:5.

[162]    *Id.* at 464:11.

the building, and if they were trespassing.  Grant explained that they were visiting their grandmother's apartment to get a key, and Grant's cousin asked if they were doing anything wrong.[163]  The Asian officer responded, "I'm the one that's talking here."[164]  When Grant's cousin said that he just wanted to know if there was a problem, the Asian officer told him to "hush up" and there would not be any problems.[165]  Then the officers made Grant, his cousin, and his friend stand with their backs against a wall and take out their IDs.[166]  When only Grant had an ID, the Asian officer told Grant's cousin and friend:  "I could take you in because you don't have ID."[167]  The Asian officer then wrote down Grant's cousin's and friend's names and birthdates in a notepad while the white officer did the same for Grant.[168]

Then the Asian officer returned Grant's ID and told the group to turn around and place their hands against the wall.  The Asian officer asked Grant's

---

[163]    *See id.* at 455:19–20, 456:8–12.

[164]    *Id.* at 456:13.

[165]    *Id.* at 456:18–19.

[166]    *See id.* at 456:21–457:5.

[167]    *Id.* at 457:15.  I know of no law stating that failure to carry an ID, standing alone, provides probable cause for an arrest.

[168]    *See id.* at 457:18–21.

cousin whether he had any drugs or blades in his pockets, then grabbed his shoulders and patted him down to the ankles, stopping to remove all the contents from his pockets.[169]   The white officer frisked Grant's friend and Grant.   Finally, the Asian officer told the group to put their backs against the wall again, warned them to carry their IDs with them, and explained that the officers had wanted to make sure the group was not trespassing.   J.A.G. came outside shortly after the officers left.   Grant testified that he did not feel free to leave until the officers told him to go home.[170]

I find Grant's testimony largely credible, though it conflicted in certain minor details with his deposition testimony.[171]   Defendants argue that the officers approached based on the group knocking on the door, rather than on the suspicion of trespass.[172]   But I accept Grant's testimony that the John Doe defendant Asian officer mentioned trespassing as the basis for the stop.[173]

### e.   Roshea Johnson's Stop

---

[169]   Again, as in the cases of Bradley and J.G., the officer's conduct clearly exceeded the constitutional bounds of a frisk.

[170]   *See id.* at 458:3–459:21, 461:4–24, 462:3–5.

[171]   For example, Grant stated at the deposition that the Asian officer frisked all three members of the group.  *See id.* at 467:8–9.

[172]   *See* Def. Findings ¶ 19.

[173]   *See* Tr. 10/17 at 461:4–19.

54

Roshea Johnson is the brother of plaintiff Letitia Ledan.[174]  From 2001 through 2010, Johnson lived at River Park Towers, a complex of buildings in the Bronx.  Sometimes he lived with Ledan, and at other times with a friend.  River Park Towers is enrolled in Operation Clean Halls.[175]

On the morning of Father's Day 2010, Johnson, who is black and was then thirty-four years old, went to Ledan's apartment to change into clothes he had left there.  To enter River Park Towers, it is not necessary to pass through security or a closed gate, or to have a key.  Johnson walked into Ledan's building and took the elevator to her floor.  When he knocked at Ledan's door, there was no answer. He went back to the elevator and returned to the ground floor, planning to call Ledan on the payphone in front of a supermarket in the complex.[176]

As Johnson crossed the street to the payphone, a black van pulled up with police officers inside.  One officer asked him where he was coming from.[177]

---

[174]   *See* Tr. 10/16 at 394:2–395:2.  Roshea Johnson is unrelated to plaintiff Kieron Johnson.  *See id.* at 393:20–22.

[175]   *See id.* at 298:11–19, 394:2–395:2.

[176]   *See id.* at 394:3–399:7.

[177]   *See id.* at 399:21–400:13.  Defendants have not located a UF-250 connected to Roshea Johnson's stop, or identified the officers involved in the stop, despite Roshea Johnson's precise identification of the time and place of his stop and his detailed physical descriptions of the officers. *See* Musick Chart (incident 11); Tr. 10/16 at 401:20-402:3.

Johnson told the officer he was coming from his sister's house but she was not home.[178]   Then the officer "mentioned something about trespassing."[179]   Johnson tried to tell the officer that he could prove he was not trespassing, and that he had a letter in his pocket with his name and his sister's address on it.   The officer responded by handcuffing Johnson and placing him in the back of the van.[180]

The officers then drove the van to another part of the complex and questioned Johnson.[181]   One of the officers asked Johnson "where was the drugs or the guns at."[182]   Johnson said he "didn't know where the drugs or the gun was."[183] The officers continued asking similar questions for a few minutes, then pulled out of the complex.[184]   During the drive, the officers "said you could make it easy on yourself if you tell us where the guns and the drug was, but I didn't know where no guns or drugs was."[185]   Finally, after about fifteen or twenty minutes, the officers

---

[178]   *See* Tr. 10/16 at 400:14–15.

[179]   *Id.* at 400:17.

[180]   *See id.* at 400:17–401:18.

[181]   *See id.* at 402:4–22.

[182]   *Id.* at 402:19–20.

[183]   *Id.* at 402:21–22.

[184]   *See id.* at 402:23–403:8.

[185]   *Id.* at 403:11–13.

pulled over at a location about a mile from River Park Towers, opened the door, and told Johnson to get out of the van.[186]  "When I got out of the van, he said maybe you don't know nothing, and took the handcuffs off me and let me go."[187] Looking back, Johnson said that the encounter made him feel "angry and kind of helpless."[188]

I find Johnson's testimony credible.  Johnson provided no grounds for suspicion of trespass as he entered and exited Ledan's building.  He also provided no grounds for suspicion in his interactions with the officers.  Nor did Johnson's conduct provide any other basis for a stop.

### f.    Letitia Ledan's Stops

Letitia Ledan, Roshea Johnson's sister, testified that she has lived at River Park Towers for the past eleven years.  She chairs the maintenance and elevator committee in the tenants' association.  As noted above, River Park Towers is enrolled in Operation Clean Halls.[189]

Ledan, who is black, testified that she has been stopped six times in or

---

[186]    *See id.* at 403:15–20, 403:25–404:3.

[187]    *Id.* at 403:18–20.

[188]    Tr. 10/17 at 417:21–23.

[189]    *See* Tr. 10/16 at 297:2–298:19.

around her building.  Twice the stops occurred outdoors.  The first took place at some time in 2009, although she could not provide a more precise date.  Two white male officers stopped her in front of a supermarket in the River Park Towers complex as she was about to leave the complex.  They asked her whether she lived there and whether she had an ID, then took her ID, looked at it, handed it back to her, and said to have a nice day.  During the roughly three-minute encounter, she did not feel free to leave because the officers were standing in front of her and had her ID.[190]

Ledan's second outdoor stop occurred in the summer of 2011.  Ledan was returning home from work in the afternoon and saw four uniformed police officers standing with her husband and two of her friends in front of her building.  While one of the officers patted down one of Ledan's friends, another was patting down Ledan's husband and removing items from his pockets.  As Ledan approached her building, she asked what was going on.[191]  Then an officer approached her, and she asked, "[W]hy are you stopping us?"[192]  The officer told her to be quiet and asked whether she lived at the building, then asked for her ID,

---

[190]   *See id.* at 300:22–24, 301:1–14, 302:5–25, 317:18–25.

[191]   *See id.* at 306:16–308:8.

[192]   *Id.* at 308:8–10.

which she gave to him.[193]  After returning her ID and finishing the search of her husband and friends, the officers "just started walking away."[194]  As in 2009, Ledan did not feel free to leave during the encounter because the officer blocked the entrance to her building and had her ID.[195]

I find Ledan's testimony as to both encounters credible.  Plaintiffs have failed to establish, however, that Ledan's encounters constituted *Terry* stops. Despite Ledan's subjective feeling that she was not free to leave in the first encounter, Ledan's limited testimony tended to show that the officers approached and asked her questions politely and not in an aggressive, coercive, or threatening manner.  "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; [and] ask to examine the individual's identification . . . as long as the police do not convey a message that compliance with their requests is required."[196]  Ledan's testimony did

---

[193]   *See id.* at 308:10–19.

[194]   *Id.* at 308:19–309:4.

[195]   *See id.* at 328:22–330:4.

[196]   *Bostick*, 501 U.S. at 434–35 (collecting cases) (citations omitted). *Accord Delgado*, 466 U.S. at 216 ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded.").

not provide adequate evidence that the police conveyed a message that compliance with their requests was required, and thus that she was not free to terminate the encounter.

Similarly, Ledan's testimony concerning her second encounter with the police suggested that it was consensual. Without delving into the intricacies of Fourth Amendment case law concerning consensual stops,[197] the Supreme Court has made clear that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."[198] Ledan testified that in her second encounter, she approached the police, initiated the encounter, and questioned the police before being questioned by them. Based on this testimony, I find that Ledan's second encounter was most likely consensual.

---

[197] Even when the Supreme Court has found consent for a search, it has held that the "terminate the encounter" standard defines a *Terry* stop. *See, e.g.*, *Drayton*, 536 U.S. at 200–01 ("The proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" (quoting *Bostick*, 501 U.S. at 436)). *See also* LAFAVE, SEARCH & SEIZURE § 9.4(a) ("[I]t does not appear . . . that the *Mendenhall-Royer* ['free to leave'] test is intended to divide police-citizen encounters into their seizure and nonseizure categories by reliance upon the amorphous concept of consent.").

[198] *Drayton*, 536 U.S. at 200 (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)).

### g.    Fernando Moronta's Stop

Fernando Moronta, who is Latino, was thirty-six years old at the time of the hearing.  He lives in a Clean Halls building in the Bronx.  One day after work in the winter of 2008, Moronta went with his brother, Eladio Vasquez, to his brother's apartment building at 1453 Walton Avenue in the Bronx, which is also a Clean Halls building.[199]

When Moronta left the building at around 10:30 p.m., a police van pulled up and half a dozen uniformed officers exited and began questioning Moronta about where he was going and what he was doing in the building.  After Moronta explained that he had been at his brother's apartment, one of the officers asked if he had anything sharp in his pockets and then patted him down and searched his pockets.[200]  Then the officer asked if they could go upstairs to confirm Moronta's story, and Moronta gave his permission.  A white officer asked for Moronta's ID.[201]  On the way up in the elevator, a black officer told Moronta that he "better be telling the truth," because if Moronta's brother did not live in the

---

[199]    *See id.* at 340:24–341:4, 342:1–343:13, 343:14–344; Pl. Findings ¶ 43 ("Eladio").

[200]    Once again, as in the searches of Bradley, J.G., and Grant, the officer violated the Fourth Amendment by exceeding the constitutionally permissible scope of a frisk.

[201]    *See* Tr. 10/16 at 344:24–346:11.

building, Moronta would be arrested for trespassing.[202]

At the door, Moronta's brother identified Moronta, and after the white officer compared the name given to the name on Moronta's ID, "he looked at me and smirked and gave my ID back."[203]  On the way down the elevator, the officers explained that they had stopped Moronta because "the neighborhood is bad, got drugs and stuff like that."[204]  Moronta stated that he did not feel free to leave until he left his brother's building.[205]

I find Moronta's testimony credible.  Moronta provided no grounds for suspicion as he exited his brother's building, or in his responses to the officers' questions.  Moronta's conduct provided no other basis for a stop.

### h.    Kieron Johnson's Stop

Kieron Johnson, who is black, was twenty-one years old at the time of

---

[202]    *Id.* at 346:14–18.

[203]    *Id.* at 346:19–347:4.

[204]    *Id.* at 347:6–9.

[205]    *See id.* at 346:12–349:1.  Moronta's initial inability to remember whether the stop occurred in the winter of 2007 or of 2008 does not significantly undermine his credibility.  *See id.* at 350:12–24.  Defendants also note that plaintiffs' Complaint alleges that Moronta's stop occurred in 2010.  *See* Def. Findings ¶ 22 n.10; Compl. ¶ 129.  But Moronta testified that he had not looked at the Complaint closely enough to notice the error until three days before his hearing testimony, and that plaintiffs' counsel may have confused the stop to which he testified with an arrest for trespass in 2010.  *See* Tr. 10/16 at 350:22–352:18.

the hearing.  He lives in a Clean Halls building in the Bronx and testified to having been stopped in or near Clean Halls buildings seven or eight times, and to having seen others stopped about ten times.  His best friend, plaintiff Jovan Jefferson, lives across the street at 1546 Selwyn Avenue, another Clean Halls building.[206]

On a warm day in 2010, around noon, Jefferson invited Johnson over to play basketball.  Johnson went to Jefferson's building and waited outside, about six steps away from the door.[207]  After about two minutes, two uniformed officers "pulled up in a car and . . . jumped out and ran out and around me."[208]  One asked whether Johnson had been in the building.  After he replied that he had not, one of the officers asked for his ID while the other patted down his front pockets and reached into his back pockets, where he kept his wallet.[209]  The officer looked through his wallet, then the other officer returned his ID and told him he was free to go.  Until then, Johnson did not feel free to leave.[210]

---

[206]   *See* Tr. 10/16 at 377:11–379:22.

[207]   *See id.* at 380:1–381:11.

[208]   *Id.* at 381:12–23.

[209]   Yet again, as in the cases of Bradley, J.G., Grant, and Moronta, the officer who searched Johnson violated Johnson's Fourth Amendment rights by reaching into his pockets during a frisk without a reasonable basis in self-protection.

[210]   *See id.* at 382:6–383:5.  Johnson stated that after the incident, he felt "[e]mbarrassed and worried," because "there's usually people outside and I don't

I find Johnson's testimony credible, despite his inability to offer a more precise date for the stop. Defendants argue that Johnson's stop was not for trespass, because he testified that at the time of the stop, he believed the officers were truancy officers.[211] But defendants offer no persuasive evidence that the officers were, in fact, truancy officers.[212] Even if the officers were truancy officers, defendants fail to show how this fact would undermine plaintiffs' claim that Johnson was stopped on suspicion of trespass.[213] Presumably truancy officers are no less able to make trespass stops than any other kind of officer. Moreover, Johnson's testimony that the officers asked him whether he had been inside the building suggests a trespass stop.[214] Based on Johnson's testimony, I find that he provided no grounds for suspicion of trespass as he waited outside Jefferson's building, in his responses to the officers' questions, or in any other manner.

### i.   Jovan Jefferson's Stop

Jovan Jefferson, who is black, was twenty years old at the time of the hearing. As noted above, he lives in a Clean Halls building in the Bronx.

---

like when they see me being stopped by officers." *See id.* at 384:7–10.

[211]   *See id.* at 385:4–13; Pl. Findings ¶ 17.

[212]   *See* Tr. 10/16 at 385:4–387:19, 389:8–391:5, 392:3–10.

[213]   *Cf. id.* at 387:21–23.

[214]   *See id.* at 382:6–10.

Jefferson testified that he had been stopped outside Clean Halls buildings about seven to eight times, and inside Clean Halls buildings about three to four times. Jefferson's friend Brandon Muriel lives at 1515 Selwyn Avenue, another Clean Halls building in the Bronx.[215]

       Jefferson testified that his most recent stop outside a Clean Halls building occurred between April and June 2012.  He and Muriel had been watching SportsCenter in Muriel's apartment when Muriel left for work.  It was shortly after noon as the two of them stepped out of Muriel's building.[216]  A passing police van stopped and three officers got out, including two that Jefferson recognized as officers named "Marquez" and "Rodriguez."[217]  Jefferson testified that these officers had previously stopped him inside his building, and had arrested Kieron Johnson for trespass inside Jefferson's building at a time when Jefferson was with him.  The officers had also arrested another friend of Jefferson's for trespass.[218]  I

---

[215]    *See id.* at 359:17–361:14.

[216]    *See id.* at 361:15–362:16.

[217]    *Id.* at 362:18–363:15; Compl. ¶ 83.  Officer Luis Rodriguez testified to being a truancy officer who patrolled Selwyn Avenue between April and June 2012.  *See* Tr. 10/22 at 1067:1–18.  Rodriguez testified that he recognized Jefferson but did not remember stopping him between April and June 2012.  *See id.* at 1068:8–1069:5.

[218]    *See* Tr. 10/16 at 363:14–364:8.

find it more likely than not that Rodriguez participated in the stop that Jefferson described.

Rodriguez asked Jefferson and Muriel where they were coming from and why they were in the building. The officers also asked Muriel for his ID. Then Jefferson's mother drove by with his aunt.[219] After his mother got out and approached the officers, Rodriguez stated that Jefferson was "free to go and that he was just talking to me."[220] Jefferson testified that he did not feel free to leave before his mother approached.[221]

I find Jefferson's testimony largely credible, despite his failure during his deposition to remember the stop to which he testified at the hearing.[222] Given the number of times Jefferson has apparently been stopped, it is understandable that he might forget one and then remember it later, just as it would be understandable if a police officer were unable to remember a relatively brief, unrecorded stop. I find that neither Jefferson nor Muriel provided grounds for

---

[219]   *See id.* at 364:22–365:17.

[220]   *Id.* at 365:7–13.

[221]   *See id.* at 366:13–15. He also stated that the stop made him feel the officers were biased "because I am being stopped all the time just because of the kind of neighborhood that I live in." *Id.* at 366:16–22.

[222]   *See id.* at 370:11–372:3.

suspicion of trespass as they exited Muriel's building, as they responded to the officers' questions, or in any other manner.

### 3.    Expert Testimony Regarding UF-250 Forms

Plaintiffs' expert witness, Dr. Jeffrey Fagan, is a criminologist with expertise in statistics.[223]  Dr. Fagan performed a statistical analysis of data contained on certain UF-250 forms completed by NYPD officers in the Bronx in 2011.[224]  As noted above, officers are required to complete a UF-250 form after each stop.[225]  The front and back of the form contain various checkboxes and fields in which officers indicate the nature of the stop and the circumstances that led to the stop.[226]

Dr. Fagan ultimately concluded that the NYPD recorded 1,663 stops outside a Clean Halls building in the Bronx in 2011 based only on a suspicion of trespass, and without observing any indoor behavior.[227]  Of these stops, Dr. Fagan

---

[223]    *See Floyd v. City of New York*, 861 F. Supp. 2d 274, 279–80 (S.D.N.Y. 2012) (describing Dr. Fagan's qualifications).

