**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- X

**DAVID FLOYD,** *et al.,*

                **Plaintiffs,**

          - against -

**CITY OF NEW YORK,**

               **Defendant.**

------------------------------------------------------- X

**JAENEAN LIGON,** *et al.,*

                **Plaintiffs,**

          - against -

**CITY OF NEW YORK,** *et al.,*

               **Defendants.**

------------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 1034 (SAS)**

**12 Civ. 2274 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     BACKGROUND

        By letter dated August 27, 2013, defendants ("City") in the above-captioned actions moved for a stay of this Court's August 12 Orders pending appellate review.[1] On September 6, 2013, plaintiffs opposed the request for a

---

      [1]     *See* 8/27/13 Letter from Heidi Grossman and Linda Donahue, Assistants Corporation Counsel for the City, to the Court ("City Stay Ltr."). *See*

stay.[2]  Declarations in opposition to the stay were also received from City Council Speaker Christine Quinn; City Council Members Helen Foster and Robert Jackson; Joo-Hyun Kang, the Director for Communities United for Police Reform; and named plaintiff David Ourlicht.[3]  In addition, Public Advocate Bill de Blasio submitted an *amicus curiae* letter in opposition to the stay.[4]  On September 12, 2013, defendants filed a letter in reply to plaintiffs' opposition.[5]  For the following reasons, the request for a stay is DENIED.

The standard for obtaining a stay pending appeal is well-established, as is the burden of proof.  The court must consider:  "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether

---

*also Floyd v. City of New York*, No. 08 Civ. 1034, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013) ("Liability Opinion"); *Floyd v. City of New York*, No. 08 Civ. 1034, 2013 WL 4046217 (S.D.N.Y. Aug. 12, 2013) ("Remedies Opinion") (collectively, "August 12 Orders").

[2]    *See* 9/6/13 Letter from Jonathan C. Moore *et al.*, Counsel for *Floyd* Plaintiffs, to the Court ("*Floyd* Pl. Opp. Ltr."); 9/6/13 Letter from Alexis Karteron *et al.*, Counsel for *Ligon* Plaintiffs, to the Court ("*Ligon* Pl. Opp. Ltr.").

[3]    *See* Declarations of City Council Speaker Christine C. Quinn ("Quinn Decl."), City Council Member Helen D. Foster ("Foster Decl."), City Council Member Robert Jackson ("Jackson Decl."), *et al.*, Exhibits to *Floyd* Pl. Opp. Ltr.

[4]    *See* 9/6/13 Letter from *Amicus Curiae* Public Advocate Bill de Blasio to the Court ("Public Advocate Ltr.").

[5]    *See* 9/12/13 Letter from Heidi Grossman and Linda Donahue, Assistants Corporation Counsel for the City, to the Court ("City Reply Ltr.").

issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[6]  "The degree to which a factor must be present varies with the strength of the other factors, meaning that more of one factor excuses less of the other."[7]  The party seeking the stay bears the burden of proving that a stay is necessary.[8]  The Second Circuit has noted that this is "a difficult burden."[9]  Finally, "a stay is not a matter of right, even if irreparable injury might otherwise result."[10]

## II.   DISCUSSION

### A.   The Relief Ordered

Contrary to statements by certain high-level city officials and pundits, this Court did *not* order an end to the practice of stop and frisk.  Rather, this Court ordered that such activity be conducted in accordance with well-established controlling law from both the United States Supreme Court and the Second Circuit Court of Appeals.

In furtherance of this goal, the immediate relief ordered by this Court

---

[6]   *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[7]   *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quotation omitted).

[8]   *See Nken*, 556 U.S. at 433–34.

[9]   *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995).

