# CRAVATH, SWAINE & MOORE LLP

| | | | | |
|---|---|---|---|---|
| JOHN W. WHITE | DAVID R. MARRIOTT | | KEVIN J. ORSINI | NICHOLAS A. DORSEY |
| EVAN R. CHESLER | MICHAEL A. PASKIN | WORLDWIDE PLAZA | MATTHEW MORREALE | ANDREW C. ELKEN |
| RICHARD W. CLARY | ANDREW J. PITTS | 825 EIGHTH AVENUE | JOHN D. BURETTA | JENNY HOCHENBERG |
| STEPHEN L. GORDON | MICHAEL T. REYNOLDS | NEW YORK, NY 10019-7475 | J. WESLEY EARNHARDT | VANESSA A. LAVELY |
| ROBERT H. BARON | ANTONY L. RYAN | | YONATAN EVEN | G.J. LIGELIS JR. |
| DAVID MERCADO | GEORGE E. ZOBITZ | TELEPHONE: +1-212-474-1000 | BENJAMIN GRUENSTEIN | MICHAEL E. MARIANI |
| CHRISTINE A. VARNEY | GEORGE A. STEPHANAKIS | FACSIMILE: +1-212-474-3700 | JOSEPH D. ZAVAGLIA | LAUREN R. KENNEDY |
| PETER T. BARBUR | DARIN P. MCATEE | | STEPHEN M. KESSING | SASHA ROSENTHAL-LARREA |
| THOMAS G. RAFFERTY | GARY A. BORNSTEIN | | LAUREN A. MOSKOWITZ | ALLISON M. WEIN |
| MICHAEL S. GOLDMAN | TIMOTHY G. CAMERON | | DAVID J. PERKINS | MICHAEL P. ADDIS |
| RICHARD HALL | KARIN A. DEMASI | CITYPOINT | JOHNNY G. SKUMPIJA | JUSTIN C. CLARKE |
| JULIE A. NORTH | DAVID S. FINKELSTEIN | ONE ROPEMAKER STREET | J. LEONARD TETI, II | SHARONMOYEE GOSWAMI |
| ANDREW W. NEEDHAM | DAVID GREENWALD | LONDON EC2Y 9HR | D. SCOTT BENNETT | C. DANIEL HAAREN |
| STEPHEN L. BURNS | RACHEL G. SKAISTIS | TELEPHONE: +44-20-7453-1000 | TING S. CHEN | EVAN MEHRAN NORRIS |
| KATHERINE B. FORREST | PAUL H. ZUMBRO | FACSIMILE: +44-20-7860-1150 | CHRISTOPHER K. FARGO | LAUREN M. ROSENBERG |
| KEITH R. HUMMEL | ERIC W. HILFERS | | KENNETH C. HALCOM | |
| DAVID J. KAPPOS | GEORGE F. SCHOEN | | DAVID M. STUART | |
| DANIEL SLIFKIN | ERIK R. TAVZEL | WRITER'S DIRECT DIAL NUMBER | AARON M. GRUBER | SPECIAL COUNSEL |
| ROBERT I. TOWNSEND, III | CRAIG F. ARCELLA | +1-212-474-1080 | O. KEITH HALLAM, III | SAMUEL C. BUTLER |
| PHILIP J. BOECKMAN | DAMIEN R. ZOUBEK | | OMID H. NASAB | |
| WILLIAM V. FOGG | LAUREN ANGELILLI | | DAMARIS HERNÁNDEZ | |
| FAIZA J. SAEED | TATIANA LAPUSHCHIK | WRITER'S EMAIL ADDRESS | JONATHAN J. KATZ | |
| RICHARD J. STARK | ALYSSA K. CAPLES | bgruenstein@cravath.com | MARGARET SEGALL D'AMICO | OF COUNSEL |
| THOMAS E. DUNN | JENNIFER S. CONWAY | | RORY A. LERARIS | MICHAEL L. SCHLER |
| MARK I. GREENE | MINH VAN NGO | | KARA L. MUNGOVAN | CHRISTOPHER J. KELLY |

June 5, 2020

*Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT)

Dear Judge Torres:

