UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/8/2020_____
```

| | |
|---|---|
| DAVID FLOYD, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>CITY OF NEW YORK,<br><br>Defendant. | **ORDER**<br><br><br>08 Civ. 1034 (AT) |
| KELTON DAVIS, *et al.*,<br>Plaintiffs,<br><br>-against-<br><br>CITY OF NEW YORK, *et al.*,<br><br>Defendants. | 10 Civ. 0699 (AT) |
| JAENEAN LIGON, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>CITY OF NEW YORK, *et al.*,<br><br>Defendants. | 12 Civ. 2274 (AT) |

ANALISA TORRES, District Judge:

Before the Court is a motion by the *Floyd* and *Davis* Plaintiffs ("Plaintiffs") challenging the legality of the New York City Police Department's (the "NYPD") enforcement of rules promulgated by state and local officials during the COVID-19 pandemic. For the reasons stated below, the motion is DENIED.

**BACKGROUND**

I.      _Ligon_, _Floyd_, and _Davis_ Cases

This long-running litigation addresses the NYPD's stop, frisk, search, and trespass enforcement policies and practices.

In _Ligon v. City of New York_, after a seven-day evidentiary hearing, on January 8, 2013, the Court issued a preliminary injunction against the City of New York (the "City"), finding that the plaintiffs would likely succeed in proving that the City, by its deliberate indifference, had a policy of conducting unconstitutional stops in or near Bronx apartment buildings enrolled in the Trespass Affidavit Program ("TAP"), which permits the NYPD to patrol private buildings with their owners' consent. 925 F. Supp. 2d 478, 486 (S.D.N.Y. 2013), _amending and superseding Ligon v. City of New York_, No. 12 Civ. 2274, 2013 WL 71800 (S.D.N.Y. Jan. 8, 2013). In _Floyd v. City of New York_, after years of litigation culminating in a nine-week trial, on August 12, 2013, the Court issued an opinion holding that the City had a policy of conducting race-based stops and frisks that ran afoul of the Fourth and Fourteenth Amendments (the "Liability Opinion"). _Floyd v. City of New York_, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013).

Given the similarities in the City's constitutional violations in _Floyd_ and _Ligon_, the Court then directed the NYPD to institute certain reforms to remedy the unconstitutional stop-and-frisk practices in both cases (the "Remedial Order"). _Floyd v. City of New York_, 959 F. Supp. 2d 668, 671 (S.D.N.Y. 2013). The Court appointed an independent monitor (the "Monitor") to oversee those reforms, and directed the parties to participate in a community-input process under the guidance of a neutral facilitator (the "Facilitator") to develop additional reforms. _Id._ at 686–88.[1]

---

[1] On July 19, 2017, the parties in _Ligon_ settled the outstanding claims, agreeing to significant reforms to the NYPD's trespass enforcement practices, documentation, and training, and agreeing to continued participation in the remedial process. _See Ligon v. City of New York_, No. 12 Civ. 2274 (S.D.N.Y. July 19, 2017), ECF No. 296.

In *Davis v. City of New York*, the plaintiffs alleged unlawful, race-based enforcement of trespass laws in New York City Housing Authority ("NYCHA") developments.  The parties settled the case on February 4, 2015, agreeing, among other things, that they would participate in the *Floyd* and *Ligon* remedial process, and that orders issued in that process would be incorporated into the settlement.  *Davis v. City of New York*, No. 10 Civ. 699 (S.D.N.Y. Feb. 4, 2015), ECF No. 330 at 9–11.

