CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1080

WRITER'S EMAIL ADDRESS
bgruenstein@cravath.com

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

SPECIAL COUNSEL
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

July 20, 2020

<u>Floyd, et al. v. City of New York, 08-CV-1034 (AT)</u>
<u>Ligon, et al. v. City of New York, et al., 12-CV-2274 (AT)</u>
<u>Davis, et al. v. City of New York, et al., 10-CV-0699 (AT)</u>

Dear Judge Torres:

      I am counsel to the Monitor, Peter L. Zimroth, and respectfully write in response to the letter filed by Plaintiffs in the above-captioned matters on June 29, 2020. (Letter from the Ctr. for Const. Rts.,[1] ECF No. 786 (June 29, 2020) [hereinafter "Pls. Ltr."].) That letter concerns the Monitor's recommendations on the NYPD Auditing Plan and Instructions for Command Self-Inspections, which propose processes by which the NYPD's Quality Assurance Division ("QAD") and commands will assess officers' law-enforcement activities for compliance with departmental and constitutional requirements. (Letter from Peter L. Zimroth, ECF No. 778 (June 15, 2020) [hereinafter "Recommendations Ltr."].)

---

[1] All ECF cites refer to documents as filed on the *Floyd* docket.

Plaintiffs make five requests in their letter: they ask that (1) the Monitor be directed to develop further NYPD processes for monitoring officers' compliance with the Fourteenth Amendment; (2) the Auditing Plan require more audits of police-initiated-enforcement ("PIE") arrests and self-initiated stops; (3) the Auditing Plan require auditors to opine on the adequacy of supervisors' corrective decisions, including discipline; (4) the Auditing Plan define its use of the term "consistent" in the context of its instructions that auditors assess whether certain findings are "consistent"; and (5) the Auditing Plan require auditors to determine whether Trespass Crimes Fact Sheets ("TCFS") were fully "completed."  (Pls. Ltr. at 1-5.)

As explained in more detail below, each of those requests is imprudent: (1) the work of improving NYPD processes for monitoring officers' compliance with the Fourteenth Amendment is already underway; (2) the Auditing Plan requires audits of an appropriate number of PIE arrests and self-initiated stops, and including more could delay auditors' feedback to the commands; (3) auditors lack the context necessary to usefully assess the adequacy of supervisors' corrective decisions; (4) the term "consistent" is clear in the context of the Auditing Plan; and (5) requiring auditors to assess whether TCFS were "completed" would flag as improper TCFS that are substantively correct.  Accordingly, those requests should be denied, and the Monitor's recommendations should be approved.

I.      **Background on the Auditing Plan**

The Auditing Plan is another step in the work of improving the NYPD's auditing processes, which began with the two decisions at the outset of the remedial process.  In its liability opinion, this Court held that the NYPD was deliberately

indifferent to unconstitutional stops and frisks, in part because it had "no meaningful procedures for auditing stop paperwork to monitor the constitutionality of stops." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 609 (S.D.N.Y. 2013). In particular, this Court found that the QAD's process of reviewing stops consisted of "a superficial review of whether paperwork was completed, not a substantive review of whether a stop was constitutional." *Id.* at 609-10. Partly to address that finding, this Court's remedial order instructed the Monitor to develop reforms to the NYPD's "monitoring . . . regarding stop and frisk." *Floyd v. City of New York*, 959 F. Supp. 2d 668, 677 (S.D.N.Y. 2013).

Those decisions led to an iterative process in which the Monitor has worked with the NYPD and Plaintiffs to make the QAD's review of stops more effective. That process has produced many changes through the years. In 2016, for example, new methods were developed and implemented for reviewing representative samples of stop reports in the precincts. (*See* Peter L. Zimroth, Second Report of the Independent Monitor, ECF No. 523, at 45-52 (Feb. 16, 2016) (reporting on changes to QAD's processes); Peter L. Zimroth, Fourth Report of the Independent Monitor, ECF No. 536, at 21-28 (Nov. 18, 2016) (same).) In 2017, more stringent criteria were developed for assessing whether stop reports articulate reasonable suspicion; a new worksheet was created to improve the commands' self-inspections of encounters; and QAD went beyond stop reports to start auditing TCFS. (Peter L. Zimroth, Seventh Report of the Independent Monitor, ECF No. 576, at 33-43 (Dec. 13, 2017).) And in 2019, QAD began auditing stop reports weekly, rather than monthly, and began reviewing the body-worn-camera footage related to some of the stop reports it audited. (Peter L. Zimroth, Ninth Report of the Independent Monitor, ECF No. 680-1, at 34-43 (Jan. 11, 2019).)

