UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAENAN LIGON, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, et al.,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/26/2026___

12 Civ. 2274 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendant, the City of New York (the "City"), moves to vacate the Stipulation of Settlement and Order (the "Stipulation") entered by the Court on July 19, 2017. Stipulation, ECF No. 296; Mot., ECF No. 586; Mem., ECF No. 587; Opp., 592; Reply, ECF No. 595; Monitor TAP Mem., ECF No. 605. For the reasons stated below, the motion is granted.

**BACKGROUND**

I.      History of TAP, Related Litigation, and Stipulation of Settlement

In the 1990s, the New York City Police Department (the "NYPD" or the "Department") established the Trespass Affidavit Program ("TAP" or the "Program"), which called for NYPD officers to conduct patrols in and around privately-owned residential buildings to address potential crime, including trespass and narcotics sales. Preliminary Injunction Order ("PI Order") at 82, ECF No. 105. TAP created a formal process for private building owners to enroll in the Program by submitting an affidavit permitting officers to carry out "vertical" patrols[1] inside their buildings and make trespass arrests. *Id.* at 82, 86.

---

[1] "Vertical" patrols involve a patrol of an entire building, including in "lobbies," "stairwell[s,]" and "rooftops." Oct. 17, 2012 Trial Tr. at 519:23–520:6, ECF No. 75; PI Order at 82–83.

On March 28, 2012, a class of individuals brought this suit, alleging that the NYPD had engaged in unconstitutional trespass enforcement policies in and around TAP buildings in the Bronx by stopping individuals without reasonable suspicion and arresting them for trespassing without probable cause. *See generally* Compl., ECF No. 1.

In an order dated February 14, 2013, the Court found that Plaintiffs were entitled to preliminary injunctive relief on their claims, *see generally* PI Order (amending identified errors in the Court's original order dated January 8, 2013 at ECF No. 96). In a separate order dated August 12, 2013 in a related case, *Floyd v. City of New York*, No. 08 Civ. 1034, the Court held the City liable for unconstitutional stop, question, and frisk ("SQF") practices. *See* ECF No. 373 in *Floyd*, 08 Civ. 1034. That same day, the Court issued a Remedial Order in both *Ligon* and *Floyd*, which directed the NYPD to implement reforms to its policies, training, and supervision. *See generally Ligon/Floyd* Remedial Order, ECF No. 120 (later modified at ECF No. 198) in *Ligon*, 12 Civ. 2274[2]; ECF No. 372 in *Floyd*, 08 Civ. 1034. The Remedial Order in both cases also appointed an independent monitor (the "Monitor") to oversee the NYPD's implementation of reforms. *See Ligon/Floyd* Remedial Order at 9–13; *see also* ECF No. 502 (appointing successor monitor); *cf.* ECF No. 481 in *Davis v. City of New York*, No. 10 Civ. 699 (incorporating the terms and provisions of the *Floyd/Ligon* Remedial order into the *Davis* action).

The Stipulation obligated the NYPD to develop and implement standards for stops and arrests made in and around TAP addresses. Stipulation at 7. Specifically, NYPD officers were required to "have at least 'an objective credible reason' to approach a person in and around a TAP building" and to have probable cause before arresting any individual. *Id.* at 7, 10. The Stipulation also outlined jointly-agreed-upon revisions to the administration of TAP and provisions for

---

[2] Unless otherwise stated, ECF numbers refer to docket numbers in *Ligon*, No. 12 Civ. 2274.

"training, supervision, auditing, monitoring, and discipline of officers." *Id.* at 13–17.  The NYPD's compliance with the Stipulation is subject to monitoring under the *Ligon/Floyd* Remedial Order. *See, e.g.*, *Ligon/Floyd* Remedial Order at 9–13.