[224]    *See* Fagan Report at 2.  Dr. Fagan extracted the data from the City of New York's Stop, Question, and Frisk Database.  *See id.*

[225]    *See id.* at 3; Tr. 10/15 at 69:24–70:1.  *See also infra* Part V.B.1.a (more detailed discussion of UF-250 forms).

[226]    *See infra* Appendix B ("App. B.").

[227]    *See* Fagan Report at 2–6 & nn.2–8 (analysis leading to original count of 1,857 stops); Apps. C–E to Fagan Report (exclusion of stops where indoor

concluded that 1,044 lacked any justification on the front or back of the UF-250 form that would have constituted reasonable suspicion of trespass.[228]  In other words, Dr. Fagan concluded that sixty-three percent of the recorded trespass stops outside Clean Halls buildings in the Bronx in 2011 where no indoor behavior was observed were not based on any articulated reasonable suspicion.[229]

      Defendants offer a number of arguments against Dr. Fagan's conclusions.  *First*, they argue that it is impossible to conclude whether reasonable suspicion existed for a stop based on a UF-250 alone because "it is a conclusory form that does not capture all details, nuances and circumstances that may lead to a stop."[230]  Defendants argue that Dr. Fagan had an obligation to incorporate into his

---

behavior was observed); Tr. 10/15 at 73:5–77:7 (general search method), 114:23–115:2 (exclusion of alleged NYCHA stops), 117:20–119:20 (recapitulation of general search method); Table 14: Period of Observation of Proximity Stops, Bronx Trespass Stops, 2011 ("Period of Observation Table"), Pl. Ex. 98 (stop totals at various stages of analysis).

    [228]    *See* Fagan Report at 15 tbl. 8; App. L to Fagan Report; Tr. 10/15 at 114:4–115:2.

    [229]    *See* Tr. 10/15 at 115:1–2.

    [230]    Def. Findings ¶ 3 n.1.  In *Arvizu*, the Supreme Court rejected the Ninth Circuit's attempt to clarify the reasonable suspicion standard by analyzing various stop factors in isolation as part of what the Supreme Court described as a "reasonable-suspicion calculus."  534 U.S. at 272.  The Supreme Court emphasized the importance of looking to the "'totality of the circumstances'" in reasonable suspicion analyses.  *See id.* at 273 (quoting *Cortez*, 449 U.S. at 417–18).  Dr. Fagan's report, though quantitative, attempts no such mechanistic analysis, because

analysis other sources of information, such as "911 calls or SPRINT Reports, memobooks, arrest and complaint reports, Trespass Crimes Fact Sheets, Owner's Affidavits and/or criminal court complaints."[231]  Defendants also criticize Dr. Fagan for having no expertise regarding police training on street stops and reasonable suspicion, and for having conducted no interviews with police personnel.[232]

If defendants believe that such research would have shown that reasonable suspicion existed for some or all of Dr. Fagan's 1,044 unlawful stops, defendants were free to conduct such research themselves and introduce evidence rebutting Dr. Fagan's conclusions regarding specific UF-250 forms.  Defendants

---

it does not claim to be the final word on whether reasonable suspicion existed for any individual stop in the UF-250 database.  *See* Fagan Report at 15 (identifying stops "where there *does not appear*" to be any combination of factors justifying a trespass stop (emphasis added)).  *Accord Floyd*, 861 F. Supp. 2d at 293 (noting that "(il)legality of a stop" cannot be "conclusively determined on the basis of paperwork alone," and clarifying that the UF-250 database "is necessarily an incomplete reflection of the totality of the circumstances leading to each stop").  Unlike a hearing on a single motion to suppress, this hearing aims to determine, based on necessarily limited data, whether the City and NYPD engaged in a widespread practice of constitutional violations.

[231]    Def. Findings ¶ 7.

[232]    *See id.* ¶ 4.

did not.[233]  In general, as I stated when evaluating Dr. Fagan's methods in *Floyd*,

the contents of UF-250s are admissible and probative.[234]  As defendants themselves

emphasize, officers are required to record *all* the reasons justifying a stop,[235] and

the UF-250 provides spaces for officers to record any reason.[236]  To the extent that

plaintiffs used the UF-250 database primarily to estimate the magnitude of the

problem at issue in this case, plaintiffs were under no legal obligation to

supplement "the extremely rich and informative material"[237] contained in the UF-

---

[233]   Similarly, defendants speculate that some of the buildings Dr. Fagan identified as Clean Halls buildings might not have been enrolled in Clean Halls on the date of the stop.  *See id.* ¶ 10.  Yet defendants fail to identify a single stop for which this was actually the case.

[234]   *See Floyd*, 861 F. Supp. 2d at 290–91.  Defendants' expert misquotes this earlier opinion as flatly holding that "it would be improper to declare certain stops 'unjustified' and others 'justified' on the basis of paperwork alone."  Report of Defendant[s'] Expert Dr. Dennis Smith in Response to Plaintiffs' Expert Dr. Jeffrey Fagan ("Smith Report"), Def. Ex. JJJJ, at 3 n.3 (quoting *Floyd*, 861 F. Supp. 2d at 291).  In fact, the quoted sentence continues:  "*without offering any qualifications*:  a perfectly lawful stop cannot be made unlawful because the arresting officer has done a poor job filling out the post-arrest paperwork; nor can an egregiously unlawful stop be cured by fabrication of the paperwork."  *Floyd*, 861 F. Supp. 2d at 291 (emphasis added).  Plaintiffs have presented Dr. Fagan's conclusions in the instant case with the appropriate qualifications.

[235]   *See* Def. Findings ¶ 4 ("NYPD training evidence . . . clearly identifies that its officers are instructed to include *all* circumstances leading to the stop on the worksheet[.]" (citing Tr. 10/15 at 86:12–87:2)); Tr. 10/19 at 849:13–19 (testimony of NYPD Chief James Shea).

[236]   *See* App. B.

[237]   *Floyd*, 861 F. Supp. 2d at 292.

250 database with other paperwork or testimony.

In any case, even if there are reasons to believe that Dr. Fagan's exclusive reliance on UF-250s led to inaccuracies, the inaccuracies generally favored defendants, not plaintiffs.  UF-250s present a one-sided picture of a stop: they are completed not by neutral third parties, or with the cooperation of the stopped person, but by officers who have obvious incentives to justify the stops they have made.[238]  More significantly, evidence from the hearing suggested that many stops take place for which no UF-250 form is ever generated.  Sgt. Musick failed to identify a single UF-250 form for any of the eleven stops to which plaintiffs testified,[239] and in both of the stops where officers were clearly identified, the officers admitted that they had failed to complete a UF-250 for the stop.[240]  Plaintiffs also introduced two reports by the Civilian Complaint Review Board ("CCRB") stating that there is a systemic problem with officers failing to complete

---

[238]    This conclusion receives anecdotal support from Officer Santiago's erroneous paperwork regarding Bradley's arrest, which tended to overstate rather than understate the justifications for the arrest.  *See* Bradley Fact Sheet.

[239]    *See* Tr. 10/23 at 1125–1143.

[240]    *See* Tr. 10/22 at 1024:2–7 (Officer Ramdeen's failure to complete UF-250 for Turner's stop); Tr. 10/23 at 1110:3–18 (Officer Santiago's failure to complete UF-250 for Bradley's stop).

UF-250 forms after stops.[241]

In light of the above, I reject defendants' contention that the sole reliance on UF-250 forms as a statistical tool provides a categorically inadequate basis for determining the rough magnitude of unlawful stops in this case. I also find that failures to fill out UF-250 forms likely led to a significant undercounting of both lawful and unlawful stops in Dr. Fagan's analysis.

*Second*, defendants attack Dr. Fagan's analysis based on his failure to take account of a field on the UF-250 labeled "Period of Observation Prior To Stop."[242] Defendants correctly note that the location field that Dr. Fagan matched to Clean Halls addresses indicates not the location of the suspected trespass but the location of the stop.[243] According to defendants' theory, Dr. Fagan's analysis overcounted the number of outdoor stops based on suspicion of trespass in Clean

---

[241]    *See* CCRB 2010 Annual Report, Pl. Ex. 78, at 13 (2010 report describing failure to fill out UF-250s as "major failure[]"); CCRB 2011 Annual Report, Pl. Ex. 79, at 14 (2011 Report describing same as "major categor[y] of failure"). I note that the NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck may be read as suggesting, erroneously, that UF-250s need not be prepared when a stop results in arrest:  "If the investigation does not lead to an arrest the individual must be released immediately, and a UF-250 must be prepared." NYPD Legal Bureau, Street Encounters PowerPoint Presentation ("Street Encounters Presentation"), Def. Ex. J, at 27. *But see id.* at 33 (stating that a UF-250 must be prepared for every stop that is based on reasonable suspicion).

[242]    *See* Def. Findings ¶ 6; App. B.

[243]    *See* Tr. 10/15 at 45:14–47:4.

Halls buildings because officers may have stopped someone near a Clean Halls building on suspicion of trespass in a nearby building.[244]  As defendants conceded in their opening argument, however, the possibility of a discrepancy between the location of the suspected trespass and the location of the stop "cuts both ways."[245] Just as Dr. Fagan's analysis might erroneously include stops that were in fact based on suspicion of trespass in a building near a Clean Halls building, so might his analysis erroneously exclude stops that were based on suspicion of trespass in a Clean Halls building but took place elsewhere.[246]  I am not persuaded that one effect would be larger than the other.

On the other hand, there is some validity to defendants' argument that Dr. Fagan's method might have failed to exclude stops based wholly or in part on observations of indoor behavior, despite Dr. Fagan's attempt to exclude these stops.[247]  Dr. Fagan assumed that whenever an officer checked "Outside" rather than "Inside" on a UF-250 and gave no indication elsewhere on the form of having

---

[244]    *See* Def. Findings ¶¶ 6, 10; Tr. 11/7 at 1309:9–1310:22.

[245]    Tr. 10/15 at 47:1–4.  *Accord* Fagan Report at 5–6 (noting underinclusive results of Dr. Fagan's "exact match" method).

[246]    I address below defendants' argument that the period of observation field could contribute to reasonable suspicion.

[247]    *See* Def. Findings ¶ 10.

observed indoor behavior,[248] the officer's suspicion was not based at all on an
observation of indoor behavior.[249]   But it is easy to imagine an officer observing
behavior inside a Clean Halls building, making a stop outside, checking the
"Outside" box as a result of the stop location, describing the location of the
outdoor stop in greater detail in the "Type of Location" field, and failing to
indicate elsewhere on the form that all or part of the observed behavior took place
inside.

Nonetheless, defendants have failed to show why it was necessary for
Dr. Fagan to exclude all stops involving the observation of indoor behavior in the
first place.   An outdoor stop based on the observation of *unsuspicious indoor*
behavior may be just as unconstitutional, and just as potentially relevant to
establishing a pattern of unlawful trespass stops outside Clean Halls buildings,[250] as

---

[248]    According to plaintiffs, the UF-250 database fields that could contain
text suggesting an observation of indoor behavior included the field called
"premname," as summarized in App. D to the Fagan Report, and the field called
"detailSA," as summarized in App. E to the Fagan Report.

[249]    *See* Fagan Report at 3–4; Tr. 10/15 at 73:8–77:7, 128:1–130:16.

[250]    *See* Pl. Findings ¶ 69 (stating plaintiffs' claim as follows:  "[T]he
defendants have a pattern and practice of unlawful stops on suspicion of
trespassing outside TAP buildings in the Bronx.").   Some of the text strings in
Fagan Report Appendices D and E that indicate indoor behavior also indicate
reasonable suspicion for a trespass stop, such as "DRINKING IN REAR OF
BUILDING," and "STAIRWELL DRINKING."   App. E to Fagan Report.   Many
others, however, do not.   *See* App. D to Fagan Report (excluding stops with text

a stop based solely on the observation of *unsuspicious outdoor* behavior near a

TAP building, or a person exiting a TAP building.  Perhaps Dr. Fagan attempted to

exclude all stops involving the observation of indoor behavior because these stops

as a group tend to have a greater likelihood of being based on *reasonable*

suspicion, especially if the officer observed the person indoors for a long period of

time.  If so, the exclusion was a gesture of methodological conservatism,[251] and the

apparent unfeasibility of perfectly executing the exclusion should not be held

against plaintiffs.  While Dr. Fagan's methods may have failed to exclude some

stops that were preceded by an observation of indoor behavior, this failure, by

itself, is unlikely to have any significant impact on the validity of Dr. Fagan's

conclusions.[252]

> *Third*, defendants criticize Dr. Fagan for having departed from

———————————————

strings such as "LOBBY," and "VESTIBULE"); App. E to Fagan Report (same
with text strings such as "INSIDE CLEAN HALLS," and "SUSPECT
OBSERVED INSIDE CLEAN HALL BUILDING").

[251]     Dr. Fagan's testimony suggested that he attempted to exclude any stop
that was "not *purely* an outdoor stop."  *See* Tr. 10/15 at 74:3–5 (emphasis added).

[252]     A similar argument applies to defendants' assertion that Dr. Fagan's
method failed to exclude some stops that took place outside a Clean Halls building
but within the legal limits of the property on which the building sits.  *See* Def.
Findings ¶ 10; Tr. 10/15 at 128:1–9.  An unconstitutional stop outside a Clean
Halls building but within the property line can support the existence of a pattern of
unconstitutional stops outside Clean Halls buildings just as well as an
unconstitutional stop a few steps outside the lot boundary.

methods he used to analyze UF-250 forms in *Davis* and *Floyd*.[253]   I decline to evaluate Dr. Fagan's simple methods in the instant case through the circuitous route proposed by defendants of analyzing Dr. Fagan's far more complicated methods in the other two cases, determining whether those methods were valid, comparing those methods to Dr. Fagan's methods in the instant case, analyzing whether Dr. Fagan's methods in the instant case are consistent with the methods in the other two cases, and then, if any inconsistency arises, rejecting Dr. Fagan's methods in the instant case on that basis.  Instead, I will simply evaluate the validity of Dr. Fagan's methods in the instant case on their own terms.

Furthermore, it would be entirely understandable if the application of the method from *Floyd* to the instant case resulted in a lower count of unlawful stops than the method Dr. Fagan used here.  The explanation for such a discrepancy is apparent.  Dr. Fagan used more conservative assumptions throughout *Floyd* than in the instant case, and with valid reason.[254]  The universe of stops that *Floyd* analyzes for unconstitutionality is vastly larger than the universe

---

253     *See* Def. Findings ¶ 4 (citing generally Dr. Fagan's analyses in *Floyd* and *Davis*).

254     For example, Dr. Fagan assumed in *Floyd* and *Davis*, which also dealt with a far larger universe of stops, that Furtive Movements in combination with High Crime Area should be coded as constituting reasonable suspicion.  *See* Tr. 10/15 at 151:2–5.

analyzed for unconstitutionality as part of the instant motion — 2.8 million stops

versus 1,663.[255]  As a result, the plaintiffs in *Floyd* have less of a need for precision

than plaintiffs in the instant case.  That does not mean that plaintiffs' precision in

the instant case is spurious.  Dr. Fagan's credibility should hardly be questioned in

the instant case simply because, for whatever strategic or pragmatic reasons, he

chose cautious but more manageable methods in another case that might result in a

large number of unlawful stops being coded as lawful.  Once again, the relevant

question in evaluating Dr. Fagan's methods in the instant case is whether the

methods are valid here, not whether they are identical to the methods used in a

different case based on a different universe of stops.[256]

 *Fourth*, defendants persuasively note that Dr. Fagan's analysis,

---

[255] *Compare Floyd*, 861 F. Supp. 2d at 278, *with* Period of Observation Table.

[256] In addition, I note that the method in *Floyd* aims to identify stops for which no reasonable suspicion of *any* crime exists, whereas the method in the instant case aims to identify stops for which no reasonable suspicion of *trespass* exists.  Given a universe of forms recording stops based only on suspicion of trespass, there may be some forms containing data that could arguably constitute reasonable suspicion of some crime, but not of trespass.  The *Floyd* method will identify these stops as arguably lawful, while Dr. Fagan's method in the instant case will identify them as apparently unlawful.  As a result, Dr. Fagan's method in the instant case will result in a higher count of unlawful stops than his method in *Floyd*.  This does not imply bad faith or a contradiction in Dr. Fagan's methods, much less prove the invalidity of Dr. Fagan's method in the instant case.  *Floyd* and *Ligon* simply aim to assess different sets of stops.

standing alone, does not provide a convincing methodology for establishing a

causal nexus between the Clean Halls program and the stops that Dr. Fagan

analyzed.[257]  As Dr. Smith, stated in his report:

> Professor Fagan's methodology, by its very nature, cannot
> distinguish between whatever impact Clean Halls may have had
> on the pattern of *Terry* stops in the Bronx [and] the impact other
> factors . . . might have had on that same pattern. . . . [I]t would be
> invalid to conclude that Professor Fagan has demonstrated that the
> Clean Halls program itself, and its implementation, *caused* the
> outcomes Professor Fagan observes and the Plaintiffs challenge.[258]

In essence, Dr. Fagan selected a set of stops from the UF-250 database

based on several selection criteria — the stops had to be in the Bronx, on suspicion

of trespass only, at the location of a Clean Halls address, outside, and so on[259] —

and then determined how many of the stops in the set were unjustified.  This

approach cannot show whether stops in the set were more likely to be unjustified

than stops in the UF-250 database in general, or stops in some other relevant set.

Much less can this approach show that belonging to the set *causes* an increased

likelihood that a stop will be unjustified.  Just as Dr. Fagan analyzed the number

---

[257]   *See* Def. Findings ¶ 3 (citing Tr. 10/23 at 1172–77; Smith Report at 7–29).

[258]   Smith Report at 8 (emphasis added).