[10]   *Nken*, 556 U.S. at 434 (quotation omitted).

in the Remedies Opinion consisted of (1) appointing a Monitor to ensure that the New York City Police Department ("NYPD") carries out its stop and frisk activities in a manner consistent with the mandates of the Fourth and Fourteenth Amendments to the United States Constitution; (2) appointing a Facilitator to meet with stakeholders in the community — including the NYPD, the Corporation Counsel, the Mayor, the City Council, the police unions, tenant associations, churches, schools, block associations, and any others that the Facilitator may identify — to suggest reforms that would accomplish the goal of conducting essential law enforcement activity in a constitutional manner; and (3) conducting a pilot project requiring the use of body-worn cameras by police officers on patrol in five select precincts, under appropriate terms and conditions to be recommended by the Monitor.  The costs associated with the activities of the Monitor, the Facilitator, and their necessary staff must be borne by the City.

Long-range relief requires the NYPD to institute new mechanisms for the training, supervision, monitoring, and disciplining of officers with respect to stop and frisk activity.  This relief includes revising the UF-250 form used to record stop activity, designing a tear-off form or card for police officers to give to the stopped person, improving the written records of stops and/or frisks in officer activity logs, improving training materials and classes, strengthening oversight by superior officers, and applying internal discipline where needed.  The vast majority of these reforms will not be implemented until the Facilitator and the Monitor have

-4-

the opportunity to work with the community, the NYPD, and the other stakeholders identified above to recommend appropriate reforms.

In short, the only activity at this stage is discussion between the Monitor, the Facilitator, and the parties to develop the remedies described above. No other specific relief is imminent, much less ordered.

**B.    Likelihood of Success on the Merits**

The Supreme Court has held that the first two factors — likelihood of success on the merits and irreparable harm — "are the most critical."[11]  Defendants have presented no cogent argument that they are likely to succeed on their appeal of this Court's Orders.  Defendants assert in a single conclusory paragraph in their opening letter brief that the Court erred in finding violations of the Fourth Amendment, violations in *Floyd* of the Fourteenth Amendment, and "any actionable widespread pattern or practice, deliberate indifference or causation" under *Monell v. Department of Social Services*.[12]  The City also asserts that the injunctive relief ordered in *Floyd* is "not narrowly tailored or clear enough to

_____

[11]     *Id.*

[12]     City Stay Ltr. at 2 (citing *Monell*, 436 U.S. 658 (1978)).  The City's reply to plaintiffs' opposition letter effectively acknowledges that the City does not attempt to carry its burden of establishing the likelihood of success on the merits. In response to plaintiffs' argument that the City's opening brief "made no showing" of likely success, *Floyd* Pl. Opp. Ltr. at 3, the City's reply "respectfully refers the Court" to the totality of the legal and factual arguments submitted by the City in "the years of litigation and substantive motion practice" prior to the August 12 Orders.  City Reply Ltr. at 6–7.

address found wrongs, particularly as it has no discernible end point or standards to measure success."[13]

Putting aside that the City made no convincing showing of a likelihood of success on appeal, the City's final point regarding the allegedly inappropriate injunctive relief is particularly troubling. The reason the relief is not yet "clear," that no end point is yet "discernible" and that "standards" have not yet been determined is because the remedial phase of the case is ongoing and no final order has yet issued. Plaintiffs identify this as a problem of "ripeness," "non-finality," "non-appealability," and lack of appellate jurisdiction.[14] Regardless of the legal basket in which the argument is placed, the result is the same. It takes time to fashion appropriate remedies. While the Court used the term "immediate" relief, this merely prioritized relief that should be implemented at the earliest practicable time,[15] as opposed to longer-range relief, which will not be implemented until after the completion of the Joint Remedial Process. The Remedies Opinion outlined the relief to be imposed in *Floyd* and — with more specificity — in *Ligon*. However, implementing remedies is a process — and a process that is still in its earliest stages. It is unlikely that any orders will issue for

---

[13]     City Stay Ltr. at 2.

[14]     *See Floyd* Pl. Opp. Ltr. at 2.

[15]     *See* Remedies Opinion, 2013 WL 4046217, at *5 (stating that the "Immediate Reforms" "will be developed and submitted to the Court as soon as practicable, and implemented when they are approved").

several months.  The only action required of the City to date is attendance at meetings with the Monitor.