      I am counsel to the Monitor, Peter L. Zimroth, and respectfully write in response to the letter filed by Plaintiffs in the above-captioned matter on May 1, 2020. In their letter, Plaintiffs represent that the Monitor "has yet to provide meaningful reporting" on the "central terms" of the consent decree in this matter. (Letter from NYCLU & The Bronx Defenders, ECF No. 412,[1] at 1 (May 1, 2020) [hereinafter "Pls. Ltr."].) They state that "further direct efforts with the monitor will not remedy this situation," and ask that this Court direct the Monitor to report on the NYPD's compliance with all terms of the decree, provide the instruments and methods that he and his team are using to assess that compliance, and file a plan with deadlines for all monitoring tasks. (*Id.* at 1, 4.)

      Plaintiffs' account of the Monitor's reporting and correspondence in this matter is incomplete and misleading. The Monitor has reported in detail on the NYPD's compliance with the orders in this matter—both the 2013 preliminary injunction and the

---

[1] All ECF cites refer to documents as filed on the *Ligon* docket.

2017 consent decree—throughout the monitorship, including in the Monitor's First, Second, Fourth, Seventh, Ninth, and Tenth Reports. After the 2017 decree was ordered, the Monitor team shared a monitoring plan with Plaintiffs that included methodologies for assessing compliance with the decree's provisions. Since then, the team has received and considered Plaintiffs' feedback on multiple iterations of those methodologies, including the latest and final iterations published with the Tenth Report. And the team has explained to Plaintiffs that it will report on compliance with the provisions of the consent decree in its six-month reports, including in the forthcoming Eleventh Report.

Thus, the directives that Plaintiffs request from this Court are superfluous or moot. The Monitor's reports will assess compliance with the provisions of the consent decree; Plaintiffs have seen and had ample opportunities to comment on the instruments and methodologies of compliance; and there is already a biannual schedule in place for the Monitor's reports. Accordingly, Plaintiffs' requests should be denied.

I.   **The History of *Ligon* Compliance Monitoring and Reporting**

   A.   *Preliminary Injunction*

In February 2013, this Court granted Plaintiffs' motion for a preliminary injunction in this matter. In its opinion and order (the "Preliminary Injunction"), this Court ordered that the NYPD (or "the Department") stop performing trespass stops outside Trespass Affidavit Program ("TAP") buildings in the Bronx without reasonable suspicion of trespass, and also adopt broader reforms with respect to the Department's TAP trespass enforcement (i) policies and procedures, (ii) training, and (iii) supervision. (Amended Opinion & Order, ECF No. 105, at 143-49 (Feb. 14, 2013) [hereinafter "Prelim. Inj."].)

In August 2013, this Court appointed the Monitor to oversee these reforms, and left to his discretion the matters of appropriate timeframe for oversight tasks and appropriate reporting; as explained below, the Monitor has chosen to report on *Ligon* mandates in the six-month reports (the "Reports") that this Court ordered for *Floyd, et al. v. City of New York*, 08-CV-1034 (AT). (*See* Opinion and Order, ECF No. 120, at 33 (Aug. 12, 2013) [hereinafter "Remedial Order"]). And in November 2014, following the withdrawal of the City's appeals in this matter and in *Floyd*, the monitorship began.

B.   *Monitorship Milestones*

One of the Monitor's first tasks was to work with the parties to establish milestones in the *Ligon* and *Floyd* matters in January 2015.[2] These milestones set forth the criteria the NYPD needed to meet in order to satisfy the requirements of the court orders in each matter. (First Report of the Independent Monitor, ECF No. 235, at 11 (July 9, 2015) [hereinafter "First Report"].) Milestones for the *Ligon* matter included that the NYPD: (i) issue a "Finest" message to all members of the Department describing the reforms agreed upon in *Ligon*; (ii) draft and disseminate new TAP trespass-enforcement policies, to be approved by the Monitor and the Court; (iii) incorporate the new TAP trespass-enforcement policies in training for new recruits, experienced officers and supervisors, and (iv) implement a system for supervising and reviewing the constitutionality of stops for criminal trespass outside TAP buildings in the Bronx. (*See generally id.*)

---

[2] Milestones for *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT) were added after the settlement in that matter in April 2015.