Since this Court's issuance of the Liability Opinion and Remedial Order, the Facilitator completed his Final Report and Recommendation, ECF No. 597, and the Monitor has submitted ten reports detailing the progress of the monitorship.  *See* Tenth Report of the Monitor, ECF No. 754.[2]

II.   COVID-19 Pandemic

In March of this year, with the advent of the COVID-19 pandemic, government officials began taking measures to address the rapid spread of the novel coronavirus.  After declaring a statewide emergency on March 7, 2020, N.Y. Exec. Order No. 202 (Mar. 7, 2020),[3] Governor Andrew M. Cuomo announced a stay-at-home order requiring non-essential businesses to "reduce the in-person workforce . . . by 100%" and banning all public gatherings, N.Y. Exec. Order No. 202.8 (Mar. 20, 2020).[4]  Mayor Bill de Blasio declared a state of emergency in New York City on March 12, 2020.  N.Y.C. Emer. Exec. Order No. 98 (Mar. 12, 2020).[5]  The Governor ordered all individuals over the age of two to wear a mask when in public, so long as they could "medically tolerate" one.  N.Y. Exec. Order No. 202.17 (Apr. 15, 2020).[6]  Mayor de

[2] Except as otherwise noted, ECF citations refer to the docket in *Floyd v. City of New York*, No. 08 Civ. 1034.
[3] Cooper Decl., Ex. D, ECF No. 773-1 at 23–25.
[4] Cooper Decl., Ex. E, ECF No. 773-1 at 27–28.
[5] Cooper Decl., Ex. H, ECF No. 773-1 at 35–36.
[6] Cooper Decl., Ex. F, ECF No. 773-1 at 30.

Blasio adopted Governor Cuomo's orders and directed the NYPD and other City agencies to enforce them.  N.Y.C. Emer. Exec. Order No. 108 (Apr. 19, 2020).[7]

On June 1, 2020, the Mayor imposed a City-wide curfew prohibiting all persons from being in public except for police officers, firefighters, emergency medical technicians, and other essential workers.  N.Y.C. Emer. Exec. Order No. 117 (June 1, 2020).[8]  Also excluded were homeless people, and individuals seeking medical treatment or supplies.  *Id.*  Mayor de Blasio stated that the curfew was necessary because large gatherings increase potential spread of the virus, and also because peaceful demonstrations in response to the death of George Floyd had been "escalated" by individuals accused of property damage and other crimes.  *Id.*  The curfew began on June 1, *id.*, and was set to expire on June 8, 2020, N.Y.C. Emer. Exec. Order No. 119 (June 2, 2020).[9]  The Mayor, however, terminated the curfew one day early.  N.Y.C. Emer. Exec. Order No. 122 (June 7, 2020).[10]

<b>REQUEST FOR RELIEF</b>

On May 26, 2020, Plaintiffs filed an "emergency motion" alleging that the NYPD has engaged in racially discriminatory enforcement of social distancing directives in violation of three of the Court's prior orders related to unconstitutional, race-based policing.  Proposed Order to Show Cause ("OSC") at 1, ECF No. 759.[11]  Plaintiffs cite racial disparities in arrests and the issuance of summonses, and allege that the police have used excessive force in enforcing COVID-19 rules.[12]  *Floyd* and *Davis* Pl. Mem. at 1, ECF No. 760.  Plaintiffs also express a

---

[7] Cooper Decl., Ex. I, ECF No. 773-1 at 38–39.
[8] Cooper Decl., Ex. K, ECF No. 773-1 at 44–45.
[9] Cooper Decl., Ex. M, ECF No. 773-1 at 50–51.
[10] Cooper Decl., Ex. N, ECF No. 773-1 at 53.
[11] *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013) (the Liability Opinion); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 671 (S.D.N.Y. 2013) (the Remedial Order); *Floyd v. City of New York*, No. 08 Civ. 1034, 517 (S.D.N.Y. Aug. 24, 2015), ECF No. 517 (order approving changes to the NYPD Patrol Guide).
[12] The challenged COVID-19 enforcement includes the NYPD's enforcement of social distancing and mask-wearing requirements and the stay-at-home orders.  *Floyd* and *Davis* Pl. Mem. at 2 n.1.

concern that the NYPD's enforcement of the curfew was "likewise facilitating discrimination against Black and Latinx people." *Floyd* and *Davis* Pls. Supp. Ltr. at 1, 3, ECF No. 768.