The Auditing Plan now before this Court is the latest part of the process of improvement, the product of discussions beginning when the NYPD circulated draft versions of the Plan's components in November 2019. (Recommendations Ltr. at 1.) Since then, the Plan has evolved to reflect the substantial feedback shared among the Monitor team, Plaintiffs, and NYPD. (*Id.*) In particular, the filed Plan includes responses to many of Plaintiffs' comments, including changes that the NYPD argued against. But the Monitor declined to adopt certain suggestions that he considered imprudent, which Plaintiffs now raise as objections to his recommendations. (Pls. Ltr. at 1.) As explained below, those suggestions were rightly rejected. The filed Plan is consistent with the Monitor's high standards for the progress that the NYPD's auditing needs to make at this time, and the Monitor respectfully submits that his recommendations should be approved.

## II. The Work of Improving the NYPD's Oversight of Officers' Compliance with the Fourteenth Amendment Is Already Underway

Plaintiffs ask this Court to direct the Monitor to develop NYPD processes for monitoring officers' compliance with the Fourteenth Amendment. (*Id.* at 2.) As an initial matter, that request is improper because it is irrelevant to whether this Court should approve the Monitor's recommendations. Plaintiffs themselves "recognize it may not be possible to address [that request] through changes to the QAD Audit or Self-Inspection protocols." (*Id.* at 1.) They are correct: assessments of compliance with the Fourteenth Amendment require statistical and other analytical expertise that QAD lacks. Those assessments must be performed by other NYPD entities that are not addressed by the Monitor's recommendations.

In any event, Plaintiffs' request should be denied because the requested instruction is unnecessary: the Monitor recognizes the importance of sound NYPD procedures for monitoring Fourteenth Amendment compliance, and will continue to work on the development and improvement of those procedures.  For example, the Monitor team will be working with the NYPD and Plaintiffs on a plan for implementing this Court's recent order instructing the NYPD to monitor officers for several measures of potential racial bias as part of the Early Intervention System.  (Order, ECF No. 767, at 4-5, 8-9 (June 2, 2020).)  The Monitor team continues to work with Plaintiffs and the NYPD on improving the processes for investigating racial-profiling complaints against officers.  (*See* Peter L. Zimroth, Tenth Report of the Independent Monitor, ECF No. 754, at 73-79 (Jan. 7, 2020) [hereinafter "Tenth Report"].)  And the Monitor has both required the NYPD to analyze relevant racial disparities in his compliance metrics, and given it a model for beginning that analysis through his team's analysis of disparities in his semi-annual reports.  (*See, e.g.*, Tenth Report at 57-62.)  As those efforts progress, the Monitor will continue to consider whether the NYPD should take additional steps to assess officers' compliance.

III.    **The Auditing Plan Includes Assessment of an Appropriate Number of PIE Arrests and Self-Initiated Stops**

Plaintiffs ask this Court to amend the Auditing Plan so that it triples the number of audited PIE arrests, and to direct the Monitor to develop additional NYPD processes for auditing self-initiated stops.  (Pls. Ltr. at 3.)  Those requests should be denied because the Auditing Plan will audit enough stops, including a substantial number of self-initiated stops, to permit rigorous inferences about the under-reporting of stops without exceeding the QAD's auditing capacity.

Under the Plan, the PIE audit will review one encounter every week in each of 133 commands, meaning roughly 6,916 encounters over the course of each year. (Attachment 1 to the Letter from Peter L. Zimroth, ECF No. 778-1, at 2, 8 (June 15, 2020) [hereinafter "Auditing Plan"].)  That audit alone will review enough stops to permit rigorous inferences about key issues in analyzing and addressing the under-reporting of stops.  That includes inferences about the citywide rate of under-reporting; statistically significant increases and decreases over the course of a few weeks in the citywide rate of under-reporting; and statistically significant differences over the course of a year between under-reporting rates in different patrol boroughs.[2]  The strength of those inferences will be enhanced by the data from the RAND audit, as well as the QAD review of each command's self-inspection of five PIE encounters each month, which will yield data on roughly 7,980 additional encounters over the course of each year.