II.      NYPD Formally Terminates TAP

On September 14, 2020, the NYPD Deputy Commissioner of Risk Management notified all commands through its internal messaging platform "FINEST" that TAP would end on September 30, 2020.  *See* Mem. at 4; Berry Decl. at 34, ECF No. 588.[3]  The message directed Crime Prevention Officers ("CPOs") to "contact owners of buildings enrolled in the Program and inform them that the Program is ending effective" September 30, 2020, and that "any signs in the building referencing TAP must be removed."  *Id.*  The message also ordered CPOs not to enroll any new buildings in TAP.  *Id.*  Finally, the message directed Commanding Officers to post the message and read it at 20 consecutive roll calls, which are briefings held by supervising officers at the start of a shift to communicate relevant information to officers.  *Id.*  On September 30, 2020, the Assistant Deputy Commissioner of Risk Management reiterated in a message to all NYPD commands that the termination of TAP was effective on that day.  *See id.* at 38.

At roll call trainings held on September 30, October 3, and December 2, 2020, the NYPD advised Department members that TAP was terminated and directed them to cease TAP enforcement and disregard any remaining TAP signage in buildings.  Monitor's Eighteenth Rep., ECF No. 524-1 at 7.

On October 7, 2020, the NYPD issued Interim Order 85, which revoked several written policies related to TAP.  *See also* Barry Decl. at 40–44; Mem. at 11.  The Interim Order also

---

[3] The Barry declaration includes several appended exhibits, which are not filed separately and are instead filed with the declaration as one document.  For the sake of clarity, the Court refers to the different exhibits in ECF No. 588 by page number only.

revoked NYPD forms titled "Trespass Crimes-Owner's Affidavit (PD651-051)" and "Trespass Crimes-Fact Sheet and Supporting Deposition (PD351-144)". Barry Decl. at 40. The NYPD notified the City's district attorney's ("DA") offices, as well as TAP building owners, property managers, and tenants of TAP's termination. *See id.* at 11–20 (Sep. 17, 2020 NYPD letters to Manhattan, Brooklyn, Queens, Richmond County, and Bronx DA offices previewing TAP's termination); *id.* at 22–23 (Sep. 17, 2020 NYPD letter to TAP landlord or property manager); Mem. at 5.

III.    Monitor's Audit of NYPD Encounters at Former TAP Buildings

In 2022, the Monitor conducted an audit of NYPD encounters at buildings enrolled in TAP in 2019 and 2020 to assess whether the program had in fact terminated and whether enforcement in and around former TAP addresses was constitutionally compliant. *See generally* Monitor's Eighteenth Rep. To administer its audit, the Monitor team analyzed various sources of NYPD enforcement activities in and around the buildings: body-worn camera ("BWC") videos, stop and arrest reports, and NYPD patrol data from October 2020 to October 2021. *Id.* at 2, 9–10, 17. The Monitor concluded that "most precincts did not appear to continue to engage in random or routine interior patrols of residential buildings that were formerly enrolled in TAP." *Id.* at 2. According to the audit, "there were only 76 stop reports" in and around former TAP addresses during the one-year study period, which the Monitor characterized as a "relatively small number." *Id.* at 14. Although the Monitor expressed some "serious compliance concerns with stop and frisk encounters" after finding only 62.8% of those 76 stops were constitutionally compliant, the Monitor concluded that stop and frisk data alone did not provide conclusive "evidence of a continuation of TAP." *Id.* at 16.