[259]   *See* Fagan Report at 8 tbl.1; Tr. 10/15 at 83:15–85:7, 124:25–126:17 (excluding stops at NYCHA addresses).

and percentage of trespass stops outside Clean Halls buildings that were unjustified, one could analyze the quantity of unjustified trespass stops outside any arbitrary category of building — such as green buildings, or buildings with odd-numbered addresses.  If, hypothetically, the police were making a large number of unjustified stops throughout New York City, the analysis would show that a large number of stops outside odd-numbered buildings were unjustified.  It would obviously be inappropriate to infer from this that the police had a customary practice of making unlawful stops outside odd-numbered buildings, or to grant a preliminary injunction requiring the police to conduct specific training regarding stops outside odd-numbered buildings.[260]

Thus, defendants are correct that Dr. Fagan's analysis, standing alone, cannot establish a causal nexus between Clean Halls buildings and unlawful trespass stops.  But plaintiffs have already established a clear likelihood of proving such a nexus based on other evidence.  ADA Rucker credibly testified to the police

---

[260]    Plaintiffs imply in their Reply Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Reply Mem.") that it is not necessary for plaintiffs to prove "that officers are stopping people *because* the building is enrolled in the Clean Halls program."  Reply Mem. at 3.  But as the analogy to the odd-numbered building hypothetical suggests, this cannot be correct.  Plaintiffs' request for preliminary relief depends on there being a *specific* problem involving stops outside Clean Halls buildings, a problem that can only be partially solved by improving the *general* training regarding the law of stop and frisk.

repeatedly making unjustified trespass stops and arrests outside Clean Halls buildings *because* they were Clean Halls buildings.[261]   One plaintiff testified that an officer explained an unlawful trespass stop based on the fact that it took place outside a Clean Halls building.[262]   As discussed below, an officer in the NYPD's Legal Bureau learned through focus groups with sergeants and lieutenants that they believed it was legal to approach and question, if not stop, anyone in a TAP building even without a reason for doing so.[263]   Finally, on 417 of the UF-250s in Dr. Fagan's original universe of 1,857 trespass stops outside Clean Halls buildings, officers handwrote phrases or words to the effect of "Clean Halls" or "Trespass Affidavit."[264]   The purpose of a UF-250 is to record the circumstances that led to an

---

[261]   *See supra* Part IV.A.1.

[262]   *See* Tr. 10/17 at 481:7–482:8 (Hispanic officer in Turner stop).   I also note — though the evidence does not relate directly to the *outdoor* stops at issue in this case — that Officer Santiago testified that even after receiving the NYPD's stop and frisk training at Rodman's Neck, he still believed there was legal justification to ask anyone in the lobby or hallways of a Clean Halls building for an ID, even in the absence of any suspicion, reasonable or otherwise.   *See* Tr. 10/23 at 1111:2–1113:10.   Officer Santiago attempted to qualify this rule by stating that the building needed to be in a high crime area in order to justify a request for ID.   *See id.* at 1111:9–22.   He then undermined this qualification by stating, categorically, that all Clean Halls buildings are in high crime areas.   *See id.* at 1111:24–1112:1.

[263]   *See* Tr. 10/18 at 648:18–649:16.

[264]   *See* Tr. 10/15 at 124:18–24.

officer's stop.[265]  The frequency with which officers took the time to note "Clean Halls" on a form, even though there is no specific field or checkbox and no reason for doing so,[266] suggests that many officers thought a building's enrollment in Clean Halls contributed to the justification for the stop.

*Fifth*, defendants challenge the methods and assumptions Dr. Fagan followed in processing the information contained on UF-250 forms into conclusions regarding the number of unlawful stops.[267]  Not surprisingly, defendants argue that many of the forms Dr. Fagan identified as lacking an articulation of reasonable suspicion in fact contained such an articulation.  Because these arguments involve mixed questions of fact and law that depend on a fine-grained analysis of what constitutes reasonable suspicion, I will address them in my conclusions of law below.[268]  In any case, the facts regarding how Dr. Fagan counted the number of unlawful stops are not in material dispute.

Based on the testimony of plaintiffs and others, the decline to prosecute forms, and the statistical analysis performed by Dr. Fagan and discussed

---

[265]     *See id.* at 123:17–20.

[266]     *See id.* at 124:14–17; Tr. 10/22 at 1058:24–1059:2, 1072:9–19; Tr. 10/23 at 1110:23–1111:1; App. B.

[267]     *See* Def. Findings ¶¶ 3, 6, 8–10.

[268]     *See infra* Part V.B.1.a.

in greater detail below, I find that plaintiffs have shown a clear likelihood of laying a sufficient factual foundation to prove that defendants have engaged in a widespread practice of making unlawful trespass stops outside TAP buildings in the Bronx.

### B.    Steps Taken by the NYPD in 2012

TAP began in the early 1990s in Manhattan.[269]  Despite the program's name, TAP was originally focused not on trespass but on narcotics sales taking place in the common areas of private buildings, such as lobbies, stairwells, and rooftops.[270]  An officer who testified regarding the origins of TAP stated that "[t]he more that we cracked down on drug sales on the street, the more that you saw drug dealers move indoors."[271]  Before TAP, officers had to deal informally with

---

[269]    *See* Tr. 10/17 at 519:8–520:16; Smith Report at 10–11; NYPD Legal Bureau, Trespass Affidavit Program: Legal Guidelines for Citizen Encounters in Trespass Affidavit Buildings ("1999 TAP Legal Guidelines"), Def. Ex. O, at 1. When TAP expanded to the Bronx, it was called "Clean Halls," though as of May 2012 the NYPD has begun referring uniformly to the program as TAP.  *See* Tr. 10/17 at 520:17–521:7.  In Queens, TAP was referred to, inexplicably, as "FTAP." *See id.*

[270]    *See* Tr. 10/17 at 519:23–520:16.  For the historical background of the War on Drugs, see WILLIAM J. STUNTZ, THE COLLAPSE OF AMERICAN CRIMINAL JUSTICE 23–26, 267–74 (2011); MICHELLE ALEXANDER, THE NEW JIM CROW 40–58 (2010).

[271]    Tr. 10/17 at 519:14–16.

landlords to get permission to enter private buildings in search of drug sales.[272]

TAP provided a formal process for building owners to permit officers to conduct

"vertical patrols" inside the buildings.[273]

Defendants were unable to produce a single written policy or

procedure governing any aspect of TAP between the program's origins in the early

1990s and the issuance of two orders in 2012, discussed below.[274]  Nor did

defendants produce evidence that the NYPD conducted any training or created any

training materials specific to TAP before 2012.[275]  Nor did the NYPD have an

---

[272]     *See id.* at 519:8–520:6.

[273]     *See id.* at 519:23–520:6.

[274]     *See id.* at 633:13–17.  In 1999, the NYPD's Legal Bureau created its
"Legal Guidelines for Citizen Encounters in Trespass Affidavit Buildings."  *See*
1999 TAP Legal Guidelines.  One passage of the fourteen-page document states:
"IT SHOULD BE UNDERSTOOD THAT WHEN AN OFFICER IS NOT IN THE
BUILDING (E.G., SITTING ACROSS THE STREET IN AN R.M.P.), MERELY
OBSERVING AN INDIVIDUAL ENTERING AND EXITING THE BUILDING,
OR SIMPLY EXITING THE BUILDING, IS NOT ENOUGH TO CONDUCT A
STOP."  *Id.* at 6; Tr. 10/18 at 684:2–4.  But Inspector Sweet testified that he did
not know of anyone to whom the document had been distributed.  *See* Tr. 10/18 at
654:5–7.  Defendants argue that a document from 2000 called Patrol Guide 212-
59, "Vertical Patrol" (P.G. 212-59), Def. Ex. FFFF, governed TAP before the 2012
Interim Orders.  *See* Def. Findings ¶ 26 & n.15 (citing P.G. 212-59).  But P.G. 212-
59 provides general guidelines for conducting vertical patrols and makes no
mention of TAP or Clean Halls.  *See* Tr. 10/18 at 679:20–25.

[275]     For the first TAP-specific training and the absence of prior training,
see the numerous citations to the record at Pl. Findings ¶ 48 & n.7.

accurate and complete count of buildings enrolled in TAP prior to a survey

conducted in the summer of 2012.[276]

### 1.    NYPD Recognition of a Problem in TAP

The improvements to TAP in 2012 had their roots in earlier years.

Inspector Kerry Sweet, the executive officer of the NYPD Legal Bureau, testified

that by early 2010, he had become involved in a group that was examining vertical

patrols and trespass issues in NYCHA buildings.[277]  Inspector Sweet received

approval to examine these issues in the TAP program as well.[278]  In the summer of

2010 through 2011, Inspector Sweet conducted focus groups with sergeants and

lieutenants involved with TAP, and then with prosecutors and various NYPD

officials.[279]  Inspector Sweet learned that "there really wasn't a lot of direction

about the administration of the program."[280]  During his deposition, Inspector

Sweet testified that he also learned of "some confusion" regarding TAP stops:

> [O]fficers believe their role might have been as doorman [or]

---

[276]     *See* Tr. 10/19 at 773:23–775:14.  The survey revealed that there were over eight thousand buildings enrolled in TAP, including over three thousand in the Bronx.  *See id.*

[277]     *See* Tr. 10/17 at 511:10–514:17.

[278]     *See id.* at 521:13–23.

[279]     *See id.* at 523:13–524:5, 528:11–13, 531:6–533:1.

[280]     *Id.* at 524:6–7.

custodian, rather than a strict application of *De Bour*.  And once again, understanding that they needed that articulate reason to approach somebody and that if you were a doorman, you could approach everybody, but that is not the case.  . . .  [I]n TAP buildings, you have to have a reason to approach people.

. . .

I wasn't getting the sense necessarily that they were stopping people in their tracks, but they may have been asking everybody coming into a building, what are you doing here, what is your reason for being here.  And that obviously isn't what we want them to do nor is it probably the right thing to do under the *De Bour* standard.[281]

Inspector Sweet testified that Katherine Lemire, special counsel to Police Commissioner Raymond Kelly, attended meetings with Inspector Sweet where this problem was discussed.[282]

### 2.     Interim Orders 22 and 23 of 2012

After completing the focus groups in 2010 and 2011, Inspector Sweet helped to draft two new regulations to govern the TAP program:  Interim Orders

---

[281]     Tr. 10/18 at 648:18–649:16.  I note that Inspector Sweet's testimony regarding what officers said at the focus groups appears to refer to the practice of stops without reasonable suspicion *inside* TAP buildings, and thus does not necessarily indicate that Inspector Sweet was aware of the problem of unlawful stops outside TAP buildings.  At the hearing, Inspector Sweet also emphasized that his concern was with unlawful *approaches*, not unlawful *stops*.  *See id.* at 649:20–650:7.

[282]     *See id.* at 650:18–651:17.

("IOs") 22 and 23, both published in May 2012.[283]  IO 23 of 2012 addresses

various administrative issues relating to TAP, including procedures for enrolling

buildings in the program.[284]  IO 22 of 2012 lays out procedures for the conduct of

vertical patrols *inside* TAP buildings, with an emphasis on trespass arrests.[285]  It

provides explicit guidance regarding when stops are lawful based on the suspicion

of trespass in a TAP building.  The second page of the Order begins with an

italicized warning:

> *A uniformed member of the service may approach and question*
> *persons if they* [sic] *have an objective credible reason to do so.*
> *However, a uniformed member may not stop (temporarily detain)*
> *a suspected trespasser unless the uniformed member <u>reasonably</u>*
> *<u>suspects</u> that the person is in the building without authorization.*[286]

The next page, in a separate section, repeats the first sentence of this note, and then

continues, again in italics:

> *When reasonable suspicion exists, a STOP, QUESTION AND*
> *FRISK REPORT WORKSHEET shall be prepared as per P.G.*
> *212-11, "Stop and Frisk."  Some factors which may contribute to*

---

[283]    *See* Tr. 10/17 at 534:6–536:1; Interim Order 22 of 2012 ("IO 22 of 2012"), Def. Ex. A; Interim Order 23 of 2012 ("IO 23 of 2012"), Def. Ex. B.  An "Interim Order" is a revision to a patrol guide procedure and becomes the policy of the NYPD upon publication.  *See* Tr. 10/17 at 522:2–13.

[284]    *See* IO 23 of 2012.

[285]    *See* IO 22 of 2012 at 1 (¶ 1, "SCOPE," and "PROCEDURE").

[286]    *Id.* at 2.

> *"reasonable suspicion" that a person is trespassing, in addition to those factors set forth in P.G. 212-11, "Stop and Frisk," are contradictory assertions made to justify presence in the building and/or assertions lacking credibility made to justify presence in the building.*[287]

The section continues by stating that a trespass arrest requires probable cause, and that refusal to answer questions is insufficient to establish probable cause.[288]

As plaintiffs correctly note, however, IO 22 of 2012 makes no reference to stops *outside* TAP buildings.[289]  It does not explicitly state that stops outside TAP buildings require reasonable suspicion, and that merely exiting a TAP building is insufficient to establish reasonable suspicion, even in a high crime area.[290]

At the hearing, defendants offered evidence of numerous steps that have been taken to support the implementation of IOs 22 and 23 of 2012.[291]  After

---

[287]    *Id.* at 3.

[288]    *See id.*

[289]    *See* Pl. Findings ¶ 54.

[290]    *See* IO 22 of 2012.

[291]    I give little weight to an August 20, 2012 memo from Chief of Patrol James P. Hall to all commanding officers.  *See* 8/20/12 Memo from Chief of Patrol to Commanding Officer, All Patrol Boroughs, Def. Ex. E.  The letter, distributed as the preliminary injunction hearing approached, contains a number of ambitious orders, such as that platoon commanders must personally critique all interior or exterior "street encounters" involving TAP buildings, including all stops.  *See id.* ¶ 3.  At the hearing, the executive officer of the Patrol Services Bureau testified

87

any trespass *arrest*, officers must now complete a "Trespass Crimes – Fact Sheet" documenting the facts that established probable cause.[292]  The Chief of Patrol distributed IOs 22 and 23 to 2012 to all commanding officers with a brief synopsis,[293] pursuant to a two-page plan to promote knowledge of criminal trespass offenses among uniformed servicemembers.[294]  Legal Bureau and other personnel offered instruction on IOs 22 and 23 of 2012 to training sergeants and special operations lieutenants,[295] who were then expected to pass along the information to "the rank and file" at training sessions during roll call.[296]  Legal Bureau and other

-------------------

that he was unaware of any supervisors conducting critiques of stops inside or outside of TAP buildings.  *See* Tr. 10/19 at 759:6–15.

[292]   *See* Tr. 10/17 at 545:15–546:1, 559:24–560:7; Trespass Crimes – Fact Sheet, Def. Ex. H.  While the use of this fact sheet may be a welcome development, it will do nothing to clarify officers' confusion regarding the standards for making a *stop* outside a Clean Halls building.  There is also a new "Trespass Crimes – Owner's Affidavit" in support of the administrative goals of IO 23 of 2012.  *See* Tr. 10/17 at 526:21–528:7; Trespass Crimes – Owner's Affidavit, Def. Ex. G.

[293]   *See* 8/12/12 Memo from Chief of Patrol to Commanding Officers, All Patrol Boroughs, Def. Ex. C.

[294]   *See* 6/18/12 Memo from Chief of Patrol to Chief of Department ("Trespass Law Plan"), Def. Ex. D, ¶ 2.

[295]   *See id.* ¶ 3.

[296]   Tr. 10/19 at 789:19–790:5.

personnel provided separate instruction to borough and precinct commanders.[297]

Some of the training involved the use of a newly prepared video on "Stop,

Question, and Frisk,"[298] and an updated version of the Chief of Patrol Field

Training Guide.[299]

Many of these steps are peripheral to the concerns of this case.  The

video and the Training Guide, for example, deal with stop and frisk in general, and

make no specific reference to trespass stops outside TAP buildings.[300]  In addition,

as discussed below, some of the training materials contain inaccurate or misleading

information that could exacerbate rather than resolve the problem of

---

[297]    *See* Tr. 10/18 at 711:24–714:11.

[298]    *See, e.g.*, Tr. 10/22 at 996:2–4.

[299]    *See* Trespass Law Plan ¶ 6; July 2012 Chief of Patrol Field Training Unit Program Guide ("Training Guide"), Def. Ex. N.  The Police Student's Guide, which is hundreds of pages long, has also been revised to include several pages on IO 22 of 2012.  *See* Police Student's Guide (excerpt) ("Police Student's Guide"), Def. Ex. RRR, at 30–34; Tr. 10/22 at 915:7–919:17.

[300]    *See* Training Guide at 10–24; NYPD Stop Question & (Possibly) Frisk Video Series, "Frisk," ("SQF Training Video No. 5"), Def. Ex. T; Script of SQF Training Video No. 5, Def. Ex. U; Tr. 10/22 at 942:25–943:3 (nothing in film deals specifically with TAP).  One page of the Training Guide, which was distributed only to the supervisors of IMPACT officers, reiterates IO 22 of 2012 by stating that reasonable suspicion is required for stops based on suspicion of trespass in a TAP building.  *See* Training Guide at 65; Tr. 10/23 at 1252:1–3.  The page makes no specific reference to stops outside TAP buildings, and could easily be read, in context, as a discussion of stops during vertical patrols.  *See* Training Guide at 65.

unconstitutional stops.[301]

### 3.   Absence of Steps Meaningfully Addressing Outdoor TAP Stops

During the hearing, defendants emphasized the training that officers receive throughout their careers regarding the laws governing stop and frisk *in general*.[302]  This training has recently been supplemented by a refresher course on stop and frisk at the Rodman's Neck training center in the Bronx.[303]  More than three thousand officers have attended the training course since its development in 2012.[304]

The root problem that led to unlawful trespass stops outside TAP buildings in the Bronx, however, based on ADA Rucker's testimony and the other evidence introduced at the hearing, is that officers perceived trespass stops in the proximity of TAP buildings as *exceptions* to the general rules governing stop and frisk.  Improving the training surrounding stop and frisk in general may do nothing to dispel the notion that there is an exception for stops outside TAP buildings.

IO 22 of 2012 makes clear that presence inside a TAP building is not

---

[301]   *See infra* Part V.B.1.b.

[302]   *See* Def. Findings ¶¶ 35–36.

[303]   *See* Tr. 10/17 at 571:25–572:23.