### C.    Irreparable Harm

#### 1.    The City's Arguments

The City argues that irreparable harm is "imminent" for a number of reasons.  *First*, the City worries that communicating a summary of the Liability Opinion (through a FINEST message to all officers) will cause confusion if this Court's interpretation of the law is overturned.  Similarly, any retraining of officers on the legal aspects of stop and frisk, and then any changes in the practices of monitoring, supervision, and discipline that will implement that retraining, will also result in confusion should the Court's orders be overturned on appeal.

*Second*, the City argues that irreparable harm will result from the body-worn camera pilot project.  Specifically, the City argues that this pilot project will cause significant harm "in terms of time, resources and possible impingement on privacy rights of the public."[16]

*Third*, the City argues that this Court's orders violate principles of federalism, resulting in "constitutional harm which is always irreparable."[17]  The City claims that the constitutional harm arises from an "unjustified incursion into

---

[16]    City Stay Ltr. at 2.

[17]    *Id.*

-7-

the municipality's authority to police its citizens."[18]

## 2.   The Response

The City's first argument is circular.  The Court's orders simply require that the NYPD conform its policies and practices to well-established constitutional requirements.  The City's argument here is merely a restatement of its argument regarding the likelihood of success on the merits.  Because it believes the Court's decisions are based on an erroneous view of the law — despite repeated citations to Supreme Court and Second Circuit controlling law — it also believes that irreparable harm will result from basing any relief on those decisions. Thus, the City's argument conflates the first two factors and fails to prove either one.

With respect to the pilot project on body-warn cameras, it is undisputed that the project will require the expenditure of time and resources, but it is also clear that the Monitor will oversee the project to ensure that the privacy rights of both police officers and citizens are carefully protected.  The purpose of the experiment is to ensure that both police and citizens benefit from the recording of stop and frisk encounters — which will provide a contemporaneous and presumptively incontestable record of what occurred during the encounter.  Again, it does not appear that any irreparable harm will result from instituting a pilot

---

[18]    *Id.*

project that will be carefully developed prior to implementation and that has been used by other police departments with apparent success.

The City's federalism argument is equally flawed. The City has the obligation and the right to police its citizens — but it must do so in compliance with the dictates of the United States Constitution.[19] The Court's August 12 Orders require that all stops be based upon an objectively reasonable suspicion that a crime has been, is being, or will be committed,[20] and that all frisks be based on an objectively reasonable suspicion "that the person stopped is armed and dangerous.'"[21] Requiring the City to follow these principles *cannot as a matter of law* improperly intrude on the City's authority to police its citizens.[22]

In sum, the City has failed to show that it will be irreparably harmed

---

[19]     *See Sibron v. New York*, 392 U.S. 40, 61 (1968) (holding that New York "may not . . . authorize police conduct which trenches upon Fourth Amendment rights").

[20]     *See generally Terry v. Ohio*, 392 U.S. 1 (1968).

[21]     *United States v. Lopez*, 321 Fed. App'x 65, 67 (2d Cir. 2009) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)).

[22]     Federal courts have a duty to remedy constitutional violations, even where the relief ordered involves municipal institutions. *See Brown v. Plata*, 131 S. Ct. 1910, 1928–29 (2009) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."); *Allee v. Medrano*, 416 U.S. 802, 815 (1974) ("Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate."); *Association of Surrogates & Supreme Court Reporters Within City of N.Y. v. State of N.Y.*, 966 F.2d 75, 79, *opinion modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992) ("[S]tate budgetary processes may not trump court-ordered measures necessary to undo a federal constitutional violation[.]").

absent the imposition of a stay.

### D.    Harm to Plaintiffs If a Stay Is Issued

It is well-established that a violation of one's constitutional rights constitutes irreparable harm.[23]  A stay of this Court's orders would encourage the NYPD to return to its former practice of conducting thousands upon thousands of improper stops — including those based merely on a person entering or exiting a building in which he or she resides.  The recent reduction in the number of stops appears to have been a positive step toward remedying an improper practice without sacrificing the security of the community.[24]  Thus, in weighing the equities, the danger of granting a stay far outweighs any possible benefit of granting one.