C.  *First, Second, and Fourth Monitor Reports*

Between the creation of the monitorship milestones in early 2015 and the issuance of the *Ligon* Stipulation of Settlement and Order ("Consent Decree") in 2017, the Monitor issued three Reports—the First, Second and Fourth—that reported on the NYPD's status with respect to the Preliminary Injunction and the monitorship milestones. In their letter, Plaintiffs state that while these and other Reports have effectively reported on the NYPD's compliance with *Ligon* requirements related to "written policies and procedures," they have not done likewise for requirements related to "on-the-street action by NYPD officers." (Pls. Ltr. at 1-2.) Unsurprisingly, the *Ligon* reporting in these early Reports focused attention on the matters central to the Preliminary Injunction and milestones: the Department's TAP enforcement-related policies and training. However, even these early reports contained information on the NYPD's on-the-ground TAP trespass enforcement. Below are some examples of such reporting:

- As part of the supervision requirements mandated under the Preliminary Injunction, the NYPD began requiring Bronx Integrity Control Officers ("ICOs") to review a certain percentage of TAP trespass stops each month to assess the constitutionality of the stops and determine if officers were completing the stop forms correctly. (First Report at 54.) In the Second Report, the Monitor and Plaintiffs' counsel reviewed the ICOs' audits of TAP trespass stops from March through September 2015, as well as reviewed the underlying stop reports and activity logs. (Second Report of the Independent Monitor, ECF No. 245, at 54 (February 16, 2016) [hereinafter "Second Report"].) The Monitor team found the stop reports failed to articulate reasonable suspicion for the recorded stops. (*Id.*) As a result, the NYPD drafted (and Plaintiffs and the Monitor reviewed) an operations order establishing a system for monitoring and auditing stops for criminal trespass at TAP buildings in the Bronx. (*Id.* at 54-55.)

- Also in the Second Report, the Monitor reported on the findings of the NYPD's "RAND" and Police-Initiated Enforcement ("PIE") audits, both of which are used to identify undocumented stops. (*Id.* at 48-51.) In

>   RAND audits,[3] the Department reviews radio transmissions to identify events that likely involved a *Terry* stop, and then searches NYPD records to determine if a stop was recorded. (*Id.*)  PIE audits review arrest documents where the officer makes an arrest based on his or her observations and investigation (*e.g.* an arrest for criminal possession of a controlled substance). (*Id.* at 50.)  When it is determined that a stop led to the arrest, the NYPD reviews arrest documents and court affidavits to determine whether the officer prepared a stop report as required. (*Id.*)  While not specific to *Ligon*, the RAND and PIE audits review for undocumented stops occurring citywide, thereby encompassing *Ligon* TAP stops.

- In the Fourth Report, the Monitor reviewed monthly self-inspection reports prepared by Bronx ICOs who audited trespass stops in and around TAP buildings. (Fourth Report of the Independent Monitor, ECF No. 257, at 29 (November 11, 2016) [hereinafter "Fourth Report"].).  The Monitor identified several deficiencies with the ICOs' audits, and as a result, the Court approved the creation of a pilot program for increased supervisory review of criminal-trespass stops in the Bronx. (*Id.* at 30.)

- The Fourth Report also continued to report on the NYPD's efforts to identify and measure unreported stops through RAND and PIE audits. With respect to PIE audits, during the second half of 2016, the NYPD began evaluating criminal-trespass arrests at NYCHA and TAP buildings to determine whether stop reports had been prepared when a stop led to a trespass arrest. (*Id.* at 28.)  The Monitor reported that from this review, the NYPD identified 59 trespass arrests in TAP buildings, of which 32 were found to involve a likely *Terry* stop.  A stop report was on file in only one of those 32 incidents. (*Id.*)  The report also included information on the broader RAND audits, which also encompass TAP stops. (*Id.* at 25-28.)