Plaintiffs have submitted a statistical analysis prepared by The Legal Aid Society, which indicates that "18 of the 20 precincts with the highest rates of known social distancing arrests or summonses per 10,000 people are in majority Black and Latin[x] precincts," even though "slightly less than half (46.2%) of [311[13] social distancing] complaints concerned violations" in those areas. Day Decl. ¶ 9, ECF No. 761; *see also id.* ("While four of the five precincts receiving the most social distancing complaints through 311 were in neighborhoods that are majority white, four of the five precincts with the most COVID-19 related arrests and summonses were in neighborhoods that are majority Black and Latinx. In this vein, 78.9% of summonses and 74.1% of arrests for which The Legal Aid Society was able to identify a precinct occurred [in those areas]." (citations omitted)). Plaintiffs also point to information released by the Brooklyn District Attorney's Office indicating that between March 17 and May 4, 2020, "of [the] 40 people arrested for social distancing violations in Brooklyn . . . [35] were Black, four were Hispanic, and one was white." *Id.* ¶ 15. Further, they present reports of encounters between police and Black or Latinx individuals where NYPD officers made allegedly unjustifiable arrests or used excessive force.[14] *Id.* ¶¶ 17–26.

Plaintiffs request four forms of relief. First, they seek a declaration that the NYPD's enforcement of COVID-19 rules constitutes a violation of the Liability Opinion, Remedial Order, and an order approving changes to the NYPD's patrol guide.[15] *Floyd* and *Davis* Pls. Mem. at 1. Second, they ask the Court to direct the Monitor to investigate, and file a report evaluating the

---

[13] "311 serves the public and handles all requests for government and non-emergency services . . . ." *NYC 311*, New York State (last visited July 8, 2020), https://www.ny.gov/agencies/nyc-311.
[14] The City disputes the facts of many of these encounters. *See* City Opp. at 36–39, ECF No. 771.
[15] *See* ECF No. 517 (approving revisions to Patrol Guide 212.11, regarding "Stop and Frisk," and Patrol Guide 203.25, regarding "Department Policy Prohibiting Racial Profiling").

legality of, the NYPD's COVID-19 and curfew enforcement practices. *Id.* at 23. Third, they request an order prohibiting the NYPD from further enforcement pending the Monitor's report and the Court's determination on whether enforcement may continue. *Id.* And fourth, they seek discovery from the City, including officers' written reports and body-worn camera videos, data on summonses and arrests, and NYPD training and supervisory material related to COVID-19 and curfew enforcement. *Id.* at 21–22; *Floyd* and *Davis* Pls. Supp. Ltr. at 1. The *Ligon* Plaintiffs join in the second and fourth requests. *Ligon* Pls. Ltr. at 1–2, No. 12 Civ. 2274, ECF No. 420 (S.D.N.Y. June 2, 2020).

## DISCUSSION

I.    <u>Legal Standards</u>

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). "Although a district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct, it is nonetheless the essence of equity jurisdiction that a court is only empowered to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, "[a]n injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *Id.* at 145. And a court does not have the power to restrain "acts unlike or unrelated to those originally judged unlawful." *Id.* (internal quotation marks and citation omitted).[16] For subjects that fall within the scope of prior litigation,

---

[16] It is not clear what legal authority Plaintiffs rely upon in their request for relief. They claim to be seeking an order "pursuant to Rule 37 of the Federal Rules of Civil Procedure," which concerns discovery, and "this Court's inherent equitable power to enforce its own orders and judgments." OSC at 1. The Second Circuit has noted that neither the

the determination of what measures are necessary and appropriate to enforce its orders is

committed to the district court's sound discretion.  *See In re Tronox Inc.*, 855 F.3d 84, 112 (2d

Cir. 2017) ("The [d]istrict court plainly had jurisdiction to interpret and enforce its own prior

order . . . .  The court's choice of how to enforce the order is reviewed for abuse of discretion."

(internal quotation marks, citation, and alterations omitted)).

"The Court has the relevant authority as part of its inherent power to enforce its

judgments, and it is clear that appropriate discovery should be granted where significant

questions regarding noncompliance with a court order have been raised."  *Abdi v. McAleenan*,

No. 17 Civ. 721, 2019 WL 1915306, at *2 (W.D.N.Y. Apr. 30, 2019) (internal quotation marks,

citation, and alterations omitted) (collecting cases).