Plaintiffs argue that the QAD should review three times as many encounters in the PIE audit, and suggest that a tripled sample would permit rigorous inferences about under-reporting problems with particular officers, squads, units, and commands. (Pls. Ltr. at 3.)  But the Monitor team performed a statistical analysis and determined that Plaintiffs' conclusion is unfounded: the tripled sample would not permit rigorous inferences about problems at the granular level that Plaintiffs suggest.  In any event, that sample would likely exceed the QAD's auditing capacity, which is already

---

[2] The PIE audit will be rigorous not only because of the number of encounters it will review, but also because the reviewed encounters will be more likely to include stops than before.  Under previous protocols, the PIE audit reviewed arrests of *every* kind in which the State was the complainant—and that resulted in samples consisting of many arrests for motor-vehicle and theft-of-services offenses, which are unlikely to include related stops.  Under the Plan, by contrast, arrests for those offenses will not be sampled, so the sample will focus on other kinds of encounters that are more likely to involve stops (and, thus, are more likely to contribute to rigorous inferences about the issues important to this monitorship).

under pressure in the recommended Plan, particularly because that Plan requires a significant increase in the number of body-worn-camera videos that QAD auditors will review. Exceeding the QAD's capacity could produce, among other problems, the QAD's historical problem with returning timely feedback to the commands about improper encounters; feedback must arrive shortly after those encounters occur or else memories fade and corrective actions lose educative value. The Plan's number of audited encounters is manageable enough to mitigate the risk of delayed feedback and other problems; Plaintiffs' proposed number is not.

Plaintiffs also argue that the Plan will not audit enough self-initiated stops, principally on the assumption that the RAND audit will not review such stops. (Pls. Ltr. at 3.) That assumption is mistaken: the RAND audit will review self-initiated stops because it will review *all* encounters in which officers call in on the radio and use certain key words—including, for example, when officers call to report that they "stopped" people, or need "warrant checks," in the course of self-initiated stops. (Auditing Plan at 10.) Furthermore, as Plaintiffs recognize, the PIE audit will review self-initiated stops. (Pls. Ltr. at 3.) Plaintiffs assert that the PIE audit is deficient because it will review only stops that end in arrests (*id.*)—but the RAND audit will review stops that do not end in arrests. Together, the different reviews in the Monitor's recommendations should lead to rigorous inferences about under-reporting without need for additional protocols for auditing self-initiated stops.

### IV. The Auditing Plan Should Not Require Auditors to Assess the Adequacy of Supervisors' Responses to Improper Stops

Plaintiffs ask this Court to amend the Auditing Plan so that auditors are required to opine on the adequacy of supervisors' responses to improper stops and

trespass enforcement conducted by subordinate officers.  (Pls. Ltr. at 4.)  That amendment would, for example, require auditors to determine whether a supervisor should have used discipline instead of training or instructions to correct an officer who conducted a stop lacking reasonable suspicion.  (*Id.*)  Plaintiffs' request should be denied because auditors lack the context necessary to effectively assess supervisors' corrective decisions, and because the existing plan will record the data necessary to identify flawed corrective strategies.

Appropriate corrective decisions are informed by context that officers' supervisors have and auditors do not: a history of working with the officers, knowledge about their levels of activity, and details about the prior corrective actions that have been taken with them.  Auditors could not reasonably and reliably learn all of that context for all audited officers.  And without it, auditors' assessments of corrective decisions would likely produce unreliable data.