The Monitor's review of arrest reports and summonses, however, did reveal some evidence that "TAP-like" activities persisted after the program's formal termination. *Id.* at 2. Precinct 120 in Staten Island continued to carry out patrols inside former TAP buildings in the fourth quarter of 2020 until the NYPD "reinstruct[ed]" precinct executives and officers to address the issue in March 2021. *Id.* at 11, 13–14. In 2021, officers in two Brooklyn precincts (Precincts 71 and 81) continued to make TAP-like arrests and issue summonses originating from self-initiated interior patrols made without an appropriate predicate to enter private buildings. *Id.* at 2, 13–14 & n.17. The Monitor reported that although the NYPD had addressed the concerns raised about Precinct 120, she could not conclude that TAP had ceased because the Department had not yet tackled the problems in the two Brooklyn precincts. *Id.* at 25. As a result, the Monitor determined that "the Department will need to take additional steps to ensure that police activities replicating TAP do not continue in practice." *Id.*

In December 2022, the Monitor organized a focus group with CPOs who were responsible for administering TAP. *Id.* at 22–23. The CPOs stated that they communicated the termination of TAP to building owners and managers, and several CPOs requested that building managers remove the TAP signs. *Id.* at 23. The CPOs also asked building managers to advise them, the command Neighborhood Coordination Officer, or the local precinct, of any crime issues in their buildings. *Id.* Additionally, the CPOs stated that the Department conducted a training, reiterating to officers that TAP had ended and instructing them on when they could and could not enter a private building. *Id.*

IV.    NYPD's Response to the Monitor's Audit

In response to the Monitor's audit, the NYPD endeavored to address the concerns about continued TAP-like activities.  In January 2023, the NYPD circulated an Administrative Bulletin and interior patrol guidelines to officers, which provided guidance on when interior patrols are permitted in private dwellings, as compared to when such patrols are permitted in New York City Housing Authority ("NYCHA") developments.  Berry Decl. at 73–75.  In March 2023, the NYPD disseminated a training bulletin with the same guidelines, reminding officers not to carry out routine interior patrols or obtain owners' affidavits that would authorize random, routine patrols inside private buildings.  *Id.* at 77.  In May 2024, the NYPD contacted landlords, owners, and property managers of former TAP buildings, reminded them that TAP had terminated, and requested that they take down TAP-related signage.  *Id.* at 63.

On September 5, 2024, the NYPD administered an audit of police enforcement activity at former TAP addresses, using the Monitor's Eighteenth Report as guidance.  *See* NYPD TAP Audit, ECF No. 554-1.  The audit compiled data from the second half of 2022 and the second half of 2023 and found that:  (1)  Precinct 120 in Staten Island and Precinct 81 in Brooklyn were not engaging in TAP-like activities; and (2)  officers in Precinct 71 in Brooklyn continued to conduct some TAP-like interior patrols in the second half of 2022.  *Id.* at 1–2.  The NYPD determined that the interior patrols in Precinct 71 occurred at certain buildings where the Precinct's Special Operations Lieutenant directed officers to carry them out as part of "Crime Reduction overtime."  *Id.* at 8. The NYPD provided further instructions to Precinct 71 officers through its Federal Monitor Liaison Unit.[4]  *Id.* at 2.  The Department's analysis of data from the second half of 2023 showed that TAP-like activity in Precinct 71 had ceased.  *Id.* at 8–11.  In the audit, the City noted that if it

---

[4] The NYPD also reported that it transferred the Special Operations Lieutenant to another command in 2023 for reasons unrelated to the TAP assessment.  NYPD TAP Audit at 8.

"becomes aware of other locations where TAP signs remain, it will request that the signs be removed." *Id.*

V.        Monitor's Second Audit of SQF Activity at Former TAP Buildings

The Monitor conducted a second audit of trespass enforcement and SQF activity at buildings that had been enrolled in TAP in 2019 or 2020. Monitor TAP Mem. at 7. The Monitor concluded that SQF data from January 1, 2024 to June 30, 2025, showed that former TAP buildings were being policed in the same fashion as other buildings. *Id.* Specifically, during that period, the NYPD's SQF database included 39,817 stop reports, and only 256, or 0.64%, of those involved 2019 and 2020 TAP buildings. *Id.* Of the 39,817 stop reports, 421 were self-initiated stops for trespass, and only six trespass stops were at former TAP addresses. *Id.*