[304]   *See* Tr. 10/19 at 888:1–2; Tr. 10/22 at 955:8–13.

a sufficient basis for a stop, and that stops made during vertical patrols of TAP

buildings must be based on reasonable suspicion.  But IO 22 of 2012 and the

training introduced in support of it present themselves as guides to conducting

vertical patrols *inside* a TAP building, not guides for making trespass stops and

arrests *outside* TAP buildings.  The difference may seem insignificant when

viewed in the abstract.  In theory, officers should be able to infer from the rules in

IO 22 of 2012 how to perform lawful trespass stops outside TAP buildings.

      In practice, however, the evidence at the hearing suggests that NYPD

officers are trained to carry out their duties according to a set of standard operating

procedures.  The NYPD's training reduces the unpredictable, confusing challenges

that arise on patrol to a manageable set of standard situations and orderly

procedures for addressing them.[305]  If a recurring, problematic situation is not

---

[305]   IO 22 of 2012, for example, defines the standard scenario for a
vertical patrol in a TAP building, lays out various common problems that may arise
during such a patrol, and prescribes what to do and what not to do in response to
them, including specific questions to ask.  *See* IO 22 of 2012 at 2.  After receiving
training on IO 22 of 2012, including role-play simulations, *see* Tr. 10/19 at
836:7–840:13, an officer will have less need to improvise under pressure or base
his or her responses on inferences from general principles or analogies to other
scenarios.  In this sense, the NYPD's training follows the model of a traditional
Western military academy, which aims "to reduce the conduct of war to a set of
rules and a system of procedures — and thereby to make orderly and rational what
is essentially chaotic and instinctive."  JOHN KEEGAN, THE FACE OF BATTLE 18
(1976).  On the functioning of standard operating procedures in bureaucracies
generally, see GRAHAM ALLISON & PHILIP ZELIKOW, ESSENCE OF DECISION
143–96 (2d ed. 1999) .

included in the training, officers may categorize it in the wrong way and employ

inappropriate responses — such as stopping someone simply because he exited a

TAP building.  The evidence at the hearing, as summarized in the previous section,

strongly supports the conclusion that many officers took such actions before

2012.[306]  Yet none of the steps taken by the NYPD in 2012 were directly and

meaningfully focused on uprooting the misconceptions regarding trespass stops

outside TAP buildings that resulted in the constitutional violations in this case.

In fact, based on the evidence at the hearing, the only piece of

instruction that has been provided to officers on a systematic basis and that

specifically targets the problem of outdoor trespass stops at TAP buildings is a

single bullet point included in a PowerPoint presentation offered by the Legal

Bureau as part of the Rodman's Neck training.[307]  The bullet point, which takes up

---

[306]     As plaintiffs stated in their summation:  "We have a 20-year program.
There is a culture around these stops.  So [corrective instruction] needs to happen
periodically . . . so that people get the message."  Tr. 11/7 at 1373:2–6.

[307]     *See* Street Encounters Presentation at 40; Tr. 10/17 at 572:24–573:6;
Tr. 10/18 at 663:13–664:1.  A former commanding officer of the New York City
Police Academy testified that the role-playing at Rodman's Neck sometimes
involves individuals standing outside of TAP buildings, but the individuals appear
to play the role of civilian bystanders and witnesses, not suspects.  *See* Tr. 10/19 at
815:11–14, 838:25–840:9.  Chief Hall testified that "we have made [it] clear" to
officers that "we do not want" them "stopping an individual outside of [a] Clean
Halls building simply because they are exiting a building, without more."  Tr.
11/23 at 1244: 6–12.  Chief Hall did not provide specifics as to how this was made
clear.  *See id.*

one third of a page of a forty-five-page presentation, states:

> Observation of an individual exiting a NYCHA/TAP Building,
> without more, is *not* an objective, credible reason to approach that
> individual.[308]

As common sense would suggest, and evidence at the hearing

confirmed, attendees at the Rodman's Neck training do not always absorb the

lesson contained in this bullet point, or even recall having seen it.  One officer who

had recently attended the refresher course at Rodman's Neck testified that he did

not remember any discussion of TAP,[309] and both he and another officer testified

that they could not remember any training involving outdoor stops on suspicion of

trespass.[310]

In light of the above, and in the absence of reliable statistics regarding

stops in 2012, I find that defendants failed to introduce persuasive evidence

regarding whether the improvements undertaken by the NYPD in 2012 have

affected the magnitude of unlawful trespass stops outside TAP buildings in the

Bronx.[311]

---

[308]   Street Encounters Presentation at 40.

[309]   *See* Tr. 10/22 at 1043:17–1044:13.

[310]   *See id.*; Tr. 10/23 at 1111:2–8.

[311]   Defendants introduced evidence of a dramatic reduction in declines to
prosecute for trespass *arrests*, in general, in the Bronx in 2012.  *See, e.g.*, Tr. 10/18

V.     **DISCUSSION**

A.     **Standing**

As a preliminary matter, defendants argue that plaintiffs lack standing to seek injunctive relief.[312] I addressed this issue extensively in *Floyd*, and again in *Davis*, and the same analysis applies here.[313] *First*, "[c]oncrete injury is a prerequisite to standing and a 'plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.'"[314] *Second*, "'[t]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'"[315] *Third*, "'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"[316]

---

at 726:18–727:7; Tr. 10/23 at 1249:7–17.  But this obviously does not provide a reliable basis for inferring that unlawful trespass *stops* outside TAP buildings have declined.

[312]     *See* Def. Findings ¶ 47.

[313]     *See Davis*, 2012 WL 4813837, at *26; *Floyd*, 283 F.R.D. at 169.

[314]     *Floyd*, 283 F.R.D. at 169 (quoting *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).

[315]     *Davis*, 2012 WL 4813837, at *26 n.225 (quoting *Nicacio v. United States Immigration & Naturalization Serv.*, 768 F.2d 1133, 1136 (9th Cir. 1985)).

[316]     *Id.* at *26 (quoting *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 53 (2006)).

Abdullah Turner testified to two specific unlawful trespass stops outside TAP buildings in the Bronx, and J.G. and Jovan Jefferson both referred to having been stopped multiple times outside TAP buildings.[317]  The evidence suggests that both of Turner's stops were on suspicion of trespass.[318]  Furthermore, Turner has lived since 2008 in a TAP building,[319] where, based on the evidence presented at the hearing, he will likely be the target of future unlawful stops — if such stops continue to take place as they have in the past.[320]  This is sufficient to

---

[317]     *See supra* Part IV.A.2.b, c, i.  Jefferson testified to being stopped seven to eight times outside TAP buildings.  *See* Tr. 10/16 at 361:12–14.

[318]     *See supra* Part IV.A.2.b.

[319]     *See* Tr. 10/17 at 471:11–472:19, 486:9–487:1.

[320]     I also note, as I did in *Floyd*, that in light of the frequency of unlawful trespass stops outside TAP buildings in the Bronx, even those plaintiffs who have only been subjected to such a stop one time would likely have standing, provided that they continue to live in or visit TAP buildings.  "'[T]here is no per se rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury.'"  *Floyd*, 283 F.R.D. at 170 n.106 (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001)).  *Accord Battle v. City of New York*, No. 11 Civ. 3599, 2012 WL 112242, at *3–4 (S.D.N.Y. Jan. 12, 2012) (concluding that plaintiffs, each of whom had only one alleged wrongful experience with NYPD officers under program involving searches of livery cars, had standing to pursue injunctive relief against NYPD, based on number of cars enrolled in the program and plaintiffs' reliance on such cars); *National Cong. for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161–62 (S.D.N.Y. 1999) (concluding that frequency of NYPD stops and plaintiffs' belonging to groups distinctly affected by NYPD stop practices gave plaintiffs standing to seek injunctive relief).

confer standing on plaintiffs.[321]

B.    **Preliminary Injunctive Relief**

Plaintiffs seek a variety of injunctive remedies that would require the NYPD to act in ways that depart from the status quo, including the development and implementation of new formal policies, new training procedures, and burdensome new supervisory and monitoring procedures.[322]  Because the preliminary injunctive relief sought by plaintiffs is thus mandatory rather than prohibitory, plaintiffs must show (1) that they are clearly or substantially likely to prove at trial that defendants are engaged in an ongoing custom of making trespass stops outside TAP buildings in the Bronx in the absence of reasonable suspicion, in violation of the Fourth Amendment; (2) that plaintiffs are likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in plaintiffs' favor; and (4) that an injunction is in the public interest.[323]

---

[321]    Of course, plaintiffs would not be likely to suffer injury in the future if the NYPD no longer had a custom of making unlawful trespass stops outside TAP buildings.  But while defendants have introduced evidence of certain changes in the NYPD's policies and training in 2012, defendants have not proven that the NYPD's custom of making unlawful trespass stops outside TAP buildings has ended.  *See supra* Part IV.B.3; *infra* Part V.B.1.b.

[322]    *See* Pl. Findings ¶¶ 72–75.  The remedies proposed in this Opinion, though not identical to those requested by plaintiffs, remain largely mandatory in nature.  *See infra* Part V.C.

[323]    *See supra* Part II.

The following sections address each of these factors in turn.

### 1.      Clear or Substantial Likelihood of Success on the Merits

Because plaintiffs do not assert that defendants have an explicit or formally approved policy of making trespass stops without reasonable suspicion outside TAP buildings in the Bronx, plaintiffs must show a clear or substantial likelihood of proving at trial that defendants have a custom or usage of making such stops.  Specifically, plaintiffs argue that defendants "have a pattern and practice" of making unlawful trespass stops outside TAP buildings, and that "the City of New York has been deliberately indifferent" to this practice "by failing to supervise and train."[324]

My analysis of plaintiffs' claim proceeds in two steps.  *First*, I analyze plaintiffs' deliberate indifference claim and conclude that plaintiffs have shown a clear likelihood of establishing that defendants' longstanding failure to train officers regarding the legal standards for trespass stops outside TAP buildings in the Bronx, despite actual or constructive notice that this omission was causing city employees to violate individuals' constitutional rights, has risen to the level of deliberate indifference.  Whether plaintiffs' deliberate indifference claim is

---

[324]     Pl. Findings ¶¶ 69–70.  Plaintiffs present the former as a "constructive acquiescence" claim, and the latter as a deliberate indifference claim based on failure to train.  *See id.*  Because constructive acquiescence is merely a way of proving deliberate indifference, I analyze the claims together.

analyzed in terms of the general standard in *Connick*, the three-part *Walker* standard, or the constructive acquiescence standard, plaintiffs have shown a clear likelihood of success on their *Monell* claim. *Second*, I analyze whether defendants have rebutted plaintiffs' evidence of deliberate indifference based on the steps taken by the NYPD in 2012. I conclude that these steps have not meaningfully addressed the specific problem of unconstitutional trespass stops outside TAP buildings in the Bronx.

### a. Deliberate Indifference

Applying the law of *Terry* stops to my findings of fact, above, plaintiffs offered more than enough evidence at the hearing to support the conclusion that they have shown a clear likelihood of proving at trial that the NYPD has a practice of making unlawful trespass stops outside of TAP buildings in the Bronx:

### i. ADA Rucker's Testimony

As described above, ADA Rucker credibly testified that NYPD officers have treated proximity to a TAP building as a factor contributing to reasonable suspicion, and have frequently made trespass stops outside TAP buildings for no reason other than that the officer had seen someone enter and exit

or exit the building.[325]  These stops were made *because* the building was enrolled in TAP, and they were not based on any reasonable suspicion of trespass.[326]  ADA Rucker's testimony is corroborated by the accounts of stops and arrests in the twenty-six decline to prosecute forms, as well as by the hundreds of UF-250s on which officers wrote "Clean Halls" as a justification for a stop.[327]  As discussed below, Dr. Fagan's analysis of UF-250s provides further corroboration of ADA Rucker's testimony.[328]

### ii.    Plaintiffs' Stops

The conclusion that the NYPD has repeatedly made trespass stops outside TAP buildings without reasonable suspicion is further supported by the credible and mutually corroborating testimony of named plaintiffs regarding the circumstances leading to their encounters with police.[329]  *First*, with the exception of Ledan's two police encounters, each of plaintiffs' encounters with the police constituted *Terry* stops requiring reasonable suspicion.  As Ledan's first encounter illustrates, it is possible for an officer to approach a person outside a TAP building

---

[325]    *See supra* Part IV.A.1.

[326]    *See id.*

[327]    *See* Tr. 10/15 at 124:18–24; Fagan Report at 13.

[328]    *See infra* Part V.B.1.a.iii.

[329]    *See supra* Part IV.A.2.

and ask the person her name, where she is coming from, whether she lives in the building, and if not, whether she knows anyone in the building, all the while acting in such a way that a reasonable person would feel free to terminate the encounter and go about her business. But the other plaintiffs' testimony showed that many trespass-related encounters outside TAP buildings involve aggressive, coercive, and threatening police behavior that would not leave a reasonable person feeling free to terminate the encounter.

Bradley was stopped when an officer in a van gestured for him to come over, he came over, and the officer asked "What are you doing here?"[330] Turner was stopped when three officers approached and one "snatched the phone out of [his] hand,"[331] abruptly and aggressively ending his call and taking control of his property, without any request for permission to do so. The stop continued as the officer asked Turner what he was doing and whether he lived in the building beside which he was standing.[332] Turner was stopped a second time when a police car pulled up in front of him as he and others were exiting a Clean Halls building,

---

[330]   Tr. 10/16 at 266:3.

[331]   Tr. 10/17 at 477:8.

[332]   *See id.* at 478:13–22, 479:8–11.

an officer got out, questioned the group, and requested Turner's identification.[333]
J.G. was stopped when five officers approached him outside his building, stopped
him, and asked him where he was coming from, where he was headed, and what he
had in his bag.  He was surely stopped when the officers made him raise his hands,
frisked him, and searched inside his pockets and his grocery bag.[334]  Jerome Grant
was stopped when two officers approached with flashlights, questioned him and
his friends to determine whether they were trespassing, and in response to
questions from those who were stopped, replied with strong words such as "I'm the
one that's talking here,"[335] and "hush up."[336]  Roshea Johnson was stopped when a
black van pulled up in front of him with police officers inside and one of them
began questioning him about trespassing.[337]  He was certainly stopped — and
arrested — a moment later when he was placed in handcuffs in the back of the
van.[338]

No reasonable person would have felt free to leave in these plaintiffs'

---

[333]   *See id.* at 486:9–490:25.

[334]   *See id.* at 437:17, 439:4–443:2.

[335]   *Id.* at 456:13.

[336]   *Id.* at 456:18–19.

[337]   *See id.* at 399:21–400:17.

[338]   *See id.* at 400:17–401:18.

circumstances once an officer or officers approached, caused the plaintiff to stop through a command, gesture, accusatory introduction, or by taking possession of the person's property, and then began asking questions that were clearly intended to elicit incriminating responses regarding trespassing.

Any doubt that these plaintiffs were free to leave after the commencement of intrusive investigatory questioning is resolved by looking to the instances in the decline to prosecute forms when suspects attempted to terminate their encounters. In one encounter, "the defendant attempted to walk away[,] at which time [the officer] grabbed the defendant[']s arms."[339] After a struggle, the defendant was arrested.[340] In another encounter, "[t]he arresting officer stopped defendant and defendant clenched his fists on his sides and spread his feet apart and . . . stated . . . YOU'RE NOT GOING TO TOUCH ME. YOU'RE NOT GOING TO TOUCH ME. YOU'RE NOT PUTTING YOUR HANDS ON ME."[341] The arresting officer then handcuffed the defendant and placed him in a patrol vehicle.[342] Similarly, when various defendants simply refused to answer an

---

[339]   App. A ¶ 12.

[340]   *See id.*

[341]   *Id.* ¶ 20.

[342]   *See id.*

officer's questions, it became clear that they were not free to terminate the encounter in this way either.[343]  In one encounter, the arresting officer "approached the defendant and asked her where she was coming [from], what was she doing in the building[,] and what apartment number was she visiting.  Defendant responded in sum and substance: I WAS VISITING A FRIEND.  I AM NOT TELLING YOU THE APARTMENT NUMBER OR THE NAME."[344]  The defendant was then arrested for trespass.[345]

The responses of the police officers as summarized in the decline to prosecute forms do not tell a surprising story.  Indeed, they are what a reasonable person would have expected under the circumstances.  When a person considers walking away from an officer who has stopped her and begun asking accusatory questions, it is objectively reasonable for the stopped person to believe that the officer will attempt to prevent her from doing so.  Persons who are stopped by the police in circumstances like those described by the plaintiffs (other than Ledan)

---

[343]    *See, e.g., id.* ¶¶ 4, 15, 22, 25, 26.  In *Davis*, I held that "the Fifth Amendment prohibits police from arresting an individual for refusing to provide 'testimonial' evidence."  *Davis*, 2012 WL 4813837, at *14.  Whether refusal to provide testimonial evidence may contribute to reasonable suspicion of trespass is a distinct issue, and one not raised by the parties at this stage of the litigation.

[344]    App. A ¶ 4.

[345]    *See id.*

reasonably conclude that they are *not* free to terminate the encounter.  As a result, such stops are *Terry* stops under the Fourth Amendment,  and *DeBour* Level 3 stops under New York state law, and require that the officer have a "reasonable suspicion" that criminal activity may be afoot.

 *Second*, all but two of the eleven encounters to which plaintiffs testified appear to have been based on suspicion of trespass, but lacked the reasonable suspicion of trespass needed to support a *Terry* stop.  The two exceptions are Jerome Grant's stop and Letitia Ledan's second encounter.[346]

### iii. Decline to Prosecute Forms

 There remains the question of how widespread the practice of unlawful stops was.  Plaintiffs argue that the decline to prosecute forms independently support the finding of a widespread practice of unlawful stops outside of TAP buildings.[347]  Their rather complicated argument proceeds as

---

[346] In Grant's case, his cousin's or his friend's knocking loudly and perhaps angrily on the door of a Clean Halls building may have provided a minimal level of objective justification for suspecting that Grant and the others were attempting to enter unlawfully.  *See supra* Part IV.A.2.d.  As noted above, Ledan initiated her second encounter, which was most likely consensual and thus did not require reasonable suspicion.  Even if the stop had been nonconsensual, under the circumstances her interest in the detention of her husband and friends may have provided adequate grounds for brief questioning.  *See supra* Part IV.A.2.f.