### E.    The Public Interest

---

[23]    *See, e.g.*, *State of Conn. Dep't of Envtl. Prot. v. Occupational Safety &Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004).  The City suggests that any future violations of constitutional rights can be remedied by individual actions for damages, *see* City Stay Ltr. at 3, but I have already noted that such suits are "particularly ineffective as a remedy . . . where individuals often do not know what the basis for their stop was, and thus cannot know whether the stop lacked a legal basis or was influenced improperly by race."  Remedies Opinion, 2013 WL 4046217, at *3 n.21.

[24]    *Compare* City Stay Ltr. at 3 (noting that stops are down by more than 50% in the second quarter of 2013 compared to the second quarter of 2012), *with* Office of the Mayor of New York City, Weekly Update on Murders and Shootings in New York City (Aug. 27, 2013), Exhibit A to *Ligon* Pl. Opp. Ltr. (noting that the murder rate as of August 2013 had declined by 27% as compared to the same point in 2012 and that the number of murders committed with firearms had decreased by 30%).

The City's final argument is that the public interest favors a stay. The City dramatically declares that if this Court's orders are not stayed, the "long-standing record of crime reduction in this city" will be reversed.[25] The City goes on to say that "[i]f officers are required to be trained on erroneous principles of Fourth and Fourteenth Amendment law, the enforcement action that can no longer take place will certainly jeopardize potential crime victims."[26] Finally, the City states that public safety will suffer if police resources are spent on retraining and body-worn camera logistics instead of actual policing.[27]

The City offers no evidence to support the argument that the stop and frisk practices found unconstitutional in this Court's opinions are necessary to crime reduction. Indeed, the evidence cited by the City directly contradicts this argument. The City notes that the number of stops in the second quarter of 2013 is half what it was in the second quarter of 2012.[28] Despite the precipitous decline in the number of stops, the crime rate has continued to fall (or has certainly not increased).[29] The City presents no evidence that effective policing and

---

[25]    City Stay Ltr. at 3.

[26]    *Id.*

[27]    *See id.*

[28]    *See id.*

[29]    *See supra* note 24 (citing crime statistics). *See also* Public Advocate Ltr. at 6 (noting that while the use of stop and frisk has fallen more than 50% in New York City since last year, the overall crime rate has declined 2.7% during the

constitutional policing are incompatible.

There is little doubt that the decrease in stops from their zenith in 2011 to today is due, in part, to this Court's orders over the past several years, as well as the criticisms of the City's stop and frisk practices from diverse sources throughout the City.  Ordering a stay now would send precisely the wrong signal. It would essentially confirm that the past practices, resulting in hundreds of thousands of stops — overwhelmingly of minorities — that resulted in little or no enforcement action or seizure of contraband were justified and based on constitutional police practices.  It would also send the message that reducing the number of stops is somehow dangerous to the residents of this City.  Because neither proposition is accurate, the granting of a stay is not in the public interest. By contrast, allowing a process of consultation with all stakeholders, and recommendations for measured reform, is in the public interest.

A number of elected City officials reached the same conclusion.  They submitted statements opposing the City's request for a stay.  Their statements contain frequent invocations of the public interest.  For example, City Council Speaker Christine Quinn stated that she opposes the City's request for a stay

> because the joint remedial process is integral to repairing the damage in community relations caused by the current stop and frisk policies and to meaningfully move forward towards achieving reforms that balance the need for effective policing

---

same time period, including a 30% decline in murders).

policies with protections for the constitutional rights of every New Yorker, and, in particular, New York City's minority residents. . . . [T]he joint remedial process will facilitate a much-needed dialogue between the NYPD and the community. . . . [T]he public has a strong interest in beginning the remedial process immediately and ending the practice of unconstitutional stops. . . . [I]t is a *delay* in implementing important and necessary reforms . . . that would cause irreparable harm to the City and its residents.[30]

Similarly, Public Advocate Bill de Blasio stated:

A stay of the Remedies Order will result in irreparable harm to the citizenry of New York by allowing the unconstitutional stop and frisk violations of untold numbers of people to continue, especially and disproportionately in communities of color. . . . It is the irreparable harm to the constitutional rights of thousands of New Yorkers should the Remedies Order *not* be implemented that weighs decisively *against* granting a stay. . . . The violation of an individual's civil liberties and constitutional rights is *per se* irreparable harm that cannot justify staying an injunction crafted to cease and remedy the violation. . . . The City's continued stonewalling harms New York, and a stay would reward such obstinance. . . . It is well-past time for the City to cease the meritless scare tactic of contending that conforming the use of stop and frisk to constitutional standards will increase crime or make the public unsafe. There is simply no proof of the divisive proposition that the District Court Orders will harm the public.[31]

City Council Member Helen Foster wrote:

The stay is not in the public interest. Rather, starting the reform process through a dialogue between stakeholders and the NYPD will immediately pave the way for meaningful changes to the NYPD's stop and frisk policies. Such a dialogue will also ease

---

[30]    Quinn Decl. ¶¶ 7–10.

[31]    Public Advocate Ltr. at 1, 4, 5, 8.

tensions between the community and the NYPD . . . .[32]

Likewise, City Council Member Robert Jackson, the co-chair of the Council's

Black, Latino and Asian Caucus, wrote:

> The [Caucus] believes that this court-ordered dialogue will finally force the NYPD to meaningfully engage with communities of color and to confront the reality that current stop and frisk policies reinforce negative racial stereotypes and engender a distrust of the police. . . . The public has a strong interest in beginning the remedial process immediately and ending the practice of unconstitutional stops, with the dual goals of securing the liberties guaranteed by the Constitution, as well as fostering the kind of community trust in the NYPD that can ultimately contribute to its efforts to reduce crime.[33]

The submissions of these City officials are entitled to significant weight in

determining where the public interest lies.  In short, adapting the words of Judge

Susie Morgan of the United States District Court of the Eastern District of

Louisiana, the "residents of [New York] will suffer substantial harm to their

interests in having a constitutional police force if the Court grants the City's

motion [for a stay]."[34]

## III.   CONCLUSION

For the reasons set forth above, the City's request for a stay of this

Court's August 12 Orders is DENIED.

---

[32]     Foster Decl. ¶ 12.

[33]     Jackson Decl. ¶¶ 10, 13.

[34]     *United States v. City of New Orleans*, No. 12 Civ. 1924, 2013 WL 492362, at *4 (E.D. La. Feb. 8, 2013).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      September 17, 2013
            New York, New York

-15-

- **Appearances** -

**For *Floyd* Plaintiffs:**

Jonathan C. Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

Darius Charney, Esq.
Sunita Patel, Esq.
Chauniqua Young, Esq.
Baher Azmy, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Eric Hellerman, Esq.
Kasey L. Martini, Esq.
Bruce Corey, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

**For *Ligon* Plaintiffs:**

Alexis Karteron, Esq.
Christopher Dunn, Esq.
Daniel Mullkoff, Esq.
NY Civil Liberties Union Foundation
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

Mariana Kovel, Esq.
Scott Levy, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

J. McGregor Smyth, Jr., Esq.
NY Lawyers for the Public Interest
151 West 30th Street, 11th Floor
New York, NY 10001
(212) 244-4664

John A. Nathanson, Esq.
Jeffrey Resetarits, Esq.
Michael Grunfeld, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For *Floyd* and *Ligon* Defendants:**

Linda Donahue
Heidi Grossman
Assistants Corporation Counsel
Special Federal Litigation Division
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300

**For *Amicus Curiae* New York City
Public Advocate Bill de Blasio:**

Steven R. Newmark
General Counsel
Office of the Public Advocate
One Centre Street
New York, NY 10007
(212) 669-7200

John Siegal, Esq.
Fernando A. Bohorquez, Jr., Esq.
Jacqlyn R. Rovine, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4245