D.  Ligon *Consent Decree*

In July 2017, the Court approved the Consent Decree. (Stipulation of Settlement and Order, ECF No. 296 (July 19, 2017) [hereinafter "Consent Decree"].) This Decree provided that the Monitor would oversee the implementation of its provisions, but incorporated the description of his "role and functions" from the earlier Remedial Order. (*Id.* at 17.)  The Consent Decree's orders to the NYPD largely echoed

---

[3] Named after the audit methodology created by the RAND Corporation.

those of the Preliminary Injunction, but newly required the NYPD to "develop, adopt and implement [certain] standards regarding enforcing activities in and around TAP Buildings." (Consent Decree at 7-11.) Those standards largely incorporated the requirements of the Remedial Order, the NYPD's procedures for interior patrols at private buildings (Patrol Guide Section 212-59), and familiar constitutional rules, such as the requirements of reasonable suspicion for frisks and stops. (*Id.* at 10-11.) The Monitor has, as explained above, long assessed officers' compliance with several of those standards in his Reports. (*See, e.g.*, Fourth Report at 23-28.)

    E.    *Seventh Report*

Less than five months after the issuance of the Consent Decree, the Monitor issued his Seventh Report on December 13, 2017. This Report provided updates on the Preliminary Injunction and Consent Decree mandates. In addition to reporting on the updates to *Ligon*-related policies and trainings, the report included updates on the NYPD's on-the-ground TAP trespass enforcement. For example:

- As in previous reports, the Monitor reviewed the self-inspection reports, prepared by Bronx ICOs, that assessed stop reports for TAP trespass stops. (Seventh Report of the Independent Monitor, ECF No. 306, at 43-44 (December 13, 2017) [hereinafter "Seventh Report"].). The self-inspection reports provided by the NYPD showed that only 19 trespass stops were recorded at TAP buildings in the Bronx in 2016 and only four were recorded for the first nine months of 2017. (*Id.*)

- Additionally, the Seventh Report, like previous reports, again included information on the NYPD's RAND and PIE audits. (*Id.* at 39-42.) In the Seventh Report, the PIE audits specifically broke out information on underreported stops occurring in and around TAP buildings. (*Id.* at 42.) The NYPD's audit found only 33% of stops that led to a trespass arrest in or around a TAP building were documented by a stop report. (*Id.* at 42.)

F.     Ligon *Monitoring Workplan*

After the issuance of the Consent Decree, the Monitor met with Plaintiffs, and later jointly with Plaintiffs and the NYPD, to develop a plan for monitoring each of the settlement provisions outlined in the Consent Decree.  The Monitor sent a draft workplan, the *Ligon* Monitoring Plan (the "Monitoring Plan" or "the Plan"), to Plaintiffs in April 2018.  The Plan set forth each settlement provision from the Consent Decree, listed the data and documents that the Monitor would rely on to assess the NYPD's compliance with the provision, described how the Monitor team would evaluate the data, provided information on sampling methodologies, and included a draft timeline.

Plaintiffs provided feedback on the Plan in June 2018.  After considering that feedback, the Monitor provided the parties with a revised draft of the Monitoring Plan in October 2018.  *See* Appendix 1.  The October 2018 draft of the Monitoring Plan was included as Appendix 1 to the Monitor's Ninth Report, published on January 11, 2019.  (Ninth Report of the Independent Monitor at Appendix 1, ECF No. 361 (January 11,2019) [hereinafter "Ninth Report"]).

The Ninth Report stated that the Monitoring Workplan was "still being finalized" and in draft form.  (*Id.* at 10.)  In their letter, Plaintiffs represent that the Monitor allowed "important deadlines in that plan" to "pass without progress."  (Pls. Ltr. at 3.)  But, as the Monitor has repeatedly explained to them, the dates in the Plan are provisional targets, subject to adjustment as the Monitor team deals with unanticipated hurdles and demands on its limited resources.  Those dates have never been hard deadlines, which has preserved the team's ability to prioritize tasks appropriately in light of its many obligations.