II.   Analysis

A.  Request for Declaration, Investigation, and Injunction

Plaintiffs allege that during street encounters related to COVID-19 enforcement, the

NYPD engaged in race-based discrimination.  *Floyd* and *Davis* Pls. Mem. at 2.  As examples of

this discrimination, they allege (1) racial disparity in the issuance of summonses and arrests in

predominantly Black and Latinx neighborhoods as compared to lax enforcement of social

distancing in "crowded parks, synagogues, and bars frequented by white persons," *id.* at 3–6, 18;

(2) racial disparity in social distancing arrests as evidenced by data released by the Brooklyn

District Attorney's Office indicating that between March 17 and May 4, 2020, 35 of 40 people

arrested for social distancing violations in Brooklyn were Black, four were Latinx, and one was

---

Federal Rules of Civil Procedure nor case law permit a freestanding "motion to enforce," and that although there are
various methods for enforcement of a class action settlement (or an injunction), "[e]ach one of these (or other)
possibilities, however, carries its own procedures, its own standards for granting relief by the district court, and its
own standards of review . . . thus making identification of the precise nature of the motion an essential for
[appellate] review (and, we believe, for the district court's decision in the first instance)."  *Martens v. Thomann*, 273
F.3d 159, 172 (2d Cir. 2001).  At a minimum, however, a party requesting an order enforcing prior rulings must
show that the conduct complained of falls within the scope of the litigation.

white, Day Decl. ¶ 15; (3) use of excessive force in enforcement of social distancing against "Black and Latinx persons only," Def. Mem. at 14–15; (4) stopping of individuals "with little or no apparent justification" in "situations [that] frequently started with social distancing and then escalated to stops and the use of force against bystanders," *id.* at 15; and (5) contrast in "posture of the police toward the community" as evidenced by the tone and language of the public service announcements broadcast by the NYPD in Queensbridge, a public housing development in Queens with predominantly Black and Latinx residents, as compared to those used in Nolita, a neighborhood in Manhattan with few Black or Latinx residents, *id.*[17]

To be sure, some of the alleged police conduct described by Plaintiffs falls squarely within the ambit of *Floyd v. City of New York*.[18] In that case, the Court determined that the City's policy of conducting suspicionless and racially motivated stops and frisks violated the Constitution, *see* Liability Opinion, 959 F. Supp. 2d at 658–60; Remedial Order, 959 F. Supp. 2d at 671, and ordered the NYPD to make changes to its policies, training, supervision, auditing, performance evaluation system, and disciplinary process. Remedial Order, 959 F. Supp. 2d at 677–78. The Court appointed the Monitor to assist the parties in developing and implementing reforms, and to report on the NYPD's progress in complying with the Court's mandates. *Id.* at 676–78, 686–87. The Monitor's work is ongoing and encompasses all suspicionless and race-

---

[17] Approximately 48% and 33% of Queensbridge residents are Black and Latinx, respectively. *Census Tract 25, Queens, NY*, Census Reporter (last visited June 29, 2020), https://censusreporter.org/profiles/14000US36081002500 -census-tract-25-queens-ny. In Nolita, approximately 80% of residents are white or Asian, and approximately 10% are Black and Latinx. *Nolita (North of Little Italy) Neighborhood in New York, New York (NY), 10012 Detailed Profile*, City-Data.Com (last visited June 29, 2020), http://www.city-data.com/neighborhood/Nolita-New-York-NY.html. The Court takes judicial notice of the demographics of these neighborhoods. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *see also United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991) (taking judicial notice of population statistics in the Eastern District of New York and accepting them as a proxy for corresponding statistics about venire).

[18] Plaintiffs do not allege that the NYPD engaged in racially discriminatory COVID-19 or curfew enforcement with respect to NYCHA or TAP buildings, as would be required to bring their motion within the scope of the *Davis* and *Ligon* cases, respectively.

based stops, including those which may have taken place during the COVID-19 pandemic.[19]  The Court is not inclined to short-circuit that process.