Those assessments are also unnecessary because the existing plan will note the content of corrective decisions, the fact of their implementation, and officers' compliance with the rules—all data that could indicate shortcomings and prompt discussions about improvement.  The Instructions for Command Self-Inspections require Integrity Control Officers to note the kinds of corrective actions that supervisors decide to take with officers who violate the rules governing stop reports, and to note whether those actions are in fact taken.  (Attachment 5 to the Letter from Peter L. Zimroth, ECF No. 778-5, at 4 (June 15, 2020).)  And the Auditing Plan requires auditors to assess officers' compliance with the stop-report rules.  (Auditing Plan at 1-6.)  Failures to implement corrective decisions and failures to achieve appropriate compliance can show

where corrective improvements are warranted.  Further auditing of the adequacy of particular corrective decisions is not appropriate or required.[3]

### V. The Auditing Plan Need Not Include Further Guidance on Assessing Whether Data Is "Consistent"

Plaintiffs ask this Court to direct the Monitor to provide a "specific and objective" definition of the term "consistent" as it is used in the Auditing Plan.  (Pls. Ltr. at 4-5.)  The Plan instructs auditors to evaluate whether documentation of law-enforcement encounters was "consistent" with related body-worn camera footage, and to evaluate whether their own findings were "consistent" with those of the commands' self-inspections.  (Auditing Plan at 2-3, 6.)  Plaintiffs' request should be denied because "consistent" has a plain meaning in this context.  If documentation identifies facts or articulates legal conclusions that footage does not support, then the documentation and footage are not "consistent."  If auditors identify problems with encounters that the commands do not, or vice versa, then their findings are not "consistent."  The Plan need not guard against unreasonable interpretations of words that are contextually clear.

### VI. The Auditing Plan Contemplates Appropriate Assessments of the Completion of Trespass Crimes Fact Sheets

Plaintiffs ask this Court to amend the Auditing Plan so that it requires auditors to determine whether TCFS were "completed."  (Pls. Ltr. at 5.)  By contrast, the

---

[3] The existing plan will not involve any auditing of supervisors' follow-up actions regarding improper trespass enforcement, and Plaintiffs assert that the plan should be modified to include that auditing.  (Pls. Ltr. at 4.)  But this argument misunderstands the way that trespass-enforcement documentation works: if upon reviewing TCFS, supervisors conclude that officers conducted improper trespass enforcement, then the TCFS are simply voided.  Supervisors do not, as with inadequate stop reports, note corrective actions on the documents that can be recorded, and whose execution can be verified, by auditors.  This does not mean that the existing plan leaves supervisors' review of TCFS free from scrutiny, though.  Auditors will be assessing whether supervisors correctly determined that TCFS and related trespass enforcement were appropriate, and the results of those assessments will be recorded through the Plan.  (Auditing Plan at 7-8.)

existing Plan requires auditors to assess whether TCFS were "prepared"; whether they sufficiently articulated objective credible reasons for approaching suspects; and whether they sufficiently articulated probable cause for arrests. (Auditing Plan at 7.) Plaintiffs' request should be denied because if TCFS were audited for "completion," they would be deemed improper even if they were substantively sound.

Plaintiffs argue that a "completion" audit should be added because under the existing Plan, a TCFS could fail to "capture critical information regarding [an] officer's basis for [an] arrest" and nonetheless be cleared as proper. (Pls. Ltr. at 5.) But Plaintiffs' concern is unfounded: if a TCFS missed critical information about the basis for an arrest, then it will be deemed improper because it failed to sufficiently articulate probable cause. Rather than capture that substantive flaw, a "completion" audit would rule TCFS improper for failures to complete every field in the form, even if unrelated to the form's information about the propriety of the encounters it documents. For example, suppose that an officer found someone in a conspicuously labeled restricted area on the roof of a building, and arrested him for trespass. In her TCFS, the officer documented the arrest and the fact that she found the person in the labeled restricted area, but skipped the field asking her whether the front door to the building was locked, because that factor was totally irrelevant to her probable-cause determination. A "completion" audit would deem the TCFS improper simply because that field was blank, even though the form as a whole was substantively sound—and that outcome would not generate meaningful auditing data. *See Floyd*, 959 F. Supp. 2d at 609-10 (criticizing QAD for performing "a superficial review of whether paperwork was completed," rather than a "substantive review" of the constitutionality of audited encounters).

\* \* \*

For the foregoing reasons, Plaintiffs' requests should be denied, and the Monitor's recommendations should be approved.

Respectfully submitted,

/s/ Benjamin Gruenstein
Benjamin Gruenstein

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
bgruenstein@cravath.com

Hon. Analisa Torres
  United States District Court
    Southern District of New York
      500 Pearl Street
        New York, New York 10007-1312
BY ECF