The Monitor's audit also analyzed constitutional compliance with respect to stops at former TAP buildings. Looking first at NYPD Quality Assurance Section ("QAS") data, the Monitor made three observations. First, of the 256 reports for stops occurring at buildings enrolled in TAP in 2019 and 2020, 82 of those stop reports were assessed as part of the QAS' routine audits. *Id.* at 8. Second, 85.4% of stops at former TAP locations were deemed lawful in QAS audits, as compared to 89.4% across all audited stops, which the Monitor team noted was not a statistically significant difference. *Id.* Third, frisks and searches at former TAP addresses were, respectively, 66.7% and 61.4% compliant, figures which the Monitor team assessed were not statistically significantly different from the QAS audit of frisks and searches during the same time period. *Id.* Based on its audit, the Monitor concluded that "there appears to be little if any difference between the way the NYPD now polices former TAP buildings and the way it polices other buildings in the City." *Id.*

VI.     Motion to Vacate and Dismiss

The City now seeks an order vacating the Stipulation and dismissing the Plaintiffs from participation in the monitorship.  *See* Mot.  The City argues that the Court should vacate the Stipulation under Federal Rule of Civil Procedure 60(b) because the termination of TAP in 2020 constituted a "significant change" in factual circumstances.  Mem. at 8–9.  The City contends that the NYPD's assessments demonstrate that the Department no longer conducts random interior patrols at former TAP addresses and that TAP-specific claims are now moot.  *Id.* at 9, 14–16.  The City also argues that any concerns related to SQF activity in and around former TAP buildings will be subject to monitoring under the *Floyd* monitorship.  *Id*. at 19.

Plaintiffs contend that the City has not fully complied with the Stipulation because: (1)  officers continue to perform interior patrols inside former TAP locations when they have a predicate reason; (2)  officers continue to engage in unconstitutional SQF activity outside of former TAP buildings; (3)  TAP signage remains; and (4) notwithstanding TAP's termination, it may be replaced by a new NYPD program.  *Id*. at 1, 14–15.

On March 6, 2026, the Monitor filed papers in support of the City's motion.  *See generally* Monitor TAP Mem.  The Monitor agrees with the City that the Stipulation should be vacated, and emphasizes that the *Floyd* monitorship will address any further concerns about SQF activity with respect to former TAP buildings.  *See id.*

**DISCUSSION**

I.     Legal Standard

Federal Rule of Civil Procedure 60(b) allows the Court to vacate an order, final judgment, or proceeding on six enumerated grounds.

Under Rule 60(b)(5), a party may obtain relief from a final judgment or an order if it "has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."  A party moving to vacate an order under this Rule may not use the Rule "to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).  The moving party bears the burden of establishing that changed circumstances merit relief, and "once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'"  *Id*. at 447 (citing *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

For the purposes of Rule 60(b)(5), a final judgment or order only has prospective application where it is "'executory' or involves 'the supervision of changing conduct or conditions.'"  *Tapper v. Hearn*, 833 F.3d 166, 170–71 (2d Cir. 2016) (quoting *DeWeerth v. Baldinger*, 38 F.3d 1266, 1275 (2d Cir. 1994)).  Therefore, relief from a final judgment or an order with prospective application is appropriate where the moving party can demonstrate that the Court has imposed a continuing obligation to decide or oversee the rights and or liabilities of parties "on the basis of future events," but applying such continuing obligation is no longer equitable based on a change in factual conditions or the law.  *Colon v. Berryhill*, No. 15 Civ. 834, 2019 WL 5305469, at *5–6 (W.D.N.Y. Oct. 21, 2019) (citation omitted).