[347] *See* Pl. Findings ¶ 17.

follows:  *First*, plaintiffs assume the City's expert was correct in reporting that

approximately thirteen percent of the trespass stops analyzed by Dr. Fagan resulted

in arrest.[348]  From this, plaintiffs infer a rough, general rule that thirteen percent of

trespass stops in the Bronx in 2011 resulted in arrest — or in other words, for every

recorded trespass *arrest*, there were roughly 7.7 trespass *stops*.[349]  *Second*, in three

randomly selected months in 2011, the Bronx DA's office produced at least

twenty-six decline to prosecute forms describing arrests that were apparently based

only on a person entering or exiting a TAP building.[350]  Because entry or exit from

a TAP building does not provide reasonable suspicion, there were at least twenty-

six arrests in the three sample months that were preceded by stops that were not

based on reasonable suspicion.  *Third*, if the twenty-six decline to prosecute forms

reflect only thirteen percent of the suspicionless trespass stops outside TAP

---

[348]    *See* Smith Report at 6.

[349]    *See* Pl. Findings ¶ 17.

[350]    *See supra* Part IV.A.1.  In the absence of more detailed evidence or
testimony regarding the initial police encounters described in the decline to
prosecute forms, I assume that the encounters were likely similar to those
described by plaintiffs, and thus that the intrusiveness of the encounters likely rose
to the level of a *Terry* stop at or shortly after the time that the officer or officers
initiated questioning.  *See generally* App. A.  I also note that in many of the
encounters described in the decline to prosecute forms, the defendant's behavior as
described in the form never gave rise to reasonable suspicion, even after the stop
began.  *See* App. A ¶¶ 2, 3, 8, 11, 12, 16, 17, 21, 24.

buildings in the three sample months in 2011, and if the sample months were
representative of the year, then eight hundred trespass stops took place outside
TAP buildings in the Bronx in 2011 without reasonable suspicion.[351]

        Assuming as I do that the decline to prosecute forms contain largely
accurate descriptions of stops, plaintiffs' reasoning is persuasive.  If anything,
plaintiffs undercount the number of suspicionless stops suggested by the decline to
prosecute forms.  Dr. Smith's thirteen percent figure is the arrest rate for *all* the
trespass stops outside TAP buildings in Dr. Fagan's study, including both stops
based on and stops lacking reasonable suspicion.[352]  Common sense would suggest,
however, that the arrest rate for stops lacking reasonable suspicion — for example,
stops based on nothing more than a person exiting a TAP building — should be
significantly lower than the combined arrest rate for lawful and unlawful stops.
The lower the arrest rate for unlawful stops, the higher the number of unlawful
stops that would be required to generate twenty-six arrests based on such stops.  If
the arrest rate for unlawful stops were five percent, for example, the existence of
twenty-six arrests in three months based on unlawful stops would imply a yearly

_____

[351]    I have altered plaintiffs' calculations to account for the two decline to
prosecute forms containing revisions of other forms.  *See supra* Part IV.A.1.

[352]    *See* Smith Report at 6.  Dr. Fagan calculated arrest rates (or, as he
called them, "hit rates") in *Floyd*, but does not appear to have done so in the instant
case.  *Compare Floyd*, 861 F. Supp. 2d at 284–85, *with* Fagan Report.

106

total of more than two thousand (2,080) unlawful stops.

### iv.    Dr. Fagan's Analysis

Dr. Fagan's analysis of the UF-250 database provides further evidence that plaintiffs have a clear likelihood of being able to prove at trial that the NYPD's practice of unlawful stops was widespread.  In order to understand Dr. Fagan's claim that 1,044 trespass stops within his set apparently lacked reasonable suspicion, it is necessary to understand the basic features of a UF-250 form.[353]  I have included a copy of a blank UF-250 form as Appendix B to this Opinion.

The UF-250 form has two sides.[354]  On Side 1 there is a section labeled "What Were Circumstances Which Led To Stop? (MUST CHECK AT LEAST ONE BOX)."  Inside the section are several boxes that officers may check, such as "Fits Description" and "Actions Indicative of Acting As A Lookout."  There is also a checkbox for "Other Reasonable Suspicion Of Criminal Activity (Specify)" (the "Other" box) that officers can check and then supplement with a handwritten note.  On the back of the form, Side 2, there is a section labeled "Additional Circumstances/Factors: (Check All That Apply)."  Inside this section there are other checkboxes, such as "Report From Victim/Witness" and "Evasive,

---

[353]    *See* Fagan Report at 15 & tbl.8; App. L to Fagan Report ("Stop Factor List"), Pl. Ex. 64.

[354]    *See* App. B.

False Or Inconsistent Response To Officer's Questions." As noted above, officers are required to record all the reasons justifying a stop.[355]

In an appendix to Dr. Fagan's report, he lists the combinations of factors from UF-250 forms that he counted as indicative of a stop apparently lacking reasonable suspicion of trespass.[356] The list descends from the most common combinations of factors to the least common.[357] On all of the forms that Dr. Fagan identified as apparently lacking reasonable suspicion, the officer had checked at most one of the listed "circumstances" on Side 1.[358] In some cases the officer had also checked the "Other" box on Side 1 and handwritten a text string, which Dr. Fagan also analyzed.[359]

The most frequent combination of stop factors identified by Dr. Fagan as apparently inadequate were "Furtive Movements" (Side 1) and "Area Has High

---

[355] *See* Def. Findings ¶ 4 ("NYPD training evidence . . . clearly identifies that its officers are instructed to include *all* circumstances leading to the stop on the worksheet[.]" (citing Tr. 10/15 at 86:12–87:2)); Tr. 10/19 at 849:13–19 (testimony of Chief Shea); Police Student's Guide at 20.

[356] *See* Fagan Report at 15 & tbl.8; Stop Factor List.

[357] *See* Stop Factor List at 1. The final four pages of the six page list contain the many allegedly inadequate combinations that appeared on only one UF-250. *See id.* at 3–6.

[358] *See* Fagan Report at 11–15.

[359] *See id.*

Incidence Of Reported Offense Of Type Under Investigation" (Side 2), referred to in Dr. Fagan's shorthand as the "High Crime Area" box.[360]  On ninety-one forms, these two factors were the only recorded basis for the stop.[361]

Of the 1,044 trespass stops that Dr. Fagan identified as apparently unlawful, 503 were based on the ten most frequent combinations of stop factors.[362] In each of these ten combinations, which offer a manageable illustration of Dr. Fagan's assumptions, the officer filling out the form recorded only the following basis for the trespass stop.  *First*, on Side 1, the officer offered one of the following three factors:

1)    "Furtive Movements."

2)    "Other Reasonable Suspicion Of Criminal Activity (Specify)" (the "Other" box), and a text string referring to "Clean Halls," "Trespass," or both as the sole notation.[363]

---

[360]    *See* Stop Factor List at 1.

[361]    *See id.*

[362]    *See id.*

[363]    *See* Fagan Report at 13 (explaining "Clean Halls/Trespass" category); "detailSA Stop Factor Analysis" ("'Other' Text Strings"), App. F to Fagan Report at 5–6 (listing the text strings in this category, including "CLEAN HALLS," "CLEAN HALLS BLDG," "CRIM TRES," and "CLEAN HALLS PROGRAM-CRIM TRES").

3)      The "Other" box and words indicating the suspect was observed

exiting the building.[364]

*Second*, on Side 2, under "Additional Circumstances/Factors," the

officer either checked no box, or offered one of the following five justifications:

1)      High Crime Area.

2)      "Time Of Day, Day Of Week, Season Corresponding To Reports Of

Criminal Activity" (the "Time of Day" box).

3)      Both High Crime Area and Time of Day.

4)      "Proximity To Crime Location" (the "Proximity to Scene" box).

5)      "Changing Direction At Sight Of Officer/Flight" (the "Change

Direction" box).

Standing alone, Dr. Fagan's categorizations leave a great deal of room

for skepticism.  The Supreme Court has "recognized that nervous, evasive behavior

is a pertinent factor in determining reasonable suspicion."[365]  It is possible to

---

[364]     *See* "Other" Text Strings at 7–8 (listing text strings in the "Observed
Exit" category, including many variations on the phrase "EXITING CLEAN
HALLS BUILDING").

[365]     *Wardlow*, 528 U.S. at 124 (citing numerous cases).  On the other
hand, "furtive behavior absent additional indicia of suspicion generally does not
suffice to establish reasonable suspicion."  *United States v. Bellamy*, 592 F. Supp.
2d 308, 318–19 (E.D.N.Y. 2009) (collecting cases).  In *Bellamy*, the court held that
the following stop factors did not give rise to reasonable suspicion that Bellamy
was trespassing in a building:

110

imagine scenarios in which an officer observing behavior that would probably give rise to reasonable suspicion might reasonably record that behavior by checking nothing more than "Furtive Movements."  For example, an officer might observe a person standing nervously outside a TAP building, pretending to walk away whenever others approach, then returning after they are gone, and finally entering the building without a key, nervously looking both ways before opening the door. I also note that in each of the twenty stops where the officer checked "Change Direction" on Side 2, the officer also checked "Furtive Movement" on Side 1.[366]  If these forms were based on an officer seeing someone engage in the behavior described above, and then run away at the sight of the officer, the officer almost certainly had reasonable suspicion of trespass.[367]

---

> (1) the officers' knowledge that the . . . building was located in a high-crime, drug-prone neighborhood; (2) the officers' knowledge that the . . . building had experienced problems with drug trafficking and trespassing; (3) the officers' understanding that the building had participated in FTAP; (4) Bellamy's presence in the [building's] vestibule; (5) the presence of the supposed "crack addict" outside of the . . . building; and (6) Bellamy's furtive gestures.

*Id.* at 317.

[366]     *See* Stop Factor List.

[367]     *See Floyd*, 861 F. Supp. 2d at 298 (discussing *Wardlow*, which "held that a defendant's 'presence in an area of heavy narcotics trafficking' and 'unprovoked flight upon noticing the police' were together sufficient to raise

On the other hand, there are good reasons to doubt that most, or even many, of the forms marked with the combinations listed above were in fact based on such suspicious behavior. *First*, many of the 503 forms in the top ten on Dr. Fagan's list contain stop factor combinations providing no basis whatsoever for reasonable suspicion. 205 of these forms simply indicate that the person was stopped outside a Clean Halls building, or for criminal trespass, neither of which explains why the officer's suspicion was *reasonable*; or that the person was observed exiting, which also contributes nothing to reasonable suspicion; and that the stop took place in a high crime area and/or at a suspicious time of day, neither of which can establish reasonable suspicion in the absence of some additional contributing factor.[368] Thus, at a bare minimum, over two hundred of the five hundred stops at the top of Dr. Fagan's list provide no basis for a finding of suspicious behavior.

*Second*, Dr. Fagan reported that in his original universe of stops, officers had checked the Other box on nearly forty percent of the UF-250 forms.[369]

---

reasonable suspicion and justify a stop" (quoting *Wardlow*, 528 U.S. at 124)).

[368]    "Reasonable articulable suspicion does not exist merely on the basis of [High Crime Area and Time of Day]: many people live in high crime areas and many crimes occur at night; simply being in a high crime area at night is not suspicious behavior." *Floyd*, 861 F. Supp. 2d at 298 (citations omitted).

[369]    *See* Fagan Report at 11.

Officers were clearly willing and able to describe suspicious behavior when they observed it.[370]  In fact, officers frequently took the time to write notes that do not contribute to reasonable suspicion.[371]  Given the evident eagerness of officers to check the Other box and write notes — even when they had no basis for doing so — it is doubtful that many officers observed the kind of highly suspicious behavior hypothesized above and then merely checked the Furtive Movements box.[372]

   *Third*, as Dr. Fagan notes, when police officers are in an area where they are primed to look for signs that "crime is afoot," they may be more likely to perceive a gesture as an indicator of criminality.[373]  Recent psychological research

---

[370] *See, e.g.*, "Other" Text Strings at 7 ("Observed Entry" text strings including, for example, "RAN INTO BLDG").  The NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck contains a number of examples of concise, easily written descriptions of furtive behavior that could give rise to reasonable suspicion.  *See* Street Encounters Presentation at 22–23.

[371] *See id.* (listing text strings accompanying checked Other boxes).

[372] In addition, many behaviors that would, like the behaviors hypothesized above, lead to a suspicion of trespass would presumably also provide grounds to check "Actions Indicative [o]f 'Casing' Victim Or Location" or "Actions Indicative of Acting As A Lookout" on Side 1.  *See* App. B.

[373] *See* Fagan Report at 11 n.12 (citing Robert J. Sampson & Steven W. Raudenbush, *Seeing Disorder: Neighborhood Stigma and the Social Construction of "Broken Windows"*, 67 SOC. PSYCHOL. Q. 319 (2004); Geoffrey P. Alpert, John M. MacDonald, & Roger G. Dunham, *Police Suspicion and Discretionary Decision Making During Citizen Stops*, 43 CRIMINOLOGY 407 (2005)).

has provided evidence of such cognitive distortions.[374]  Thus the category of Furtive Movements may be inherently prone to overuse on UF-250s.  Given the nature of their work on patrol, officers may have a systematic tendency to see and report furtive movements where none *objectively* exist.[375]

Dr. Fagan raised further doubts in *Floyd* regarding the general validity of assuming reasonable suspicion based on Furtive Movements.[376]  Dr. Fagan's report in *Floyd* showed that "the *arrest rates* in stops where the high crime area or furtive movement boxes are checked off is actually *below* average."[377]  Officers may have a tendency to check these boxes when they are unable to articulate any other basis for a stop — perhaps because the suspicion leading to the stop was, in fact, not reasonable.

Defendants attack the accuracy of Dr. Fagan's categorization scheme

---

[374]     *See id.*  Indeed, this is an area in which further training may be highly beneficial.

[375]     *See Bayless*, 201 F.3d at 133 ("Reasonable suspicion is an *objective* standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." (emphasis added)).

[376]     *See Floyd*, 861 F. Supp. 2d at 284–85; Fagan Report at 11 n.12 (citing Dr. Fagan's report in *Floyd*).

[377]     *Floyd*, 861 F. Supp. 2d at 285 (emphasis added).

in various ways.[378]  *First*, defendants criticize Dr. Fagan for neglecting to factor

into his analysis a field on Side 1 of the UF-250 form labeled "Period Of

Observation Prior To Stop."[379]  Though defendants' reasoning is not explicit, I take

it they assume that a long enough period of observation, combined with some of

the stop factor combinations in Dr. Fagan's list of unlawful stops, might justify

removing a stop from the list.[380]  *Second*, defendants' expert noted a few dozen

text strings accompanying the Other box that Dr. Fagan included in his count of

unlawful stops but that defendants argue could justify a *Terry* stop.[381]  For

example, Dr. Fagan categorized "RAN INTO BLDG" as an instance of an

observed entry into a TAP building, and thus not a basis for a stop.[382]  *Third*,

---

[378]    *See* Def. Findings ¶¶ 6 ("Period of Observation"), 8 (metacategories for "Other" text strings), 9 ("Furtive Movements,""Ongoing Investigation").

[379]    *See id.* ¶ 6; App. B.

[380]    *See* Def. Findings ¶ 6.  According to the UF-250 database, in sixty-five percent of the trespass stops outside TAP buildings in the Bronx in 2011, the Period of Observation was less than one minute, and in eighty-four percent of those stops, the period of observation was less than two minutes.  *See* Period of Observation Table.  Only five of the 1,044 unlawful stops identified by Dr. Fagan involved periods of observation of greater than ten minutes.  *See* Table 15: Distribution of Period of Observation, Pl. Ex. 99.

[381]    *See* Def. Findings ¶ 8; Smith Report at 34–39.  Neither Dr. Smith nor defendants offer a total of the number of stops contested by Dr. Smith in this way. Plaintiffs state that Dr. Smith identified thirty-six stops with contestable text strings out of Dr. Fagan's 1,044.  *See* Pl. Findings ¶ 12.

[382]    *See* Smith Report at 34–35.

115

defendants argue that Dr. Fagan's list of unlawful stops should not have included the forty-one stops in which an officer marked Furtive Movement on Side 1 and a box on Side 2 labeled "Ongoing Investigations, e.g., Robbery Pattern" (the "Ongoing Investigations" box).[383]

Rather than addressing each of these claims individually, it is enough to note that even if the one hundred forty-three stops involving observation periods over two minutes, the thirty-six stops with contestable text strings, and the forty-one stops with both Furtive Movements and Ongoing Investigations marked were excluded from Dr. Fagan's grand total of 1,044 unlawful stops, the total would still show that out of the 1,663 stops in Dr. Fagan's revised set of trespass stops outside TAP buildings in the Bronx in 2011, over eight hundred (824) were unconstitutional. That is, even if defendants' arguments on these points are accepted — and I am not convinced that they should be — Dr. Fagan's report would still show that on hundreds of occasions in the Bronx in 2011, people were stopped without basis outside of TAP buildings, in violation of their rights under the U.S. Constitution, and required to answer questions from an officer with the power to arrest them if they answered incorrectly.

The essential fact, sufficiently established by Dr. Fagan's analysis

---

[383]   *See* Def. Findings ¶ 9; App. B.

when viewed in combination with the other evidence discussed above, is that a
very large number of constitutional violations took place outside TAP buildings in
the Bronx in 2011.  Whether the percentage of trespass stops that were
unconstitutional was thirty or sixty, and whether one assumes that officers failed to
fill out UF-250s ten, twenty, or fifty percent of the time, plaintiffs have succeeded
in showing a clear likelihood that they will be able to prove that the City of New
York and its agents displayed deliberate indifference toward the violation of the
constitutional rights of hundreds and more likely thousands of individuals prior to
2012.

### v.      Notice to Defendants

By 2011 city policymakers were on actual notice of a practice of
unconstitutional trespass stops by city employees outside TAP buildings in the
Bronx.[384]  As early as 1999, the NYPD Legal Bureau was aware that it was
unlawful to stop someone simply for entering and exiting a TAP building.[385]  By
July 2010, as Inspector Sweet testified, the NYPD was on actual notice that
officers were unlawfully approaching people entering or inside TAP buildings to

---

[384]      *See supra* Part IV.B.1.

[385]      *See* 1999 TAP Legal Guidelines at 6; Tr. 10/18 at 684:2–4.