G.    *Ninth Report*

In addition to providing the *Ligon* Monitoring Plan, the Ninth Report, like previous reports, continued to report on the *Ligon* mandates.  With regard to the propriety of on-the-ground police activity, the Ninth Report included the following:

- In the last quarter of 2017, the Quality Assurance Division of the NYPD ("QAD") began auditing Trespass Crime Fact Sheets ("TCFS"), a form officers are required to complete for all trespass arrests made in and around TAP buildings and NYCHA buildings.  (*Id.* at 43.)  QAD audited 44 TAP trespass arrests in the fourth quarter of 2017 and 57 in the first quarter of 2018.  (*Id.*)  QAD found that all trespass arrests at TAP buildings had an accompanying TCFS and that the overwhelming majority of the TCFS reviewed sufficiently articulated a proper basis to approach. (*Id.*)

- The Ninth Report also continued to report on the NYPD's citywide RAND and PIE audits, which did not specifically break out TAP trespass stops, but encompassed TAP stops.  *Id.* at 40-43.

H.    *Continued Discussions with Plaintiffs on the Ligon Monitoring Workplan and Methodologies*

In early Spring 2019, the Monitor provided to both the *Ligon* and *Davis* Plaintiffs additional information regarding the Monitor's methodologies for sampling data in order to assess compliance, including the team's methodologies for sampling interior-patrol BWC videos.  Discussions regarding these methodologies and the *Ligon* Monitoring Plan continued in May and November 2019, and the Monitor provided the parties with a revised version of the *Ligon* Monitoring Plan in December 2019.  *See* Appendix 2.

I. *Tenth Report*

On January 7, 2020,[4] the Monitor issued his latest Report, the Tenth, which included further reporting on the *Ligon* mandates. (Tenth Report of the Independent Monitor, ECF No. 410 (Jan. 7, 2020) [hereinafter "Tenth Report"]). Plaintiffs assert that the Report's information about the propriety of officers' encounters was "extremely limited," and claim that the Monitor "has yet to report any information" about the "encounters in and around TAP buildings governed by the Consent Decree: Level 1 encounters, Level 2 encounters, frisks, and searches." (Pls. Ltr. at 2-3.)

Plaintiffs misunderstand the contents of the Tenth Report and the context in which it was issued. Officers do not document Level 1 or 2 encounters on forms,[5] which means that the Monitor team's review of those encounters in TAP buildings is predominantly limited to review of (i) BWC footage of officers' TAP interior patrols, and (ii) TCFS, the forms that officers complete when they perform trespass arrests in TAP areas, on which they must document their reasons for initial (Level 1 or 2) approach. And the Tenth Report reported findings from scores of internal-patrol videos and TCFS, as well as stop reports that provide information on the propriety of frisks and searches.

*First*, the Tenth Report contained information on the Monitor team's review of TAP interior-patrol BWC videos from 2018. (Tenth Report at 24-25.) Plaintiffs' letter suggests that the Monitor team reviewed only 26 BWC videos; in fact, the team reviewed a sample of 160. (*Id.* at 24.) That sample was large enough to draw

---

[4] The Tenth Report was initially issued on December 16, 2019, but a corrected version was issued on January 7, 2020.

[5] The only time that officers document Level 2 encounters is when they request consent to search, in which case they complete consent-to-search forms.

statistically rigorous conclusions about interior patrols, because the number of interior patrols in 2018 was small: there were just 1,126 TAP interior-patrol videos available, (*id.*,) reflecting the fact that the NYPD significantly reduced the number of buildings enrolled in the TAP program from 2017 to 2018.  Though only 26 of the 160 sampled videos recorded encounters between officers and civilians—of which 24 were compliant with applicable rules—the sample enabled the team to say, with a confidence level of 95%, that the large majority of interior patrols do not involve unconstitutional police behavior.[6]  (*Id.* at 24-25, 24 n.5.)

*Second*, the Tenth Report contained information on the QAD's audit of 201 trespass arrests at TAP buildings between 2018 and the first quarter of 2019.  (*Id.* at 66-67.)  Of those arrests, 161 included TCFS; analyzing those forms, QAD concluded that 156 articulated a proper basis for approach, including 19 of the 21 (91%) TCFS from the first quarter of 2019.  (*Id.*)  Then, the Monitor team did its own analysis of 30 trespass arrests at the TAP locations audited by QAD.  (*Id.* at 26.)  Of those arrests, 28 included TCFS, and the team concluded that 25 of those (89%) articulated a proper basis for approach, corroborating QAD's finding from the first quarter of 2019.  That reporting covered a significant number of trespass arrests, especially in light of the fact that the NYPD has significantly reduced the use of trespass arrests since 2015.