Much of the police conduct alleged by Plaintiffs, however, extends beyond the suspicionless and racially motivated stops and frisks addressed by the Court in *Floyd*.  For example, Plaintiffs claim that in the course of enforcement related to COVID-19 rules, police officers have disproportionately arrested and employed excessive force against Black and Latinx individuals.  *Floyd* and *Davis* Pls. Mem. at 14–18, 20–21.  Plaintiffs also allege that the City and NYPD leadership have willfully ignored this conduct.  *Id.* at 19.  These claims are deeply troubling.  But, whatever their merits, they do not fall squarely within the scope of the policies and practices adjudicated in this litigation.  Likewise, the request for a blanket injunction barring the NYPD from COVID-19 enforcement, *see Floyd* and *Davis* Pls. Mem. at 1, would interfere with a wide range of police conduct that is outside the bounds of this case, and would halt even lawful enforcement.  If individuals have been injured by racial bias in the NYPD's making of arrests or use of force in the context of COVID-19 or curfew enforcement, they have the right to pursue those allegations in a plenary action.  But, in its discretion, the Court concludes that Plaintiffs' motion seeking to apply the Court's prior orders in the *Ligon*, *Floyd*, and *Davis* cases is not an appropriate vehicle to redress those claims.

Pointing to two cases, Plaintiffs argue that a court can expand on the terms of a previous injunction to address further violations of a similar type.  *Floyd* and *Davis* Pls. Mem. at 10–12; *see Hutto v. Finney*, 437 U.S. 678, 684–85 (1978); *Handschu v. Police Dep't of New York*, 219 F. Supp. 3d 388, 392–93 (S.D.N.Y. 2016).  It is true that "[i]n fashioning a remedy, [the Court

---

[19] The Monitor has already committed to requesting from the City "information necessary to evaluate stops, frisks, searches and trespass enforcement in the course of" COVID-19 and curfew enforcement, and to "assess and report on that information in the ways, and to the extent, consistent with his mandate."  Monitor Ltr. at 23, ECF No. 785. The City has agreed to comply with the Monitor's requests.  *Id.*

has] ample authority to go beyond earlier orders and to address each element contributing to the violation." *Hutto*, 437 U.S. at 687.  And this Court has done so by issuing a number of orders addressing factors that contributed to the constitutional violations identified in the Liability Opinion.  *See, e.g.*, ECF No. 662 (directing the NYPD to "implement a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements" (internal quotation marks and citation omitted)); ECF No. 767 (setting out required NYPD procedures for early intervention to correct officer behavior that suggests a risk of engaging in illegal stops or illegal trespass enforcement).  But it is not within this Court's authority to amplify its prior rulings to encompass a different set of potentially unconstitutional practices.

Accordingly, that portion of Plaintiffs' motion seeking an order declaring that the City and NYPD are in violation of this Court's earlier orders, directing the Monitor to investigate COVID-19 and curfew enforcement involving police conduct outside the scope of this litigation, and enjoining the NYPD from participating in COVID-19 enforcement is DENIED.

## B.  Request for Discovery

To the extent that Plaintiffs' request for information is related to alleged police stops, frisks, searches, and trespass enforcement, such requests are already being addressed by the Monitor.  *See Floyd* and *Davis* Pls. Mem. at 21–22; *Ligon* Pls. Ltr. at 1–2.  Insofar as their requests reach beyond that, however, Plaintiffs have failed to show that ordering such discovery falls within, or would be an appropriate use of, the Court's inherent power to enforce its judgments.

Accordingly, Plaintiffs' motion to compel discovery is DENIED.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' requests for an order (1) declaring that the NYPD's enforcement of COVID-19 rules violates the Court's prior orders, (2) directing the Monitor to investigate COVID-19 and curfew enforcement involving police conduct outside the scope of this litigation, (3) enjoining the NYPD from enforcing COVID-19 rules, and (4) compelling discovery are DENIED. *See* No. 08 Civ. 1034, ECF No. 759; No. 10 Civ. 699, ECF No. 502. The Clerk of Court is directed to terminate the motion at ECF No. 430 in case number 12 Civ. 2274.

SO ORDERED.

Dated: July 8, 2020
       New York, New York

_____
ANALISA TORRES
United States District Judge

11