Rule 60(b)(6) permits a party to obtain relief from an order or judgment for "any other reason that justifies relief."  The Rule provides the Court with a "grand reservoir of equitable power to do justice in a particular case," *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012) (citation

9

omitted), but the Court requires the moving party to show "exceptional circumstances" to receive such equitable relief. *United States v. Cirami*, 535 F.2d 736, 738 (2d Cir. 1976). In this Circuit, the Court "may treat a motion to vacate a prior judgment as having been made under [Rule] 60(b)(6) only if the other, more specific grounds for relief encompassed by the rules are inapplicable." *Maduakolam v. Columbia Univ.*, 866 F.2d 53, 55 (2d Cir. 1989). Here, because the Court finds that Rule 60(b)(5) applies, it shall analyze the City's motion under that Rule.

## II.    Change in Factual Circumstances

The Court agrees with the City and the Monitor that a change in factual circumstances justifies the vacatur of the Stipulation and dismissal of the *Ligon* Plaintiffs from continued participation in the monitorship.

The Stipulation and the *Ligon* Plaintiffs' inclusion in the Remedial Order are based on the existence of TAP and continued TAP-like enforcement. The Stipulation requires the NYPD to "develop, adopt and implement the standards regarding enforcement activities in and around TAP Buildings;" make revisions to the NYPD Patrol Guide, Administrative Guide, and NYPD forms such that constitutionally compliant standards are set forth regarding the administration of TAP; and provide additional training to officers regarding legal enforcement activities in and around TAP buildings. *See* Stipulation at 7–16 (Sections E–I). The Remedial Order contemplates that the *Ligon* Plaintiffs "represent[] a putative class of people stopped outside buildings participating in . . . TAP[] in the Bronx," *see Floyd/Ligon* Remedial Order at 1–2, and requires the NYPD to adopt a "formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside a *TAP building* on a suspicion of trespass," *see id.* at 33–36 (Sections III.A.1–B.2) (emphasis added).

The Court is persuaded that the NYPD has terminated TAP and TAP-like activities, rendering the Stipulation moot and making the *Ligon* Plaintiffs' continued inclusion in the Remedial Order moot.[5]

As explained above, the NYPD has taken multiple and repeated steps to terminate TAP, both as a matter of NYPD policy and in practice. The NYPD formally terminated TAP in September 2020. Two years later, the Monitor organized an audit to determine whether TAP had ceased. The Monitor found evidence of TAP's termination but had concerns with SQF data and with TAP-like activity in three precincts. The NYPD implemented corrective action in response to the Monitor's audit and took further steps to cease TAP-like activities. The Monitor then administered a second audit to assess more recent trespass enforcement and SQF activity at former TAP buildings. The second audit determined that there appears to be little difference in how the NYPD polices former TAP buildings and other buildings in the City. *See supra*, Background.

In light of the formal termination of TAP and the lack of evidence that TAP-like activity has continued in or around former TAP locations, the Court concludes that significant portions of the Stipulation are now moot. The Stipulation certified the settlement class entitled to equitable relief as "[a]ll individuals who have been or are at risk of being stopped, frisked, arrested, searched, or issued a summons inside or outdoors within the vicinity of apartment buildings *enrolled in* a

---

[5] The PI Order is based on the existence of TAP and continued TAP enforcement. *See* PI Order at 141–43, 145–48 (Sections V.C.1, V.C.2a, and V.C.2b) (requiring the NYPD to immediately cease trespass stops outside of TAP buildings that lacked reasonable suspicion; develop formal policies specifying the legal bases to conduct a trespass stop outside of a TAP building; require proper documentation and review of trespass stops outside of TAP buildings; and revise and distribute updated training materials regarding trespass stops outside of TAP buildings). Because the Court finds that the NYPD has terminated TAP and TAP-like activities, that order is now moot. The Court also finds the PI Order is moot because of the Stipulation. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (finding that a member of Plaintiff's environmental organization no longer had an injury in fact "[a]fter the District Court had issued a preliminary injunction . . . [and, thereafter,] the parties settled"); *see also id.* ("We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action . . ., apart from any concrete application that threatens imminent harm to his interests. Such a holding would fly in the face of Article III's injury-in-fact requirement."); *see also* Stipulation at 23–25 (release of claims against the City). Accordingly, the preliminary injunction order entered at ECF No. 105 is VACATED.