117

question them about their presence.[386]   The special counsel to Commissioner Kelly

attended meetings where the problem was discussed.[387]   In February 2011, a

number of NYPD officials received letters from ADA Rucker on behalf of the

Bronx DA's office clarifying the unconstitutionality of stopping people merely for

entering or exiting a TAP building.[388]   Throughout this period, the NYPD received

copies of decline to prosecute forms describing arrests in which officers apparently

stopped people for no reason other than their proximity to a TAP building.[389]

### vi.   Legal Analysis

Deliberate indifference is "a stringent standard of fault,"[390] especially

when it is based on a failure to train.[391]   Nevertheless, "deliberate indifference may

be inferred where 'the need for more or better supervision to protect against

constitutional violations was obvious,' but the policymaker 'fail[ed] to make

---

[386]   *See* Tr. 10/18 at 648:18–649:16.

[387]   *See id.* at 650:18–651:17.

[388]   *See id.* at 659:20–660:17.

[389]   *See* Tr. 10/16 at 256:8–13.

[390]   *Connick*, 131 S.Ct. at 1360.

[391]   *See id.* at 1359 (citing *Tuttle*, 471 U.S. at 822–23).

meaningful efforts to address the risk of harm to plaintiffs[.]'"[392]

Based on the conclusions above, plaintiffs have shown a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard. Stated in terms of *Connick*'s general standard for failure-to-train claims, plaintiffs have shown a clear likelihood of proving that city policymakers were on actual notice by 2011, and constructive notice prior to then, that the failure to train NYPD officers regarding the legal standard for trespass stops outside TAP buildings in the Bronx was causing city employees to violate the constitutional rights of a large number of individuals.[393] Stated in terms of the three-part *Walker* test for deliberate indifference through failure to train, plaintiffs have shown a clear likelihood of proving (1) city policymakers knew to a moral certainty that NYPD officers, who regularly patrol in and around TAP buildings in the Bronx, would confront the question of when it was legally permissible to stop people outside those buildings; (2) the decline to prosecute forms, ADA Rucker's letters, and the hundreds of UF-250 forms that failed to articulate reasonable suspicion for trespass stops outside TAP buildings provided an extensive record of NYPD officers mishandling these stops; and (3) when NYPD officers made the

---

[392]     *Cash*, 654 F.3d at 334 (quoting *Reynolds*, 506 F.3d at 192; *Vann*, 72 F.3d at 1049).

[393]     *See Connick*, 131 S.Ct. at 1359.

wrong choice in these stops, the deprivation of constitutional rights frequently resulted.[394]  Thus, plaintiffs have shown a clear likelihood of proving that city policymakers should have known that their inadequate training and supervision regarding trespass stops outside TAP buildings in the Bronx was "'so likely to result in the violation of constitutional rights,'" that their failure to train constituted deliberate indifference.[395]  Stated in terms of the constructive acquiescence standard, plaintiffs have shown a clear likelihood of proving that there was "a sufficiently widespread practice among police officers" of unlawful trespass stops outside TAP buildings "to support reasonably the conclusion that such abuse was the custom of the officers," and that "supervisory personnel must have been aware of it but took no adequate corrective or preventive measures."[396]

In fact, plaintiffs presented some evidence suggesting that the practice of making stops outside TAP buildings without regard for reasonable suspicion might have been "so persistent and widespread as to practically have the force of law."[397]  In addition to the sheer magnitude of apparently unlawful stops, ADA

---

[394]   *See Walker*, 974 F.2d at 297–98.

[395]   *Id.* at 298 (quoting *Canton*, 489 U.S. at 390).

[396]   *Jones*, 691 F.3d at 82.

[397]   *Connick*, 131 S.Ct. at 1359.

Rucker offered testimony suggesting that prior to her legal research into the standards governing stops outside TAP buildings, she had been explicitly advising officers that it was permissible to stop a person simply because he had exited a TAP building, so long as the officer had observed the person in the vestibule first.[398]  Even defendants seemed to recognize that the similarities among the stops described in this case support the conclusion that officers' behaviors were the result of uniform training.[399]

### b.    Failure to Rebut Deliberate Indifference Claim Based on Steps Taken by NYPD in 2012

Defendants spent a great deal of time at the hearing introducing evidence concerning steps the NYPD took in 2012 to improve TAP and provide training regarding stop and frisk practices.[400]  Yet in spite of receiving actual notice of NYPD officers carrying out widespread constitutional violations outside TAP buildings, and in spite of already being engaged in changes to the TAP program and the training related to stop and frisk more generally, the NYPD has failed to take meaningful action to address the *specific* and narrow problem at issue in this

---

[398]    *See* Tr. 10/15 at 176:14–23.

[399]    *See* Def. Findings ¶ 29 n.16 ("Defendants contend that any similarity in the interactions [between officers and plaintiffs] demonstrates that officers are being uniformly trained.").

[400]    *See supra* Part IV.B.

case:  the problem of unconstitutional trespass stops *outside* TAP buildings in the Bronx.  To date, as noted above, the only piece of instruction that has been provided to officers on a systematic basis and that specifically targets the problem at issue in this case is a single bullet point in a single slide show during a single part of the Rodman's Neck training.[401]  This has been the NYPD's most meaningful specific response to the problem that caused Charles Bradley's unlawful stop and arrest, Abdullah Turner's unlawful stop and arrest, the unlawful stop of J.G. that led Jaenean Ligon to fear for her son's life, Roshea Johnson's stop and interrogation in an unmarked NYPD van, all the other indignities that the other plaintiffs were obliged to suffer, and the hundreds of other unlawful stops, recorded and unrecorded, whose precise details this Court will never know.

The Rodman's Neck bullet point is plainly insufficient to rebut plaintiffs' showing of a clear likelihood of success on the merits of their deliberate indifference claim.  Nor did defendants provide reliable statistics regarding stops in 2012 that might have rebutted plaintiffs' claim.  Defendants have provided no evidence that the NYPD has ceased its practice of making unlawful trespass stops outside TAP buildings in the Bronx.

The evidence introduced by defendants of broader reforms to TAP

---

[401]   *See* Street Encounters Presentation at 40; Tr. 10/17 at 572:24–573:6; Tr. 10/18 at 663:13–664:1.

and stop and frisk undertaken by the NYPD in 2012 also does not rebut plaintiffs'
case that city policymakers have displayed deliberate indifference to an ongoing
practice of constitutional violations by city employees based on unlawful stops
outside TAP buildings.  To the contrary, many of the training materials introduced
by defendants may serve to further entrench the problem of these unconstitutional
stops.  In some cases, defendants' introduction of training materials not only failed
to rebut plaintiffs' case, but made plaintiffs' case stronger.

Most strikingly, within the last year the NYPD has produced a video
on stop and frisk that has now been shown in every precinct.[402]  Chief Shea
testified that "it would be fair to say that every single member of a patrol borough
has probably" seen the video by now.[403]  The video, whose script was also entered
into evidence, begins by briefly summarizing the four levels of police encounters
recognized by New York state courts.  Then the video provides the following
description of what constitutes a stop requiring reasonable suspicion, that is, a
*Terry* stop:

> Your authority to conduct a Stop Question and Frisk

---

[402]    *See* Tr. 10/19 at 900:21–904:20; Tr. 10/22 at 942:13–24; SQF
Training Video No. 5; Script of SQF Training Video No. 5.

[403]    *See* Tr. 10/22 at 22–24.  Chief Shea also testified that the information
in the video is "consistent with the training that recruit officers receive at the
academy" regarding reasonable suspicion.  *See* Tr. 10/19 at 904:16–20.

encounter is limited to public places within the City of New York. . . . A forcible stop can take many different forms. It can be constructive in nature, such as using verbal commands or blocking a subject's path. Or it could be an actual stop, such as grabbing or holding the subject.

> The courts will look to an officer's actions in making this determination. They consider: if the officer's gun was drawn; if the person was physically prevented from moving; the number and tone of verbal commands; the content of the commands; the number of officers present; and the location of the encounter.

> Usually just verbal commands, such as STOP, POLICE!!!, will not constitute a seizure. However, a verbal command, *plus other actions* may be considered a seizure — other actions, such as: using physical force to subdue a suspect; physically blocking a suspect's path; grabbing a suspect by the arm, shirt or coat; pointing a gun at a suspect; using an ASP or baton to contain a suspect; or placing a suspect against a wall or on the ground.[404]

This misstates the law. It is incorrect in its specific claim that if an officer yelled "STOP, POLICE!!!" and the person stopped, the result would not "[u]sually" constitute a *Terry* stop.[405] Indeed, it is difficult to imagine many contexts in which

---

[404]   Script of SQF Training Video No. 5 at 58–59 (formatting altered), beginning at roughly 6:35 in SQF Training Video No. 5.

[405]   Perhaps the video reflects a misunderstanding of the Supreme Court's ruling in *Hodari D.*, 499 U.S. at 626–28. *Cf.* Def. Findings ¶ 42 n.19 (citing *Hodari D.*). In *Hodari D.*, the Court explained that the word "seizure" "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *Id.* at 626. The Court's point was that there is no seizure unless the individual is in fact *seized*, in the sense of being *stopped*, either by physical force, or by submission to the assertion of the officer's authority — *not* that a *Terry* stop requires a display of authority beyond shouted commands. *See Swindle*, 407 F.3d at 572 (interpreting *Hodari D.*).

124

an officer shouting this command, followed by the person stopping, would *not* constitute a *Terry* stop.  As noted above, the test for a *Terry* stop is whether "a reasonable person would feel free 'to disregard the police and go about his business.'"[406]  If the "reasonable person" of Fourth Amendment law would feel free to disregard an officer yelling "STOP, POLICE!!!" and go about his business, then this "reasonable person" bears little or no resemblance to the many reasonable people who have been or will be affected by the NYPD's stop and frisk practices.

The video is also incorrect in its more general suggestion that an officer must deploy something resembling physical force or the threat of such force in order for an encounter to constitute a stop.  It is true that *Terry* stops are sometimes referred to as "forcible stops."[407]  But the test for a *Terry* stop, again, is not the use of force:  it is whether a "reasonable person" would feel free "'to disregard the police and go about his business.'"[408]  The Second Circuit has held, for example, that a stop took place where an officer twice ordered a person to "hold on a second," and after the second order the person stopped.[409]  The Second Circuit

---

[406]   *Bostick*, 501 U.S. at 434 (quoting *Hodari D.*, 499 U.S. at 628).

[407]   *See, e.g.*, *Alabama v. White*, 496 U.S. 325, 328 (1990) (referring to *Terry* stop as "forcible stop").

[408]   *Bostick*, 501 U.S. at 434 (quoting *Hodari D.*, 499 U.S. at 628).

[409]   *Simmons*, 560 F.3d at 101, 105–06.

also held that a stop occurred where an officer pointing a spotlight at a person said, "What, are you stupid?  Come here.  I want to talk to you," and then told the person to show his hands.[410]  In *Davis*, the City of New York conceded, and I held, that a person was stopped when he encountered an officer in a stairway, the officer asked if he lived in the building, the officer asked for his ID, and then the officer asked him to step out of the stairwell and into the lobby.[411]  I also held in *Davis* that a person was stopped "when she attempted to walk to the elevator, was told to 'come back' by [an officer], and stopped walking," because the officer's "order to 'come back' was an order to stop and [she] obeyed the order."[412]

The Second Circuit held more than twenty years ago, in a case that remains good law, that the following factors are indicative of a "seizure," which can mean either an arrest or a *Terry* stop:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the

---

[410]   *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000).  On the other hand, the court held that where a person encountered two officers in his dorm lobby, and the officers asked him to show them his hands, he was not seized.  *See id.* at 341.

[411]   *See Davis*, 2012 WL 4813837, at *5–6.

[412]   *Id.* at *14.

officer to accompany him to the police station or a police room.[413]

Because the yelled command "STOP, POLICE!!!" contains both language and a tone indicating that compliance is compulsory, the NYPD's video is incorrect to suggest that other actions would usually be required for an encounter to constitute a *Terry* stop.  Indeed, some of the "other actions" described by the NYPD's video — "using physical force to subdue a suspect; physically blocking a suspect's path; grabbing a suspect by the arm, shirt or coat; pointing a gun at a suspect; using an ASP or baton to contain a suspect; or placing a suspect against a wall or on the ground"[414] — go significantly beyond the level of coercion suggested by the Second Circuit's list of factors that define a *Terry* stop.  While any evaluation of whether a *Terry* stop has taken place requires consideration of the totality of the circumstances, it is clear that the NYPD's video conflicts with the Second Circuit's guidance:  there is a certain range of conduct that a viewer of the video would identify as insufficiently coercive to constitute a *Terry* stop, while a reader of the Second Circuit's list would identify the same conduct as falling squarely within the parameters of a *Terry* stop.

By raising the *Terry* bar above where it was set by the Second Circuit,

---

[413]   *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting *Lee*, 916 F.2d at 819).

[414]   Script of SQF Training Video No. 5 at 58–59.

127

the NYPD trains its officers that they do not need reasonable suspicion to engage in conduct that the Second Circuit would identify as sufficiently coercive to qualify as a *Terry* stop.  In other words, the NYPD's video, which was produced in 2012, which has now been seen by nearly every officer in the patrol bureau, and which defendants continue to present as a sign of their lack of deliberate indifference,[415] trains officers that it is acceptable to engage in conduct that amounts to a *Terry* stop without reasonable suspicion.

   The Chief of Patrol Field Training Unit Program Guide, which is distributed to supervisors in Operation IMPACT,[416] also reflects the tendency of NYPD training materials to exaggerate how intrusive a police encounter must be in order to constitute a *Terry* stop.  The Guide states that with something less than reasonable suspicion,[417] an officer may approach a person and engage in "pointed, invasive, and accusatory" questioning that is "intended to elicit an incriminating response," and even "ask for permission" to search the person.[418]  While "[t]he

---

   [415] *See* Def. Findings ¶ 42.

   [416] *See* Tr. 10/19 at 744:2–6.

   [417] Using the language of *De Bour* Level 2, not Level 3, the Training Guide requires a "founded suspicion that criminal activity is afoot" in order to approach and engage in an encounter of this kind.  *See* Training Guide at 17.

   [418] *Id.* (emphases omitted).  The Guide clarifies that the officer "may not touch the person, display a weapon, or act in a threatening manner," but notes that

Fourth Amendment does not proscribe all contact between the police and citizens,"[419] it is difficult to imagine many circumstances in which a reasonable person being aggressively interrogated by the police regarding suspected criminal activity could feel free "'to disregard the police and go about his business.'"[420]  The more realistic outcome would be for the person to assume that if he refused to answer, walked away, gave the wrong answers, or made a false move, serious consequences would follow.[421]  As Abdullah Turner testified, "I don't know anyone . . . who ever just walked away from a cop in the middle of a conversation."[422]  Given the high stakes of any encounter in which an officer interrogates someone regarding his suspected criminal activity, it is fanciful to say that a reasonable person would as a rule feel free in the midst of such an

---

"[i]f a confronted citizen walks away without answering, the officer may follow to continue questioning."  *See id.* at 17–18.

[419]    *Delgado*, 466 U.S. at 215.

[420]    *Bostick*, 501 U.S. at 434 (quoting *Hodari D.*, 499 U.S. at 628).

[421]    Indeed, based on the accounts of stops in the decline to prosecute forms, this appears to be an accurate expectation.  *See* App. A ¶¶ 12, 20, discussed below.  Moreover, it would not be surprising to learn that based on the experiences of their families, friends, and neighbors, the residents of these buildings fully appreciate the consequences that will follow if they attempt to walk away from the police during questioning.

[422]    Tr. 10/17 at 491:22–23.

interrogation to "'terminate the encounter'"[423] at will.

A lesson on TAP that was added to the Guide in 2012 similarly reflects a model of policing in which the investigative questioning of suspects routinely *precedes* rather than *follows* reasonable suspicion:

> A uniformed member of the service <u>may not</u> stop (temporarily detain) a suspected trespasser unless the uniformed member reasonably suspects that the person is in the building without authority. . . . Some factors which may contribute to "reasonable suspicion" that a person is trespassing . . . are contradictory assertions made to justify presence in the building and/or assertions lacking credibility made to justify presence in the building.[424]

---

[423]  *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436).

[424]  Training Guide at 65; Tr. 10/19 at 743:6–7.  I recognize that many of the NYPD's training materials purport to derive from *De Bour*, as defendants have emphasized.  *See, e.g.*, Def. Findings ¶ 42 & n.19.  Because plaintiffs have brought their case under the Fourth Amendment, and not New York law, Pl. Findings ¶¶ 64–71, it would lie beyond the scope of this Opinion to make general statements regarding the precise relations between the law of *De Bour* and the case law interpreting the Fourth Amendment.  I note, however, that in theory, *De Bour* should provide *greater* protection than the Fourth Amendment by restricting police action even in encounters whose level of invasiveness falls below the minimum threshold for Fourth Amendment scrutiny.  *See, e.g.*, *De Bour*, 40 N.Y.2d at 381 (prohibiting any investigative encounter, even at Level 1, if it is based on "intent to harrass" or "mere whim, caprice, or idle curiosity").

Some commentators have expressed skepticism regarding the practical virtues of *De Bour*'s multi-level analysis.  LaFave questions whether *De Bour*'s more sophisticated articulation of *Terry*'s balancing approach is advantageous, or is likely to result in "such confusion and uncertainty that neither police nor courts can ascertain with any degree of confidence precisely what it takes to meet any of these standards."  LAFAVE, SEARCH & SEIZURE § 9.4(e).  *Accord* Emily J. Sack, *Police Approaches and Inquiries on the Streets of New York: The Aftermath of*

Instead of reasonable suspicion providing a basis for investigative questioning, the NYPD's training materials suggest that the standard scenario is for investigative questioning to lead to reasonable suspicion.  The NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck similarly suggests that even when an officer lacks reasonable suspicion for a stop, the officer may not only approach and ask accusatory questions, but during the encounter may "place [his] hand on [his] holstered firearm" or "draw and conceal" his weapon, all without escalating the encounter to a *Terry* stop.[425]

What is most troubling about these materials is not the suggestion that

---

*People v. De Bour*, 66 N.Y.U. L. REV. 512, 520, 548–53 (1991) (arguing that "the courts routinely conflate the *De Bour* standards and use inappropriately low levels of suspicion to justify police intrusions," and that "the multitiered structure of the *De Bour* model allows inadequately justified low-level intrusions to escalate quickly into inappropriate forcible stops and arrests").  *See also* Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 MINN. L. REV. 349, 394 (1974) (a "sliding scale approach" to the Fourth Amendment may "produce more slide than scale").