*Third*, the Tenth Report reported on the QAD's findings from 6,902 stop reports in 2018, as well as the Monitor team's assessment of 1,205 of those same stop

---

[6] The 1,126 videos were not marked in such a way that members of the Monitor team could know before viewing whether they recorded encounters or not.  But in sampling the videos, the team sought to increase the likelihood of reviewing encounters by selecting videos that had been tagged in the BWC data-management system with words, like "arrest", "summons" and "investigative encounter", that made them more likely to depict encounters.  These category-tagged videos ultimately comprised half of the 160-video sample.

reports.  (*Id.* at 53-56.)  QAD assessed 6,902 stops (finding that 76% were based on reasonable suspicion), 3,764 frisks (finding that 91% were based on reasonable suspicion), and 2,175 searches (finding that 95% had a properly articulated legal basis). (*Id.* at 54.)  Then, the Monitor team assessed 1,205 of the same stops (finding that 75% were based on reasonable suspicion), 736 of the same frisks (finding that 90% were based on reasonable suspicion), and 399 of the same searches (finding that 90% had a properly articulated legal basis), largely corroborating QAD's analysis.  (*Id.* at 56.)  While these analyses were not narrowly focused on encounters in the TAP areas subject to the *Ligon* mandates, it would be surprising to see significantly different patterns of compliance in those areas.  Nonetheless, in the forthcoming Eleventh Report, the Monitor team intends to separately analyze a sample of stop reports from encounters at TAP buildings.

    J.  *Communications with Plaintiffs following the Tenth Report*

After the Monitor shared with Plaintiffs the latest draft of the *Ligon* Monitoring Plan and issued the Tenth Report, Plaintiffs wrote him on January 17, 2020 with concerns regarding his methodologies for monitoring compliance, the timeline proposed in the Plan, and the timing for beginning "actual monitoring" of the *Ligon* mandates.  *See* Appendix 3.  The letter included 21 specific questions on these subjects.

On February 15, 2020, the Monitor responded, providing detailed answers to each question, including information on the *Ligon* Monitoring Plan methodologies. *See* Appendix 4.  The Monitor also provided Plaintiffs the instruments that his team uses to assess compliance with the *Ligon* mandates: templates of the Excel tools used when reviewing BWC videos and trespass-arrest documentation.  *See* Appendix 5 and 6. Plaintiffs did not respond and, instead, filed their letter requesting intervention from this Court on May 1, 2020.

## II. Plaintiffs' Requests for New Directives to the Monitor Should be Denied

Plaintiffs ask this Court to add four new directives to the duties prescribed to the Monitor by previous remedial orders. (Pls. Ltr. at 4; Consent Decree at 17; Remedial Order at 12-13, 33.) This Court should decline to add those directives in "the exercise of its sound discretion," because all are superfluous or moot. *Brown v. Plata*, 563 U.S. 493, 542 (2011) (explaining the legal standard for amendment of existing orders and decrees).

### A. *The First and Second Requested Directives Are Superfluous*

The first and second requested directives would require the Monitor to publicly report the status of the NYPD's compliance with all provisions of the Consent Decree by December 31, 2020, and in each report filed thereafter. (Pls. Ltr. at 4.) Those directives are superfluous because the Monitor already plans on providing assessments of the Consent Decree provisions in future Reports to the extent possible in light of available data.

The Eleventh Report will be the first in which the Monitor team will use the compliance metrics published in the Tenth Report to provide compliance determinations—"in compliance" or "not in compliance," as opposed to the more general compliance reporting of earlier Reports—for the Preliminary Injunction and Consent Decree provisions. But the Monitor team may not have all of the data necessary to assess the actual status of the NYPD's compliance with each and every provision. If the lack of that data makes the Monitor team unable to reliably assess whether the NYPD is, in fact, in or out of compliance with any Consent Decree provision, the Monitor will provisionally report that the NYPD is not in compliance until the NYPD provides

sufficient data to conclude otherwise.  Adding the first and second directives to the Monitor's duties would not make this process any different.