[TAP]." Stipulation at 5 (emphasis added). Because there are no longer any TAP buildings, the class contemplated by the Stipulation no longer exists. The NYPD revoked the Patrol and Administrative Guides related to TAP on October 7, 2020, which rendered Sections F and H of the Stipulation moot. *See* Berry Decl. at 34 (revoking the Administrative Guide provision relating to TAP), 40–44 (revoking the Patrol Guide provision relating to TAP); *see also* ECF No. 249 (order approving NYPD's revised version of the Patrol Guide provision relating to TAP). The NYPD eliminated references to TAP in its Trespass Crimes Fact Sheet (the "Sheet"), such that the Sheet only applies to NYCHA buildings, and notified officers that the Sheet would be in electronic form only and apply only to trespass arrests in NYCHA buildings. *See* Berry Decl. at 40–44, 46. These changes satisfied the requirements of Section G of the Stipulation.

The Court is not persuaded by Plaintiffs' arguments that the City has not fully complied with the Stipulation and addresses each argument in turn.

First, Plaintiffs argue that they should remain in the monitorship even if officers do not currently conduct self-initiated stops at former TAP buildings because they continue to carry out interior patrols inside those buildings when they have a predicate reason. *See* Opp. at 15. This argument fails. The scope of the Stipulation is specifically aimed at addressing random, self-initiated patrols for trespass enforcement at formerly enrolled TAP buildings, not calls from the public for police assistance inside private buildings. *See* Stipulation at 2–3 (Section B), 5–6 (Section C). Nor does it alter pre-existing state law and constitutional standards concerning when officers may conduct patrols inside dwellings. *See id*. The *Ligon* Plaintiffs were included in the monitorship "for the purpose of enforcing th[e] Stipulation as it pertains to reforms of the NYPD's policies and practices regarding trespass enforcement in or around TAP buildings, including training, supervision, auditing, monitoring, and discipline of officers." Stipulation at 17. The

Court, therefore, rejects Plaintiffs' attempt to expand the scope of the Stipulation and Plaintiffs' inclusion in the monitorship to encompass *any* activity related to officer responses inside private buildings.

Second, Plaintiffs' contention that the City's motion should be denied because officers continue to engage in unconstitutional SQF activity outside of former TAP locations is unpersuasive. *See* Opp. at 15–16. As explained below, SQF activity will continue to be monitored by the Remedial Order in *Floyd*.

Third, the Court rejects Plaintiffs' argument that the presence of TAP signage in former TAP addresses constitutes evidence of TAP's continued existence. *See* Opp. at 11. The City employed various methods to request that TAP signage be removed and to communicate TAP's termination to owners and property managers. *See supra* Background I, IV; Mem. at 11–13. Plaintiffs do not contest that these buildings are privately owned or managed, *see, e.g.*, Opp. at 11, and Plaintiffs do not cite any authority to support the proposition that the City can order owners of private property to take down signage. *Cf.* Monitor TAP Mem. at 13 ("The City cannot mandate the removal of these signs on private property."). Additionally, as the Monitor notes, there is no evidence that officers seeing the remaining TAP signs carry out interior patrols or stops for trespass. *See id.*

Fourth, Plaintiffs' argument that the Court should retain jurisdiction over the Stipulation because TAP could be replaced by another NYPD program also fails. *See* Opp at 21–22. There is no indication that the NYPD has endeavored to restart a TAP-like program. *See* Reply at 6–7; Monitor TAP Mem. at 14. Further, as explained below, the Court will direct the City to continue conducting audits in former TAP buildings for a specified time period to ensure that TAP

enforcement is not reactivated and to alert Plaintiffs' counsel 90 days before any reinstatement of TAP or a similar program.