The NYPD's training materials may illustrate the risk created by the multi-level doctrine of *De Bour*.  The mere existence of *De Bour* Level 2, and the inevitable difficulty of clearly distinguishing an encounter on the more intrusive end of Level 2 from an encounter on the less intrusive end of Level 3, creates problems of administrability.  In practice, the possibility of classifying a stop as Level 2 or even Level 1 may lead police to perform a large number of stops — in the ordinary sense of the word, but inevitably often in the *Terry* sense as well — without the minimal foundation in reasonable suspicion required by the U.S. Constitution.

[425]     Street Encounters Presentation at 16, 19.

investigative questioning might under certain circumstances lawfully precede

reasonable suspicion, but that it should do so as a matter of course, routinely, as the

rule rather than the exception.  If the difference between a *Terry* stop and a less

intrusive encounter hinges on indefinite factors such as the demeanor and

positioning of the officers; and if it is safe to assume that officers routinely display

their authority and power through aggressive behavior, as many of the officers did

in their encounters with plaintiffs in the instant case; then a training program that

invites officers to approach large numbers of people and question them without

reasonable suspicion will inevitably result in frequent *Terry* stops that lack

reasonable suspicion, effectively guaranteeing the commission of widespread

constitutional violations.  The evidence of numerous unlawful stops at the hearing

strengthens the conclusion that the NYPD's inaccurate training has taught officers

the following lesson:  stop and question first, develop reasonable suspicion later.[426]

  The NYPD's training failures may also help to explain why no UF-

250s were located for any of the plaintiffs in the instant case.  Based on training

---

[426] I note that the NYPD's stop practices also appear to conflict with the considered judgment of the New York State Legislature, which enacted New York's stop and frisk law.  This law states that without a warrant, "a police officer may stop a person . . . when he reasonably suspects that such person is committing, has committed, or is about to commit" a crime, "and may demand of him his name, address and an explanation of his conduct."  CPL § 140.50.  In other words, the New York State Legislature envisioned reasonable suspicion preceding the request for a name, address, and purpose.

materials like those above, the officers who stopped plaintiffs may very well have perceived themselves as not engaged in *Terry* stops at all, but in something less intrusive.  The NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck continues to encourage this belief, and the constitutional violations that will naturally follow from it, by redefining the standards for stops and arrests.  Thus, the final slide on arrests states:  "If you are at probable cause, you have made an arrest."[427]  This is not correct.  If you have arrested someone, you have made an arrest; whether or not you had probable cause only determines whether the arrest was constitutional.  Similarly, the presentation states:  "When an individual is stopped *based upon Reasonable Suspicion* a UF-250 must be prepared."[428]  IO 22 of 2012 offers a similar message:  "*When reasonable suspicion exists, a STOP, QUESTION AND FRISK REPORT WORKSHEET shall be prepared . . . .*"  Both of these statements are incorrect.  Whether a stop constitutes a *Terry* stop and thus requires the completion of a UF-250 form does not depend on whether the stop is based on reasonable suspicion, but on whether a reasonable person would have felt free to terminate the encounter.[429]

---

[427]     Street Encounters Presentation at 37 (capitalization altered).

[428]     *Id.* at 33 (emphasis altered).

[429]     *See Drayton*, 536 U.S. at 202.

In response to criticisms directed at the NYPD's training materials, defendants have argued that the materials reflect New York state law, and in particular *De Bour* and its progeny.[430]  Defendants assert that "New York Law applies" in the instant case.[431]  But practices that violate the Fourth Amendment cannot be saved by proving that they comply with state law.[432]  To the extent that *De Bour* suggests a police officer, without reasonable suspicion, may lawfully stop and question an individual in such a way that a reasonable person would not feel free to terminate the encounter, that suggestion would be incorrect.

## 2.    Irreparable Harm

In addition to showing a clear likelihood of success on the merits, plaintiffs have the burden of showing that they are "likely to suffer irreparable harm in the absence of preliminary relief."[433]  Plaintiffs have moved for class

---

[430]    *See, e.g.*, Def. Findings ¶ 42 & n.19.

[431]    *Id.*

[432]    As I noted in the Introduction, the Supreme Court held in *Sibron* that "New York is, of course, free to develop its own law of search and seizure to meet the needs of local law enforcement.  . . .  It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct."  392 U.S. at 60–61.  *Sibron* makes clear that any conflict between the Fourth Amendment and New York state law must be resolved in favor of the Fourth Amendment.

[433]    *Winter*, 555 U.S. at 20.

134

certification in connection with their motion for a preliminary injunction.

Plaintiffs' putative class is "comprised of individuals who have been or are at risk

of being subjected to the New York City Police Department's practice of stopping

individuals outside of buildings enrolled in Operation Clean Halls in the Bronx on

suspicion of trespassing inside those buildings."[434]

 While I have not yet ruled on plaintiffs' motion, "[i]t is well

established that '[c]ertain circumstances give rise to the need for prompt injunctive

relief for a named plaintiff or on behalf of a class' and that the 'court may

conditionally certify the class or otherwise award a broad preliminary injunction,

without a formal class ruling, under its general equity powers.'"[435]  Based on the

conclusions in the preceding section, the putative class in this case is threatened

with imminent violations of their constitutional rights in the absence of preliminary

relief.[436]  The frequency of unconstitutional trespass stops outside Clean Halls

buildings reflected in the decline to prosecute forms and Dr. Fagan's report

---

[434]    Class Mem. at 1.

[435]    *Strouchler v. Shah*, — F. Supp. 2d —, 2012 WL 3838159, at *8
(S.D.N.Y. Sept. 4, 2012) (quoting ALBA CONTE & HERBERT NEWBERG, NEWBERG
ON CLASS ACTIONS § 9:45 (4th ed. 2002)).

[436]    *See id.* at *6 ("In order to merit preliminary relief, the threat of
irreparable harm must be imminent." (citing *Rodriguez v. DeBuono*, 175 F.3d 227,
235 (2d Cir. 1999)).

establishes that members of plaintiffs' putative class will likely be subject to such

stops between now and the completion of trial if this Court does not act.  Because

"[t]he violation of a constitutional right . . . constitutes irreparable harm for the

purpose of a preliminary injunction,"[437]  plaintiffs have carried their burden of

showing likely irreparable harm on behalf of the putative class.

### 3.    Balance of Equities

In order to qualify for a preliminary injunction, plaintiffs must show

"that the balance of equities tips in [their] favor."[438]  Given that a preliminary

injunction is "'an extraordinary remedy never awarded as of right,'"[439] it would be

inappropriate to award such an injunction if doing so would result in an

arrangement less fair to the parties than the status quo, such as an arrangement in

which the hardship imposed on one party outweighed the benefit to the other.

"[T]he Court should 'balanc[e] . . . the equities to reach an appropriate result

protective of the interests of both parties.'"[440]

---

[437]    *Ligon*, 2012 WL 3597066, at *1 (citing *Johnson v. Miles*, 355 F. App'x 444, 446 (2d Cir. 2009)).

[438]    *Winter*, 555 U.S. at 20.

[439]    *UBS Fin. Servs.*, 660 F.3d at 648 (quoting *Winter*, 555 U.S. at 24).

[440]    *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994) (quoting *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1330 (2d Cir. 1987)) (emphasis omitted).

I do not take lightly the burden on defendants of altering NYPD policies and training procedures. It is partly out of concern for defendants' hardships that I have rejected some of plaintiffs' proposed remedies.[441] Nevertheless, the burden on putative class members of continued unconstitutional stops goes far beyond administrative inconvenience. As I stated in *Floyd*:

> The right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[442]

Eliminating the threat that the kinds of stops described by plaintiffs might occur at any moment, without legal justification, in the vicinity of one's home and the homes of one's friends and family, is itself an important interest deserving of judicial protection.

Equally important are the potential consequences of an unlawful stop. The stakes of "field interrogation"[443] by the police have dramatically risen since *Terry* was decided in 1968. The use of incarceration has increased, sentences have

---

[441]    *See* Pl. Findings ¶¶ 73–75.

[442]    *Floyd*, 283 F.R.D. at 158–59 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

[443]    *Terry*, 392 U.S. at 12, 14.

grown, the threat of lengthy incarceration has created new incentives to plead

guilty, and the collateral consequences of a conviction — on employment, housing,

access to government programs, and even the right to vote or serve on a jury —

have become more common and more severe.  If an unjustified stop happens to

lead to an unjustified arrest for trespassing, as it did in Charles Bradley's case, not

every overburdened public defender will have the wherewithal to obtain a

notarized letter from the defendant's host explaining that the defendant was

invited, as Bronx Defender Cara Suvall did on behalf of Bradley.[444]  When

considering the relative hardships faced by the parties, it is important to consider

the potentially dire and long-lasting consequences that can follow from

unconstitutional stops.[445]

---

[444]     *See* Tr. 10/16 at 269:2–9; Rappa Letter.

[445]     Though it is unnecessary to reach the issue in this Opinion, I note that
the appropriate form of Fourth Amendment analysis may differ depending on the
quantity and nature of stops being scrutinized, and the remedies available.  Not
only are the consequences of stops different today than they were in 1968, but the
frequency of stops is far higher as well.  *See Floyd*, 283 F.R.D. at 159 (over 2.8
million stops by NYPD between 2004 and 2009).  As the stops have increased in
frequency, they have also become more standardized and predictable.  In *Terry*, the
Supreme Court emphasized "the myriad daily situations in which policemen and
citizens confront each other on the street."  *Terry*, 392 U.S. at 12.  "No judicial
opinion can comprehend the protean variety of the street encounter, and we can
only judge the facts of the case before us."  *Id.* at 15.  In the instant case, by
contrast, the contested police encounters are strikingly uniform.  The stops in the
decline to prosecute forms echo the stops of plaintiffs, which in turn echo aspects
of the training materials introduced at the hearing.  *See, e.g.*, IO 22 of 2012 at 2

Weighing the equities in light of the totality of the circumstances, the administrative burdens that defendants will face in revising the NYPD's policies and training materials are real, but are outweighed by plaintiffs' interest in not being subjected to unconstitutional stops outside their homes and the homes of their family and friends.

### 4.   Public Interest

Any preliminary injunction must be "in the public interest."[446]  Courts

---

(¶ 11).  *Terry* envisions street stops as uniquely tailored to unforeseen circumstances.  The stops in the instant case are more like the products of fixed, repeatable processes.  The NYPD training materials that teach these processes can be scrutinized in ways that an individual officer's discretionary act cannot.  Because of this, a different constitutional analysis may be appropriate.

In addition, the constitutional framework for the *ex post* evaluation of highly individualized, discretionary stops, where exclusion is the only remedy, may not be appropriate to the *ex ante* evaluation of routinized, highly scripted, largely predictable stops, where the remedy can involve changes in training.  Ultimately, "the central inquiry under the Fourth Amendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."  *Terry*, 392 U.S. at 19.  An invasion of privacy that is reasonable when it occurs on an *ad hoc* basis and is weighed in the context of the exclusionary rule may not be reasonable when it occurs as a matter of programmatic policy on a far larger scale.

*Terry* itself seems to invite scrutiny of stops falling below the intrusiveness of *Terry* stops, provided that the remedies applied are less severe than the exclusion of evidence.  "[O]f course, our approval of legitimate and restrained investigative conduct undertaken on the basis of ample factual justification should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate."  *Terry*, 392 U.S. at 15.

[446]      *Winter*, 555 U.S. at 20.

have no special institutional competence in determining what the public interest is, and the parties presented little evidence at the hearing directly addressing this issue.  Nevertheless, the public interests at issue in plaintiffs' motion are familiar from a long line of cases concerning "the power of the police to 'stop and frisk' . . . suspicious persons."[447]  In these cases, there is a recurring conflict between liberty and dignity on the one hand, and safety on the other.[448]

Because any member of the public could conceivably find herself outside a TAP building in the Bronx, the public at large has a liberty and dignity interest in bringing an end to the practice of unconstitutional stops at issue in this case.  Even if the constitutional violations described by plaintiffs were confined to the members of a discrete community, the public has a clear interest in protecting the constitutional rights of all its members.  At the same time, enforcing constitutional restrictions on the NYPD's ability to stop and potentially frisk people outside TAP buildings could conceivably inhibit the NYPD's ability to provide security to the residents of those buildings and their communities.

In light of these considerations, and taking account of all the evidence presented at the hearing, I find that the public interest lies with the enforcement of

---

[447]   *Terry*, 392 U.S. at 10.

[448]   *See Davis*, 2012 WL 4813837, at *1.

the Constitution.  It is "'clear and plain'"[449] that the public interest in liberty and

dignity under the Fourth Amendment trumps whatever modicum of added safety

might theoretically be gained from the NYPD making unconstitutional trespass

stops outside TAP buildings in the Bronx.  I am not ordering the abolition or even

a reduction of TAP, which appears to be a valuable way of using the NYPD's

resources to enhance the security in voluntarily enrolled private buildings.[450]  My

ruling today is directed squarely at a category of stops lacking reasonable

suspicion.  Precisely because these stops lack rational justification, they are

presumably of less value to public safety than would be the stops of individuals

who displayed objectively suspicious behavior.

### C.    Appropriate Scope of Injunctive Relief

Injunctive relief "'should be narrowly tailored to fit specific legal

violations.'"[451]  In addition, "great[] caution is appropriate where a federal court is

asked to interfere by means of injunctive relief with a state's executive functions, a

---

[449]    *Reynolds*, 506 F.3d at 198 (quoting *Rizzo v. Goode*, 423 U.S. 362, 378 (1976)).

[450]    *See, e.g.*, Tr. 10/18 at 593:15–594:3 (testimony of landlord to the advantages of enrollment in Operation Clean Halls).

[451]    *Patsy's Ital. Res., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (quoting *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003)).  *Accord City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143–44 (2d Cir. 2011) (summarizing limitations on scope of injunctive relief).

sphere in which states typically are afforded latitude."[452]  Prudence counsels in favor of the exercise of restraint and caution when the important interests of policing and safety may conflict with the equally important interests of protecting the constitutional rights of all those who are or may be affected by police practices in New York City.[453]  Nevertheless, where the levers of municipal democracy have failed, leaving in place practices that violate constitutional rights, courts have a duty to intervene.  As I stated in *Floyd*, safeguarding the liberties guaranteed under the Fourth Amendment "is quintessentially the role of the judicial branch."[454]

In light of these considerations, as well as the findings of fact and conclusions of law detailed above, I impose the following preliminary relief:

### 1.    Immediate Relief

---

[452]    *Reynolds*, 506 F.3d at 198.

[453]    Some recent scholarship has argued that the NYPD's stop and frisk program may be partly responsible for the decline in crime in New York City in recent decades.  *See* FRANKLIN E. ZIMRING, THE CITY THAT BECAME SAFE: NEW YORK'S LESSONS FOR URBAN CRIME AND ITS CONTROL (2011).  The issue in this case, however, is not whether trespass stops outside TAP buildings in the Bronx are effective at reducing crime, but whether they are constitutional.  No matter how effective a police practice may be, if it violates the Fourth Amendment, the Constitution requires the government to find other means of achieving its goals.  For example, while preventive detention might be an effective law enforcement tool, police departments are not allowed to employ it, because doing so would violate the Constitution.

[454]    *Floyd*, 283 F.R.D. at 159.

The NYPD is ordered immediately to cease performing trespass stops outside TAP buildings in the Bronx without reasonable suspicion of trespass, in accordance with the law as set forth and clarified in this Opinion.[455]  To summarize:  as the Fourth Amendment has been interpreted by the U.S. Supreme Court and the Second Circuit, an encounter between a police officer and a civilian constitutes a *Terry* stop whenever a reasonable person would not feel free to "'terminate the encounter.'"[456]  The stops in this case illustrate that the threat or use of force is not a necessary or even typical element of *Terry* stops.  Encounters involving nothing more than commands or accusatory questioning can and routinely do rise to the level of *Terry* stops, provided that the commands and questioning would lead a reasonable person to conclude he was not free to

---

[455]    Defendants appear to believe that an order prohibiting stops outside TAP buildings that lack reasonable suspicion is "a simple command that the defendant obey the law," and thus is not legally cognizable.  *See* Def. Findings ¶ 54 n.21 (quoting *S.C. Johnson, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (interpreting Rule 65(d)).  But as I stated prior to the preliminary injunction hearing, "the City misapprehends the purpose of Rule 65."  *Ligon*, 2012 WL 3597066, at *3–4.  Cases like *S.C. Johnson* do not prohibit courts from ordering parties to obey the law, but rather require that such orders be *specific* and *clear*. *See S.C. Johnson*, 241 F.3d at 240.  "[A]n injunction must 'be specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'" *Id.* at 240–41.  The immediate relief ordered here is specific, clear, and necessary to correct the misconceptions of NYPD officers that led to the violations of constitutional rights at issue in this case.

[456]    *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436).

terminate the encounter.

In order for an officer to have "reasonable suspicion" that an individual is engaged in criminal trespass, the officer must be able to articulate facts providing "a minimal level of objective justification for making the stop,"[457] which means "something more than an inchoate and unparticularized suspicion or hunch.'"[458]  In particular, an individual observed exiting or entering and exiting a TAP building does not establish reasonable suspicion of trespass, even if the building is located in a high crime area, and regardless of the time of day.  For the reasons described above, "furtive movement" is a problematic basis for a trespass stop, especially when it is offered as a stand-alone justification.  If an officer is unable to articulate *anything* more specific than that a person displayed "furtive movement," including anything *about* the person's furtive movement that suggested trespass, then the statement that a person displayed "furtive movement" is nothing more than an unparticularized suspicion or hunch, and does not constitute reasonable suspicion.

## 2.   Proposed Additional Relief

In addition to the immediate relief ordered above, I *propose* to enter

---

[457]    *Wardlow*, 528 U.S. at 123.