      B.     *The Third Requested Directive Is Moot and Superfluous*

The third requested directive would require the Monitor to provide the Plaintiffs copies of all instruments being used to assess compliance with the Consent Decree, detailed descriptions of all methodologies being used to sample data, and an opportunity to comment on those instruments and methodologies—first within 30 days, and then continuously thereafter as new instruments and methodologies are developed. (Pls. Ltr. at 4.)  That directive is moot because the Monitor has already provided Plaintiffs the existing instruments and methodologies, as well as meaningful opportunities for comment.  And it is superfluous because, consistent with his past practice, the Monitor intends to provide Plaintiffs meaningful opportunities to comment in the event that new instruments and methodologies are developed.

The Monitor team first provided information to the Plaintiffs on its sampling methodologies when it shared the first draft of the *Ligon* Monitoring Plan with Plaintiffs in April 2018.  Plaintiffs provided feedback on that Plan in June 2018.  The Monitor considered Plaintiffs' feedback and provided the parties with a revised draft of the Monitoring Plan in October 2018, which was included in the Ninth Report.  The Monitor provided Plaintiffs further information regarding sampling methodologies in Spring 2019.  Plaintiffs again provided the Monitor feedback and, after considering that feedback, the Monitor provided the parties with the revised, most recent version of the Monitoring Plan in December 2019.  That version includes a column explaining the methodologies related to each of the Consent Decree's provisions.  And when Plaintiffs

requested further explanation of the Monitor's methodologies in their January 2020 letter, the Monitor team provided that explanation in its February 15, 2020 letter.

In addition to explaining its methodologies, the Monitor team also provided the Plaintiffs with the two instruments it uses to assess compliance with the Consent Decree: (i) the BWC interior-patrol video review template (*see* Appendix 5) and (ii) the trespass-arrest review template (*see* Appendix 6). The Monitor team uses these templates to record and analyze data about the TAP-related BWC videos and trespass arrests.

As the Monitor team explained in its February 15 letter, it is currently using, and expects to continue to use, the sampling methodologies described in the December 2019 Monitoring Plan and the instruments provided with the letter. But the Monitor remains open to discussing the methodologies and instruments, and any modifications or additions to the methodologies and instruments, with Plaintiffs.

    C.    *The Fourth Requested Directive Is Moot and Superfluous*

The fourth requested directive would require the Monitor to provide an update of the Monitoring Plan by June 30, 2020, with details about how all monitoring will be conducted and dates by which all tasks will be completed. (Pls. Ltr. at 4.) That directive is moot because the Monitor team has already provided the latest details about how monitoring will be conducted in the latest Monitoring Plan, and superfluous because the Monitor team will assess the NYPD's compliance with the provisions of the Consent Decree in future Reports, which already have deadlines.

As explained above and in the Monitor's February 15 letter, the December 2019 Monitoring Plan expresses all of the current details about how monitoring will be conducted. There is no update to share at this time.

And as explained above, the Monitor team will assess the NYPD's compliance with the Consent Decree provisions in the Reports that this Court has ordered should be filed every six months.  (Remedial Order at 13.)  Additional deadlines for monitoring tasks would be unhelpful, because the timeline for the team's ability to accurately assess the NYPD's compliance with certain provisions is dependent on factors outside the team's control—especially the availability of adequate relevant data.  And additional deadlines could also impair the monitorship by constraining the team's ability to prioritize its resources in ways that make sense over time.

* * *

For the foregoing reasons, Plaintiffs' requests for new directives to the Monitor should be denied.

Respectfully submitted,

/s/ Benjamin Gruenstein
Benjamin Gruenstein

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
bgruenstein@cravath.com

Hon. Analisa Torres
   United States District Court
      Southern District of New York
         500 Pearl Street
           New York, New York 10007-1312
BY ECF

Christopher Dunn, Grace Li, Daniel Lambright
   New York Civil Liberties Union
      125 Broad Street, 17th floor
         New York, NY 10004
BY ECF


Thomas Scott-Railton, Jenn Rolnick Borchetta
   The Bronx Defenders
      360 East 161st Street
         Bronx, NY 10451
BY ECF