The City has met its burden to demonstrate that TAP and TAP-like activity have ceased. Continued enforcement of the Stipulation and the inclusion of the *Ligon* Plaintiffs in the Remedial Order would be "detrimental to the public interest," and vacatur is an appropriate form of relief. *Horne*, 557 U.S. at 447. In other words, because TAP has terminated, continued prospective application of the Stipulation and inclusion of the *Ligon* Plaintiffs in the Remedial Order would detract from judicial resources that should be directed toward the NYPD's failure to comply with other aspects of the Remedial Order. *See* Monitor TAP Mem. at 14–15.

III.    Continuing Monitorship in *Floyd*

The NYPD's SQF activity in and around any building, including locations formally enrolled in TAP, will remain within the scope of the Monitor's ongoing work in *Floyd*. The Remedial Order will also continue to address Plaintiffs' concerns about the "NYPD's failure to conduct constitutional stops more generally." Opp. at 11–12. As the Monitor has repeatedly stated, the NYPD has not yet demonstrated that its SQF practices comport with the Constitution. *See* Monitor TAP Mem. at 13–14. It is well documented that the Department continues to struggle significantly to comply with the Remedial Order as it relates to self-initiated stops, supervisor accountability, and Fourth and Fourteenth Amendment compliance in its SQF activity. *See, e.g.*, Monitor's Twenty-Third Rep. at 2, ECF No. 571-1 (concluding that officers in Neighborhood Safety Teams ("NST") and Public Safety Teams ("PST") "are not performing stops, frisks, and searches at constitutional levels, and that supervisors of NST, PST, and patrol officers are not appropriately overseeing their officers"); Monitor's Twenty-Fifth Rep. at 2–3, 15–16, ECF No. 583-1 (finding that Community Response Team ("CRT") officers "stopped, frisked, and

14

searched individuals unlawfully at higher rates than patrol officers"; "[t]here was a lack of meaningful NYPD supervisory review of CRT stops"; and "CRT officers misidentified BWC videos and did not properly document *Terry* stops"); Monitor's Twenty-Sixth Rep. at 1, ECF No. 594-1 ("The Department's remedy for unconstitutional stops has been more and more training, but that has proved to be ineffective. The Department needs to take action, including discipline at all levels for officers and supervisors who consistently fail to abide by the law."); Monitor's 2025 Year-End Ltr. at 1, ECF No. 602 ("After twelve years of Monitor oversight, the NYPD has yet to reach substantial compliance with this Court's 2013 order requiring constitutional policing. The City . . . and the NYPD have known the problems they need to correct to come into substantial compliance."). Therefore, although TAP and the inclusion of the *Ligon* Plaintiffs in the monitorship has ended, there remains much work to be done for the NYPD to comply with the other aspects of the Remedial Order. This order will not affect that work.

IV.    Additional NYPD Audits and Future TAP-like Programs

The City is directed to administer additional targeted audits in former TAP buildings for a time period to be determined by the Monitor following the entry of this order to ensure that officers are not entering buildings and conducting random patrols without a legal predicate. *See* Mem. at 19 ("[T]he City is prepared to conduct additional, targeted self-analysis for a finite period, should the Court find it warranted"). By **April 9, 2026**, the Monitor shall file a proposal for the time period for such auditing and the parameters of the audit. The City Department of Investigation shall perform the audit. *See* Monitor TAP Mem. at 15.

Additionally, if the NYPD plans to reinstate TAP or a similar program, it shall notify the Court and the *Ligon* Plaintiffs' counsel **90 days** before doing so.

15

## CONCLUSION

For the reasons stated above, the City's motion at ECF No. 586 is GRANTED.  The Stipulation entered at ECF No. 296 is VACATED, and the *Ligon* Plaintiffs are dismissed from the monitorship established in the Remedial Order.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 586.

SO ORDERED.

Dated: March 26, 2026
New York, New York

_____
ANALISA TORRES
United States District Judge