[458]    *White*, 496 U.S. at 329 (quoting *Sokolow*, 490 U.S. at 7) (certain quotation marks omitted).

the preliminary relief described under the following subheadings.  I present this relief as a proposal for two reasons.  *First*, the parties in *Ligon* had little opportunity to argue and present evidence at the preliminary injunction hearing concerning the appropriate scope of relief.  *Second*, the preliminary relief I propose is similar though not identical to the relief sought by plaintiffs in the *Floyd* action, where I have already certified a city-wide class of plaintiffs alleging that they have or will be victims of unconstitutional stops.  *Floyd* is scheduled for trial on March 11, 2013.  As part of the proof in that case, plaintiffs intend to present evidence regarding the remedies they seek.

Because of the rapidly approaching trial date in *Floyd* and the inefficiency of hearing separate arguments regarding the closely related remedies at issue in *Ligon* and *Floyd*, I am ordering the consolidation of the remedies hearing in the instant case with the remedies portion of the *Floyd* trial.  Thus, the relief proposed under the subheadings below will not take effect until the parties in this case have had the opportunity to participate in a hearing at which they may present evidence or argument as to whether the proposed relief is insufficient or too burdensome or otherwise inappropriate, as well as regarding the appropriate timeline for relief.  This remedy hearing will be held in conjunction with the *Floyd*

trial, following the phase of the trial dealing with proof of liability.[459]  Plaintiffs'

counsel in *Ligon* and *Floyd* must coordinate their presentations with respect to

appropriate remedies.[460]  Submissions by counsel in *Ligon* related solely to

remedies must be filed no later than February 22, 2013, and may not exceed

twenty-five pages per side.

### a.    Policies and Procedures

The NYPD is ordered to develop and adopt a formal written policy

specifying the limited circumstances in which it is legally permissible to stop a

person outside a TAP building on a suspicion of trespass.  The policy must reflect

the fact that trespass stops outside TAP buildings are governed not only by New

York state law, but by the Fourth Amendment.  Guidance in drafting this policy

should be drawn from the legal discussion found in this Opinion.

---

[459]    I emphasize that this ruling should in no way be taken to indicate that I have already concluded that plaintiffs will prevail in *Floyd*.  The evidence presented by both sides in *Floyd* will be judged on its own merits.  While the Applicable Law section of this Opinion — *see supra* Part III — certainly applies to issues raised in *Floyd*, the Findings of Fact section does not.  As I have noted throughout this Opinion, this case relates *solely* to trespass stops outside of TAP buildings in the Bronx.  It is only because of the unavoidable overlap between the steps that are necessary to address plaintiffs' harms in the instant case, and the steps that *would be* necessary to address plaintiffs' harms in *Floyd* if plaintiffs prevailed there, that I am ordering the consolidation of the remedies presentations.

[460]    In the interests of efficiency, counsel in *Floyd* and *Ligon* are also permitted, but not required, to invite the participation of counsel in *Davis* in the presentation on appropriate remedies.

A draft of the written policy governing trespass stops outside TAP buildings shall be provided to the Court (or a monitor appointed by the Court) for approval prior to distribution, with a copy to plaintiffs' counsel.

### b.      Supervision

*First*, the City is ordered to take all necessary steps to ensure that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx. Again, a "stop" in the relevant sense is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter.

*Second*, the City is ordered to implement a system of review modeled on the one ordered by Chief Hall in paragraph 3 of Exhibit E.  Supervisory personnel in each Bronx precinct must review, on a quarterly basis, each UF-250 completed for a trespass stop outside a TAP building in the Bronx.  To the extent that such review reveals nonconformity with the formal written policy described above, the City will take specific steps to retrain the officer.  The results of these reviews and any retraining will be periodically reported to the relevant precinct commander, a designated member of the Bronx Borough Command, a designated member of the Chief of Patrol's Office, and plaintiffs' counsel.  Copies of all reviewed UF-250s shall be provided to plaintiffs' counsel.

### c.      Training

The City is ordered to revise the NYPD's training materials and training programs to conform with the law as set forth in this Opinion.  The instruction must be sufficient to uproot the longstanding misconceptions that have afflicted TAP in the Bronx.  It must include, but need not be limited to, the following reforms:  (1) The formal written policy governing trespass stops outside TAP buildings, described above, must be distributed to each Bronx NYPD member, and then redistributed two additional times at six-month intervals. (2) The stop and frisk refresher course at Rodman's Neck must be altered to incorporate instruction specifically targeting the problem of unconstitutional trespass stops *outside* TAP buildings.  Whether the instruction includes additional slides, role-playing, or exams, it must be sufficient to convey to all officers who attend the course that reasonable suspicion of trespass is required before making a trespass stop outside a TAP building.  Training regarding these stops must also be provided to new recruits and to officers who have already attended the Rodman's Neck refresher course and are not scheduled to do so again.  (3) Chapter 16 of the Chief of Patrol Field Training Guide must be revised to reflect the formal written policy governing trespass stops outside TAP buildings described above.  (4) SQF Training Video No. 5 must be revised to conform with the law as set forth in this Opinion.  I recognize that this step, like some of the others above, will involve

alterations to training materials used outside the Bronx and outside the context of

TAP.  But such steps are necessary to correct the longstanding misconceptions that

led to the violations of plaintiffs' constitutional rights described in this Opinion.

Drafts of the written or scripted training materials described above

shall be provided to the Court (or a monitor appointed by the Court) for approval

prior to use, with a copy to plaintiffs' counsel.

### d.    Attorneys' Fees

Reasonable attorneys' fees and costs will be rewarded as appropriate,

on application.

In closing, I stress that my conclusions in this Opinion are based on

the limited evidence presented at the preliminary injunction hearing.  It could be

the case that the development and implementation of IOs 22 and 23 of 2012, as

well as the changes to NYPD training in 2012, have resolved the problem of

unconstitutional trespass stops outside TAP buildings in the Bronx.  Because these

changes were so recent, however, and so late in the two-decade history of TAP,

they were insufficient to rebut plaintiffs' evidence at the hearing of defendants'

deliberate indifference to a practice of unconstitutional stops.  At any time that

defendants develop persuasive evidence, supported by reliable statistics, that

unconstitutional trespass stops are no longer taking place outside TAP buildings in

the Bronx, defendants may move for the dissolution of this preliminary injunction and the proposed relief.

## VI.   CONCLUSION

For the reasons explained above, plaintiffs' motion is granted, although the full extent of the relief has not yet been determined.[461]  No action is required by the Clerk of the Court, because plaintiffs' motion has already been closed.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        February 14, 2013
              New York, New York

---

[461]    Subsequent to the publication of the original version of this Opinion on January 8, 2013, I stayed the immediately ordered relief granted above.  *See Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 227654 (S.D.N.Y. Jan. 22, 2013).  The publication of this Amended Opinion does not have the effect of lifting the stay.

**APPENDIX A**

Excerpts from Decline to Prosecute Affidavits:

1.      The Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building, and asked defendant, why were you in the building? Defendant stated in sum and substance:  VISITING A FRIEND.  The Arresting Officer then observed defendant to have a white powdery substance on his nose . . . however, the amount was too small to field test or recover.

        The Arresting Officer arrested Defendant and charged him with violating New York State Penal Law section 140.15 (Criminal Trespass).  However, the Arresting Officer failed to ask defendant [redacted] you know anyone in the building; if so, what is the person's name and apartment number.

2.      [T]he defendants were observed exiting a clean halls building.  The defendants stated that they were there to visit a tenant . . . .  After being arrested a tenant from the building did corroborate the defendant's statements and the tenant stated that both defendants were in the building as his guests.

3.      The Arresting Officer . . . observed defendant exiting the lobby of . . . a Clean Halls Apartment Building.  The Arresting Officer . . . approached the defendant and asked the defendant do you live in the building and defendant stated in sum and substance: NO.  The Arresting Officer further asked the defendant what apartment did you come from and defendant stated in sum and substance: I MET WITH [redacted] IN THE LOBBY.  The Arresting Officer further asked defendant what apartment does [redacted] live in and defendant stated in sum and substance: I DON'T KNOW THE APARTMENT NUMBER.  [Another officer then went inside the building and asked two people exiting if they knew anyone by the name of the defendant's host.  When they said no, the defendant was arrested for trespass.]

4.      . . . Arresting Officer observed defendant enter and exit a Clean Halls Building.  Arresting Officer approached the defendant and asked her where she was coming [from], what was she doing in the building and what apartment number was she visiting.  Defendant responded in sum and substance: I WAS VISITING A FRIEND.  I AM NOT TELLING YOU THE APARTMENT NUMBER OR THE NAME.  [The defendant was then arrested for trespass.]

5.     Defendants entered . . . a clean halls building, and exited.  Defendant was stopped outside of the location.  When the arresting officer questioned the defendant, defendant stated, in sum and substance, I'M JUST CHILLING.  Defendant did not admit that he was in the location.  [The defendant was then arrested for trespass.]

6.     [A]rresting officer . . . observed the defendant enter and exit the lobby of . . . a Clean Halls Apartment Building, asked defendant does he live there and defendant did not respond.  The arresting officer then asked the defendant if he knows anyone in the apartment and defendant did not respond.  Arresting officer then asked defendant what was he doing in the building and defendant stated in sum and substance I WASN'T THERE TO BUY DRUGS.  [The defendant was then arrested for trespass.]

7.     Arresting Officer observed the defendant enter and exit the lobby of . . . a Clean Halls Apartment building, and asked defendant do you live in the building, do you know anyone in the building, what are you doing in the building, to which defendant stated in sum and substance:  NO, NO, I WAS INSIDE FOR A COUPLE OF MINUTES MAKING A PHONE CALL.  [The defendant was then arrested for trespass.]

8.     Arresting Officer . . . observed both defendants exit the lobby of . . . a Clean Halls Apartment Building and asked defendants what was their purpose inside of said building and defendant [redacted] stated in sum and substance: I WAS VISITING MY COUSIN [redacted] IN [redacted] but defendant [redacted] remained silent.  [Another officer] entered the building to investigate further, however, the arresting officer was unable to articulate how [the other officer] disproved [the speaking defendant's] claim.  [Both defendants were arrested for trespass.]

9.     Police Officer . . . observed the defendant exiting the lobby of . . . a Clean Halls Apartment Building and asked defendant whether he lived in the building and defendant stated in sum and substance: NO.  [The officer] then asked the defendant, were you visiting anyone in the building, and defendant stated in sum and substance: YES.  [The officer] then asked the defendant for the name of the person he was visiting and the apartment number and defendant stated in sum and substance: I DON'T KNOW.  [The defendant was then arrested for trespass.]

10.    Arresting Officer observed the defendant enter and exit the lobby of . . . a Clean Halls Building, and radioed defendant's description.  Arresting Officer's partner asked defendant why did you go into the building, do you know anyone in the building, to which defendant stated in sum and substance: I CAME OUT OF A FRIEND[']S APARTMENT.  I WAS INSIDE FOR ABOUT AN HOUR.  [The defendant was then arrested for trespass.]

11.    [T]he arresting officer observed the defendant enter into [a Clean Halls building] and exit after approximately five (5) minutes. . . .
        . . . The defendant was not observed in an area of the building that is not open to the public such as the hallways, lobby and stairwells.  [The defendant was arrested for trespass.]

12.    [A police officer] observed the defendant enter a Clean Halls Building and exit moments later. . . . [W]hen the defendant exited the building, [the officer] asked the defendant if he lived in the building, to which the defendant stated in sum and substance, NO. . . . [The officer] did not ask the defendant if he was a guest of a tenant in the building. . . . [T]he defendant attempted to walk away at which time [the officer] grabbed the defendant[']s arms, and the defendant pulled away.  [A struggle ensued, and the defendant was then arrested in part for trespass.]

13.    [T]he defendants entered a Clean Halls building, stayed there approximately five minutes, and then left.  The arresting officer stopped the defendants and asked them where they were coming from.  The defendants replied, in sum and substance, WE'RE COMING FROM . . . WE'RE COMING FROM . . ., and could not provide a name or apartment number.  The officer placed both defendants under arrest and searched them.

14.    The Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building, approached defendant and asked, Do you live in the building?, defendant stated in sum and substance: NO.  The Arresting Officer then asked the defendant, Do you know anyone in the building?, defendant stated in sum and substance: YES, A FRIEND.  The Arresting Officer then asked the defendant, What's your friend's name?  What apartment does your friend live in?, defendant stated in sum and substance: I DON'T KNOW HIS NAME.  HE'S IN [redacted].  The Arresting Officer went to [redacted] however, the apartment was unoccupied, and as a result, the Arresting Officer was unable to locate anyone who

could verify defendant's claim.  [The defendant was then arrested for trespass.]

15.    The Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building and [another officer] approached defendant on the sidewalk and asked defendant, Do you live in the building?, and defendant stated in sum and substance: NO.  [The officer] asked defendant, What was your reason for being in the building?, and defendant stated in sum and substance:  LOOKING FOR A GIRL.  [The officer] then asked the defendant, What's the name of the girl?, and defendant refused to provide an answer to the aforementioned question.  [The defendant was then arrested for trespass.]

16.    Arresting Officer observed the defendant enter and exit the lobby of . . . a clean halls Building.  [The defendant was then arrested for trespass.]  However, arresting Officer could not obtain a clean halls affidavit.

17.    [I]n front of . . . a Clean Halls building, [the arresting officer] observed defendant and several unapprehended individuals exit the lobby . . . .  [The officer] approached defendant and asked defendant if he knew anyone in above-mentioned location and defendant stated in sum and substance: NO.  I'M JUST LOOKING FOR MY FRIEND [redacted].  NO [redacted] DOESN'T LIVE HERE.  [The defendant was then arrested for trespass.]

18.    [D]efendant was observed entering and exiting the lobby of [a Clean Halls building].
       Arresting officer asked defendant what he was doing in the building and defendant stated in sum and substance I WAS IN THE BUILDING LOOKING FOR WORK.  Arresting officer asked defendant what kind of work he was looking for and defendant stated in sum and substance I WAS LOOKING FOR MY FRIEND [redacted].  Arresting officer asked defendant where his friend lived and defendant stated in sum and substance I DON'T KNOW WHERE HE LIVES.  [The defendant was then arrested for trespass.]

19.    Arresting officer observed defendant enter . . . a clean halls building and observed defendant exit said building.  Arresting officer approached and asked defendant, what were you doing in the building and defendant stated in sum and substance:  I WAS THERE TO VISIT A FRIEND.  I DON'T KNOW WHAT APARTMENT THEY LIVE IN.  [The officer then searched the defendant, found crack-cocaine and a pipe, and arrested defendant in part for trespass.]

20.    The arresting officer . . . observed defendant exiting the lobby of . . . a Clean Halls Apartment Building.  The arresting officer stopped defendant and defendant clenched his fists on his sides and spread his feet apart and . . . stated in sum and substance YOU'RE NOT GOING TO TOUCH ME.  YOU'RE NOT GOING TO TOUCH ME.  YOU'RE NOT PUTTING YOUR HANDS ON ME.  [The arresting officer then handcuffed defendant and placed him in the patrol vehicle.]

21.    [D]efendant was observed entering the above location, a Clean Halls Apartment building, and was also observed exiting said location minutes later. Arresting police officer . . . asked defendant if he lived in the building and defendant stated in sum and substance, I'M NOT THERE, I'M IN [redacted].  [The defendant was then arrested for trespass.]

22.    Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building.  Arresting officer approached defendant and asked him, do you live in the building, do you know anyone in the building, what apartment does your friend live [in], what is his name[,] to which defendant stated in sum and substance:  . . . NO I DON'T, YES I'M VISITING MY FRIEND ON THE [redacted] FLOOR, NO I'M NOT GOING TO GIVE YOU MY FRIEND'S NAME.  [The officer then patted down the defendant and arrested him in part for trespass.]

23.    Arresting officer observed defendant enter . . . a clean halls building and observed defendant exit said building.  Arresting officer approached and asked defendant, what were you doing in the building and do you know anyone in the building and defendant stated in sum and substance:  NO, I DON'T KNOW ANYONE AND I WENT TO BUY DRUGS.  [The defendant was then arrested in part for trespass.]

24.    The Arresting Officer states that . . . he observed defendant exiting . . . a Clean Halls Apartment Building.  The Arresting Officer approached defendant and asked defendant if he lives in the building and defendant stated in sum and substance: NO.  The Arresting Officer further asked the defendant where are you coming from and defendant stated in sum and substance:  I'M COMING FROM THE [redacted] FLOOR.  The Arresting Officer asked the defendant what apartment are you coming from and defendant stated in sum and substance:  I DON'T KNOW THE APARTMENT NUMBER BUT I'LL SHOW IT TO YOU. [The officer went with the defendant to the apartment.  No one answered the door.

The defendant was arrested for trespass.]

25.    Arresting Officer observed the defendant enter and exit the lobby of . . . a
Clean Halls Building.  Arresting Officer told defendant that he observed him enter
said building along with separately apprehended [redacted] . . . and separately
apprehended stated in sum and substance WE WERE IN THE BUILDING.
Arresting Officer then asked separately apprehended and defendant what apartment
they were visiting, and neither defendant nor separately apprehended provided a
response.  [The defendant was then arrested for trespass.]
        . . . [T]he Arresting Officer did not observe defendant to go beyond the
public vestibule of said building, nor did defendant admit to being inside of said
building, beyond the public vestibule.

26.    The arresting officer states that . . . inside of . . . a Clean Halls Building, she
observed defendant and separately apprehended [redacted] enter the lobby of said
location and exit shortly thereafter.  Arresting officer stopped defendant and asked
him if he lived in the building and defendant stated in sum and substance I DON'T
LIVE IN THE BUILDING.  Arresting officer asked defendant what he was doing
in the building and defendant stated in sum and substance I WAS WAITING FOR
A FRIEND.  Arresting officer asked defendant for the name of the person he was
waiting for and defendant did not reply.  Arresting officer asked defendant for his
identification and defendant was unable to produce one at which time arresting
officer attempted to handcuff defendant and defendant ran.

# APPENDIX B
Blank UF-250 Form

**- Appearances -**

**For Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

J. McGregor Smyth, Jr., Esq.
Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For Defendants:**

Heidi Grossman
Mark Zuckerman
Joseph Marutollo
Brenda Cooke
Richard Weingarten
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300